| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| HARVEST LLP<br>10940 Wilshire Blvd, Suite 1600<br>Jamie Altman Buggy (SBN 280075)<br>E-mail: jbuggy@harvestllp.com<br><br>LAW OFFICE OF MICHAEL G. OLINIK<br>Michael G. Olinik (SBN 291020)<br>501 W Broadway, Ste 800<br>San Diego, CA 92101<br>Telephone: 619.780.5523<br>E-mail: michael@oliniklaw.com<br><br>☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Creditor, TUVF - Esplanade, LLC | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA -  LOS ANGELES DIVISION**

| In re:<br><br>SEN Fitness Group dba UFC Gym Oxnard, | CASE NO.: 9:25-bk-10820-RC<br><br>CHAPTER: 11 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY UNDER 11 U.S.C. § 362(l)**<br>**(with supporting declarations)**<br>**(UNLAWFUL DETAINER)** |
| Debtor(s). | DATE: 07/15/2025<br>TIME: 9:00 am<br>COURTROOM: 201 |
| **Movant**: TUVF - Esplanade, LLC | |

1.  **Hearing Location**:

    ☐ 255 East Temple Street, Los Angeles, CA 90012        ☐ 411 West Fourth Street, Santa Ana, CA 92701
    ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367    ☒ 1415 State Street, Santa Barbara, CA 93101
    ☐ 3420 Twelfth Street, Riverside, CA 92501

2.  Notice is given to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

3.  To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

4. When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5. If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6. ☐ This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d). If you wish to oppose this motion, you must file and serve a written response to this motion no later than 14 days before the hearing and appear at the hearing.

7. ☒ This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b). If you wish to oppose this motion, you must file and serve a response no later than (*date*) _____ and (*time*) _____; and, you may appear at the hearing.

    a. ☐ An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

    b. ☐ An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

    c. ☒ An application for order setting hearing on shortened notice was filed and remains pending. After the court rules on that application, you will be served with another notice or an order that specifies the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date: 06/24/2025

Harvest LLP
Printed name of law firm (if applicable)

Jamie Altman Buggy
Printed name of individual Movant or attorney for Movant

*Jamie Altman Buggy*
Signature of individual Movant or attorney for Movant

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                    Page 2                    **F 4001-1.RFS.UD.MOTION**

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY
### (Unlawful Detainer)

**1. Movant is the:**

    a. ☒ Owner of the Property
    b. ☐ Authorized Agent of the owner of the Property
    c. ☐ Other (*specify*):

**2. The Property at Issue (Property):**

    Type of Property:  ☐ Residential  ☒ Nonresidential

    *Street Address*: 451 West Esplanade Drive
    *Unit/Suite Number*:
    *City, State, Zip Code*: Oxnard, CA 93036

**3. Bankruptcy Case History:**

    a. ☒ A voluntary  ☐ An involuntary   petition under chapter   ☐ 7 ☒ 11 ☐ 12 ☐ 13
       was filed on (*date*): 06/19/2025

    b. ☐ An order to convert this case to chapter  ☐ 7  ☐ 11  ☐ 12  ☐ 13
       was entered on (*date*):

    c. ☐ A plan was confirmed on (*date*):

**4. Pursuant to 11.U.S.C. § 362(b)(22) and (23) there is no stay because (*check all that apply*):**

    a. ☐ Movant commenced an eviction, unlawful detainer action or similar proceeding against the Debtor involving residential property in which the Debtor resides and:

       (1) ☐ The Debtor has not filed and served on Movant the certification required under 11 U.S.C. § 362(l)(1).

       (2) ☐ The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become due during the 30-day period after the filing of the petition.

       (3) ☐ The Debtor or adult dependent of the Debtor has not filed and served on Movant the further certification required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has been cured.

       (4) ☐ Movant filed and served an objection to the Debtor's certification.  A copy of the objection is attached as Exhibit _____.  A hearing on this objection is set for (*date*) _____.

**5. Grounds for Relief from Stay:** (*check all that apply*)

    a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists because, as of the bankruptcy petition date, the Debtor had no right to continued occupancy of the premises, as follows:

       (1) ☒ Movant caused a notice to quit to be served on the Debtor.

       (2) ☒ An unlawful detainer proceeding was commenced on (*date*) _12/20/2024_.

       (3) ☐ An unlawful detainer judgment was entered on (*date*) _____.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

(4) ☐ Movant acquired title to the Property by foreclosure sale before the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

(5) ☐ Movant acquired title to the Property by foreclosure sale after the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(1) the Debtor's right to possession should be terminated because (*check all that apply*):

(1) ☐ The lease or other right of occupancy expired by its terms on (*date*) _____.

(2) ☐ The lease has matured, been rejected or deemed rejected by operation of law on (*date*) _____.

(3) ☒ Lease payments have not been made after the filing of the bankruptcy petition.

(4) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant filed and served upon the Debtor a certification that ☐ such an action was filed or
☐ that within the 30 days preceding the certification, the Debtor has endangered the subject Property or illegally allowed the use of controlled substances on the Property. A copy of Movant's certification is attached as Exhibit _____. The Debtor ☐ has ☐ has not filed an objection to Movant's certification. A copy of the Debtor's objection, if any, is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

(5) ☒ The bankruptcy case was filed in bad faith:

(A) ☒ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

(B) ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

(C) ☐ The Debtor filed only a few case commencement documents. No schedules or statement of financial affairs (or chapter 13 plan, if appropriate) has been filed.

(D) ☐ There was a recent transfer of all or part ownership of, or other interest in the Property without the consent of the Movant or court approval.

c. ☐ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and pursuant to 11 U.S.C. § 362(d)(2)(B), the Property is not necessary to an effective reorganization.

6. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor:

a. ☐ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ Other:

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                              Page 4                                    **F 4001-1.RFS.UD.MOTION**

7.  **Evidence in Support of Motion:**  (*Important Note: Declaration(s) in support of the Motion MUST be signed under penalty of perjury and attached to this motion.*)

   a.  The UNLAWFUL DETAINER DECLARATION on page 7.

   b.  ☒  Supplemental declaration(s).

   c.  ☐  Other (*specify*):

**Movant requests the following relief.**

1.  Relief from stay pursuant to:  ☒ 11 U.S.C. § 362(d)(1)    ☐ 11 U.S.C. § 362(d)(2)

2.  ☒  Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to obtain possession of the Property.

3.  ☐  Confirmation that there is no stay in effect.

4.  ☐  The stay is annulled retroactive to the bankruptcy petition date.  Any postpetition acts taken by Movant to enforce its remedies regarding the Property shall not constitute a violation of the stay.

5.  ☐  The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6.  ☒  The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7.  ☒  A designated law enforcement officer may evict the Debtor and any other occupant from the Property regardless of any future bankruptcy filing concerning the Property for a period of 180 days from the hearing of this motion:
   ☒  without further notice.
   ☐  upon recording of a copy of the order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

8.  ☐  Relief from stay is granted under 11 U.S.C. § 362(d)(4), if the order granting this motion is recorded in compliance with state laws governing notices of interest or liens in real property, the order is binding in any other case under this title purporting to affect the Property filed not later than two years after the date of entry of such order, except that a debtor in a subsequent case under this title may move for relief from the order based upon changed circumstances or for good cause shown, after notice and a hearing.

9.  ☒  The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days from the hearing of this Motion:
   ☒  without further notice.
   ☐  upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

10.  ☐  The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

11.  ☒  The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                    Page 5                    **F 4001-1.RFS.UD.MOTION**

12. ☒ If relief from stay is not granted with respect to the Property because the Property is the subject of a lease that may be assumable;

   a. ☐ Establishment of a deadline for assumption or rejection of the lease.

   b. ☒ Adequate protection in the form of regular payments at the lease rate from petition date until assumption or rejection of the lease.

13. ☐ Other relief requested.

Date: ___06/24/2025___

 

                    Harvest LLP
                    _____
                    Print name of law firm (*if applicable*)

                    Jamie Altman Buggy
                    _____
                    Print name of individual Movant or attorney for Movant (*if applicable*)

                    *Jamie Altman Buggy*
                    _____
                    Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# UNLAWFUL DETAINER DECLARATION

I, (name of declarant) _Elena Trujillo_____ , declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the Property because (specify):

    a. ☐ I am the Movant and owner of the Property.

    b. ☒ I manage the Property as the authorized agent for the Movant.

    c. ☐ I am employed by Movant as (title and capacity):

    d. ☐ Other (specify):

2. a. ☒ I am one of the custodians of the books, records and files of Movant as to those books, records and files that pertain to the rental of this Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

    b. ☐ Other (see attached):

3. The Property is:

    ☐ Residential ☒ Nonresidential

    *Street Address*: 451 West Esplanade Drive
    *Unit/Suite Number*:
    *City, State, Zip Code*: Oxnard, CA 93036

4. Movant is the ☒ legal owner of the Property, or ☐ the owner's legally authorized agent. A true and correct copy of the trustee's deed upon sale, lease, rental agreement, or other document evidencing Movant's interest in the Property is attached as Exhibit _1___. A true and correct copy of the applicable document establishing Movant's authority as agent for the owner is attached as Exhibit _____.

5. The Debtor asserts a possessory interest in the Property based upon:

    (1) ☐ a month-to-month tenancy

    (2) ☒ a lease that is in default

    (3) ☐ after a foreclosure sale that was held on (date): _____

    (4) ☐ other (specify):

6. The Debtor failed to pay:

    a. ☒ The monthly rent of $_45,833.33_____ beginning on (date): _04/01/2024__ .

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

b. ☒ Other obligations including:

(1) ☒ Common area maintenance charges

(2) ☒ Property taxes

(3) ☐ Other obligations (*specify*):

7. Procedural status

a. ☐ The lease matured or was rejected on (*date*) _____:

(1) ☐ by operation of law.

(2) ☐ by order of the court.

b. ☒ Movant caused a notice to quit to be served upon the Debtor on (*date*) _12/10/2024_, and a true and correct copy is attached as Exhibit _2_.

c. ☒ Before the bankruptcy petition was filed:

(1) ☒ Movant filed a complaint for unlawful detainer against the Debtor on (*date*) _12/20/2024_, and a true and correct copy is attached as Exhibit _3_.

(2) ☐ Trial was held on (*date*) _____.

(3) ☒ Trial was continued to (*date*) _07/28/2025_.

(4) ☐ An unlawful detainer judgment against the Debtor was entered on the complaint for unlawful detainer on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

(5) ☐ A writ of possession for the Property was issued on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

d. ☐ After the bankruptcy petition was filed:

(1) ☒ The Debtor has not filed and served on the Movant the certification required under 11 U.S.C. § 362(l)(1).

(2) ☒ The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

(3) ☒ The Debtor or adult dependent of the Debtor has not filed and served on the Movant the further certification required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has been cured.

(4) ☐ The Debtor filed and served on the Movant the certification required under 11 U.S.C. § 362(d)(1).

(A) ☐ Movant filed and served an objection a copy of which is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

(B) ☐ Movant has not filed and served an objection.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

(5) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant has filed a certification that ☐ such action was filed or ☐ that the Debtor has endangered the Property within 30 days preceding the certification or allowed the illegal use of controlled substances on the Property. A copy of Movant's certification is attached hereto as Exhibit _____. The Debtor ☐ has ☐ has not filed an objection to Movant's certification. A copy of the Debtor's objection, if filed, is attached as Exhibit ___. A hearing on this objection is set for: _____.

(6) ☒ Regular lease payments have not been made after the bankruptcy petition was filed.

8. ☐ The Debtor does not have an interest in the Property that could be assumed or assigned under 11 U.S.C. § 365.

9. ☒ The Property is not necessary to an effective reorganization because it is:

a. ☐ Residential, and is not producing income for the Debtor.

b. ☒ Commercial, but no reorganization is reasonably in prospect.

c. ☐ No longer property of the estate.

d. ☐ Other (specify):



10. ☒ The bankruptcy case was filed in bad faith:

a. ☒ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

b. ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

c. ☐ The Debtor filed only a few case commencement documents. Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

d. ☒ Other (specify):
The bankruptcy was filed on the eve of the unlawful detainer trial (previously scheduled for 6/23/25), for the purpose of delaying the trial and delaying Landlord's recovery of possession of the premises.

11. ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder or defraud creditors that involved:

a. ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page of facts establishing the scheme.

b. ☐ Multiple bankruptcy cases affecting the Property include:

(1) Case name: _____
Chapter: _____    Case number: _____
Date filed: _____    Date discharged: _____    Date dismissed: _____
Relief from stay regarding the Property ☐ was ☐ was not granted.

(2) Case name: _____
Chapter: _____    Case number: _____
Date filed: _____    Date discharged: _____    Date dismissed: _____
Relief from stay regarding the Property ☐ was ☐ was not granted.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

(3) Case name: _____

    Chapter: _____    Case number: _____

    Date filed: _____    Date discharged: _____    Date dismissed: _____

    Relief from stay regarding the Property ☐ was ☐ was not granted.

    ☐ See attached continuation page for information about other bankruptcy cases affecting the Property.

    ☐ See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, or defraud creditors.

12. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

  a. ☐ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

  b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

  c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| 06/24/2025 | Elena Trujillo | [signature] |
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014    Page 10    F 4001-1.RFS.UD.MOTION

# EXHIBIT 1

Recording Requested by
Fidelity National Title

**DOC# 2024000019307**

**RECORDING REQUESTED BY:**

Daniel W. Lurie, Esq.
Blank Rome LLP
1271 Avenue of the Americas
New York, NY 10020

**WHEN RECORDED RETURN TO:**

Robert P. Friedman, Esq.
Carlton Fields, P.A.
2029 Century Park East, Suite 1200
Los Angeles, CA 90067-2913

**MAIL TAX STATEMENTS TO:**

TUVF – ESPLANADE, LLC
9950 Jefferson Boulevard, Building 2
Culver City, California 90232

03/28/2024
Titles: 1    Pages: 9
11:38 AM
Total Fees: $99038.00
REYELA

APN: 142-0-010-515, 142-0-010-555, 142-0-010-565,    SPACE ABOVE THIS LINE FOR RECORDER'S USE
142-0-010-575, 142-0-010-605, 142-0-010-625,
142-0-010-635, 142-0-010-645

## GRANT DEED

The Undersigned Grantor(s) Declare(s): DOCUMENTARY TRANSFER
TAX $99,000.00; CITY TRANSFER TAX $0;

[  X  ] computed on the consideration or full value of property conveyed, OR
[       ] computed on the consideration or full value less value of liens
           and/or encumbrances remaining at time of sale, and
[       ] unincorporated area; [  X  ] City of Oxnard.

FOR VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
G&I IX ESPLANADE PROPERTY LP, a Delaware limited partnership ("**Grantor**"), hereby
GRANTS, BARGAINS, SELLS and CONVEYS to ESPLANADE C3 LLC, as to a 32.9% tenant-
in-common interest, TRANSPORT ESPLANADE, LLC, as to a 17.1% tenant-in-common interest,
and TUVF – ESPLANADE, LLC, as to a 50% tenant-in-common interest, each a Delaware limited
liability company, as tenants-in-common, that certain real property (the "**Property**") located in
County of Ventura, State of California, more particularly described on Exhibit A attached hereto
and incorporated herein.

TOGETHER WITH all and singular the ways, easements, rights, benefits,
privileges and appurtenances thereto or in any way appertaining, all improvements thereon and all
the estate, right, title, interest and claim, either at law or in equity, of Grantor in the said Property.

166667.00413/134583811v.4

THIS GRANT DEED is made SUBJECT TO:

1.  Nondelinquent taxes and assessments for the year 2024 and subsequent years;

2.  The rights of parties in possession and under unrecorded leases;

3.  All other covenants, conditions, and restrictions, reservations, rights of way, easements, encumbrances, and liens that are matters of record; and

4.  All matters shown on the ALTA/NSPS Land Title Survey of the Property prepared by Millman Surveying, Inc. d/b/a CBRE Land Surveying, dated December 8, 2023, last revised on January 23, 2024.

DATED effective as of: __March 27__, 2024.

*[Signature page follows]*

**GRANTOR:**

**G&I IX ESPLANADE PROPERTY LP,**
a Delaware limited partnership

By:    G&I IX Esplanade GP LLC,
       a Delaware limited liability company,
       its general partner

  By:    G&I IX Esplanade LLC,
    a Delaware limited liability company,
    its sole member

    By:    G&I IX Investment Esplanade Series LLC,
      a Delaware limited liability company,
      its managing member

      By: _____
      Name:  David Gray
      Title:   **Vice President**

---

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

---

State of _New York_ )
        )
County of _New York_ )

On _March 25_ , 2024, before me, _Susan Fattorusso_ , a Notary Public, personally appeared _David Gray_ , who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of ~~California~~ _New York_ that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

SUSAN FATTORUSSO
Notary Public, State of New York
No. 01FA6021152
Qualified in Kings County
Commission Expires March 8, _____

Signature _Susan Fattorusso_
   *Signature of Notary Public*

         *Place Notary Seal Above*

Exhibit A

Legal Description of Property

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF OXNARD, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:

PARCELS A AND C AS SHOWN AND DESIGNATED ON THAT CERTAIN LOT LINE ADJUSTMENT NO. 00-5-126, RECORDED JANUARY 2, 2001 AS INSTRUMENT NO. 2001-00010 OF OFFICIAL RECORDS, IN THE CITY OF OXNARD, COUNTY OF VENTURA, STATE OF CALIFORNIA, AND BEING PORTIONS OF SUBDIVISIONS 9 AND 10, RANCHO EL RIO DE SANTA CLARA O'LA COLONIA, ACCORDING TO THAT CERTAIN PARTITION FILED IN THE OFFICE OF THE COUNTY CLERK OF SAID COUNTY, IN THAT CERTAIN ACTION ENTITLED THOMAS A. SCOTT, ET AL., PLAINTIFFS VS. RAFAEL GONZALES, ET AL., DEFENDANTS.

EXCEPT FROM PARCEL C THAT PORTION DESCRIBED IN FINAL ORDER OF CONDEMNATION RECORDED AUGUST 2, 1990 AS INSTRUMENT NO. 90-115008 OF OFFICIAL RECORDS.

EXCEPT THEREFROM THOSE PORTIONS DESCRIBED IN THAT CERTAIN QUITCLAIM DEED TO THE CITY OF OXNARD RECORDED OCTOBER 29, 2001 AS INSTRUMENT NO. 01-0215424 OF OFFICIAL RECORDS.

ALSO EXCEPT FROM PORTIONS OF SAID PARCEL C ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE OF SAID LAND THEREFOR, OR OTHERWISE DEVELOP THE SAME IN SUCH A MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON THE LAND HEREIN CONVEYED, AS RESERVED BY EL RIO ASSOCIATION, A PARTNERSHIP, IN DEED RECORDED OCTOBER 5, 1954 IN BOOK 1233, PAGE 39; AS RESERVED BY SUSIE JONES, ET UX., BY DEED RECORDED DECEMBER 19, 1953 IN BOOK 1175, PAGE 315 AND RESERVED BY SARAH GRAY, A WIDOW, BY DEED RECORDED JUNE 21, 1954 IN BOOK 1209, PAGE 591 ALL OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM FROM PORTIONS OF PARCELS A AND C ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE

Exhibit, Page 1

FROM LANDS THAN THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 100 FEET OF THE SUBSURFACE OF THE  LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LAND, AS RESERVED BY GRACE HOBSON, ET AL., IN DEED RECORDED JANUARY 28, 1955 IN BOOK 1261, PAGE 48 OF OFFICIAL RECORDS; RESERVED BY SARAH GRAY, A WIDOW, IN DEED RECORDED MARCH 13, 1963 IN BOOK 2290, PAGE 216; RESERVED BY SUSIE C. JONES, A WIDOW, IN DEED RECORDED SEPTEMBER 5, 1963 IN BOOK 2387, PAGE 566 AND RESERVED BY EL RIO ASSOCIATES, A PARTNERSHIP, ET AL., IN FINAL ORDER OF CONDEMNATION RECORDED JUNE 29, 1965 IN BOOK 2816, PAGE 402 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM A PORTION OF SAID PARCEL C, AN UNDIVIDED 50% INTEREST IN AND TO ALL MINERALS AND MINERAL RIGHTS, INCLUDING, BUT NOT LIMITING, THE FOREGOING TO ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES IN, ON OR UNDERLYING SAID LAND WITHOUT THE RIGHT, HOWEVER, OF SURFACE ENTRY UPON THE LAND FOR THE PURPOSE OF MINING, DRILLING AND/OR EXPLORING SAID LAND FOR OIL, GAS, HYDROCARBON OR OTHER MINERALS AND REMOVING THE SAME THEREFROM AS RESERVED IN DEED RECORDED IN BOOK 1143, PAGE 371 OF OFFICIAL RECORDS, AS TO A PORTION OF SAID LAND.

ALSO EXCEPTING THEREFROM A PORTION OF SAID PARCEL C AN UNDIVIDED 1/2 INTEREST OF THE REMAINING 1/2 INTEREST (BEING AN UNDIVIDED 1/4TH INTEREST OF THE WHOLE) OF ALL OIL, GAS, MINERALS AND HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, WITHOUT, HOWEVER, THE RIGHT TO ENTER THE SURFACE OF SAID LAND OR THE SUBSURFACE THEREOF, A DEPTH OF 500 FEET FOR THE REMOVAL OF SAID SUBSTANCES AS RESERVED BY EL RIO ASSOCIATION, A PARTNERSHIP, DEED RECORDED JULY 26, 1962 IN BOOK 2182, PAGE 145 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM A PORTION OF SAID PARCEL C AND REMAINING INTEREST IN AND TO ALL OIL, OIL RIGHTS, NATURAL GAS AND OTHER HYDROCARBONS IN THAT PORTION OF SAID LAND DESCRIBED IN DEED RECORDED IN BOOK 2317, PAGE 438 OF OFFICIAL RECORDS, WITHOUT, HOWEVER THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE OF SAID LAND FOR THE

Exhibit, Page 2

PURPOSE OF OBTAINING SAID SUBSTANCES, AS RESERVED BY LOUIS H. LOPEZ AND VALENTINE LOPEZ, IN DEED RECORDED MAY 6, 1963 IN BOOK 2317, PAGE 438 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM A PORTION OF SAID PARCELS A AND C, ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREIN DESCRIBED OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREIN DESCRIBED AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS, UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES WITHOUT HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE ON AND THROUGH THE SURFACE OR THE UPPER 500 FEET OF THE SUBSURFACE OF SAID LAND EXCEPTED IN THE DEED FROM GRACE HOBSON SMITH, ET AL., RECORDED OCTOBER 1, 1964 IN BOOK 2639, PAGE 50 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM A PORTION OF SAID PARCEL C ALL OIL, GAS, MINERALS AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER THAT PORTION OF SAID LAND DESCRIBED IN DEED RECORDED IN BOOK 3174, PAGE 581 OF OFFICIAL RECORDS, WITHOUT, HOWEVER, ANY RIGHT OF SURFACE ENTRY OR ANY RIGHT OF ENTRY IN AND TO THE SUBSURFACE THEREOF, AT A DEPTH OF LESS THAN 500 FEET BENEATH THE SURFACE FOR THE DEVELOPMENT OR REMOVAL OF SAID SUBSTANCES, AS RESERVED BY SARAH GRAY, A WIDOW, IN DEED RECORDED JULY 31, 1967 IN BOOK 3174, PAGE 581 OF OFFICIAL RECORDS.

PARCEL 2:

THOSE PORTIONS OF SUBDIVISIONS 9 AND 10, RANCHO EL RIO DE SANTA CLARA O'LA COLONIA, IN THE CITY OF OXNARD, COUNTY OF VENTURA, STATE OF CALIFORNIA, ACCORDING TO THAT CERTAIN PARTITION MAP FILED IN THE OFFICE OF THE COUNTY CLERK OF SAID COUNTY, IN THAT ACTION ENTITLED THOMAS A SCOTT, ET AL., PLFFS. VS. RAFAEL GONZALEZ, ET AL. DEFTS., DESCRIBED AS A WHOLE AS FOLLOWS:

BEGINNING AT THE WESTERLY TERMINUS OF 2ND COURSE IN PARCEL 1, OF THE LAND CONVEYED TO THE MAY DEPARTMENT STORES COMPANY, A CORPORATION, BY DEED RECORDED IN BOOK 4035, PAGE 474 OF OFFICIAL RECORDS; THENCE FROM SAID POINT OF BEGINNING:

1ST: NORTH 13° 54' 34" WEST 99.49 FEET; THENCE

2ND: NORTH 9° 20' 59" WEST 99.50 FEET TO A POINT; THENCE

3RD: NORTH 8° 49' 11" WEST 298.76 FEET TO A POINT; THENCE

4TH : NORTH 3° 15' 42" WEST 151.20 FEET TO A POINT; THENCE

5TH: NORTH 6° 13' 08" EAST 113.95 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHEASTERLY, HAVING A RADIUS OF 35 FEET TO A CENTRAL ANGLE OF 101° 15' 47"; THENCE ALONG SAID CURVE

6TH: NORTHEASTERLY, EASTERLY AND SOUTHEASTERLY AN ARC DISTANCE OF 61.86 FEET TO A TANGENT LINE; THENCE

7TH: SOUTH 72° 31' 05" EAST 193.06 FEET TO A POINT; THENCE

8TH: SOUTH 64° 11' 28" EAST 177.82 FEET TO A POINT; THENCE

9TH: SOUTH 51° 40' 10" EAST 185.16 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 2976 FEET, A CENTRAL ANGLE OF 1° 55' 08"; THENCE ALONG SAID CURVE

10TH: SOUTHEASTERLY AN ARC DISTANCE OF 99.67 FEET TO THE BEGINNING OF A COMPOUND CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 1530.53 FEET AND A CENTRAL ANGLE OF 8° 13' 32"; THENCE ALONG SAID CURVE

11TH: SOUTHEASTERLY AN ARC DISTANCE OF 220.88 FEET TO A POINT ON THE BEGINNING OF A NONTANGENT CURVE CONCAVE SOUTHWESTERLY HAVING A RADIUS OF 2750.53 FEET AND THE CENTRAL ANGLE OF 00° 09' 43", A RADIAL LINE TO SAID POINT BEARS NORTH 48° 28' 30" EAST; THENCE ALONG SAID CURVE

12TH: SOUTHEASTERLY AN ARC DISTANCE OF 7.77 FEET TO A POINT ON THE EASTERLY TERMINUS OF THE 1ST COURSE OF PARCEL 2, OF THE LAND DESCRIBED IN A DEED RECORDED IN BOOK 4035, PAGE 474, OF OFFICIAL RECORDS; THENCE FROM SAID POINT

13TH: SOUTH 56° 20' 40" WEST 135.60 FEET TO A POINT; THENCE

14TH: SOUTH 33° 39' 20" EAST 70 FEET TO A POINT; THENCE

15TH: SOUTH 56° 20' 40" WEST 336 FEET TO A POINT; THENCE

16TH: NORTH 33° 39' 20" WEST 200 FEET TO A POINT; THENCE

17TH: SOUTH 56° 20' 40" WEST 276.19 FEET TO THE POINT OF BEGINNING.

EXCEPTING THEREFROM THOSE PORTIONS DESCRIBED IN THAT CERTAIN

QUITCLAIM DEED TO THE CITY OF OXNARD RECORDED DECEMBER 17, 2001 AS INSTRUMENT NO. 01-0255699 OF OFFICIAL RECORDS.

EXCEPT FROM A PORTION OF SAID LAND ALL WATER, WATER RIGHTS, OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS, BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER HYDROCARBONS, BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED, WITHOUT, HOWEVER, THE RIGHT EVER TO DRILL, DIG OR MINE THROUGH THE SURFACE OF SAID LAND THEREFOR, OR OTHERWISE IN SUCH MANNER AS TO ENDANGER THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LAND, AS EXCEPTED BY CLARENCE A. MARKEL, IN DEED RECORDED APRIL 28, 1948 IN BOOK 826, PAGE 229 OF OFFICIAL RECORDS.

ALSO EXCEPT FROM A PORTION OF SAID LAND ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND OR ANY OTHER LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILL AND MINE FROM LANDS OTHER THAN THOSE HEREINABOVE DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT, HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE AND OPERATE THROUGH THE SURFACE OR THE UPPER 100 FEET OF THE SUBSURFACE OF THE LAND HEREINABOVE DESCRIBED OR OTHERWISE IN SUCH MANNER AS TO ENDANGER R THE SAFETY OF ANY HIGHWAY THAT MAY BE CONSTRUCTED ON SAID LANDS, AS RESERVED BY GRACE HOBSON SMITH, ET AL., IN DEED RECORDED JANUARY 28, 1955 IN BOOK 1261, PAGE 48 OF OFFICIAL RECORDS.

ALSO EXCEPT FROM A PORTION OF SAID LAND ALL OIL, OIL RIGHTS, MINERALS, MINERAL RIGHTS, NATURAL GAS, NATURAL GAS RIGHTS, AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN, THAT MAY BE WITHIN OR UNDER THE PORTION OF SAID LAND DESCRIBED IN DEED RECORDED IN BOOK 2639, PAGE 50, OF OFFICIAL RECORDS, TOGETHER WITH THE PERPETUAL RIGHT OF DRILLING, MINING, EXPLORING AND OPERATING THEREFOR AND REMOVING THE SAME FROM SAID LAND, INCLUDING THE RIGHT TO WHIPSTOCK OR DIRECTIONALLY DRILLED AND MINE FROM LANDS OTHER THAN THOSE HEREIN DESCRIBED, OIL OR GAS WELLS, TUNNELS AND SHAFTS INTO, THROUGH OR ACROSS THE SUBSURFACE OF THE LAND HEREIN DESCRIBED, AND TO BOTTOM SUCH WHIPSTOCKED OR DIRECTIONALLY DRILLED WELLS, TUNNELS AND SHAFTS UNDER AND BENEATH OR BEYOND THE EXTERIOR LIMITS THEREOF, AND

Exhibit, Page 5

TO REDRILL, RETUNNEL, EQUIP, MAINTAIN, REPAIR, DEEPEN AND OPERATE ANY SUCH WELLS OR MINES, WITHOUT HOWEVER, THE RIGHT TO DRILL, MINE, EXPLORE OR OPERATE THROUGH THE SURFACE OF THE UPPER 500 FEET OF THE SUBSURFACE OF SAID LAND, AS EXCEPTED IN THE DEED FROM GRACE HOBSON SMITH, ET AL., RECORDED OCTOBER 1, 1964 IN BOOK 2639, PAGE 50 OF OFFICIAL RECORDS.

ALSO EXCEPT FROM A PORTION OF SAID LAND ALL MINERALS, OILS, GASES AND OTHER HYDROCARBONS BY WHATSOEVER NAME KNOWN THAT MAY BE WITHIN OR UNDER THE PARCEL OF LAND HEREINABOVE DESCRIBED WITHOUT, HOWEVER, THE RIGHT TO DRILL, DIG OR MINE THROUGH THE SURFACE OR THE UPPER 500 FEET THEREOF, AS RESERVED BY THE STATE OF CALIFORNIA, IN DEED RECORDED MAY 18, 1971 IN BOOK 3816, PAGE 206 OF OFFICIAL RECORDS.

PARCEL 3:

NONEXCLUSIVE EASEMENT FOR INGRESS AND EGRESS BY VEHICULAR AND PEDESTRIAN TRAFFIC AND VEHICLE PARKING; THE INSTALLATION, OPERATION, MAINTENANCE, REPAIR AND REPLACEMENT OF UTILITY LINES AND THE INSTALLATION, OPERATION, MAINTENANCE, REPAIR AND REPLACEMENT OF THE FREE STANDING SIGNS AND ALL UTILITY LINES AND FACILITIES APPURTENANT THERETO AS DEFINED IN THAT CERTAIN RESTRICTION AGREEMENT AND GRANT OF EASEMENTS DATED JANUARY 2, 2001 EXECUTED BY AND BETWEEN M & H REALTY PARTNERS IV, L.P., A CALIFORNIA LIMITED PARTNERSHIP AND HOME DEPOT U.S.A. INC., A DELAWARE CORPORATION RECORDED JANUARY 17, 2001 AS INSTRUMENT NO. 2001-0011223 OF OFFICIAL RECORDS. AS AMENDED BY FIRST AMENDMENT RECORDED JULY 5, 2001 AS INSTRUMENT NO. 2001-127997 OF OFFICIAL RECORDS.

PARCEL 4:

RIGHTS AND EASEMENTS SET OUT IN A DOCUMENT ENTITLED "ESPLANADE REA" RECORDED AUGUST 12, 1968, IN BOOK 3350, PAGE 1, AS AMENDED BY FIRST AMENDMENT RECORDED DECEMBER 19, 1973 IN BOOK 4202, PAGE 35 OF OFFICIAL RECORDS. A TERMINATION OF ESPLANADE REA AND CONFIRMATION OF CERTAIN EASEMENTS DATED JULY 20, 2000, EXECUTED Y M & H REALTY PARTNERS IV LP., A CALIFORNIA LIMITED PARTNERSHIP AND MACERICH OXNARD, LLC, A DELAWARE LIMITED LIABILITY COMPANY, WAS RECORDED OCTOBER 2, 2000 AS INSTRUMENT NO. 2000-0155044 OF OFFICIAL RECORDS.

APN: 142-0-010-515, APN: 142-0-010-555, APN: 142-0-010-565, APN: 142-0-010-575, APN: 142-0-010-605, APN: 142-0-010-625, APN: 142-0-010-635, APN: 142-0-010-645

# EXHIBIT 2

## <u>NOTICE TO PAY RENT OR QUIT</u>

To:

Sen Fitness Group, Inc.   Sen Fitness Group, Inc.
dba UFC Gym      dba UFC Gym
4417 Presidio Drive     451 West Esplanade Drive
Simi Valley, CA 93063    Oxnard, CA 93036
Attention: Slava Vilshtein
Slava.vilshtein@ufcgym.com

With Copy To:

Paris Ackerman LLP
120 Eagle Rock Avenue, Suite 315
East Hanover, NJ 07039
Attention: Craig H. Feldman, Esq.
cfeldman@parisackerman.com

And any other person in possession of the Premises.

NOTICE IS HEREBY GIVEN that, within five (5) business days after service on you of this notice, you must pay to the Landlord, TUVF-ESPLANADE, LLC, in full, the rent now due and unpaid for the premises located at 451 West Esplanade Drive, Oxnard, CA 93036, in the amount of $435,365.08 being the <u>estimated</u> rent (including base rent and additional rent) that came due within the last year that is currently past due through December 9, 2024**,** or alternatively to surrender possession of the premises to landlord.

If you fail to pay the rent or to surrender possession within the five business-day period, Landlord elects to declare a forfeiture of the lease and legal proceedings will be commenced against you to recover possession and to recover a judgment for the rent and damages for your unlawful detention of the premises.

BE FURTHER ADVISED that such termination and such forfeiture of said lease will not relieve you from liability for additional monetary damages which may be awarded under California Civil Code Section 1951.2, and related provisions of the lease, the law and in equity.

The <u>estimated</u> amount stated above may not include all amounts that you owe to Landlord pursuant to the lease (e.g. late fees), and Landlord does not waive any such amounts not included in the above amount and reserves its rights and remedies under the lease as to any such amounts. Landlord further reserves the right to refrain from seeking to recover possession of the premises, and Landlord's non-enforcement of this notice is not intended and shall not be construed to be an admission or implied assertion that you have cured any or all defaults under the Lease and shall not waive any of Landlord's rights.

 NOTICE IS FURTHER GIVEN that in the event you make a partial payment, Landlord accepts such payment without waiving any legal or equitable rights, including any right Landlord may have to recover possession of the premises.  The address of Landlord is TUVF-ESPLANADE, LLC c/o Primestor Development, 9950 Jefferson Blvd., Bldg. 2, Culver City, CA 90232, ATTN:

Leslie Halili, 213.223.5540. Their office hours to accept payment are from Monday to Friday, from 9:00 am to 5:00 pm.

Dated: December 9, 2024

_Jamie Altman Buggy_

Jamie Altman Buggy, Harvest LLP
Attorneys for TUVF-ESPLANADE, LLC

# EXHIBIT 3

**UD-100**

| ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER: | FOR COURT USE ONLY |
|---|---|---|

NAME:  Jamie Altman Buggy (SBN 280075) / Fernando Landa (SBN 259864)
FIRM NAME:  HARVEST LLP
STREET ADDRESS:  10940 Wilshire Blvd, Suite 1600
CITY:  Los Angeles      STATE:  CA      ZIP CODE:  90024
TELEPHONE NO.:  310.842.8038      FAX NO.:
EMAIL ADDRESS:  jbuggy@harvestllp.com / flanda@harvestllp.com
ATTORNEY FOR (name):  TUVF - Esplanade, LLC

**ELECTRONICALLY FILED**
Superior Court of California
County of Ventura
12/20/2024

Brenda L. McCormick
Executive Officer and Clerk

By: _____ Deputy Clerk

Hannah Cressy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF  VENTURA
STREET ADDRESS:  3855-F Alamo Street
MAILING ADDRESS:  3855-F Alamo Street
CITY AND ZIP CODE:  Simi Valley 93063
BRANCH NAME:  East County Courthouse

PLAINTIFF: TUVF - Esplanade, LLC

DEFENDANT:  Sen Fitness Group, a California corporation dba UFC Gym

[x]  DOES 1 TO 10

| **COMPLAINT—UNLAWFUL DETAINER*** | CASE NUMBER: |
|---|---|
| [x] COMPLAINT  [ ] AMENDED COMPLAINT (Amendment Number): | 2024CUUD034876 |

**Jurisdiction** *(check all that apply):*

[ ]  **ACTION IS A LIMITED CIVIL CASE** (amount demanded does not exceed $35,000)
  Amount demanded  [ ] **does not exceed $10,000**
  [ ] **exceeds $10,000**

[x]  **ACTION IS AN UNLIMITED CIVIL CASE** (amount demanded exceeds $35,000)

[ ]  **ACTION IS RECLASSIFIED** by this amended complaint or cross-complaint *(check all that apply):*
  [ ] from unlawful detainer to general unlimited civil (possession not in issue).   [ ] from limited to unlimited.
  [ ] from unlawful detainer to general limited civil (possession not in issue).   [ ] from unlimited to limited.

1.  *PLAINTIFF (name each):*
    TUVF - Esplanade, LLC

    *alleges causes of action against DEFENDANT (name each):*
    Sen Fitness Group, a California corporation dba UFC Gym and DOES 1 to 10

2.  a.  Plaintiff is  (1) [ ] an individual over the age of 18 years.   (4) [ ] a partnership.
        (2) [ ] a public agency.      (5) [ ] a corporation.
        (3) [x] other *(specify):* a Delaware limited liability company
    b.  [ ] Plaintiff has complied with the fictitious business name laws and is doing business under the fictitious name of *(specify):*

3.  a.  *The venue is the court named above because defendant named above is in possession of the premises located at (street address, apt. no., city, zip code, and county):*
        451 West Esplanade Drive, Oxnard, CA 93036, Ventura County
    b.  The premises in 3a are *(check one)*
        (1) [x] within the city limits of *(name of city):*  Oxnard
        (2) [ ] within the unincorporated area of *(name of county):*
    c.  The premises in 3a were constructed in *(approximate year):* 2002

4.  Plaintiff's interest in the premises is  [x] as owner  [ ] other *(specify):*

5.  The true names and capacities of defendants sued as Does are unknown to plaintiff.

**\* NOTE:**  Do not use this form for evictions after sale (Code Civ. Proc., § 1161a).

| Form Approved for Optional Use | **COMPLAINT—UNLAWFUL DETAINER** | Civil Code, § 1940 et seq.; |
|---|---|---|
| Judicial Council of California | | Code of Civil Procedure, §§ 425.12, 1166 |
| UD–100 [Rev. January 1, 2024] | | www.courts.ca.gov |

Ventura Superior Court transmitted through eFiling 12/20/2024 10:26:11 AM

**UD-100**

| PLAINTIFF:  TUVF - Esplanade, LLC | CASE NUMBER: |
| DEFENDANT:  Sen Fitness Group, a California corporation dba UFC Gym | |

6.  a.  On or about *(date)*: December 26, 2019

    *defendant (name each)*:
    Sen Fitness Group, a California corporation dba UFC Gym and DOES 1 to 10

    (1)  agreed to rent the premises as a [ ] month-to-month tenancy [x] other tenancy *(specify)*: 126 month-term
    (2)  agreed to pay rent of  $ 45,833.33    payable [x] monthly   [ ] other *(specify frequency)*:
    (3)  agreed to pay rent on the [x] first of the month   [ ] other day *(specify)*:

    b.  This [x] written  [ ] oral   agreement was made with
        (1) [ ] plaintiff.  (3) [x] plaintiff's predecessor in interest.
        (2) [ ] plaintiff's agent.  (4) [ ] Other *(specify)*:

    c.  [ ] The defendants not named in item 6a are
        (1) [ ] subtenants.
        (2) [ ] assignees.
        (3) [ ] Other *(specify)*:

    d.  [x] The agreement was later changed as follows  *(specify)*:
    The First Amendment to the Lease was entered into on September 23, 2020. A Letter Agreement was entered into on or around
    August 14, 2023. A Letter Agreement was entered into on or around August 2024. Current monthly base rent is $45,833.33 and
    additional rent is $13,598.07 per the Lease.

    e.  [x] A copy of the written agreement, including any addenda or attachments that form the basis of this complaint, is attached
    and labeled Exhibit 1. *(Required for residential property, unless item 6f is checked. See Code Civ. Proc., § 1166.)*

    f.  [ ] *(For residential property)* A copy of the written agreement is **not** attached because *(specify reason)*:
        (1) [ ] *the written agreement is not in the possession of the landlord or the landlord's employees or agents.*
        (2) [ ] *this action is solely for nonpayment of rent (Code Civ. Proc., § 1161(2)).*

7.  The tenancy described in 6 *(complete (a) or (b))*
    a.  [x] is **not** subject to the Tenant Protection Act of 2019 (Civil Code, § 1946.2). The specific subpart supporting why tenancy
        is exempt is *(specify)*: commercial          .
    b.  [ ] is subject to the Tenant Protection Act of 2019.

8.  *(Complete only if item 7b is checked. Check all applicable boxes.)*
    a.  [ ] The tenancy was terminated for at-fault just cause (Civil Code, § 1946.2(b)(1)).
    b.  [ ] The tenancy was terminated for no-fault just cause (Civil Code, § 1946.2(b)(2)) and the plaintiff *(check one)*
        (1) [ ] waived the payment of rent for the final month of the tenancy, before the rent came due, under
            section 1946.2(d)(2), in the amount of  $                    .
        (2) [ ] provided a direct payment of one month's rent under section 1946.2(d)(3), equaling  $
            to *(name each defendant and amount given to each)*:

    c.  [ ] Because defendant failed to vacate, plaintiff is seeking to recover the total amount in 8b as damages in this action.

9.  a.  [x] Defendant *(name each)*: Sen Fitness Group, a California corporation dba UFC Gym and DOES 1 to 10

    was served the following notice on the same date and in the same manner:

    (1) [ ] 3-day notice to pay rent or quit          (5) [ ] 3-day notice to perform covenants or quit
                                         *(not applicable if item 7b checked)*
    (2) [ ] 30-day notice to quit              (6) [ ] 3-day notice to quit under Civil Code, § 1946.2(c)
    (3) [ ] 60-day notice to quit                             Prior required notice to perform covenants served *(date)*:          .
    (4) [ ] 3-day notice to quit              (7) [x] Other *(specify)*: 5-day notice to pay rent or quit

UD-100

| PLAINTIFF:  TUVF - Esplanade, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT:  Sen Fitness Group, a California corporation dba UFC Gym | |

9.  b.  (1)  On *(date):* December 17, 2024          the period stated in the notice checked in 9a expired at the end of the day.

   (2)  Defendants failed to comply with the requirements of the notice by that date.

   c.  All facts stated in the notice are true.

   d.  [x]  The notice included an election of forfeiture.

   e.  [x]  A copy of the notice is attached and labeled Exhibit 2. *(Required for residential property. See Code Civ. Proc., § 1166. When Civil Code, § 1946.2(c), applies and two notices are required, provide copies of both.)*

   f.  [ ]  One or more defendants were served (1) with the prior required notice under Civil Code, § 1946.2(c), (2) with a different notice, (3) on a different date, or (4) in a different manner, as stated in Attachment 10c. *(Check item 10c and attach a statement providing the information required by items 9a–e and 10 for each defendant and notice.)*

10.  a.  [x]  The notice in item 9a was served on the defendant named in item 9a as follows:

   (1)  [ ]  By personally handing a copy to defendant on *(date):*

   (2)  [ ]  By leaving a copy with *(name or description):*                                                                       ,

   a person of suitable age and discretion, on *(date):*                          at defendant's
   [ ] residence    [ ] business   AND mailing a copy to defendant at defendant's place of residence
   on *(date):*                          because defendant cannot be found at defendant's residence or usual place of business.

   (3)  [ ]  By posting a copy on the premises on *(date):*
   [ ]  AND giving a copy to a  person found residing at the premises AND mailing a copy to defendant at the premises
   on *(date):*

     (a)  [ ]  because defendant's residence and usual place of business cannot be ascertained OR

     (b)  [ ]  because no person of suitable age or discretion can be found there.

   (4)  [ ]  *(Not for 3-day notice; see Civil Code, § 1946, before using)* By sending a copy by certified or registered mail addressed to defendant on *(date):*

   (5)  [x]  *(Not for residential tenancies; see Civil Code, § 1953, before using)* In the manner specified in a written commercial lease between the parties

   b.  [ ]  *(Name):*
   was served on behalf of all defendants who signed a joint written rental agreement.

   c.  [ ]  Information about service of notice on the defendants alleged in item 9f is stated in Attachment 10c.

   d.  [x]  Proof of service of the notice in item 9a is attached and labeled Exhibit 3.

11.  [ ]  Plaintiff demands possession from each defendant because of expiration of a fixed-term lease.

12.  [x]  At the time the ~~3-day~~ 5-day notice to pay rent or quit was served, the amount of **rent due** was  $ 435,365.08

13.  [x]  The fair rental value of the premises is  $ 1,981.04                per day.

14.  [ ]  Defendant's continued possession is malicious, and plaintiff is entitled to statutory damages under Code of Civil Procedure section 1174(b). *(State specific facts supporting a claim up to $600 in Attachment 14.)*

15.  [x]  A written agreement between the parties provides for attorney fees.

16.  [ ]  Defendant's tenancy is subject to the local rent control or eviction control ordinance of *(city or county, title of ordinance, and date of passage):*

   Plaintiff has met all applicable requirements of the ordinances.

17.  [ ]  Other allegations are stated in Attachment 17.

18.  Plaintiff accepts the jurisdictional limit, if any, of the court.

| PLAINTIFF:  TUVF - Esplanade, LLC | CASE NUMBER: |
|---|---|
| DEFENDANT:  Sen Fitness Group, a California corporation dba UFC Gym | |

19. **PLAINTIFF REQUESTS**

a.  possession of the premises.

b.  costs incurred in this proceeding:

c.  [x] past-due rent of $ 435,365.08

d.  [x] reasonable attorney fees.

e.  [x] forfeiture of the agreement.

f.  [ ] damages in the amount of waived rent or relocation assistance as stated in item 8: $

g.  [x] damages at the rate stated in item 13 from

*date:* January 1, 2025

for each day that defendants remain in possession through entry of judgment.

h.  [ ] statutory damages up to $600 for the conduct alleged in item 14.

i.  [x] other *(specify):*
All further relief the Court deems just and proper, including prejudgment interest, and the value of future rent for the remainder of the lease term, in an amount no less than $5,150,000.00.

20.  [x] Number of pages attached *(specify):*        125

## UNLAWFUL DETAINER ASSISTANT  (Bus. & Prof. Code, §§ 6400–6415)

21.  [x] *(Complete in all cases.)* An unlawful detainer assistant [x] did **not** [ ] did

for compensation give advice or assistance with this form. (*If declarant has received **any** help or advice for pay from an unlawful detainer assistant, complete a–f.*)

a.  Assistant's name:

b.  Street address, city, and zip code:

c.  Telephone no.:

d.  County of registration:

e.  Registration no.:

f.  Expires on *(date):*

Date:  December 20, 2024

Jamie Altman Buggy
_____
(TYPE OR PRINT NAME)

▶ *Jamie Altman Buggy*
(SIGNATURE OF PLAINTIFF OR ATTORNEY)

## VERIFICATION

*(Use a different verification form if the verification is by an attorney or for a corporation or partnership.)*

I am the plaintiff in this proceeding and have read this complaint. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:

_____
(TYPE OR PRINT NAME)

▶
_____
(SIGNATURE OF PLAINTIFF)

1

## **VERIFICATION**

2

3  STATE OF CALIFORNIA          )
4  COUNTY OF VENTURA           )      ss.
                                       )

5          I have read the foregoing COMPLAINT—UNLAWFUL DETAINER and know its

6  contents.

7          I am an agent of TUVF - ESPLANADE, LLC, party to this action, and am authorized to

8  make this verification for and on its behalf, and I make this verification for that reason.  I make this

9  declaration in lieu of Plaintiff because I have more knowledge about the facts in the Complaint.

10 The matters stated in the foregoing document are true of my own knowledge except as to those

11 matters which are stated on information and belief, and as to those matters I believe them to be

12 true.

13         I declare under penalty of perjury under the laws of the State of California that the

14 foregoing is true and correct.

15         Executed on this  20   day of December 2024, at  Culver City       , California.

16                                              By: _____
                                                   Elena Trujillo (Dec 20, 2024 10:05 PST)

17

18                                              Name: Elena Trujillo
                                                      _____

19                                              Title: Director of Asset w
                                                       _____

20                                              Company: Primestor Development

21                                                      (Agent for Plaintiff)

22

23

24

25

26

27

28

# EXHIBIT 1

## RETAIL LEASE

This Retail Lease (this "**Lease**"), dated as of the date set forth in Section 1 of the Summary of Basic Lease Information (the "**Summary**"), below, is made by and between G&I IX ESPLANADE PROPERTY LP, a Delaware limited partnership ("**Landlord**"), and SEN FITNESS GROUP, INC., a California corporation ("**Tenant**").

### SUMMARY OF BASIC LEASE INFORMATION

| | TERMS OF LEASE | | DESCRIPTION |
|---|---|---|---|
| 1. | Effective Date: | | December 26, 2019. |
| 2. | Center; Premises: | | |
| | 2.1 | Center: | That certain retail center known as "**Esplanade Center**" located in Oxnard, California, as further set forth in Section 1.1.2 of this Lease. |
| | 2.2 | Retail Center: | That certain retail center located within Esplanade Center, which Retail Center consists of seventeen (17) single-level buildings containing a cumulative total of approximately 356,864 square feet of gross leasable area, and which Retail Center is depicted on **Exhibit A** to this Lease. |
| | 2.3 | Building: | That certain retail building (the "**Building**") located within the Retail Center, with a street address of 451 West Esplanade Drive, Oxnard, California, commonly identified within the Retail Center as "Building M 11" and depicted on **Exhibit A-1** to this Lease. The Building contains approximately 25,000 square feet of gross leasable area. |
| | 2.4 | Premises: | 25,0000 square feet of gross leasable area, as further depicted on **Exhibit A-1** to this Lease. |
| 3. | Lease Term (Article 2): | | |
| | 3.1 | Length of Term: | Ten (10) years and six (6) months. |
| | 3.2 | Lease Commencement Date: | The later to occur of the date that is one hundred and fifty (150) days after (i) the "Delivery Date", as such term is defined in **Exhibit B** attached hereto, and (ii) subject to Section 3.4 of the "Work Letter", as that term is defined in Section 1.1 of this Lease, the issuance of "Permits", as such term is defined in Section 3.4 of **Exhibit B**. |
| | 3.3 | Lease Expiration Date: | The last day of the calendar month in which the one hundred and twenty-sixth (126th) monthly anniversary of the Lease Commencement Date occurs; provided, however, to the extent the Lease Commencement Date occurs on the first day of a calendar month, then the Lease Expiration Date shall be the day immediately preceding the one hundred and twenty-seventh (127th) monthly anniversary of the Lease Commencement Date. |
| | 3.4 | Option Terms: | Two (2) five (5)-year options to renew, as more particularly set forth in Section 2.2 of this Lease. |
| 4. | Base Rent (Section 3.1): | | |

| Period During Lease Term | Annual Base Rent | Monthly Installment of Base Rent | Annual Base Rent Rate per Square Foot of Gross Leasable Area |
|---|---|---|---|
| Months 1 – 60* | $550,000.00 | $45,833.33 | $22.00 |
| Months 61 - 120 | $605,000.00 | $50,416.67 | $24.20 |
| Months 121 - 126 | N/A | $50,416.67 | $24.20 |
| First Option Term | | | |
| Months 126 – 186 | $665,000.00 | $55,458.33 | $26.62 |
| Second Option Term | | | |
| Months 186 – 246 | $732,000.00 | $61,000.00 | $29.28 |

*Notwithstanding the foregoing schedule, Tenant's obligation to pay Monthly Installment of Base Rent during months one (1) through six (6) of the initial Lease Term shall be subject to the Rent Abatement as set forth in Section 3.2 of this Lease.

| 5. | Intentionally Omitted. | | |
| 6. | Tenant's Share (Article 4 and **Exhibit C**): | | Approximately 5.11%; provided that "Tenant's Tax Share", as defined in Section 1.1.6 of **Exhibit C**, shall equal to 21.62% |

802666.06/WLA
999903-14000/11-25-19/JNO/JNO

Summary P-1

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

| 7. | Permitted Use; Trade Name (Article 5): | Permitted Use:  Tenant shall use the Premises solely for the sale of memberships to a gym/fitness facility specializing in boxing based fitness and high-intensity training and classes, and including, but not limited to, other various types of fitness and training programs, together with the ancillary uses in connection with the foregoing, including, but not limited to the sale of related fitness items on an incidental basis such as, but not limited to, exercise and training apparel, equipment, nonalcoholic beverages, nutritional supplements, sports drinks and fitness snacks (the "**Permitted Use**"); provided, however, that notwithstanding anything to the contrary set forth hereinabove, and as more particularly set forth in the Lease, Tenant shall be responsible for operating and maintaining the Premises pursuant to, and in no event may Tenant's Permitted Use violate, (A) Landlord's "Rules and Regulations," as that term is set forth in Article 5 of this Lease, (B) all "Applicable Laws," as that term is set forth in Article 24 of this Lease, (C) all applicable zoning, building codes and the "CC&Rs," as that term is set forth in Article 5 of this Lease, and (D) the character of the Center as a first-class retail center. |
| | | Trade Name:  UFC Gym |
| 8. | Security Deposit (Article 21): | None. |
| 9. | Intentionally Omitted | |
| 10. | Address of Tenant (Section 29.12): | SEN FITNESS GROUP, INC 4417 Presidio Drive Simi Valley, CA 93063 slava.vilshtein@ufcgym.com Attention: Slava Vilshtein |
| | | *with copies to:* |
| | | Paris Ackerman LLP 103 Eisenhower Parkway Roseland, NJ 007068 Attention:  Craig H. Feldman, Esq. Email:  cfeldman@parisackerman.com |
| 11. | Address of Landlord (Section 29.12): | G&I IX ESPLANADE PROPERTY LP c/o Investec Real Estate Companies 200 E. Carrillo, Suite 200 Santa Barbara, CA 93101 Attention:  William Brace |
| | | *with copies to:* |
| | | G&I IX ESPLANADE PROPERTY LP c/o DRA Advisors LLC 200 E. Carrillo, Suite 200 Santa Barbara, CA 93101 Attention:  Nick Ife Facsimile:  (212) 697-7403 Email:  nife@dradvisors.com |
| | | *and:* |
| | | Allen Matkins Leck Gamble Mallory & Natsis LLP 1901 Avenue of the Stars Suite 1800 Los Angeles, California 90067 Attention:  Alain M. R'bibo, Esq. |
| 12. | Broker(s) (Section 29.16): | |
| | *Representing Tenant:* | *Representing Landlord:* |
| | Manarino & Associates | Radius Commercial Real Estate & Investments |
| 13. | Minimum Hours of Operation (Section 5.1.4): | 6:00 a.m. to 11:00 p.m. on Mondays through Fridays, Saturdays, and Sundays. |

802666.06/WLA
999903-14000/11/27-19/JNO/JNO

Summary P-2

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

| 14. | Radius (Section 3.3): | Five (5) miles. |
|---|---|---|
| 15. | Improvement Allowance (Section 2 of **Exhibit B**): | $500,000.00 (i.e., an amount equal to $20.00 per square feet of gross leasable area). |
| 16. | Guarantor(s) (Section 29.27): | Slava Vilshtein and Ludmila Vilshtein. |

## ARTICLE 1

## PREMISES, BUILDING, RETAIL CENTER, CENTER, AND COMMON AREAS

1.1     Premises, Building, Retail Center, Center and Common Areas, and Temporary Promotional Structure.

1.1.1     **The Premises.**  Landlord hereby leases to Tenant and Tenant hereby leases from Landlord the premises set forth in Section 2.4 of the Summary (the "**Premises**").  The outline of the Premises is set forth in **Exhibit A-2** attached hereto and each floor of the Premises has the number of square feet of gross leasable area as set forth in Section 2.2 of the Summary.  The parties hereto agree that the lease of the Premises is upon and subject to the terms, covenants and conditions (the "**TCCs**") herein set forth.  The parties hereto hereby acknowledge that the purpose of **Exhibit A, Exhibit A-1** and **Exhibit A-2** is to show the approximate location of the Center, Retail Center, Building and Premises only, and such Exhibits are not meant to constitute an agreement, representation or warranty as to the construction, location or the precise area thereof.  Except as specifically set forth in this Lease and in the Work Letter attached hereto as **Exhibit B** (the "**Work Letter**"), Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises.  Tenant also acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Premises, the Building, the Retail Center or the Center or with respect to the suitability of any of the foregoing for the conduct of Tenant's business, except as specifically set forth in this Lease and the Work Letter.  The taking of possession of the Premises by Tenant shall conclusively establish that the Premises and the Building were at such time in good and sanitary order, condition and repair.

1.1.2     **The Building, Retail Center and the Center.**  The Premises is a part of the Building set forth in Section 2.3 of the Summary.  The Building itself is located within the Retail Center set forth in Section 2.1 of the Summary and, in turn, is a component of a greater retail center known as "Esplanade Center."  The term "**Center**," as used in this Lease, shall mean (i) the Building, the Retail Center, the Common Areas and the other buildings from time to time located within the area designated by Landlord as the "Center," as such area may be expanded or reduced from time to time, and (ii) the land upon which the Building, the Retail Center, the Common Areas and such other buildings are located.

1.1.3     **Common Areas.**  Tenant shall have the non-exclusive right to use in common with other tenants in the Center those portions of the Center which are provided, from time to time, for use in common by Landlord, Tenant and any other tenants of the Center (such areas, together with such other portions of the Center designated by Landlord, in its discretion, including certain areas designated for the exclusive use of certain tenants, or to be shared by Landlord and certain tenants, are collectively referred to herein as the "**Common Areas**").  The Common Areas shall consist of the "Center Common Areas," the "Retail Center Common Areas," and the "Building Common Areas," as those terms are defined below.  The term "**Building Common Areas**," as used in this Lease, shall mean the portions of the Common Areas located within, or solely serving, the Building designated as such by Landlord.  The term "**Retail Center Common Areas**," as used in this Lease, shall mean the portions of the Common Areas located within, or solely serving, the Retail Center designated as such by Landlord.  The term "**Center Common Areas**," as used in this Lease, shall mean all Common Areas other than the Retail Center Common Areas.  The Center Common Areas are subject to all mortgages, deeds of trust, ground leases, reciprocal easement agreements, declarations, covenants, conditions, restrictions, easements, rights-of-way and other matters of record (whether placed of record on, prior to, or after the date of this Lease) affecting all or any portion of the Center, as the same may be modified, amended and supplemented from time-to-time, including, without limitation that certain Agreement Affecting Real Property dated January 2, 2001 and recorded as instrument number 2001-0011223-00, as amended by that certain Restriction Agreement and Grant of Easements for Esplanade Shopping Center (as may be amended from time to time, the "**Center Declaration**") (collectively, the "**Superior Agreements**"), and the use of the Center Common Areas is subject to the TCCs of the Superior Agreements.  Retail Center Common Areas are maintained and operated by Landlord and the use thereof shall be subject to such rules, regulations and restrictions as Landlord may make from time to time, provided that such rules, regulations and restrictions do not unreasonably interfere with the rights granted to Tenant under this Lease and the permitted use granted under Article 5, below.  Landlord reserves the right to close temporarily, make alterations or additions to, or change the location of elements of the Center and/or the Common Areas; provided that no such changes shall be permitted which materially reduce Tenant's rights or access hereunder unless otherwise required to comply with Applicable Laws.

1.1.4     **Temporary Promotional Structure.**  Subject to the terms and conditions of this Lease, including, without limitations this Section 1.1.4, Tenant shall have a limited license, at no additional charge, to operate a trailer (the "**Promotional Structure**") in the western area of the parking facilities at the Center (the "**Promotional Area**") (the exact location of the Promotional Structure shall be hereafter approved by Landlord in its sole discretion) solely to solicit membership sales for Tenant's operations from the Premises for the Permitted Use for a period of approximately five (5) months prior to the Lease Commencement Date, as such timing (if at all) shall be determined by Landlord based upon the status of construction of the initial Improvements to the Premises as set forth in the Work Letter attached hereto (the "**Promotional Space License Term**").  Such Promotional Structure, if any, shall be provided by Tenant at its sole cost and located in the Promotional Area approved by Landlord in its sole discretion; provided that, prior to installing the Promotional Structure in the Promotional Area, Tenant shall provide Landlord a copy of any permits required for the use and operation of the Promotional Structure from the appropriate governmental authorities (the cost of which shall be the sole responsibility of Tenant).  The size, dimensions and general appearance of the Promotional Structure shall be subject to Landlord's prior written approval, which may be withheld in its sole and absolute discretion and shall be required prior to any placement of any structure in the Promotional Area.  The Promotional Area shall not be included in the gross leasable area of the Premises for purposes of this Lease.  Landlord shall not be obligated to provide or pay for any work or services related to the improvement of the Promotional Area.  Tenant also acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Promotional Area or the compliance of the Promotional Area with any applicable laws, statutes, ordinances or other governmental rules, regulations or requirements now in force or which may hereafter be enacted or promulgated.  Tenant shall have no right to alter, change or make improvements to the Promotional Area.  Notwithstanding Landlord's approval of the Promotional Structure, Tenant shall remain solely liable for any liability arising out of the placement of the Promotional Structure in the Promotional Area, and Landlord shall have no liability in connection therewith.  Tenant shall keep the Promotional Structure and Promotional Area in clean, safe, operable and first-class condition and repair (including keeping the Promotional Area and surrounding areas clean of all trash and debris).  Tenant shall, at Tenant's sole expense, remove the Promotional Structure from the Promotional Area upon the expiration or earlier termination of the Promotional Space License Term, and shall return the affected portion of

the Promotional Area to the condition the Promotional Area would have been in had no such Promotional Structure been installed, reasonable wear and tear excepted. Tenant shall be permitted to display commercially reasonable graphics, signs or insignias or the like in the Promotional Structure or Promotional Area, subject to Landlord's reasonable approval. Tenant's use of the Promotional Structure and Promotional Area shall be subject to such additional reasonable rules, regulations and restrictions as Landlord may make from time to time concerning the Promotional Structure and Promotional Area and all Applicable Laws. Except as expressly set forth in this Section 1.1.4, all of the terms, covenants, and conditions, limitations and restrictions contained in this Lease pertaining to the Premises and Tenant's use thereof shall apply equally to the Promotional Structure and Promotional Area and Tenant's use thereof, including, without limitation, Tenant's indemnity of Landlord set forth in Section 10.1, below, Tenant's insurance obligations set forth in Article 10, below, and Tenant's obligations to comply with law set forth in Article 24, below; provided, however, the Promotional Area shall not be deemed to be a part of the Premises for purposes of any abatement or termination rights under Articles 11 and 13. Landlord shall notify Tenant from time to time prior to the Lease Commencement Date if any space less than 3,000 rentable square feet becomes available at the Center for lease, which Tenant may lease for the purposes of soliciting membership sales for Tenant's operations from the Premises for the Permitted Use. Landlord shall set forth the rental rate for such available space in its notice to Tenant. If Tenant wishes to lease such space at the rental rate set forth in Landlord's notice, then within ten (10) days following receipt of notice from Landlord, Tenant shall deliver notice to Landlord of Tenant's election to lease such space. The terms and conditions of the foregoing shall be governed by a separate license agreement between Landlord and Tenant; provided that either Landlord or Tenant shall have the right to terminate the aforementioned license agreement at any time upon at least thirty(30) days prior written notice to the non-terminating party.

      1.2    **Stipulation of Gross Leasable Area of Premises**. The term "**gross leasable area**" means the square footage of the Premises (or, where applicable, of other premises) without deduction for the width of or space occupied by columns, shafts, risers, or other vertical penetrations. The gross leasable area is measured from the exterior surface of exterior walls (and extensions thereof, in the case of openings), and from the center line of interior demising walls, if any. For purposes of this Lease, gross leasable area of the Premises shall be deemed as set forth in Section 2.4 of the Summary.

      1.3    **Permit Contingency**. Notwithstanding the full execution and delivery of this Lease by Landlord and Tenant, Tenant shall have a period of one hundred fifty (150) days following the mutual execution and delivery of this Lease (the "**Contingency Period**") to obtain the Permits from the applicable governmental authorities in connection with the construction of the Improvements (as that term is defined in Section 2.1 of the Work Letter) (collectively, the "**Permitting Condition**"). Tenant agrees to use its best, good faith efforts and due diligence to satisfy the Permitting Condition and shall immediately perform all requirements necessary to obtain the same as soon as possible, and Landlord shall, at no cost to Landlord, use commercially reasonable efforts to cooperate with Tenant in such efforts. Tenant shall concurrently deliver to Landlord a copy of any application and other required documents in connection with the application for any of the Permits, and Tenant shall keep Landlord fully apprised of all correspondence from any applicable governmental authority, including any timelines and/or deadlines related to the issuance of the same. In connection with the foregoing, Landlord, at its sole cost and expense, shall have the right, but not the obligation, to undertake any such actions as may be necessary or helpful, in Landlord's reasonable discretion, in the procurement of any of the Permits, and Tenant shall fully cooperate with Landlord in connection therewith. Tenant shall deliver written notice (the "**Permitting Condition Notice**") to Landlord of its satisfaction of the Permitting Condition within one (1) business day after Tenant obtains the Permits. In the event that the Permitting Condition is not timely satisfied as set forth above, then Tenant (provided that Tenant has complied with its obligations under this Section 1.3) and Landlord shall each have the option to terminate this Lease (each, a "**Termination Option**") by delivering written notice thereof (the "**Termination Notice**") to the other party prior to the expiration of the Contingency Period, whereby effective as of the non-terminating party's receipt of such Termination Notice (the "**Termination Date**"), all further obligations of the parties hereunder (other than those obligations that expressly survive the termination of this Lease, including indemnification obligations, the return of any prepaid rent subject to application for Tenant defaults) shall end and be of no further force and effect. If, prior to the Termination Date, the Permitting Condition is satisfied, then any applicable Termination Notice shall be deemed null and void and neither Landlord nor Tenant shall have any right to terminate this Lease pursuant to this Section 1.3. In addition, in no event shall Tenant exercise its Termination Option if, as of the Termination Date, Tenant is then in default or has previously been in default under this Lease (beyond the applicable notice and cure period set forth in this Lease). Additionally, the parties hereby acknowledge and agree that Tenant shall not be entitled to receive any of the Improvement Allowance or delivery of possession of the Premises until either (i) Tenant waives its Termination Option in writing or (ii) the Contingency Period expires without timely delivery of a Termination Notice. If either party fails to timely deliver a Termination Notice, such party shall be deemed to have waived its right to terminate this Lease in accordance with this Section 1.3.

**ARTICLE 2**

**LEASE TERM; OPTION TERMS**

      2.1    **Initial Lease Term**. The TCCs and provisions of this Lease shall be effective as of the Effective Date of this Lease. The term of this Lease (the "**Lease Term**") shall be as set forth in Section 3.1 of the Summary, shall commence on the date set forth in Section 3.2 of the Summary (the "**Lease Commencement Date**"), and shall terminate on the date set forth in Section 3.3 of the Summary (the "**Lease Expiration Date**") unless this Lease is sooner terminated as hereinafter provided. At any time during the Lease Term, Landlord may deliver to Tenant a notice in the form as set forth in Exhibit D, attached hereto, as a confirmation only of the information set forth therein, which Tenant shall execute and return to Landlord within ten (10) days of receipt thereof.

      2.2    **Option Terms**.

      2.2.1    **Option Right**. Landlord hereby grants Tenant two (2) options to extend the Lease Term for the entire Premises each by a period of five (5) years (each, an "**Option Term**"). Such option shall be exercisable only by Notice delivered by Tenant to Landlord as provided below, provided that, as of the date of delivery of such Notice, Tenant is not then in default under this Lease (beyond any applicable notice and cure periods). Upon the proper exercise of such option to extend (and provided that, at Landlord's election, as of the end of the then applicable Lease Term, Tenant is not in default under this Lease (beyond any applicable notice and cure periods), then the Lease Term, as it applies to the entire Premises, shall be extended for a period of five (5) years. The rights contained in this Section 2.2 shall only be exercised by Tenant if Tenant is in occupancy of the entire then-existing Premises.

2.2.2    **Option Rent**. The Base Rent payable by Tenant during the Option Term (the "**Option Rent**") shall be payable by Tenant in the amounts and at such times as set forth in Section 4 of the Summary.

2.2.3    **Exercise of Option**. The option contained in this Section 2.2 shall be exercised by Tenant, if at all, only in the manner set forth in this Section 2.2.3. Tenant shall deliver notice (the "**Exercise Notice**") to Landlord not less than twelve (12) months prior to the expiration of the then Lease Term, stating that Tenant is exercising its option. If Landlord fails to receive the Exercise Notice on or before such date, Tenant shall have no further right to extend the Lease Term.

## ARTICLE 3

## BASE RENT

3.1    **Base Rent**. Tenant shall pay, without prior notice or demand, to Landlord or Landlord's agent at the management office of the Center, or, at Landlord's option, at such other place as Landlord may from time to time designate in writing, by a check for currency which, at the time of payment, is legal tender for private or public debts in the United States of America, base rent ("**Base Rent**") as set forth in Section 4 of the Summary, payable in equal monthly installments as set forth in Section 4 of the Summary in advance on or before the first day of each and every calendar month during the Lease Term, without any setoff or deduction whatsoever. The Base Rent for the first full month of the Lease Term which occurs after the expiration of any free rent period shall be paid at the time of Tenant's execution of this Lease. If any payment of Rent is for a period which is shorter than one month, the Rent for any such fractional month shall accrue on a daily basis during such fractional month and shall total an amount equal to the product of (i) a fraction, the numerator of which is the number of days in such fractional month and the denominator of which is the actual number of days occurring in such calendar month, and (ii) the then-applicable monthly installment of Rent. All other payments or adjustments required to be made under the TCCs of this Lease that require proration on a time basis shall be prorated on the same basis.

3.2    **Rent Abatement**. Provided that no default has occurred during the six (6) month period commencing on the Lease Commencement Date and ending on the last day of the sixth (6th) full calendar month of the Lease Term (the "**Rent Abatement Period**"), Tenant shall not be obligated to pay any Base Rent or Additional Rent otherwise attributable to the Premises during such Rent Abatement Period (the "**Rent Abatement**"). Landlord and Tenant acknowledge that the aggregate amount of the Base Rent abatement portion of the Rent Abatement equals Two Hundred Seventy-Four Thousand Nine Hundred Ninety-Nine and 98/100 Dollars ($274,999.98) (i.e., $45,833.33 per month). Tenant acknowledges and agrees that the foregoing Rent Abatement has been granted to Tenant as additional consideration for entering into this Lease, and for agreeing to pay the Base Rent and perform the terms and conditions otherwise required under this Lease. If Tenant shall, at any time during the Lease Term, be in monetary or material non-monetary default under this Lease beyond any applicable notice and cure period, then Landlord may at its option, by notice to Tenant, elect in addition to any other remedies Landlord may have under this Lease, that the dollar amount of the unapplied portion of the Rent Abatement as of the date of such default shall be converted to a credit to be applied to the Base Rent applicable at the end of the Lease Term and Tenant shall immediately become obligated to begin paying monthly Base Rent for the Premises in full.

3.3    **Radius Restriction**. Tenant agrees that during the Lease Term, neither Tenant nor any person or entity directly or indirectly controlling, controlled by or under common control with Tenant (which, for purposes of this Section 3.3 shall mean control of at least twenty five percent (25%) of the voting stock or management of such entity and/or Tenant (each a "**Tenant Affiliate**")) shall own, operate, manage, or become interested in a similar business within a radius of the distance set forth in Section 14 of the Summary in any direction from the closest boundary of the Center measured on a straight line basis (a "**Breaching Location**"); provided, however, that Tenant or a Tenant Affiliate that owns, operates, manages or has an interest in one or more small box UFC gyms which contain no more than 3,000 square feet of space in a location that is at least two (2) miles away from the Premises shall be deemed not to violate the terms and conditions of this Section 3.3. In the event Tenant or a Tenant Affiliate breaches the radius restriction set forth in this Section 3.3, then Tenant shall pay to Landlord, as liquidated damages, an amount equal to one hundred seventy-five percent (175%) of the Base Rent then payable under this Lease prorated on a per diem basis for each day that the Breaching Location continues to operate. Landlord's election of the foregoing remedy shall not be deemed permission for Tenant to continue such violation, and shall not preclude Landlord from seeking any other remedy for such violation, including, without limitation, injunctive relief or termination of this Lease.

## ARTICLE 4

## ADDITIONAL RENT

4.1    **In General**. In addition to paying the Base Rent specified in Article 3 of this Lease, Tenant shall pay "Tenant's Share" of the annual "Direct Expenses," as those terms are defined in Sections 1.1.5 and 1.1.1, respectively, of Exhibit C attached to this Lease, provided that, in lieu of Tenant paying Tenant's Share of the annual Tax Expenses attributable to the entire Center, Tenant shall pay "Tenant's Tax Share" of the annual Tax Expenses. Tenant's Share of the Direct Expenses for the first full month of the Lease Term which occurs after the expiration of any free rent period shall be paid at the time of Tenant's execution of this Lease. Such payments by Tenant, together with any and all other amounts payable by Tenant to Landlord pursuant to the TCCs of this Lease, are hereinafter collectively referred to as the "**Additional Rent**," and the Base Rent and the Additional Rent are herein collectively referred to as "**Rent**." All amounts due under this Article 4 and Exhibit C as Additional Rent shall be payable during the Lease Term commencing on the Lease Commencement Date; provided, however, the parties hereby acknowledge that the first monthly installment of Tenant's Share of Direct Expenses that occur after the expiration of any free rent period shall be paid at the time of Tenant's execution of this Lease. Without limitation on other obligations of Tenant which survive the expiration of the Lease Term, the obligations of Tenant to pay the Additional Rent provided for in this Article 4 and Exhibit C shall survive the expiration of the Lease Term.

4.2    **Taxes and Other Charges for Which Tenant Is Directly Responsible**.

4.2.1    Tenant shall be liable for and shall pay ten (10) days before delinquency, taxes levied against Tenant's equipment, furniture, fixtures and any other personal property located in or about the Premises. If any such taxes on Tenant's equipment, furniture, fixtures and any other personal property are levied against Landlord or Landlord's property or if the assessed value of Landlord's property is increased by the inclusion therein of a value placed upon such equipment, furniture, fixtures or any other personal property and if Landlord pays the taxes based upon such increased assessment, which Landlord shall have the

right to do regardless of the validity thereof but only under proper protest if requested by Tenant, Tenant shall repay to Landlord the taxes so levied against Landlord or the proportion of such taxes resulting from such increase in the assessment, as the case may be, within thirty (30) days following receipt of an invoice therefor.

4.2.2    Tenant shall pay prior to delinquency any (i) rent tax or sales tax, service tax, transfer tax or value added tax, or any other applicable tax on the rent or services herein or otherwise respecting this Lease, (ii) taxes assessed upon or with respect to the possession, leasing, operation, management, maintenance, alteration, repair, use or occupancy by Tenant of the Premises or any portion of the Center, including the parking facilities; or (iii) taxes assessed upon this transaction or any document to which Tenant is a party creating or transferring an interest or an estate in the Premises.

4.3    <u>Landlord's Records</u>.  Upon Tenant's written request given not more than one hundred (180) days after Tenant's receipt of a Statement for a particular Expense Year, and provided that Tenant is not then in default under this Lease beyond the applicable notice and cure period provided in this Lease, Landlord shall furnish Tenant with such reasonable supporting documentation in connection with Direct Expenses included within such Statement as Tenant may reasonably request. Landlord shall provide said information to Tenant within sixty (60) days after Tenant's written request therefor.  Within one hundred eighty (180) days after receipt of a Statement by Tenant (the **"Audit Period"**), if Tenant disputes the amount of Direct Expenses set forth in the Statement, an independent certified public accountant (which accountant (A) is a member of a nationally or regionally recognized certified public accounting firm which has previous experience in reviewing financial operating records of landlords of comparable commercial buildings, (B) shall not already be providing primary accounting and/or lease administration services to Tenant and shall not have provided primary accounting and/or lease administration services to Tenant in the past three (3) years, (C) is not working on a contingency fee basis [*i.e.*, Tenant must be billed based on the actual time and materials that are incurred by the certified public accounting firm in the performance of the audit], and (D) shall not currently or in the future be providing accounting and/or lease administration services to another tenant in the Building and/or the Center in connection with a review or audit by such other tenant of Direct Expenses) designated and paid for by Tenant, may, after reasonable notice to Landlord and at reasonable times, audit Landlord's records with respect to the Statement at Landlord's corporate offices, provided Tenant is not then in default under this Lease (beyond any applicable notice and cure periods).  In connection with such audit, Tenant and Tenant's certified public accounting firm must agree in advance to follow Landlord's reasonable rules and procedures regarding the audit of Landlord's records, and shall execute a commercially reasonable confidentiality agreement regarding such audit.  Any audit report prepared by Tenant's certified public accounting firm shall be delivered concurrently to Landlord and Tenant within the Audit Period.  Tenant's failure to dispute and/or audit the amount of Direct Expenses set forth in any Statement within the Audit Period shall be deemed to be Tenant's approval of such Statement and Tenant, thereafter, waives the right or ability to audit the amounts set forth in such Statement.  If after such audit, Tenant still disputes such Direct Expenses, an audit to determine the proper amount shall be made, at Tenant's expense, by an independent certified public accountant (the **"Accountant"**) selected by Landlord and subject to Tenant's reasonable approval; provided that if such audit by the Accountant proves that Direct Expenses were overstated by more than five percent (5%), then the cost of the Accountant and the cost of such audit shall be paid for by Landlord. Tenant hereby acknowledges that Tenant's sole right to audit Landlord's records and to contest the amount of Direct Expenses payable by Tenant shall be as set forth in this <u>Section 4.3</u>, and Tenant hereby waives any and all other rights pursuant to applicable law to audit such records and/or to contest the amount of Direct Expenses payable by Tenant.

**ARTICLE 5**

**USE OF PREMISES**

5.1    <u>Permitted Use; Use Restrictions</u>.

5.1.1    <u>Permitted Use</u>.  Tenant shall use the Premises solely for the Permitted Use set forth in <u>Section 7</u> of the Summary and Tenant shall not use or permit the Premises to be used for any other purpose or purposes whatsoever.

5.1.2    <u>Tenant's Trade Name</u>.  Landlord shall have the right to approve the name of Tenant's business establishment to be located in the Premises.  Landlord hereby approves the trade name set forth in <u>Section 7</u> of the Summary.

5.1.3    <u>Continued Operation</u>.  Tenant covenants and agrees that within ninety (90) days following the Lease Commencement Date the Premises shall be fully staffed and open for the Permitted Use and thereafter Tenant will operate and conduct within the Premises, continuously and uninterruptedly during the Lease Term for five (5) years following the Lease Commencement Date, the business which it is required to operate and conduct under the provisions hereof, except while the Premises are untenantable by reason of fire or other unavoidable casualty, and that it will at all times keep and maintain within and upon the Premises an adequate stock of merchandise and trade fixtures and have sufficient personnel to service and supply the usual and ordinary demands and requirements of its customers.  In the event Tenant fails to continuously operate its business in the Premises as required by this <u>Section 5.1.3</u> during the minimum operating hours required by <u>Section 5.1.4</u>, then in addition to all other remedies available to Landlord (including without limitation, specific performance), Tenant shall pay to Landlord, as liquidated damages, an amount equal to twenty-five percent (25%) of the Base Rent prorated on a per diem basis until such failure is cured.  Acceptance of such liquidated damages shall not be deemed permission for Tenant to continue such violation, and shall not preclude Landlord from seeking any other remedy for such violation, including, without limitation, specific performance or termination of this Lease.

5.1.4    <u>Minimum Operating Hours</u>.  Tenant shall, at a minimum, keep the Premises open for business during the Minimum Hours of Operation set forth in <u>Section 13</u> of the Summary except for the date of observation of New Year's Day, Easter Sunday, Independence Day, Labor Day, Memorial Day, Thanksgiving Day, Christmas Day and other locally or nationally recognized holidays which are observed by other projects comparable to and in the vicinity of the Center. Notwithstanding the foregoing, and subject to Applicable Laws, Tenant may operate the Premises on a 24/7 basis.

5.1.5    <u>Quality Standards</u>.  Tenant shall, throughout the Lease Term, maintain its quality and reputation, and the quality of its merchandise, consistent with a first-class business and shall utilize and operate its business and the Premises (or cause such utilization and operation) prudently and in a manner consistent with sound business practices.

5.1.6 **Deliveries**. The delivery or shipping of merchandise, supplies and fixtures to and from the Premises shall be done only at such times, in the areas, and through the entrances designated for such purposes, and shall be subject to such rules and regulations as are necessary, in the judgment of Landlord, for the proper operation of the Building and Center.

5.1.7 **Sound and Vibration Control**. Tenant shall comply with all sound and vibration isolation and control requirements of Landlord and applicable governmental authorities. Such sound requirements may include limitations on the maximum sound levels of mechanical noise and music permitted at the Premises, as may be reasonably determined by Landlord in connection with the maximum sound levels that may be deemed acceptable by Landlord or otherwise permissible at receiving spaces at the Center. Landlord acknowledges that some of the activities conducted in the Premises as part of the Permitted Use may (A) generate noise, vibration and/or moisture, and/or (B) be visible from the exterior of the Premises, and such activities are permitted provided that such activities do not generate unreasonably loud sound emanating from the Premises for the adjacent tenant in the abutting Building M10 and for any other adjacent tenant in the Center, (ii) violate the terms of this Section 5.1.7, and (iii) do not otherwise violate the other provisions of this Article 5. To the extent such noise, vibration, moisture, and/or visibility materially, adversely affects the Building, Center, and/or other tenants, occupants or visitors in the Building and/or the Center (a "**Nuisance Event**"), Tenant shall promptly abate such Nuisance Event. To that end, Tenant shall undertake reasonable means and measures to eliminate the Nuisance Event. If necessary, as reasonably determined by Landlord, Tenant shall retain, at Tenant's sole cost and expense, a qualified acoustical consultant to insure compliance with Landlord's sound isolation and control requirements, and/or install and maintain reasonable sound control and noise vibration reduction products and improvements to eliminate the noise and/or vibration generated by fitness equipment and classes to the extent such noise and/or vibration constitutes a Nuisance Event. In connection with a Nuisance Event, Landlord shall have the right to inspect the Premises in order to determine whether Tenant complies with the foregoing sound isolation and control requirements. Any alterations to the Premises that may be required by Landlord from time to time during the Lease Term in order to insure Tenant's compliance with such sound isolation and control requirements shall be made by Tenant at Tenant's sole cost and expense.

5.2 **Prohibited Uses**. Tenant covenants and agrees that, notwithstanding anything to the contrary set forth in this Lease, Tenant shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose (1) in violation of the laws of the United States of America, the State of California, the ordinances, regulations or requirements of the local municipal or county governing body or other lawful authorities having jurisdiction over the Center) including, without limitation, any such laws, ordinances, regulations or requirements relating to hazardous materials or substances, as those terms are defined by applicable laws now or hereafter in effect, (2) in violation of any easements, covenants, conditions and restrictions now or hereafter applicable to the Building, including the Superior Agreements (the "**CC&Rs**"), or (3) in violation of the exclusive uses of the other tenants in the Center as more particularly set forth on Exhibit E attached hereto or any other exclusive use hereafter in effect of which Landlord has given Tenant written notice. Tenant further covenants and agrees that it shall not use, or suffer or permit any person or persons to use, the Premises or any part thereof for any use or purpose contrary to the rules and regulations promulgated by Landlord from time to time ("**Rules and Regulations**") set forth on Exhibit I attached hereto. Landlord represent that the Permitted Use is permitted by the CC&Rs and complies with all zoning requirements without the need for variances or waivers, and does not conflict with any exclusives in the Center. Tenant shall not: (i) conduct any auction, fire, distress, going out of business, liquidation, bankruptcy or like sales in the Premises or on the Center; (ii) display, sell, lease, or offer for sale or lease, in any manner on the Premises, alcoholic beverages (unless expressly allowed by the terms of this Lease) or pornographic material of any kind, including books, magazines and movies; (iii) engage in any activity or use the Premises for any purpose that is illegal or is not in keeping with the standards or character of a first-class retail center or would otherwise interfere with standard Center operations; (iv) use any area of the Center outside of the Premises (a) for the sale of any merchandise, food or beverage items or for other business purposes, (b) to solicit business, (c) to display signs (except as otherwise provided in Article 23), or (d) for public meetings or entertainment; (v) use, or permit to be used, any sound broadcasting or amplifying device or any video or vending machine that can be heard outside of the Premises; (vi) perform, or allow any employee or agent to perform, any act or carry on any practice that may damage the Premises or any other part of the Center, or disturb any other tenant or other person in the Center; (vii) use or allow the Premises to be used for any improper, unlawful or objectionable purpose; or (viii) permit any nuisance in, on or about the Premises. Tenant shall comply with, and Tenant's rights and obligations under the Lease and Tenant's use of the Premises shall be subject and subordinate to, the CC&Rs. Tenant shall comply with reasonable Rules and Regulations that Landlord may establish from time to time; provided, however, Landlord shall not enforce, change or modify the Rules and Regulations in a discriminatory manner and Landlord agrees that the Rules and Regulations shall not be modified or enforced in a manner which will unreasonably interfere with the normal and customary conduct of Tenant's business.

5.3 **Operational Requirements**. Tenant shall be solely responsible for performing all janitorial services and other cleaning of the Premises appropriate to maintain the Premises in a first-class manner and consistent with comparable buildings, including, without limitation, the following:

5.3.1 Tenant shall cause the carpets or other floor coverings in the Premises to be professionally cleaned as needed.

5.3.2 Tenant shall cause to be provided window washing, sweeping and cleaning of the Premises as needed.

5.3.3 Tenant shall deposit trash daily, or more often if reasonably required by Landlord, in the area designated by Landlord from time to time, which trash shall be sealed in plastic bags. Alternatively, Landlord shall have the option to require Tenant, at Tenant's cost, to use a trash porter service that shall be provided by Landlord to move Tenant's trash from the Premises to Landlord's designated trash area. All trash containers must be covered and stored in a manner to prevent the emanation of odors into the Premises, the Building or the Center. If Landlord or any local governmental authority having jurisdiction over the Building requires separation of "wet" and "dry" garbage, Tenant shall comply with the requirements imposed by Landlord and/or such governmental entity (as the case may be) with respect to the separation of refuse. If Tenant's use requires such separation for "wet" and "dry" garbage, Landlord shall require that Tenant either (i) maintain a separate dumpster for Tenant's "wet" garbage, which shall be installed and maintained by Tenant at Tenant's sole cost and expense in accordance with Landlord's specifications (which specifications shall include, without limitation, the specific dimensions of such dumpster and the construction of an enclosure to screen such dumpster), or (ii) utilize a shared dumpster in common with other tenants of the Center for Tenant's "wet" garbage, which shall be installed and maintained by Landlord, subject to Tenant's payment to Landlord of Tenant's proportionate share of the cost of such installation and use. In addition to the foregoing, Tenant shall be required to participate in any recycling program conducted by Landlord at the Building or Center. Notwithstanding the foregoing, upon

written notice to Tenant, Landlord may require that Tenant procure and maintain at Tenant's sole cost and expense, a contract providing for the pickup and disposal of Tenant's refuse from the Premises, which contract shall be subject to Landlord's prior review and approval, not to be unreasonably withheld.  If such a contract is required, Tenant shall no longer use Landlord's receptacles for disposal of Tenant's refuse.

5.3.4    Tenant shall cause to be provided pest eradication and control services, as required by Landlord, with respect to the Premises.  Tenant shall notify Landlord of the timing of such services and agrees to coordinate such services with any exterior pest control services maintained by Landlord.

5.3.5    Tenant shall take all actions necessary to prevent odors from escaping into the Premises, the Building or the Center.  The Premises and the equipment contained therein must at all times be adequately ventilated and filtered and any odors must be exhausted and dispersed in a manner acceptable to Landlord, including the installation of duct systems and exhaust hoods as may be required by Landlord.  Tenant shall keep such duct systems and exhaust hoods clean and operational at all times. Tenant, at its sole cost and expense, shall procure and maintain in full force and effect a contract for the maintenance of any such duct systems and exhaust hoods with a service and maintenance firm, and within a maintenance schedule, reasonably acceptable to Landlord.  Tenant shall be liable for the cost of any maintenance to or repairs of the Building or Center as a result of Tenant's failure to comply with the terms and conditions of this provision.  Landlord reserves the right to maintain such duct systems and exhaust hood at Tenant's expense.  In addition, Landlord may require Tenant, at its sole cost and expense, to install and operate a monitoring and suppression system for any noxious gases.

5.3.6    Tenant shall keep any display windows, including window or shadow boxes, in the Premises dressed and illuminated, and permitted signs and exterior lights lit during the hours of operation set forth in Section 5.1.4, above.

5.4    **Exclusive Use Restriction**.  So long as the Original Tenant and its Permitted Franchise Assignee: (a) is open and operating in the entire Premises for the "Protected Use," as that term is defined hereinbelow, and (b) is not in default of this Lease, Landlord agrees not to enter into any lease for space within the Retail Center with any other tenant whose business is the Permitted Use, including a boxing and/or kickboxing facility, gym workout centers, high-intensity training and classes, aerobic and/or Pilates club, or martial arts or mixed marital arts (MMA) studios and/or any similar uses (the "**Protected Use**"); provided, however, that a lease for space within the Retail Center for a Protected Use that is 3,000 square feet or less of space shall be deemed not to violate the terms and conditions of this Section 5.4.  Notwithstanding anything to the contrary contained herein, the Protected Use is not applicable to: (i) any leases entered into on or before the date of this Lease or to any new leases with existing tenants or extensions of existing leases entered into with existing tenants or their successors or assigns; provided, however, if under the provisions of any such lease, such tenant leases space in the Center and must obtain Landlord's consent to change its existing use of such space to the Protected Use, Landlord, shall, if permitted to do so, refuse to consent to such change in use; (ii) any existing leases affecting the Center which leases permit the assignment thereof or the subletting of the premises demised thereby or a change in such tenant's permitted use without the Landlord's approval; and/or (iii) the lease of any other tenant located in the Center who has been permitted to operate its business for the Protected Use as the result of an actual order by a court.  In the event that Landlord enters into a lease for space with any other person or entity whose operations at the Esplanade Center violates the Protected Use (the "**Landlord Protected Use Violation**"), and Landlord has failed to cure such Landlord Protected Use Violation within sixty (60) days after Tenant provides written notice thereof to Landlord (the "**Protected Use Violation Cure Period**"), then Base Rent shall thereafter abate and Tenant shall pay, in lieu thereof, "Substitute Rent," as that term is defined hereinbelow, until Landlord cures such Landlord Protected Use Violation.  If the Landlord Protected Use Violation continues for more than two (2) years, Tenant shall have the right, upon ninety (90) days written notice to Landlord within thirty (30) days after the expiration of such two (2) year period, to terminate this Lease, and upon such ninetieth (90th) day this Lease shall terminate and all further obligations of the parties hereunder (other than those obligations that expressly survive the termination of this Lease, including indemnification obligations, the return of any prepaid rent subject to application for Tenant defaults) shall end and be of no further force and effect.  In connection with the foregoing, Landlord shall pay Tenant all of the unamortized costs of Tenant's improvements within thirty (30) days following the termination date.  Amortization shall be calculated on a one hundred twenty-six month amortization schedule commencing as of the Lease Commencement Date, based upon equal monthly payments of principal and interest.  As used herein, the term "**Substitute Rent**" shall mean and refer to: (i) fifty percent (50%) of the Base Rent that would otherwise be payable during such period, which reduced percentage shall apply for up to twelve (12) months immediately after the Protected Use Violation Cure Period, and (ii) seventy-five percent (75%) of the Base Rent that would otherwise be payable during such period, which reduced percentage shall apply to any period that the Landlord Protected Use Violation continues after such 12-month period.  Such Substitute Rent shall be payable in the same manner and at the same times as would otherwise apply to Base Rent, with appropriate proportionate allocations for any partial month(s) during which Substitute Rent applies.  In addition, Landlord shall not be deemed to be in violation of this Section 5.4 to the extent an unpermitted Center tenant (i.e., a tenant for which the foregoing items (i) through (iv) do not apply) commences a use in violation of the terms of its lease and Tenant's exclusive use protection hereunder (hereinafter, a "**Rogue Tenant**") to the extent Landlord, within sixty (60) days after receiving written notice of such violation, takes commercially reasonable steps to enforce the terms of such Rogue Tenant's lease such that the violating use shall cease; provided, however, with respect to any such Rogue Tenant, Tenant shall have the independent right, at Tenant's sole cost and expense after such sixty (60)-day period, to conduct and prosecute legal proceedings (including, without limitation, an action for injunctive relief) against such Rogue Tenant, which action shall not name or otherwise include Landlord unless and to the extent Landlord has failed to take commercially reasonable steps to enforce the terms of such Rogue Tenant's lease.

## ARTICLE 6

## UTILITIES

Tenant agrees, at its own expense, to pay for all water, power, gas, electric current, telephone, cable, wireless internet and all other utilities and services used by Tenant on the Premises (including, without limitation, all sales, use and other taxes or fees imposed thereon by any governmental authority).  Tenant agrees to provide, at Tenant's sole cost and expense, any utility meters and utility panels of the type required by Landlord.  In the event that any utilities are furnished to the Premises by Landlord, whether submetered or otherwise, then Tenant shall pay to Landlord the cost of such utilities, including a reasonable administrative charge for Landlord's supervision.  If charges for any such utilities are not separately charged to Tenant by the utility company, or separately submetered to the Premises, Landlord will reasonably apportion the costs of such utilities among the tenants utilizing the utility or service on an equitable basis as determined by Landlord.  Within thirty (30) days after receipt

of Landlord's statement of apportionment or statement setting forth the charges payable by Tenant, Tenant shall pay to Landlord as Additional Rent, the cost of such services and utilities so apportioned or so provided by Landlord. If Landlord shall from time to time reasonably determine that the use of any such utility or service in the Premises is disproportionate to the use of other tenants, Landlord may adjust Tenant's share of the cost thereof to take equitable account of such disproportionate use. If Landlord elects to utilize solar, wind or other alternatively generated electricity at the Building (**"Alternative Electricity"**), Tenant agrees to purchase from the provider of such Alternative Electricity up to 100% of Tenant's electrical requirements, as and when such Alternative Electricity is produced, at the price in effect at the time of delivery; provided, however, in no event shall the price for Alternative Electricity exceed the total cost of comparable electric service that otherwise would have been purchased from the conventional electricity provider. Tenant agrees that Landlord shall not be liable for damages, by abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service, or for any diminution in the quality or quantity thereof, and such failures or delays or diminution shall not be deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or relieve Tenant from paying Rent or performing any of its obligations under this Lease.

## ARTICLE 7

### REPAIRS

Except for Landlord's obligations set forth below, Tenant shall, at Tenant's own expense, keep the Premises, including all Improvements, Alterations, fixtures, equipment, interior window coverings, and furnishings therein, Tenants' storefront and the floor or floors of the Building on which the Premises are located, in good order, repair and first-class condition at all times during the Lease Term, including making replacements as necessary. Tenant shall also contract with an air-conditioning service company for the periodic maintenance and the repair and replacement, as necessary, of the air-conditioning system serving the Premises, which contract and company shall be subject to Landlord's prior written approval. Notwithstanding the foregoing, Landlord, at its sole cost and expense, shall be responsible for repairs to the exterior walls (other than Tenants' storefront), columns, slab, footings, and foundation, roof of the Building, other structural portions of the Building, and the systems and equipment of the Building, except to the extent that such repairs are required due to the negligence or willful misconduct of Tenant or its employees, agents or contractors; provided, however, that if such repairs are due to the negligence or willful misconduct of Tenant or its employees, agents or contractors, Landlord shall nevertheless make such repairs at Tenant's expense, or, if covered by Landlord's insurance, Tenant shall only be obligated to pay any deductible in connection therewith. Tenant hereby waives any and all rights under and benefits of subsection 1 of Section 1932 and Sections 1941 and 1942 of the California Civil Code or under any similar law, statute, or ordinance now or hereafter in effect.

## ARTICLE 8

### ADDITIONS AND ALTERATIONS

8.1    **Landlord's Consent to Alterations**. Tenant may not make any improvements, alterations, additions or changes to the Premises or any mechanical, plumbing or HVAC facilities or systems pertaining to the Premises (collectively, the **"Alterations"**) without first procuring the prior written consent of Landlord to such Alterations. Notwithstanding the foregoing, Tenant shall be permitted to make Alterations following ten (10) business days' notice to Landlord, but without Landlord's prior consent, to the extent that such Alterations are not visible from the exterior of the Premises and do not (i) affect the systems and equipment of the Building, exterior appearance of the Building, or structural aspects of the Building, (ii) adversely affect the value of the Premises or Building, (iii) require a building or construction permit, (iv) cost more than Two Hundred and Fifty Thousand and 00/100 Dollars ($250,000.00) for a particular job of work or (v) trigger a legal requirement upon Landlord to make any improvement, alteration, addition or change to the Center. The construction of the initial Improvements to the Premises shall be governed by the terms of the Work Letter and not the terms of this Article 8. Landlord may impose, as a condition of its consent to any and all Alterations, such requirements as Landlord in its reasonable discretion may deem desirable, including, but not limited to, the requirement that Tenant utilize for such purposes only contractors reasonably approved by Landlord. Tenant shall construct such Alterations and perform such repairs in a good and workmanlike manner, in conformance with any and all applicable federal, state, county or municipal laws, rules and regulations and pursuant to a valid building permit, issued by the City of Oxnard, all in conformance with Landlord's construction rules and regulations; provided, however, that prior to commencing to construct any Alteration, Tenant shall meet with Landlord to discuss Landlord's design parameters and code compliance issues. In the event Tenant performs any Alterations in the Premises which require or give rise to governmentally required changes to the Common Areas or "Base Building," as that term is defined below, then Landlord shall, at Tenant's expense, make such changes to the Common Areas or Base Building. The "**Base Building**" shall mean the improvements constituting the "Turnover Condition," as that term is defined in Section 1 of the Work Letter. In performing the work of any such Alterations, Tenant shall have the work performed in such manner so as not to obstruct access to the Center or any portion thereof, by any other tenant of the Center, and so as not to obstruct the business of Landlord or other tenants in the Center. In addition to Tenant's obligations under Article 9 of this Lease, upon completion of any Alterations, Tenant agrees to cause a Notice of Completion to be recorded in the office of the Recorder of the County of Ventura in accordance with Section 8182 of the Civil Code of the State of California or any successor statute, and Tenant shall deliver to the management office for the Center a reproducible copy of the "as built" and CAD drawings of the Alterations, to the extent applicable, as well as all permits, approvals and other documents issued by any governmental agency in connection with the Alterations. Tenant shall reimburse Landlord for Landlord's reasonable, actual, out-of-pocket costs and expenses (not to exceed $2,000.00) incurred in connection with Landlord's review of any Alterations (other than the initial Tenant work described in the Work Letter) and the plans therefor.

8.2    **Construction Insurance**. In addition to the requirements of Article 10 of this Lease, in the event that Tenant makes any Alterations, prior to the commencement of such Alterations, Tenant shall provide Landlord with evidence that Tenant carries "Builder's All Risk" insurance in an amount reasonably approved by Landlord covering the construction of such Alterations, and such other insurance as Landlord may reasonably require.

8.3    **Landlord's Property**. Landlord and Tenant hereby acknowledge and agree that (i) all Alterations, Improvements, signs, fixtures, equipment and/or appurtenances which may be installed or placed in or about the Premises, from time to time, shall be at the sole cost of Tenant and shall be and become part of the Premises and the property of Landlord, and (ii) the Improvements to be constructed in the Premises pursuant to the TCCs of the Work Letter shall, upon completion of the same, be and become a part of the Premises and the property of Landlord. Furthermore, Landlord may, by written notice to

Tenant prior to the end of the Lease Term, or given following any earlier termination of this Lease, require Tenant, at Tenant's expense, to remove any Alterations or Improvements in the Premises and any of Tenant's signs, repair any damage to the Premises, Building or Center caused by such removal and return the affected portion of the Premises to a safe and clean condition; provided, however, if, in connection with its notice to Landlord with respect to any such Alterations, (x) Tenant requests Landlord's decision with regard to the removal of such Alterations, and (y) Landlord thereafter agrees in writing to waive the removal requirement with regard to such Alterations, then Tenant shall not be required to so remove such Alterations. If Tenant fails to complete such removal and/or to repair any damage caused by the removal of any Alterations or Improvements in the Premises, and/or to return the affected portion of the Premises to a safe and clean condition, then at Landlord's option, either (A) Tenant shall be deemed to be holding over in the Premises and Rent shall continue to accrue in accordance with the terms of Article 16, below, until such work shall be completed, or (B) Landlord may do so and may charge the cost thereof to Tenant.

       8.4    **Refurbishment**. Tenant shall refurbish the Premises as necessary to maintain the Premises in good condition and in accordance with its Franchisor's requirements.

## ARTICLE 9

### COVENANT AGAINST LIENS

      Tenant shall keep the Center and Premises free from any liens or encumbrances arising out of the work performed, materials furnished or obligations incurred by or on behalf of Tenant, and shall protect, defend, indemnify and hold Landlord harmless from and against any claims, liabilities, judgments or costs (including, without limitation, reasonable attorneys' fees and costs) arising out of same or in connection therewith. Tenant shall remove any such lien or encumbrance by bond or otherwise within ten (10) days after notice by Landlord, and if Tenant shall fail to do so, Landlord may pay the amount necessary to remove such lien or encumbrance, without being responsible for investigating the validity thereof. The amount so paid shall be deemed Additional Rent under this Lease payable upon demand, without limitation as to other remedies available to Landlord under this Lease.

## ARTICLE 10

### INDEMNIFICATION AND INSURANCE

      10.1    **Indemnification and Waiver**. Except to the extent of the negligence or willful misconduct of the Landlord or the "Landlord Parties" (as that term is defined below), Tenant hereby assumes all risk of damage to property or injury to persons in, upon or about the Premises from any cause whatsoever and agrees that Landlord, its partners, subpartners and their respective officers, agents, servants, employees, and independent contractors (collectively, "**Landlord Parties**") shall not be liable for, and are hereby released from any responsibility for, any damage either to person or property or resulting from the loss of use thereof, which damage is sustained by Tenant or by other persons claiming through Tenant. Other than to the extent arising out of the negligence or willful misconduct of the Landlord or the Landlord Parties, Tenant shall indemnify, defend, protect, and hold harmless the Landlord Parties from any and all loss, cost, damage, expense and liability (including without limitation court costs and reasonable attorneys' fees) incurred in connection with or arising from: (a) any causes in, on or about the Premises; (b) the use or occupancy of the Premises by Tenant or any person claiming under Tenant; (c) any activity, work, or thing done, or permitted or suffered by Tenant in or about the Premises; (d) any acts, omission, or negligence of Tenant or any person claiming under Tenant, or the contractors, agents, employees, invitees, or visitors of Tenant or any such person (collectively, "**Tenant Parties**"); (e) any breach, violation, or non-performance by Tenant or any person claiming under Tenant or the employees, agents, contractors, invitees, or visitors of Tenant or any such person of any term, covenant, or provision of this Lease or any law, ordinance, or governmental requirement of any kind; (f) any injury or damage to the person, property, or business of Tenant, its employees, agents, contractors, invitees, visitors, or any other person entering upon the Premises under the express or implied invitation of Tenant; or (g) the placement of any personal property or other items within the Premises. Should Landlord be named as a defendant in any suit brought against Tenant in connection with or arising out of Tenant's occupancy of the Premises, Tenant shall pay to Landlord its costs and expenses incurred in such suit, including without limitation, its actual professional fees such as appraisers', accountants' and attorneys' fees. Further, Tenant's agreement to indemnify Landlord pursuant to this Section 10.1 is not intended and shall not relieve any insurance carrier of its obligations under policies required to be carried by Tenant pursuant to the provisions of this Lease, to the extent such policies cover the matters subject to Tenant's indemnification obligations; nor shall they supersede any inconsistent agreement of the parties set forth in any other provision of this Lease. The provisions of this Section 10.1 shall survive the expiration or sooner termination of this Lease with respect to any claims or liability arising in connection with any event occurring prior to such expiration or termination.

      10.2    **Tenant's Compliance With Landlord's Fire and Casualty Insurance**. Tenant shall, at Tenant's expense, comply with Landlord's insurance company requirements pertaining to the use of the Premises. If Tenant's conduct or use of the Premises causes any increase in the premium for such insurance policies then Tenant shall reimburse Landlord for any such increase. Tenant, at Tenant's expense, shall comply with all rules, orders, regulations or requirements of the American Insurance Association (formerly the National Board of Fire Underwriters) and with any similar body.

      10.3    **Tenant's Insurance**. Tenant shall maintain the following coverages in the following amounts. The required evidence of coverage must be delivered to Landlord on or before the date required under Section 10.4(I) sub-sections (x) and (y), or Section 10.4(II) below (as applicable). Such policies shall be for a term of at least one (1) year, or the length of the remaining term of this Lease, whichever is less.

      10.3.1    Commercial General Liability Insurance, including Broad Form contractual liability covering the insured against claims of bodily injury, personal injury and property damage (including loss of use thereof) based upon or arising out of Tenant's operations, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance shall be written on an "occurrence" basis. Landlord and any other party the Landlord so specifies that has a material financial interest in the Center, including Landlord's managing agent, ground lessor and/or lender, if any, shall be named as additional insureds as their interests may appear using Insurance Service Organization's form CG2011 or a comparable form approved by Landlord. Tenant shall provide an endorsement or policy excerpt showing that Tenant's coverage is primary and any insurance carried by Landlord shall be excess and non-contributing. The coverage shall also be extended to include damage caused by heat, smoke or fumes from a hostile fire. The policy shall not contain any intra-insured exclusions as between insured persons or

organizations. This policy shall include coverage for all liabilities assumed under this Lease as an insured contract for the performance of all of Tenant's indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Tenant nor relieve Tenant of any obligation hereunder. Limits of liability insurance shall not be less than the following; provided, however, such limits may be achieved through the use of an Umbrella/Excess Policy:

| | |
|---|---|
| Bodily Injury and Property Damage Liability | $3,000,000 each occurrence |
| Personal Injury and Advertising Liability | $3,000,000 each occurrence |
| Tenant Legal Liability/Damage to Rented Premises Liability | $1,000,000 |

10.3.2  Property Insurance covering (i) all furniture, personal property, business and trade fixtures, equipment, free-standing cabinet work, movable partitions, merchandise and all other items of Tenant's business personal property on the Premises installed by, for, or at the expense of Tenant, (ii) the "Improvements," as that term is defined in Section 2.1 of the Work Letter, and (iii) all Alterations performed in the Premises. Such insurance shall be written on a Special Form basis, for the full replacement cost value (subject to reasonable deductible amounts), without deduction for depreciation of the covered items and in amounts that meet any co-insurance clauses of the policies of insurance and shall include coverage for (a) all perils included in the CP 10 30 04 02 Coverage Special Form, and (b) water damage from any cause whatsoever, including, but not limited to, sprinkler leakage, bursting, leaking or stoppage of any pipes, explosion, and backup or overflow from sewers and drains.

10.3.2.1  Property Damage.  Tenant shall use the proceeds from any such insurance for the replacement of personal property, trade fixtures, Improvements and Alterations.

10.3.2.2  No Representation of Adequate Coverage.  Landlord makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Tenant's property, business operations or obligations under this Lease.

10.3.2.3  Property Insurance Subrogation.  Landlord and Tenant intend that their respective property loss risks shall be borne by insurance carriers to the extent above provided (and, in the case of Tenant, by an insurance carrier satisfying the requirements of Section 10.4(i) below), and Landlord and Tenant hereby agree to look solely to, and seek recovery only from, their respective insurance carriers in the event of a property loss to the extent that such coverage is agreed to be provided hereunder. The parties each hereby waive all rights and claims against each other for such losses, and waive all rights of subrogation of their respective insurers. Landlord and Tenant hereby represent and warrant that their respective "all risk" property insurance policies include a waiver of (i) subrogation by the insurers, and (ii) all rights based upon an assignment from its insured, against Landlord and/or any of the Landlord Parties or Tenant and/or any of the Tenant Parties (as the case may be) in connection with any property loss risk thereby insured against. Tenant will cause all other occupants of the Premises claiming by, under, or through Tenant to execute and deliver to Landlord a waiver of claims similar to the waiver in this Section 10.3.2.3 and to obtain such waiver of subrogation rights endorsements. If either party hereto fails to maintain the waivers set forth in items (i) and (ii) above, the party not maintaining the requisite waivers shall indemnify, defend, protect, and hold harmless the other party for, from and against any and all claims, losses, costs, damages, expenses and liabilities (including, without limitation, court costs and reasonable attorneys' fees) arising out of, resulting from, or relating to, such failure.

10.3.3  Business Income Interruption for one year (1).

10.3.4  Worker's Compensation or other similar insurance pursuant to all applicable state and local statutes and regulations, and Employer's Liability with minimum limits of not less than $1,000,000 each accident/employee/disease.

10.3.5  If applicable to Tenant, Commercial Automobile Liability Insurance covering all Owned (if any), Hired, or Non-owned vehicles with limits not less than $1,000,000 combined single limit for bodily injury and property damage.

10.4  Form of Policies.  The minimum limits of policies of insurance required of Tenant under this Lease shall in no event limit the liability of Tenant under this Lease. Such insurance shall (i) be issued by an insurance company having an AM Best rating of not less than A-X, or which is otherwise acceptable to Landlord and licensed to do business in the State of California, (ii) be in form and content reasonably acceptable to Landlord and complying with the requirements of Section 10.3 (including, Sections 10.3.1 through 10.3.5), (iii) Tenant shall not do or permit to be done anything which invalidates the required insurance policies, and (iv) provide that said insurance shall not be canceled or coverage changed unless thirty (30) days' prior written notice shall have been given to Landlord and any mortgagee of Landlord, the identity of whom has been provided to Tenant in writing. Tenant shall deliver said policy or policies or certificates thereof and applicable endorsements which meet the requirements of this Article 10 to Landlord on or before (I) the earlier to occur of: (x) the Lease Commencement Date, and (y) the date Tenant and/or its employees, contractors and/or agents first enter the Premises for occupancy, construction of Improvements, alterations, or any other move-in activities, and (II) five (5) business days after the renewal of such policies. In the event Tenant shall fail to procure such insurance, or to deliver such policies or certificates and applicable endorsements, Landlord may, at its option, after written notice to Tenant and Tenant's failure to obtain such insurance within five (5) days thereafter, procure such policies for the account of Tenant and the sole benefit of Landlord, and the cost thereof shall be paid to Landlord after delivery to Tenant of bills therefor.

10.5  Additional Insurance Obligations.  Tenant shall carry and maintain during the entire Lease Term, at Tenant's sole cost and expense, increased amounts of the insurance required to be carried by Tenant pursuant to this Article 10 and such other reasonable types of insurance coverage and in such reasonable amounts covering the Premises and Tenant's operations therein, as may be reasonably requested by Landlord, provided such increased amounts or other types of insurance are consistent with the requirements of other institutional landlords of similar projects in Southern California.

10.6  Third-Party Contractors.  Tenant shall obtain and deliver to Landlord, Third Party Contractor's certificates of insurance and applicable endorsements at least seven (7) business days prior to the commencement of work in or about the Premises by any vendor or any other third-party contractor (collectively, a "Third Party Contractor"). All such insurance shall

(a) name Landlord as an additional insured under such party's liability policies as required by Section 10.3.1 above and this Section 10.6, (b) provide a waiver of subrogation in favor of Landlord under such Third Party Contractor's commercial general liability insurance, (c) be primary and any insurance carried by Landlord shall be excess and non-contributing, and (d) comply with Landlord's minimum insurance requirements.

## ARTICLE 11

### DAMAGE AND DESTRUCTION

11.1    **Repair of Damage to Premises by Landlord.**  If the Premises or any Building Common Areas serving or providing access to the Premises shall be damaged by fire or other casualty, Landlord shall promptly and diligently, subject to reasonable delays for insurance adjustment or other matters beyond Landlord's reasonable control, and subject to all other terms of this Article 11, restore the base, shell and core of the Premises and such Building Common Areas.  Such restoration shall be to substantially the Turnover Condition described in the Work Letter with respect to the Premises and to substantially the same condition as existing prior to the casualty with respect to such Building Common Areas, except for modifications required by zoning and building codes and other laws, or any other modifications to the Building Common Areas deemed desirable by Landlord, provided access to the Premises shall not be materially impaired.  Upon the occurrence of any damage to the Premises, Tenant shall repair any injury or damage to the Improvements, Alterations and furniture, fixtures and equipment installed in the Premises and shall return the same to their original condition.  Tenant shall, prior to the commencement of construction, submit to Landlord, for Landlord's review and approval, all plans, specifications and working drawings relating thereto, and Landlord shall have the right to approve the contractors selected by Tenant to perform such improvement work.  Landlord shall not be liable for any inconvenience or annoyance to Tenant or its visitors, or injury to Tenant's business resulting in any way from such damage or the repair thereof; provided however, that if such fire or other casualty shall have damaged the Premises or Building Common Areas necessary to Tenant's occupancy, Landlord shall allow Tenant a proportionate abatement of Rent, during the time and to the extent the Premises are unfit for occupancy for the purposes permitted under this Lease, and not occupied by Tenant as a result thereof, but in no event shall such Rent abatement continue beyond thirty (30) days following Landlord's completion of restoration of those portions of the Base Building and Building Common Areas necessary for Tenant's use and occupancy of the Premises.

11.2    **Landlord's Option to Repair.**  Notwithstanding the terms of Section 11.1 of this Lease, Landlord may elect not to rebuild and/or restore the Premises and/or Building and instead terminate this Lease by notifying Tenant in writing of such termination within sixty (60) days after the date of discovery of such damage, such notice to include a termination date giving Tenant ninety (90) days to vacate the Premises, but Landlord may so elect only if the Building shall be damaged by fire or other casualty or cause, whether or not the Premises are affected, and one or more of the following conditions is present:  (i) repairs cannot reasonably be completed within one hundred eighty (180) days of the date of discovery of damage (when such repairs are made without the payment of overtime or other premiums); (ii) the holder of any mortgage on the Building shall require that the insurance proceeds or any portion thereof be used to retire the mortgage debt; or (iii) the damage is not fully covered by Landlord's insurance policies.  In addition, in the event that the Premises or the Building is destroyed or damaged to any substantial extent during the last twelve (12) months of the Lease Term, then notwithstanding anything contained in this Article 11, Landlord shall have the option to terminate this Lease by giving written notice to Tenant of the exercise of such option within thirty (30) days after the date of such damage or destruction, in which event this Lease shall cease and terminate as of the date of such notice.  Notwithstanding the foregoing, if such fire or other casualty shall have damaged the Premises or a portion thereof or Common Areas necessary to Tenant's occupancy and as a result of such damage the Premises are unfit for occupancy, and provided that Landlord does not elect to terminate this Lease pursuant to Landlord's termination right as provided above, and either (a) the repairs cannot, in the reasonable opinion of Landlord's contractor, be completed within two hundred seventy (270) days after being commenced, or (b) the damage occurs during the last twelve months of the Lease Term and will reasonably require in excess of ninety (90) days to repair, Tenant may elect, no earlier than sixty (60) days after the date of the damage and not later than ninety (90) days after the date of such damage, to terminate this Lease by written notice to Landlord (the "**Damage Termination Notice**") to Landlord effective as of the date specified in the Damage Termination Notice, which date shall not be less than thirty (30) days nor more than sixty (60) days after the date such notice is given by Tenant.  Notwithstanding the foregoing, if Tenant delivers a Damage Termination Notice to Landlord, then Landlord shall have the right to suspend the occurrence of the Damage Termination Date for a period ending thirty (30) days after the Damage Termination Date set forth in the Damage Termination Notice by delivering to Tenant, within five (5) business days of Landlord's receipt of the Damage Termination Notice, a certificate of Landlord's contractor responsible for the repair of the damage certifying that it is such contractor's good faith judgment that the repairs shall be substantially completed within thirty (30) days after the Damage Termination Date.  If repairs shall be substantially completed prior to the expiration of such thirty-day period, then the Damage Termination Notice shall be of no force or effect, but if the repairs shall not be substantially completed within such thirty-day period, then this Lease shall terminate upon the expiration of such thirty-day period.  Notwithstanding the provisions of this Section 11.2, Tenant shall have the right to terminate this Lease under this Section 11.2 only if each of the following conditions is satisfied: (a) the damage by fire or other casualty was not caused by the gross negligence or intentional act of Tenant or its partners or subpartners and their respective officers, agents, servants, employees, and independent contractors; (b) Tenant is not then in default under this Lease (beyond any applicable notice and cure periods); (c) as a result of the damage, Tenant cannot reasonably conduct business from the Premises; and, (d) as a result of the damage to the Project, Tenant does not occupy or use the Premises at all.  Upon any such termination of this Lease pursuant to this Section 11.2, Tenant shall pay the Base Rent and Additional Rent, properly apportioned up to such date of termination, and assign to Landlord all insurance proceeds payable to Tenant under Tenant's insurance required under clauses (ii) and (iii) of Section 10.3.2, and both parties hereto shall thereafter be freed and discharged of all further obligations hereunder, except as provided for in provisions of this Lease which by their terms survive the expiration or earlier termination of the Lease Term.

11.3    **Waiver of Statutory Provisions.**  The provisions of this Lease, including this Article 11, constitute an express agreement between Landlord and Tenant with respect to any and all damage to, or destruction of, all or any part of the Premises, the Building or any other portion of the Center, and any statute or regulation of the state in which the Building is located, including, without limitation, Sections 1932(2) and 1933(4) of the California Civil Code, with respect to any rights or obligations concerning damage or destruction in the absence of an express agreement between the parties, and any other statute or regulation, now or hereafter in effect, shall have no application to this Lease or any damage or destruction to all or any part of the Premises, the Building or any other portion of the Center.

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

## ARTICLE 12

### NONWAIVER

No waiver of any provision of this Lease shall be implied by any failure of Landlord to enforce any remedy on account of the violation of such provision, even if such violation shall continue or be repeated subsequently, any waiver by Landlord of any provision of this Lease may only be in writing, and no express waiver shall affect any provision other than the one specified in such waiver and that one only for the time and in the manner specifically stated. No receipt of monies by Landlord from Tenant after the termination of this Lease shall in any way alter the length of the Lease Term or of Tenant's right of possession hereunder or after the giving of any notice shall reinstate, continue or extend the Lease Term or affect any notice given Tenant prior to the receipt of such monies, it being agreed that after the service of notice or the commencement of a suit or after final judgment for possession of the Premises, Landlord may receive and collect any Rent due, and the payment of said Rent shall not waive or affect said notice, suit or judgment.

## ARTICLE 13

### CONDEMNATION

If the whole or any material part of the Premises, Building or Center shall be taken by power of eminent domain or condemned by any competent authority for any public or quasi-public use or purpose, or if any adjacent property or street shall be so taken or condemned, or reconfigured or vacated by such authority in such manner as to require the use, reconstruction or remodeling of any part of the Premises, Building or Center, or if Landlord shall grant a deed or other instrument in lieu of such taking by eminent domain or condemnation, Landlord shall have the right to terminate this Lease as of the date possession is required to be surrendered to the applicable authority by giving Tenant written notice thereof. Tenant shall not because of such taking assert any claim against Landlord or the authority for any compensation because of such taking and Landlord shall be entitled to the entire award or payment in connection therewith, except that Tenant shall have the right to file any separate claim available to Tenant for any taking of Tenant's personal property and fixtures belonging to Tenant and removable by Tenant upon expiration of the Lease Term pursuant to the terms of this Lease. All Rent shall be apportioned as of the date of such termination. Tenant hereby waives any and all rights it might otherwise have pursuant to Section 1265.130 of the California Code of Civil Procedure.

## ARTICLE 14

### ASSIGNMENT AND SUBLETTING

14.1    **Transfers**.  Tenant shall not, without the prior written consent of Landlord, assign, mortgage, pledge, hypothecate, encumber, or permit any lien to attach to, or otherwise transfer, this Lease or any interest hereunder, permit any assignment, or other transfer of this Lease or any interest hereunder by operation of law, sublet the Premises or any part thereof, or enter into any license or concession agreements or otherwise permit the occupancy or use of the Premises or any part thereof by any persons other than Tenant and its employees and contractors (each of the foregoing being referred to herein as a "**Transfer**" and any person or entity to whom any Transfer is made or sought to be made is referred to herein as a "**Transferee**"). In connection with any such Transfer contemplated by Tenant, Tenant shall submit a written request for consent notice to Landlord, together with any information reasonably required by Landlord which will enable Landlord to determine (i) the financial responsibility, character, and reputation of the proposed Transferee, (ii) the nature of such Transferee's business, (iii) the proposed use of the applicable portion of the Premises, and (iv) any other reasonable consent parameters. Any Transfer made without Landlord's prior written consent shall, at Landlord's option, be null, void and of no effect, and shall, at Landlord's option, constitute a default by Tenant under this Lease. Whether or not Landlord consents to any proposed Transfer, Tenant shall pay Landlord's review and processing fees, as well as any reasonable professional fees (including, without limitation, attorneys', accountants', architects', engineers' and consultants' fees) incurred by Landlord, within thirty (30) days after written request by Landlord.

14.2    **Landlord's Consent**.  Landlord shall not unreasonably withhold its consent to any proposed Transfer of the subject space to the Transferee on the terms specified in Tenant's notice pertaining to the particular Transfer. Without limitation as to other reasonable grounds for withholding consent, the parties hereby agree that it shall be reasonable under this Lease and under any applicable law for Landlord to withhold consent to any proposed Transfer where one or more of the following apply: (i) Transferee is of a character or reputation or engaged in a business which is not consistent with the quality of the Retail Center or the Center; (ii) Transferee is not a party of reasonable financial worth and/or financial stability in light of the responsibilities to be undertaken in connection with the transfer on the date consent is requested; (iii) Transferee intends to use the applicable portion(s) of the Premises for purposes which are not expressly permitted under this Lease; (iv) the proposed Transfer would cause a violation of another lease for space in the Center, or would give an occupant of the Center a right to cancel its lease; (v) the proposed Transferee does not, in Landlord's reasonable business judgment, have sufficient business experience to successfully operate the Permitted Use; (vi) the proposed Transferee does not have a tangible net worth (not including goodwill as an asset) computed in accordance with generally accepted accounting principles ("**Net Worth**") at least equal to the greater of (1) the Net Worth of Original Tenant on the date of this Lease, and (2) the Net Worth of Tenant on the day immediately preceding the effective date of such assignment or sublease; and (vii) the quality of the operation of the proposed Transferee is not equal to that of Tenant. Notwithstanding anything to the contrary in this Lease, if Tenant or any proposed Transferee claims that Landlord has unreasonably withheld or delayed its consent under this Section 14.2 or otherwise has breached or acted unreasonably under this Article 14, their sole remedies shall be a declaratory judgment and an injunction for the relief sought without any monetary damages, and Tenant hereby waives all other remedies, including, without limitation, any right at law or equity to terminate this Lease, on its own behalf and, to the extent permitted under all applicable laws, on behalf of the proposed Transferee.

14.3    **Transfer Premium**.  If Landlord consents to a proposed Transfer (excluding a Franchise Transfer pursuant to Section 14.7 below), as a condition thereto which the parties hereby agree is reasonable, Tenant shall pay to Landlord fifty percent (50%) of any "Transfer Premium," as that term is defined in this Section 14.3, received by Tenant from such Transferee. "**Transfer Premium**" shall mean all rent, additional rent or other consideration payable by such Transferee in connection with the transfer in excess of the Rent and Additional Rent payable by Tenant under this Lease during the term of the Transfer (on a

-11-

per square foot basis if less than all of the Premises is transferred); provided, however, such Transfer Premium shall also include, but not be limited to, key money, bonus money or other cash consideration paid by Transferee to Tenant in connection with such transfer, and any payment in excess of fair market value for services rendered by Tenant to Transferee or for assets, fixtures, inventory, equipment, or furniture transferred by Tenant to Transferee in connection with such Transfer.

    14.4    <u>Intentionally Omitted</u>.

    14.5    <u>Effect of Transfer</u>.  If Landlord consents to a Transfer (excluding a Franchise Transfer pursuant to <u>Section 14.7</u> below), (i) the TCCs of this Lease shall in no way be deemed to have been waived or modified, (ii) such consent shall not be deemed consent to any further Transfer by either Tenant or a Transferee, (iii) Tenant shall deliver to Landlord, promptly after execution, an executed copy of all documentation pertaining to the Transfer, (iv) Tenant shall furnish upon Landlord's request a complete statement, certified by Tenant, setting forth in reasonable detail the computation of any Transfer Premium Tenant has derived and shall derive from such Transfer, and (v) no Transfer shall relieve Tenant or any guarantor of the Lease from any liability under this Lease.  Landlord or its authorized representatives shall have the right at all reasonable times to audit the books, records and papers of Tenant relating to any Transfer, and shall have the right to make copies thereof.  If the Transfer Premium respecting any Transfer shall be found understated, Tenant shall, within thirty (30) days after demand, pay the deficiency, and if understated by more than three percent (3%), Tenant shall pay Landlord's costs of such audit.

    14.6    <u>Additional Transfers</u>.  For purposes of this Lease, the term "Transfer" shall also include (i) if Tenant is a partnership or limited liability company, the withdrawal or change, voluntary, involuntary or by operation of law, of more than fifty percent (50%) or more of the partners or members (as applicable), or transfer of more than fifty percent (50%) or more of partnership or membership interests (as applicable), within a twelve (12)-month period, or the dissolution of the partnership or limited liability company (as applicable) without immediate reconstitution thereof, and (ii) if Tenant is a closely held corporation (*i.e.*, whose stock is not publicly held and not traded through an exchange or over the counter), (A) the dissolution, merger, consolidation or other reorganization of Tenant or (B) the sale or other transfer of an aggregate of more than fifty percent (50%) or more of the voting shares of Tenant (other than to immediate family members by reason of gift or death), within a twelve (12)-month period, or (C) the sale, mortgage, hypothecation or pledge of an aggregate of more than fifty percent (50%) or more of the value of the unencumbered assets of Tenant within a twelve (12)-month period.

    14.7    <u>Franchisor Transfers</u>.  Notwithstanding anything contained in this Lease to the contrary, Tenant may assign its interest in this Lease to its Franchisor (as that term is defined in <u>Exhibit G</u> attached to this Lease), or to another qualified franchisee of Tenant's Franchisor (each, a "**Franchise Transfer**"), without the consent of Landlord.  Any such Franchise Transfer to a Franchise Transferee shall not be subject to the provisions of <u>Sections 14.1</u>, <u>14.2</u> or <u>14.3</u> above, provided that Franchisor, Tenant and any qualified franchisee of Tenant's Franchisor fully comply with all applicable requirements and conditions of the Franchisor Lease Addendum attached hereto as <u>Exhibit G</u>.  Concurrent with Landlord's and Tenant's mutual execution and delivery of this Lease, the parties shall execute the franchise rider attached hereto as <u>Exhibit G</u>.  In the event of a Franchise Transfer pursuant to this <u>Section 14.7</u>, provided that: (x) the proposed assignee and/or its principals have an aggregate net worth equal to $5,000,000.00 as of the date of the assignment, (y) the principals of the proposed assignee agree to execute a Guaranty in the form attached hereto as <u>Exhibit F</u>, and (z) the proposed guarantor(s) has an aggregate net worth equal to $2,500,000.00 as of the date of the assignment, Tenant and Guarantor shall be released from their obligations under this Lease.  Further, Tenant may mortgage its interest under this Lease upon written notice to Landlord, provided, however, that the leasehold mortgage is granted in connection with bona-fide financing for the Leased Premises from an institutional lender and in a commercially reasonable form submitted by Landlord's counsel.

<u>**ARTICLE 15**</u>

<u>**SURRENDER OF PREMISES; OWNERSHIP AND
REMOVAL OF TRADE FIXTURES**</u>

    15.1    <u>Surrender of Premises</u>.  No act or thing done by Landlord or any agent or employee of Landlord during the Lease Term shall be deemed to constitute an acceptance by Landlord of a surrender of the Premises unless such intent is specifically acknowledged in writing by Landlord.  The delivery of keys to the Premises to Landlord or any agent or employee of Landlord shall not constitute a surrender of the Premises or effect a termination of this Lease, whether or not the keys are thereafter retained by Landlord, and notwithstanding such delivery Tenant shall be entitled to the return of such keys at any reasonable time upon request until this Lease shall have been properly terminated.  The voluntary or other surrender of this Lease by Tenant, whether accepted by Landlord or not, or a mutual termination hereof, shall not work a merger, and at the option of Landlord shall operate as an assignment to Landlord of all subleases or subtenancies affecting the Premises or terminate any or all such sublessees or subtenancies.

    15.2    <u>Removal of Tenant Property by Tenant</u>.  Upon the expiration of the Lease Term, or upon any earlier termination of this Lease, Tenant shall, subject to the provisions of this <u>Article 15</u> and <u>Section 8.3</u>, quit and surrender possession of the Premises to Landlord in as good order and condition as when Tenant took possession and as thereafter improved by Landlord and/or Tenant, reasonable wear and tear and repairs which are specifically made the responsibility of Landlord hereunder excepted.

    15.3    <u>Landlord's Waiver of Security Interest in Personal Property</u>.  Tenant may remove its business and trade fixtures, machinery and equipment, removable partitions, furniture, furnishings, signs, cash registers, inventory and items of personal property (collectively, "**Tenant's Property**") placed in the Premises by Tenant or by its subtenants, licensees or concessionaires.  Tenant shall repair any damage to the Premises caused by the removal of Tenant's Property, but such obligation does not extend to painting or redecorating the Premises.  During the Lease Term, title to Tenant's Property remains with Tenant and only Tenant may claim depreciation therefor.  Landlord waives and relinquishes any and all rights of distraint, levy or attachment to Tenant's Property, including any statutory landlord's lien.  This waiver and relinquishment is self-operative without the need for further documentation.  If requested by Tenant, Landlord shall furnish Tenant or any other party written waivers of Landlord's right to distraint, levy or attachment.

## ARTICLE 16

### HOLDING OVER

If Tenant holds over after the expiration of the Lease Term or earlier termination thereof, with or without the express or implied consent of Landlord, such tenancy shall be from month-to-month only, and shall not constitute a renewal hereof or an extension for any further term, and in such case Rent shall be payable at a monthly rate equal to the product of (i) the Rent applicable during the last rental period of the Lease Term under this Lease and (ii) a percentage equal to one hundred fifty percent (150%) during the first two (2) months immediately following the expiration or earlier termination of the Lease Term, and two hundred percent (200%) thereafter. Such month-to-month tenancy shall be subject to every other applicable term, covenant and agreement contained herein. Nothing contained in this Article 16 shall be construed as consent by Landlord to any holding over by Tenant, and Landlord expressly reserves the right to require Tenant to surrender possession of the Premises to Landlord as provided in this Lease upon the expiration or other termination of this Lease. The provisions of this Article 16 shall not be deemed to limit or constitute a waiver of any other rights or remedies of Landlord provided herein or at law. If Tenant fails to surrender the Premises upon the termination or expiration of this Lease, in addition to any other liabilities to Landlord accruing therefrom, Tenant shall protect, defend, indemnify and hold Landlord harmless from all loss, costs (including reasonable attorneys' fees) and liability resulting from such failure, including, without limiting the generality of the foregoing, any claims made by any succeeding tenant founded upon such failure to surrender and any lost profits to Landlord resulting therefrom.

## ARTICLE 17

### ESTOPPEL CERTIFICATES

Within ten (10) days following a request in writing by Landlord or Tenant, Tenant or Landlord shall execute, acknowledge and deliver to the other party an estoppel certificate in such form as may be reasonably required by Landlord: (a) certifying that this Lease is unmodified and in full force and effect (or, if modified, stating the nature of such modification and certifying that this Lease, as so modified, is in full force and effect) and the date to which the Rent and other charges are paid in advance, if any; (b) acknowledging that there are not, to Tenant's knowledge, any uncured defaults on the part of Landlord hereunder (or specifying such defaults if they are claimed); and (c) containing such other matters as are set forth in such form. Any such certificate may be relied upon by any prospective mortgagee or purchaser of all or any portion of the Building. Tenant shall execute and deliver whatever other instruments may be reasonably required for such purposes. In the event Tenant is in default beyond any applicable notice and cure period expressly set forth in this Lease, or in connection with a sale or financing of the Building, or Tenant's request for Landlord's approval of a Transfer or an Alteration, Landlord may require Tenant to provide Landlord with a current financial statement and a financial statement of the year prior to the current financial statement year. Such statements shall be prepared in accordance with generally accepted accounting principles and Tenant's customary accounting practices.

## ARTICLE 18

### SUBORDINATION

This Lease shall be subject and subordinate to all present and future ground or underlying leases of the Building and to the lien of any mortgage, trust deed or other encumbrances now or hereafter in force against the Building or any part thereof, if any, and to all renewals, extensions, modifications, consolidations and replacements thereof, and to all advances made or hereafter to be made upon the security of such mortgages or trust deeds, unless the holders of such mortgages, trust deeds or other encumbrances, or the lessors under such ground lease or underlying leases, require in writing that this Lease be superior thereto. Tenant covenants and agrees in the event any proceedings are brought for the foreclosure of any such mortgage or deed in lieu thereof (or if any ground lease is terminated), to attorn to the lienholder or purchaser or any successors thereto upon any such foreclosure sale or deed in lieu thereof (or to the ground lessor), if so requested to do so by such purchaser or lienholder or ground lessor, and to recognize such purchaser or lienholder or ground lessor as the lessor under this Lease, provided such lienholder or purchaser or ground lessor shall agree to accept this Lease (or enter into a new lease for the balance of the Lease Term upon the same terms and conditions) and not disturb Tenant's occupancy, so long as Tenant timely pays the rent and observes and performs the TCCs of this Lease to be observed and performed by Tenant. Landlord's interest herein may be assigned as security at any time to any lienholder. Tenant shall, within ten (10) days of request by Landlord, execute such further instruments or assurances as Landlord may reasonably deem necessary to evidence or confirm the subordination or superiority of this Lease to any such mortgages, trust deeds, ground leases or underlying leases.

## ARTICLE 19

### DEFAULTS; REMEDIES

19.1    **Events of Default**. The occurrence of any of the following shall constitute a default of this Lease by Tenant:

19.1.1    Any failure by Tenant to pay any Rent or any other charge required to be paid under this Lease, or any part thereof, when due unless such failure is cured within five (5) business days after notice; or

19.1.2    Except where a specific time period is otherwise set forth for Tenant's performance in this Lease, in which event the failure to perform by Tenant within such time period shall be a default by Tenant under this Section 19.1.2, any failure by Tenant to observe or perform any provision, covenant or condition of this Lease to be observed or performed by Tenant (other than a failure described in the other subsections of this Section 19.1) where such failure continues for thirty (30) days after written notice thereof from Landlord to Tenant; provided that if the nature of such default is such that the same cannot reasonably be cured within a thirty (30) day period, Tenant shall not be deemed to be in default if it diligently commences such cure within such period and thereafter diligently proceeds to rectify and cure such default; or

19.1.3    To the extent permitted by law, (i) Tenant or any guarantor of this Lease being placed into receivership or conservatorship, or becoming subject to similar proceedings under Federal or State law, or (ii) a general assignment by Tenant or any guarantor of this Lease for the benefit of creditors, or (iii) the taking of any corporate action in furtherance of bankruptcy or dissolution whether or not there exists any proceeding under an insolvency or bankruptcy law, or (iv) the filing by or against

Tenant or any guarantor of any proceeding under an insolvency or bankruptcy law, unless in the case of a proceeding filed against Tenant or any guarantor the same is dismissed within sixty (60) days, or (v) the appointment of a trustee or receiver to take possession of all or substantially all of the assets of Tenant or any guarantor, unless possession is restored to Tenant or such guarantor within thirty (30) days, or (vi) any execution or other judicially authorized seizure of all or substantially all of Tenant's assets located upon the Premises or of Tenant's interest in this Lease, unless such seizure is discharged within thirty (30) days; or

19.1.4    The failure by Tenant to observe or perform according to the provisions of Articles 5, 14, 17 or 18 of this Lease where such failure continues for more than five (5) business days after notice from Landlord; or

19.1.5    Tenant's failure to commence business within ninety (90) days following the Lease Commencement Date, subject to Force Majeure.

The notice periods provided herein are in lieu of, and not in addition to, any notice periods provided by law.

19.2    **Remedies Upon Default**.  Upon the occurrence of any event of default by Tenant, Landlord shall have, in addition to any other remedies available to Landlord at law or in equity (all of which remedies shall be distinct, separate and cumulative), the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and nonexclusive, without any notice or demand whatsoever.

19.2.1    Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, and if Tenant fails to do so, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or for any claim for damages therefor; and Landlord may recover from Tenant the following:

(a)    The worth at the time of award of any unpaid rent which has been earned at the time of such termination; plus

(b)    The worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(c)    The worth at the time of award of the amount by which the unpaid rent for the balance of the Lease Term after the time of award exceeds the amount of such rental loss that Tenant proves could have been reasonably avoided; plus

(d)    Any other amount necessary to compensate Landlord for all the detriment proximately caused by Tenant's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom; and

(e)    At Landlord's election, such other amounts in addition to or in lieu of the foregoing as may be permitted from time to time by applicable law.

The term "**rent**" as used in this Section 19.2 shall be deemed to be and to mean all sums of every nature required to be paid by Tenant pursuant to the terms of this Lease, whether to Landlord or to others.  As used in Sections 19.2.1(a) and (b), above, the "worth at the time of award" shall be computed by allowing interest at the Interest Rate.  As used in Section 19.2.1(c), above, the "worth at the time of award" shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of award plus one percent (1%).

19.2.2    Landlord shall have the remedy described in California Civil Code Section 1951.4 (lessor may continue lease in effect after lessee's breach and abandonment and recover rent as it becomes due, if lessee has the right to sublet or assign, subject only to reasonable limitations).  Accordingly, if Landlord does not elect to terminate this Lease on account of any default by Tenant, Landlord may, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all rent as it becomes due.

19.2.3    Landlord shall at all times have the rights and remedies (which shall be cumulative with each other and cumulative and in addition to those rights and remedies available under Sections 19.2.1 and 19.2.2, above, or any law or other provision of this Lease), without prior demand or notice except as required by applicable law, to seek any declaratory, injunctive or other equitable relief, and specifically enforce this Lease, or restrain or enjoin a violation or breach of any provision hereof.

19.3    **Efforts to Relet**.  No re-entry or repossession, repairs, maintenance, changes, alterations and additions, reletting, appointment of a receiver to protect Landlord's interests hereunder, or any other action or omission by Landlord shall be construed as an election by Landlord to terminate this Lease or Tenant's right to possession, or to accept a surrender of the Premises, nor shall same operate to release Tenant in whole or in part from any of Tenant's obligations hereunder, unless express written notice of such intention is sent by Landlord to Tenant.  Tenant hereby irrevocably waives any right otherwise available under any law to redeem or reinstate this Lease.

19.4    **Landlord Default**.  Notwithstanding anything to the contrary set forth in this Lease, Landlord shall be in default in the performance of any obligation required to be performed by Landlord pursuant to this Lease if Landlord fails to perform such obligation within thirty (30) days after the receipt of notice from Tenant specifying in detail Landlord's failure to perform; provided, however, if the nature of Landlord's obligation is such that more than thirty (30) days are required for its performance, then Landlord shall not be in default under this Lease if it shall commence such performance within such thirty (30) day period and thereafter diligently pursues the same to completion.  Upon any such default by Landlord under this Lease, Tenant may, except as otherwise specifically provided in this Lease to the contrary, exercise any of its rights provided at law or in equity.

19.5    Notwithstanding anything to the contrary set forth in this Lease, Landlord shall use reasonable efforts to mitigate its damages.

## ARTICLE 20

### COVENANT OF QUIET ENJOYMENT

Landlord covenants that Tenant, on paying the Rent, charges for services and other payments herein reserved and on keeping, observing and performing all the other TCCs, provisions and agreements herein contained on the part of Tenant to be kept, observed and performed, shall, during the Lease Term, peaceably and quietly have, hold and enjoy the Premises subject to the TCCs, provisions and agreements hereof without interference by any persons lawfully claiming by or through Landlord. The foregoing covenant is in lieu of any other covenant express or implied.

## ARTICLE 21

### INTENTIONALLY OMITTED

## ARTICLE 22

### INTENTIONALLY OMITTED

## ARTICLE 23

### SIGNS

23.1    **Signage and Other Items**. Tenant's identifying signage shall be provided by Tenant, at Tenant's sole cost and expense, and such signage shall strictly comply with Landlord's standard signage program (collectively, the "**Sign Program**"), and shall be subject in all respects to Landlord's prior written approval. Tenant shall utilize a sign contractor selected from Landlord's list of approved sign contractors for the fabrication and installation of all exterior signs and awnings. Any signs, awnings, notices, logos, pictures, names or advertisements (collectively referred to herein as "**Signs**") which are installed and that have not been individually approved by Landlord may be removed without notice by Landlord at the sole expense of Tenant. Except as specifically set forth herein, Tenant may not install any Signs on the exterior or roof of either the Building or the Premises, or on any portion of the Center or install any Signs which are visible from the exterior of the Premises, the Building, the Center or any portion thereof. Without limiting the foregoing, Tenant shall not, without the prior written consent of Landlord, which consent shall be granted in Landlord's sole discretion, (i) affix any window or door lettering, placard, sign decoration or advertising matter or any type of awning, canopy, sun screen, tinting, film, solar screen or similar product to any window or door glass of the Premises, or (ii) erect or install any Signs, window or door lettering placard, decoration, exterior lighting or advertising media of any type which is visible from the exterior of the Premises, or erect or install any of the foregoing which are suspended from the ceiling of the Premises. Notwithstanding anything to the contrary contained in this Lease, in no event shall Tenant be permitted to erect, install or otherwise display any handwritten Signs at the Center. Any permitted Signs under this Section 23.1 shall comply with all applicable ordinances of governmental and quasi-governmental agencies. All permitted Signs shall be maintained, repaired or replaced, as necessary, by Tenant at its expense in order to keep the Signs in first-class condition and appearance. Tenant shall, at Landlord's request (which may be made no more frequently than once every five (5) years during the Lease Term and not prior to the fifth (5th) anniversary of the Lease Commencement Date) refurbish or install new Signs in compliance with Landlord then-existing standard signage program. Upon the expiration or earlier termination of this Lease, Tenant shall remove all Signs and Tenant shall repair any damage to the Premises, inside or outside, resulting from the erection, maintenance or removal of any Signs.

23.2    **Exterior Signage**. Notwithstanding the foregoing, but subject to this Section 23.2 and Landlord's sign program set forth on Exhibit H to this Lease, Tenant shall be entitled to install, at its sole cost and expense, (i) Tenant's name on three (3) sides of the exterior of the Building in the location of the former LA Fitness signs, and (ii) an identity sign on both sides of the pylon in the location of the former LA Fitness sign (collectively, the "**Exterior Signage**"). Further, in regard to Sign Type "B" shown on the Sign Plan, Landlord will support a Tenant effort to obtain a sign plan modification to allow a panel for the Tenant's sign, at Tenant's cost, on that monument sign provided that the addition of the sign panel not reduce the Home Depot signage to less than fifty percent (50%) of that sign and Landlord determines no other tenant has priority sign rights to that sign. The graphics, materials, size, color, design, lettering, lighting (if any), specifications and exact location of the Exterior Signage (collectively, the "**Signage Specifications**") shall be subject to the prior written approval of Landlord. Tenant shall provide Tenant's signage plan to Landlord within seventy-five (75) days following the mutual execution and delivery of this Lease. Landlord shall advise Tenant within ten (10) business days after Landlord's receipt of Tenant's signage plan if the same is unsatisfactory or incomplete in any respect. In addition, the Exterior Signage and all Signage Specifications therefor shall be subject to Tenant's receipt of all required governmental permits and approvals, shall be subject to all applicable governmental laws and ordinances, and all covenants, conditions and restrictions affecting the Building. Tenant hereby acknowledges that, notwithstanding Landlord's approval of the Exterior Signage and/or the Signage Specifications therefor, Landlord has made no representations or warranty to Tenant with respect to the probability of obtaining such approvals and permits. In the event Tenant does not receive the necessary permits and approvals for the Exterior Signage, Tenant's and Landlord's rights and obligations under the remaining provisions of this Lease shall not be affected. The cost of installation of the Exterior Signage, as well as all costs of design and construction of such Exterior Signage and all other costs associated with such Exterior Signage, including, without limitation, permits, maintenance and repair, shall be the sole responsibility of Tenant. The rights to the Exterior Signage shall be personal to the Original Tenant and its Permitted Franchise Assignee and may not be transferred. Should the Exterior Signage require maintenance or repairs as determined in Landlord's reasonable judgment, Landlord shall have the right to provide written notice thereof to Tenant and Tenant shall cause such repairs and/or maintenance to be performed within thirty (30) days after receipt of such notice from Landlord at Tenant's sole cost and expense. Should Tenant fail to perform such maintenance and repairs within the period described in the immediately preceding sentence, Landlord shall have the right to cause such work to be performed and to charge Tenant, as Additional Rent, for the cost of such work. Upon the expiration or earlier termination of this Lease, Tenant shall, at Tenant's sole cost and expense, remove the Exterior Signage and restore the areas upon which the Exterior Signage was located to the condition existing prior to the placement of such Exterior Signage. If Tenant fails to remove

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

such Exterior Signage and to restore as provided in the immediately preceding sentence within thirty (30) days following the expiration or early termination of this Lease, then Landlord may perform such work, and all costs and expenses incurred by Landlord in so performing such work shall be reimbursed by Tenant to Landlord within thirty (30) days after Tenant's receipt of invoice therefor. The immediately preceding sentence shall survive the expiration or earlier termination of this Lease. Should the name of the Original Tenant or its Permitted Franchise Assignee change, the Exterior Signage may be modified at Tenant's sole cost and expense to reflect the new name, provided that the new name is reasonably acceptable to Landlord, and without limiting other reasonable grounds for which Landlord may disapprove the new name, Landlord may disapprove the new name if it (i) relates to an entity that is of a character or reputation, or associate with a political orientation or a faction, that is inconsistent with the quality of the Building or would otherwise reasonably offend an institutional landlord of a comparable building, taking into consideration the level and visibility of such signage or (ii) causes Landlord to be in default under any lease or agreement with another tenant or occupant of the Center.

　　　23.3　　**Interior Signage. Subject to Section 23.1,** Tenant may, without Landlord's prior approval, have such signage and displays within the Premises and on the inside windows of the Premises that are required by or approved by Tenant's Franchisor or is otherwise typically displayed in the other franchise locations, so long as same are professionally prepared and maintained, comply with the Landlord's sign program and all Applicable Laws. Upon the expiration or earlier termination of this Lease, Tenant shall remove all such interior signs or displays and Tenant shall repair any damage to the Premises, inside or outside, resulting from the erection, maintenance or removal of any such interior signs or display.

## ARTICLE 24

### COMPLIANCE WITH LAW

　　　Landlord shall comply with all Applicable Laws relating to the Base Building, provided that compliance with such Applicable Laws is not otherwise the responsibility of Tenant under this Lease. Tenant shall not do anything or suffer anything to be done in or about the Premises and the Promotional Structure which will in any way conflict with any law, statute, ordinance or other governmental rule, regulation or requirement now in force or which may hereafter be enacted or promulgated (collectively, "**Applicable Laws**"). At its sole cost and expense, Tenant shall promptly comply with all such governmental measures (including the making of any alterations to the Premises or the Promotional Structure required by Applicable Laws). Should any standard or regulation now or hereafter be imposed on Landlord or Tenant by a state, federal or local governmental body charged with the establishment, regulation and enforcement of occupational, health or safety standards for employers, employees, landlords or tenants, then Tenant agrees, at its sole cost and expense, to comply promptly with such standards or regulations. For purposes of Section 1938 of the California Civil Code, Landlord hereby discloses to Tenant, and Tenant hereby acknowledges, that the Premises have not undergone inspection by a Certified Access Specialist (CASp). As required by Section 1938(e) of the California Civil Code, Landlord hereby states as follows: "A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises." In furtherance of the foregoing, Landlord and Tenant hereby agree as follows: (i) any CASp inspection requested by Tenant shall be conducted, at Tenant's sole cost and expense, by a CASp designated by Landlord, subject to Landlord's reasonable rules and requirements; (ii) Tenant, at its sole cost and expense, shall be responsible for making any improvements or repairs within the Premises to correct violations of construction-related accessibility standards; and (iii) if anything done by or for Tenant in its use or occupancy of the Premises shall require any improvements or repairs to the Building, the Retail Center or the Center (outside the Premises) to correct violations of construction-related accessibility standards, then Tenant shall reimburse Landlord upon demand, as Additional Rent, for the cost to Landlord of performing such improvements or repairs.

## ARTICLE 25

### LATE CHARGES

　　　If any installment of Rent or any other sum due from Tenant shall not be received by Landlord or Landlord's designee within ten (10) days following the due date, then Tenant shall pay to Landlord a late charge equal to five percent (5%) of the overdue amount; provided, however, with regard to the first two (2) such failures in any twelve (12) month period, Landlord will waive such late charge to the extent Tenant cures such failure within five (5) business days following Tenant's receipt of written notice from Landlord that the same was not received when due. The late charge shall be deemed Additional Rent and the right to require it shall be in addition to all of Landlord's other rights and remedies hereunder or at law and shall not be construed as liquidated damages or as limiting Landlord's remedies in any manner. In addition to the late charge described above, any Rent or other amounts owing hereunder which are not paid within ten (10) days after the date they are due shall bear interest from the date when due until paid at the "Interest Rate." For purposes of this Lease, the "**Interest Rate**" shall be an annual rate equal to the lesser of (i) the annual "Bank Prime Loan" rate cited in the Federal Reserve Statistical Release Publication H.15(519), published weekly (or such other comparable index as Landlord and Tenant shall reasonably agree upon if such rate ceases to be published), plus four (4) percentage points, and (ii) the highest rate permitted by applicable law.

## ARTICLE 26

### LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT

　　　All covenants and agreements to be kept or performed by Tenant under this Lease shall be performed by Tenant at Tenant's sole cost and expense and without any reduction of Rent (except as otherwise provided herein). If Tenant shall fail to perform any of its obligations under this Lease, within a reasonable time after such performance is required by the terms of this Lease, Landlord may, but shall not be obligated to, after reasonable prior notice to Tenant, make any such payment or perform any such act on Tenant's part without waiving its right based upon any default of Tenant and without releasing Tenant from any obligations hereunder. Except as may be specifically provided to the contrary in this Lease, Tenant shall pay to Landlord, within

thirty (30) days after delivery by Landlord to Tenant of statements therefor sums equal to expenditures reasonably made and obligations incurred by Landlord in connection with the remedying by Landlord of Tenant's defaults pursuant to the provisions of this Article 26.

## ARTICLE 27

## ENTRY BY LANDLORD

      Landlord reserves the right at all reasonable times and upon at least twenty-four (24) hours prior notice to Tenant (except in the case of an emergency) to enter the Premises to (i) inspect them; (ii) show the Premises to prospective purchasers, mortgagees, or tenants or to the ground or underlying lessors (during the last twelve (12) months of the Lease Term, except in the event Tenant is in default under this Lease beyond any applicable notice and cure period); (iii) post notices of non-responsibility; or (iv) alter, improve or repair the Premises or the Building if necessary to comply with current building codes or other applicable laws, or for structural alterations, repairs or improvements to the Building. Notwithstanding anything to the contrary contained in this Article 27, Landlord may enter the Premises at any time to (A) perform services required of Landlord; (B) take possession due to any breach of this Lease in the manner provided herein; and (C) perform any covenants of Tenant which Tenant fails to perform. Except with respect to clause (B), above, Landlord shall use commercially reasonable efforts to minimize interference with the conduct of Tenant's business in connection with such entries into the Premises. For each of the above purposes, Landlord shall at all times have a key with which to unlock all the doors in the Premises, excluding Tenant's vaults, safes and special security areas designated in advance by Tenant. In an emergency, Landlord shall have the right to use any means that Landlord may deem proper to open the doors in and to the Premises. Any entry into the Premises in the manner hereinbefore described shall not be deemed to be a forcible or unlawful entry into, or a detainer of, the Premises, or an actual or constructive eviction of Tenant from any portion of the Premises, nor shall such entry subject Landlord to any liability or damages or entitle Tenant to any abatement of Rent.

## ARTICLE 28

## PARKING

    28.1   **Employee Parking**. Tenant's employees shall be permitted to park, on a non-exclusive basis, only in those certain portions of the Center's parking facilities specifically designated from time to time by Landlord as employee parking areas for Tenant's employees and only to the extent that such parking is then available at any given time. Tenant's continued right to use such employee parking area is conditioned upon Tenant abiding by all reasonable rules and regulations which are prescribed from time to time for the orderly operation and use of the parking facility where the employee parking is located, including any sticker or other identification system established by Landlord, any maximum number of employee parking passes that may be used by Tenant, Tenant's causing its employees to comply with such rules and regulations and to park only in areas designated for employee parking, and Tenant not being in default under this Lease beyond applicable notice and cure period; provided, however, Landlord shall not change or modify the rules and regulations in a discriminatory manner and Landlord agrees that the rules and regulations shall not be modified or enforced in a manner which will unreasonably interfere with the normal and customary conduct of Tenant's business. Landlord specifically reserve the right to change the size, configuration, design, layout and all other aspects of the Center's parking facilities at any time and Tenant acknowledges and agrees that Landlord may, without incurring any liability to Tenant and without any abatement of Rent under this Lease, from time to time, close-off or restrict access to the Center's parking facilities for purposes of permitting or facilitating any such construction, alteration or improvements. Landlord may, at any time, utilize tandem parking stalls, "stack" parking, valet parking, access or revenue controls or other parking programs within the parking facilities, including a parking fee and validation program (collectively referred to herein as a "**Parking Program**"), and Tenant and its employees shall comply with any such Parking Program. Notwithstanding anything herein to the contrary, Landlord may, from time to time, require Tenant's employees to park in areas outside of the Center. Tenant shall, promptly following request therefor, furnish Landlord with a list of the vehicle license numbers of its employees. If Tenant's employees park in any areas of the parking facilities that are not designated by Landlord for their use, Landlord may charge Tenant, as Additional Rent, and Tenant agrees to pay, One Hundred an 00/100 Dollars ($100.00) per day for each day or partial day each such vehicle is parked in such areas, which amount shall be payable to Landlord within ten (10) days following written demand therefor. Tenant authorizes Landlord, at Tenant's sole expense, to tow away from the parking facility any vehicle belonging to Tenant or its employees parked in violation of these provisions, or to attach violation stickers or notices to such vehicle. In addition, Tenant shall indemnify, defend and hold Landlord harmless from and against any and all claims of the employee and/or owner of the vehicle towed. Landlord may delegate its responsibilities hereunder to a parking operator in which case such parking operator shall have all the rights of control attributed hereby to the Landlord.

    28.2   **Customer Parking**. Tenant's customers shall have the right, on a non-exclusive basis, to use those portions of the Center's parking facilities designated from time to time for use by the customers of the occupants of the Center. Landlord reserves the right to (i) institute and/or discontinue any Parking Program as described in Section 28.1 for customers, (ii) designate or redesignate specific areas within the parking facilities for use by customers of the occupants of the Center, and restrict parking by such customers to those specific areas, (iii) designate or redesignate specific parking spaces for the exclusive or non-exclusive use by the customers of specific occupants of the Center, (iv) adopt and enforce reasonable parking rules and regulations, and (v) charge prevailing market rates for customer parking.

## ARTICLE 29

## MISCELLANEOUS PROVISIONS

    29.1   **Binding Effect**. Subject to all other provisions of this Lease, each of the covenants, conditions and provisions of this Lease shall extend to and shall, as the case may require, bind or inure to the benefit not only of Landlord and of Tenant, but also of their respective heirs, personal representatives, successors or assigns, provided this clause shall not permit any assignment by Tenant contrary to the provisions of Article 14 of this Lease.

    29.2   **No Air Rights**. No rights to any view or to light or air over any property, whether belonging to Landlord or any other person, are granted to Tenant by this Lease. If at any time any windows of the Premises are temporarily darkened or

the light or view therefrom is obstructed by reason of any repairs, improvements, maintenance or cleaning in or about the Center, the same shall be without liability to Landlord and without any reduction or diminution of Tenant's obligations under this Lease.

29.3    **Modification of Lease**. Should any current or prospective mortgagee or ground lessor for the Building or Center require a modification of this Lease, which modification will not cause an increased cost or expense to Tenant or in any other way materially and adversely change the rights and obligations of Tenant hereunder, then and in such event, Tenant agrees that this Lease may be so modified and agrees to execute whatever documents are reasonably required therefor and to deliver the same to Landlord within ten (10) days following a request therefor.

29.4    **Transfer of Landlord's Interest**. Tenant acknowledges that Landlord has the right to transfer all or any portion of its interest in the Building and in this Lease, and Tenant agrees that in the event of any such transfer, Landlord shall automatically be released from all liability under this Lease first accruing after the date of such transfer and Tenant agrees to look solely to such transferee for the performance of Landlord's obligations hereunder after the date of transfer, and Tenant shall attorn to such transferee.

29.5    **Application of Payments**. Landlord shall have the right to apply payments received from Tenant pursuant to this Lease, regardless of Tenant's designation of such payments, to satisfy any obligations of Tenant hereunder, in such order and amounts as Landlord, in its sole discretion, may elect.

29.6    **Time of Essence**. Time is of the essence with respect to the performance of every provision of this Lease in which time of performance is a factor.

29.7    **Partial Invalidity**. If any term, provision or condition contained in this Lease shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term, provision or condition to persons or circumstances other than those with respect to which it is invalid or unenforceable, shall not be affected thereby, and each and every other term, provision and condition of this Lease shall be valid and enforceable to the fullest extent possible permitted by law.

29.8    **Landlord Exculpation**. The liability of Landlord or the Landlord Parties to Tenant for any default by Landlord under this Lease or arising in connection herewith or with Landlord's operation, management, leasing, repair, renovation, alteration or any other matter relating to the Center or the Premises shall be limited solely and exclusively to an amount which is equal to the lesser of (a) the interest of Landlord in the Building or (b) the equity interest Landlord would have in the Building if the Building were encumbered by third-party debt in an amount equal to eighty percent (80%) of the value of the Building (as such value is determined by Landlord), provided that in no event shall such liability extend to any sales or insurance proceeds received by Landlord or the Landlord Parties in connection with the Center, Building or Premises. Neither Landlord, nor any of the Landlord Parties shall have any personal liability therefor, and Tenant hereby expressly waives and releases such personal liability on behalf of itself and all persons claiming by, through or under Tenant. The limitations of liability contained in this Section 29.8 shall inure to the benefit of Landlord's and the Landlord Parties' present and future partners, beneficiaries, officers, directors, trustees, shareholders, agents and employees, and their respective partners, heirs, successors and assigns. Under no circumstances shall any present or future partner of Landlord (if Landlord is a partnership), or trustee or beneficiary (if Landlord or any partner of Landlord is a trust), have any liability for the performance of Landlord's obligations under this Lease. Notwithstanding any contrary provision herein, neither Landlord nor the Landlord Parties shall be liable under any circumstances for injury or damage to, or interference with, Tenant's business, including but not limited to, loss of profits, loss of rents or other revenues, loss of business opportunity, loss of goodwill or loss of use, in each case, however occurring.

29.9    **Entire Agreement**. It is understood and acknowledged that there are no oral agreements between the parties hereto affecting this Lease and this Lease constitutes the parties' entire agreement with respect to the leasing of the Premises and supersedes and cancels any and all previous negotiations, arrangements, brochures, agreements and understandings, if any, between the parties hereto or displayed by Landlord to Tenant with respect to the subject matter thereof, and none thereof shall be used to interpret or construe this Lease. None of the terms, covenants, conditions or provisions of this Lease can be modified, deleted or added to except in writing signed by the parties hereto. Any deletion of language from this Lease prior to its execution by Landlord and Tenant shall not be construed to raise any presumption, canon of construction or implication, including, without limitation, any implication that the parties intended thereby to state the converse of the deleted language. The parties hereto acknowledge and agree that each has participated in the negotiation and drafting of this Lease; therefore, in the event of an ambiguity in, or dispute regarding the interpretation of, this Lease, the interpretation of this Lease shall not be resolved by any rule of interpretation providing for interpretation against the party who caused the uncertainty to exist or against the draftsman. The words "hereof" and "herein" refer to this entire Lease and not merely the Section in which such words appear.

29.10    **Force Majeure**. Any prevention, delay or stoppage due to strikes, lockouts, labor disputes, acts of God, inability to obtain services, labor, or materials or reasonable substitutes therefor, governmental actions, civil commotions, fire or other casualty, and other causes beyond the reasonable control of the party obligated to perform, except with respect to the obligations imposed with regard to Rent and other charges to be paid by Tenant pursuant to this Lease (collectively, a "**Force Majeure**"), notwithstanding anything to the contrary contained in this Lease, shall excuse the performance of such party for a period equal to any such prevention, delay or stoppage and, therefore, if this Lease specifies a time period for performance of an obligation of either party, that time period shall be extended by the period of any delay in such party's performance caused by a Force Majeure.

29.11    **Waiver of Redemption by Tenant**. Tenant hereby waives, for Tenant and for all those claiming under Tenant, any and all rights now or hereafter existing to redeem by order or judgment of any court or by any legal process or writ, Tenant's right of occupancy of the Premises after any termination of this Lease.

29.12    **Notices**. All notices, demands, statements or communications (collectively, "**Notices**") given or required to be given by either party to the other hereunder shall be in writing, shall be (A) delivered by a nationally recognized overnight courier, or (B) delivered personally. Any such Notice shall be delivered (i) to Tenant at the appropriate address set forth in Section 10 of the Summary, or to such other place as Tenant may from time to time designate in a Notice to Landlord; or (ii) to Landlord at the addresses set forth in Section 11 of the Summary, or to such other firm or to such other place as Landlord may from time to time designate in a Notice to Tenant. Notices may be served by a party's counsel. Any Notice will be deemed given on the date of receipted delivery, of refusal to accept delivery, or when delivery is first attempted but cannot be made due to a change of address for which no Notice was given. If Tenant is notified of the identity and address of Landlord's mortgagee or ground or underlying lessor, Tenant shall give to such mortgagee or ground or underlying lessor written notice of any default by

Landlord under the terms of this Lease by registered or certified mail, and such mortgagee or ground or underlying lessor shall be given a reasonable opportunity to cure such default (but in no event less than thirty (30) days following such mortgagee or ground or underlying lessor's receipt of such notice) prior to Tenant's exercising any remedy available to Tenant. The party delivering Notice shall use commercially reasonable efforts to provide a courtesy copy of each such Notice to the receiving party via electronic mail.

29.13    **Authority**. If Tenant is a corporation, trust, partnership or limited liability company, each individual executing this Lease on behalf of Tenant hereby represents and warrants that Tenant is a duly formed and existing entity qualified to do business in California and that Tenant has full right and authority to execute and deliver this Lease and that each person signing on behalf of Tenant is authorized to do so. In such event, Tenant shall, within ten (10) days after written request therefor, deliver to Landlord satisfactory evidence of such authority, good standing in Tenant's state of formation and (ii) qualification to do business in California.

29.14    **Attorneys' Fees**. In the event that either Landlord or Tenant should bring suit for the possession of the Premises, for the recovery of any sum due under this Lease, or because of the breach of any provision of this Lease or for any other relief against the other, then all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party therein shall be paid by the other party, which obligation on the part of the other party shall be deemed to have accrued on the date of the commencement of such action and shall be enforceable whether or not the action is prosecuted to judgment.

29.15    **Governing Law; WAIVER OF TRIAL BY JURY**. This Lease shall be construed and enforced in accordance with the laws of the State of California, without regard to its choice of law principles. IN ANY ACTION OR PROCEEDING ARISING HEREFROM, LANDLORD AND TENANT HEREBY CONSENT TO (I) THE JURISDICTION OF ANY COMPETENT COURT WITHIN THE STATE OF CALIFORNIA, (II) SERVICE OF PROCESS BY ANY MEANS AUTHORIZED BY CALIFORNIA LAW, AND (III) IN THE INTEREST OF SAVING TIME AND EXPENSE, TRIAL WITHOUT A JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER OR THEIR SUCCESSORS IN RESPECT OF ANY MATTER ARISING OUT OF OR IN CONNECTION WITH THIS LEASE, THE RELATIONSHIP OF LANDLORD AND TENANT, TENANT'S USE OR OCCUPANCY OF THE PREMISES, AND/OR ANY CLAIM FOR INJURY OR DAMAGE, OR ANY EMERGENCY OR STATUTORY REMEDY. IN THE EVENT LANDLORD COMMENCES ANY SUMMARY PROCEEDINGS OR ACTION FOR NONPAYMENT OF BASE RENT OR ADDITIONAL RENT, TENANT SHALL NOT INTERPOSE ANY COUNTERCLAIM OF ANY NATURE OR DESCRIPTION (UNLESS SUCH COUNTERCLAIM SHALL BE MANDATORY) IN ANY SUCH PROCEEDING OR ACTION, BUT SHALL BE RELEGATED TO AN INDEPENDENT ACTION AT LAW.

29.16    **Brokers**. Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Lease, excepting only the real estate brokers or agents specified in Section 12 of the Summary (the "**Brokers**"), and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Lease. Landlord shall pay the Brokers pursuant to the terms of separate commission agreements. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent, other than the Brokers, occurring by, through, or under the indemnifying party.

29.17    **Counterparts**. This Lease may be executed in counterparts with the same effect as if both parties hereto had executed the same document. Both counterparts shall be construed together and shall constitute a single lease. The parties hereto consent and agree that this Lease may be signed and/or transmitted by facsimile, e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature. The parties further consent and agree that (1) to the extent a party signs this Lease using electronic signature technology, by clicking "SIGN", such party is signing this Lease electronically, and (2) the electronic signatures appearing on this Lease shall be treated, for purposes of validity, enforceability and admissibility, the same as handwritten signatures.

29.18    **Confidentiality**. Tenant acknowledges that the content of this Lease and any related documents are confidential information. Tenant shall keep such confidential information strictly confidential and shall not disclose such confidential information to any person or entity other than Tenant's financial, legal, and space planning consultants.

29.19    **Renovations**. Landlord may during the Lease Term construct, renovate, improve, alter, or modify (collectively, the "**Renovations**") the Center, the Building and/or the Premises, and in connection with any Renovations, Landlord may, among other things, erect scaffolding or other necessary structures in the Building, limit or eliminate access to portions of the Center, including portions of the Common Areas, or perform work in the Building and Common Areas, which work may create noise, dust or leave debris in the Building and Common Areas. Landlord shall use commercially reasonable efforts to complete any Renovations in a manner which does not materially, adversely affect Tenant's use of or access to the Premises. Notwithstanding the foregoing, Tenant hereby agrees that such Renovations and Landlord's actions in connection with such Renovations shall in no way constitute a constructive eviction of Tenant nor entitle Tenant to any abatement of Rent or damages from Landlord.

29.20    **Development of the Center**.

29.20.1    **Subdivision**. Landlord reserves the right to further subdivide all or a portion of the Center. Tenant agrees to execute and deliver, within fifteen (15) days following receipt thereof by Landlord and in the form requested by Landlord, any additional documents needed to conform this Lease to the circumstances resulting from such subdivision.

29.20.2    **The Other Improvements**. If portions of the Center or property adjacent to the Center (collectively, the "**Other Improvements**") are owned by an entity other than Landlord, Landlord, at its option, may enter into an agreement with the owner or owners of any or all of the Other Improvements to provide (i) for reciprocal rights of access and/or use of the Center and the Other Improvements, (ii) for the common management, operation, maintenance, improvement and/or repair of all or any portion of the Center and the Other Improvements, (iii) for the allocation of a portion of the Direct Expenses to the Other Improvements and the operating expenses and taxes for the Other Improvements to the Center, and (iv) for the use or improvement of the Other Improvements and/or the Center in connection with the improvement, construction, and/or

excavation of the Other Improvements and/or the Center. Nothing contained herein shall be deemed or construed to limit or otherwise affect Landlord's right to convey all or any portion of the Center or any other of Landlord's rights described in this Lease.

29.20.3   <u>Construction of Center and Other Improvements</u>. Tenant acknowledges that portions of the Center and/or the Other Improvements may be under construction following Tenant's occupancy of the Premises, and that such construction may result in levels of noise, dust, obstruction of access, etc. which are in excess of that present in a fully constructed project. Tenant hereby waives any and all rent offsets or claims of constructive eviction which may arise in connection with such construction.

29.21   <u>Hazardous Substances</u>. Tenant shall not cause or permit any hazardous materials or substances to be generated, produced, brought upon, used, stored, treated or disposed of in or about the Premises or the Center by Tenant, its agents, employees, contractors, affiliates, sublessees or invitees. However, notwithstanding the preceding sentence, Landlord agrees that Tenant may use, store and properly dispose of commonly available household cleaners and chemicals to maintain the Premises and Tenant's routine operations (such as printer toner and copier toner). At any time following Tenant's receipt of a request from Landlord, Tenant shall promptly complete an "environmental questionnaire" using the form then provided by Landlord.

29.22   <u>Joint and Several</u>. If there is more than one person or entity constituting Tenant: (i) the obligations imposed upon such persons or entities under this Lease shall be joint and several; and (ii) the act or signature of, or notice from or to, any one or more of them with respect to this Lease shall be binding upon each and all of such persons and entities with the same force and effect as if each and all of them had so acted or signed, or given or received such notice.

29.23   <u>No Discrimination</u>. Tenant covenants by and for itself, its heirs, executors, administrators and assigns, and all persons claiming under or through Tenant, and this Lease is made and accepted upon and subject to the following conditions: that there shall be no discrimination against or segregation of any person or group of persons, on account of race, color, creed, sex, religion, marital status, ancestry or national origin in the leasing, subleasing, transferring, use, or enjoyment of the Premises, nor shall Tenant itself, or any person claiming under or through Tenant, establish or permit such practice or practices of discrimination or segregation with reference to the selection, location, number, use or occupancy, of tenants, lessees, sublessees, subtenants or vendees in the Premises.

29.24   <u>Water Sensors</u>. Tenant shall be responsible for promptly installing web-enabled wireless water leak sensor devices designed to alert the Tenant on a twenty-four (24) hour seven (7) day per week basis if a water leak is occurring in the Premises (which water sensor device(s) located in the Premises shall be referred to herein as "**Water Sensors**"). The Water Sensors shall be installed in any areas in the Premises where water is utilized (such as sinks, pipes, faucets, restrooms, showers, water heaters, coffee machines, ice machines, water dispensers and water fountains), and in locations that may be designated from time to time by Landlord. With respect to the installation of any such Water Sensors, Tenant shall obtain Landlord's prior written consent to use an experienced and qualified contractor reasonably approved by Landlord, and comply with all of the other provisions of <u>Article 8</u> of this Lease. Tenant shall keep any Water Sensors located in the Premises in good working order, repair and condition at all times during the Lease Term. Landlord has neither an obligation to monitor, repair or otherwise maintain the Water Sensors, nor an obligation to respond to any alerts it may receive from the Water Sensors or which may be generated from the Water Sensors.

29.25   <u>Center Identification</u>. Tenant shall not use, publish or distribute any pictorial or other representation of the Center, or it name or logo by any means, without the prior written consent of Landlord. Tenant shall not, without the prior written consent of Landlord, use the words "Esplanade Center" (except that Tenant may use "Esplanade Center" in connection with identifying the address of the business conducted by Tenant in the Premises), nor shall Tenant do or permit the doing of anything in connection with Tenant's business or advertising that may confuse or mislead the public as to the relationship between Landlord and Tenant.

29.26   <u>Utility Billing Information</u>. In the event that the Tenant is permitted to contract directly for the provision of electricity, gas and/or water services to the Premises with the third-party provider thereof (all in Landlord's sole and absolute discretion), Tenant shall promptly, but in no event more than five (5) business days following its receipt of each and every invoice for such items from the applicable provider, provide Landlord with a copy of each such invoice. Tenant acknowledges that pursuant to California Public Resources Code Section 25402.10 and the regulations adopted pursuant thereto, Landlord may be required to disclose information concerning Tenant's energy usage at the Building to certain third parties, including, without limitation, prospective purchasers, lenders and tenants of the Building (the "**Tenant Energy Use Disclosure**"). Tenant hereby (A) consents to all such Tenant Energy Use Disclosures, and (B) acknowledges that Landlord shall not be required to notify Tenant of any Tenant Energy Use Disclosure. Further, Tenant hereby releases Landlord from any and all losses, costs, damages, expenses and liabilities relating to, arising out of and/or resulting from any Tenant Energy Use Disclosure. The terms of this <u>Section 29.26</u> shall survive the expiration or earlier termination of this Lease.

29.27   <u>Guaranty</u>. This Lease is subject to and conditioned upon Tenant delivering to Landlord, concurrently with Tenant's execution and delivery of this Lease, a guaranty (a "**Guaranty**") in the form attached hereto as <u>Exhibit F</u>, which guaranty shall be fully executed by and binding upon the Guarantor identified in <u>Section 16</u> of the Summary (the "**Guarantor**"). Tenant hereby expressly waives any and all of the benefits under the second sentence of California Civil Code Section 2822(a) with respect to the Guaranty, and agrees that Landlord (not Tenant) may designate the portion of Tenant's Lease obligations that are satisfied by a partial payment by Tenant.

29.28   <u>Prohibited Persons; Foreign Corrupt Practices Act and Anti-Money Laundering</u>. Neither Tenant nor any of its affiliates, nor any of their respective members, partners or other equity holders, and none of their respective officers, directors or managers is, nor prior to or during the Lease Term, will they become a person or entity with whom U.S. persons or entities are restricted from doing business under (a) the Patriot Act (as defined below), (b) any other requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("OFAC") (including any "blocked" person or entity listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and any modifications thereto or thereof or any other person or entity named on OFAC's Specially Designated Blocked Persons List) or (c) any other U.S.

statute, Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or other governmental action (collectively, "**Prohibited Persons**"). Prior to and during the Lease Term, Tenant, and to Tenant's knowledge, its employees and any person acting on its behalf have at all times fully complied with, and are currently in full compliance with, the Foreign Corrupt Practices Act of 1977 and any other applicable anti-bribery or anti-corruption laws. Tenant is not entering into this Lease, directly or indirectly, in violation of any laws relating to drug trafficking, money laundering or predicate crimes to money laundering. As used herein, "**Patriot Act**" shall mean the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and all other statutes, orders, rules and regulations of the U.S. government and its various executive departments, agencies and offices interpreting and implementing the Patriot Act.

29.29    Good Faith. Except (i) for matters for which there is a standard of consent or discretion specifically set forth in this Lease, (ii) matters which could have an adverse effect on the Building's HVAC system, plumbing system, electrical system, or life safety systems, or which could affect the exterior appearance of the Building, or (iii) matters covered by Article 4 (Additional Rent), Article 10 (Insurance), or Article 19 (Defaults; Remedies) of this Lease (collectively, the "**Excepted Matters**"), any time the consent of Landlord or Tenant is required under this Lease, such consent shall not be unreasonably withheld or delayed, and, except with regard to the Excepted Matters, whenever this Lease grants Landlord or Tenant the right to take action, exercise discretion, establish rules and regulations or make an allocation or other determination, Landlord and Tenant shall act reasonably and in good faith.

IN WITNESS WHEREOF, Landlord and Tenant have caused this Lease to be executed as of the Effective Date.

| "LANDLORD": | "TENANT": |
|---|---|
| G&I IX ESPLANADE PROPERTY LP, <br> a Delaware limited partnership | SEN FITNESS GROUP, INC., <br> a California corporation |
| By:  G&I IX Esplanade Property LP, its general partner | By: _Alina Vh_____ |
| By:  G&I IX Esplanade LLC, a Delaware limited <br> liability company | Name: _Slava Vilshkin_ |
| By:  G&I IX Esplanade Series LLC, a Delaware <br> limited liability company, its managing <br> member | Its: _Owner/President_ |
| By: _____ <br> Name: Andrew Peltz <br> Its: Vice President | |

## EXHIBIT A

### DEPICTION OF RETAIL CENTER





The purpose of this Exhibit is to show the approximate configuration and location of the Retail Center within the Center. It shall not be deemed to be a warranty, representation or agreement on the part of Landlord that the Retail Center or Center will be, or will remain, as depicted hereon, or that the tenants shown hereon (if any) are now, or will be, in occupancy at any time during the Lease Term.

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT A
-1-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

EXHIBIT A-1

DEPICTION OF BUILDING



ESPLANADE PLAZA - TENANT M11          REV. 02.08.2019
OXNARD, CA.                Exhibit A-1

The purpose of this Exhibit is to show the approximate configuration and location of the Building within the Retail Center. It shall not be deemed to be a warranty, representation or agreement on the part of Landlord that the Building will be, or will remain, as depicted hereon, or that the tenants shown hereon (if any) are now, or will be, in occupancy at any time during the Lease Term.

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT A-1
-1-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**EXHIBIT B**
**WORK LETTER**

This Work Letter shall set forth the terms and conditions relating to the construction of the Premises. This Work Letter is essentially organized chronologically and addresses the issues of the construction of the Premises, in sequence, as such issues will arise during the actual construction of the Premises. All references in this Work Letter to Articles or Sections of "this Lease" shall mean the relevant portions of Articles 1 through 29 of the Retail Lease to which this Work Letter is attached as **Exhibit B**, and all references in this Work Letter to Sections of "this Work Letter" shall mean the relevant portions of Sections 1 through 5 of this Work Letter.

SECTION 1

DELIVERY OF THE PREMISES

Landlord shall deliver the Premises to Tenant (such delivery date is referred to herein as the "**Delivery Date**") by the earlier of (i) the date that is thirty (30) following the expiration of the Contingency Period, or (ii) the date that is thirty (30) following Tenant's delivery of the Permitting Condition Notice, with the "Demolition Work," as that term is defined in Schedule 1 to this Work Letter, substantially completed, and Tenant shall accept the Premises from Landlord in its "as-is" condition. Such condition of the Premises with the Demolition Work substantially completed shall be referred to as the "**Turnover Condition**". Notwithstanding the foregoing, Landlord shall, at Landlord's sole cost and expense, concurrently with the construction of the "Improvements," as that term is defined in Section 2.1, below, cause the construction of the "Landlord Work," as that term is defined in Schedule 1 to this Work Letter, in accordance with "Landlord Cold Shell Construction Specifications" prior to the date that is one hundred and fifty (150) days following the Delivery Date. As used in this Section 1, "**substantially completed**" shall mean that Landlord's Work is completed to such an extent that Tenant is able to perform the construction of the "Improvements," as that term is defined in Section 2.1 below, without material disruption, subject to any punch list items which shall be completed by Landlord within thirty (30) days following such date. Except as otherwise expressly set forth in Schedule 1 to this Work Letter, Landlord shall have no obligation to modify or improve any component of the Premises, the Building or the Center in connection with the Improvements, whether due to a "Code," as that term is defined in Section 2.2.1.5 below, requirement or otherwise. As used in this Section 1, the "**Landlord Cold Shell Construction Specifications**" shall mean the condition described in Schedule 1 to this Work Letter. During any "overlap" period(s) when both parties and/or their respective employees, vendors, contractors or consultants are concurrently performing work in, or accessing, any portion of the Premises, neither party shall unreasonably interfere with or delay the work of the other party and/or its contractors or consultants, and both parties shall mutually coordinate and cooperate with each other, and shall cause their respective employees, vendors, contractors, and consultants to work in harmony with and to mutually coordinate and cooperate with the other's employees, vendors, contractors, and consultants, respectively, to minimize any interference or delay by either party with respect to the other party's work.

SECTION 2

IMPROVEMENTS

2.1    Improvement Allowance. Tenant shall be entitled to a one-time improvement allowance (the "**Improvement Allowance**") in the amount of $20.00 per square foot of gross leasable area of the Premises for the costs relating to the initial design and construction of Tenant's improvements, which are permanently affixed to the Premises (the "**Improvements**"). In no event shall Landlord be obligated to make disbursements pursuant to this Work Letter in a total amount which exceeds the Improvement Allowance. Any unused portion of the Improvement Allowance remaining as of the date that is six (6) months following the Lease Commencement Date shall revert to Landlord and Tenant shall have no further right thereto.

2.2    Disbursement of the Improvement Allowance.

2.2.1    Improvement Allowance Items. Except as otherwise set forth in this Work Letter, the Improvement Allowance shall be disbursed by Landlord only for the following items and costs (collectively the "**Improvement Allowance Items**"):

2.2.1.1    Payment of the fees of the "Architect" and the "Engineers," as those terms are defined in Section 3.1 of this Work Letter;

2.2.1.2    The payment of plan check, permit and license fees relating to construction of the Improvements;

2.2.1.3    The cost of construction of the Improvements, including, without limitation, testing and inspection costs, freight elevator usage, hoisting and trash removal costs, and contractors' fees and general conditions;

2.2.1.4    The cost of any changes in the Base Building when such changes are required by the Construction Drawings (including if such changes are due to the fact that such work is prepared on an unoccupied basis), such cost to include all direct architectural and/or engineering fees and expenses incurred in connection therewith;

2.2.1.5    The cost of any changes to the Construction Drawings or Improvements required by all applicable building codes (the "**Code**");

2.2.1.6    Sales and use taxes; and

2.2.1.7    Any and all other costs to be expended by Landlord in connection with the construction of the Improvements.

2.2.2    Disbursement of Improvement Allowance. During the construction of the Improvements, Landlord shall make three (3) disbursements of the Improvement Allowance for Improvement Allowance Items for the benefit of Tenant and shall authorize the release of monies for the benefit of Tenant as follows:

2.2.2.1    Monthly Disbursements. Subject to the terms of this Section 2.2.2.1 below, Tenant shall be entitled to three equal disbursements from the Improvement Allowance, each in an amount equal to one-third (1/3rd) of the

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT B
-1-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

Improvement Allowance. The first disbursement shall be made within fifteen (15) business days following Tenant's receipts of the Permits, and the second and third following Tenant's Disbursement Request (defined below), subject to Final Retention (defined below). Tenant shall deliver to Landlord a disbursement request ("**Disbursement Request**") upon (i) two-thirds (2/3rds) completion of the Improvements, and (ii) substantial completion of the Improvements, which each Disbursement Request shall include the following: (i) a request for payment of the "Contractor," as that term is defined in Section 4.1.1 of this Work Letter, approved by Tenant, in a form to be provided by Landlord, showing the schedule, by trade, of percentage of completion of the Improvements in the Premises, detailing the portion of the work completed and the portion not completed; (ii) invoices from all of "Tenant's Agents," as that term is defined in Section 4.1.2 of this Work Letter, for labor rendered and materials delivered to the Premises; (iii) executed conditional and unconditional mechanic's lien releases from all of Tenant's Agents which shall comply with the appropriate provisions, as reasonably determined by Landlord, of the California Civil Code; and (iv) all other information reasonably requested by Landlord. Tenant's request for payment shall be deemed Tenant's acceptance and approval of the work furnished and/or the materials supplied as set forth in Tenant's payment request. Thereafter, Landlord shall deliver a check to Tenant made jointly payable to Contractor and Tenant, or directly to Contractor at Landlord's sole discretion, within fifteen (15) business days in payment of the lesser of: (A) the amounts so requested by Tenant, as set forth in this Section 2.2.2.1, above, less a ten percent (10%) retention (the aggregate amount of such retentions to be known as the "**Final Retention**"), and (B) the balance of any remaining available portion of the Improvement Allowance (not including the Final Retention), provided that Landlord does not dispute any request for payment based on non-compliance of any work with the "Approved Working Drawings," as that term is defined in Section 3.4 below, or due to any substandard work, or for any other reason. Landlord's payment of such amounts shall not be deemed Landlord's approval or acceptance of the work furnished or materials supplied as set forth in Tenant's payment request.

2.2.2.2    Final Retention. Subject to the provisions of this Work Letter, a check for the portion of the Improvement Allowance that has not been disbursed pursuant to Section 2.2.2.1 above (the "**Final Disbursement Amount**") payable to Tenant shall be delivered by Landlord to Tenant, within fifteen (15) business days following Landlord's receipt of Tenant's complete final disbursement request (the "**Final Disbursement Request**"), which Final Disbursement Request shall be delivered to Landlord following the completion of construction of the Premises, provided that (i) Tenant delivers to Landlord properly executed mechanic's lien releases in compliance with both California Civil Code Section 8134 and either Section 8136 or Section 8138, (ii) Landlord has reasonably determined that no substandard work exists which adversely affects the mechanical, electrical, plumbing, heating, ventilating and air conditioning, life-safety or other systems of the Building, the curtain wall of the Building, the structure or exterior appearance of the Building, or any other tenant's use of such other tenant's leased premises in the Building, (iii) Architect delivers to Landlord a certificate, in a form reasonably acceptable to Landlord, certifying that the construction of the Improvements in the Premises has been substantially completed in accordance with the Construction Drawings, (iv) Tenant delivers to Landlord a "close-out package" in both paper and electronic forms (including, as-built drawings, and final record CADD files for the associated plans, warranties and guarantees from all contractors, subcontractors and material suppliers, and an independent air balance report), (v) Tenant delivers to Landlord a certificate of occupancy for the Premises and (vi) Tenant has opened for business in the Premises. In no event shall the final disbursement from the Improvement Allowance exceed the Final Disbursement Amount.

2.2.2.3    Other Terms. Landlord shall only be obligated to make disbursements from the Improvement Allowance to the extent costs are incurred by Tenant for Improvement Allowance Items. All Improvement Allowance Items for which the Improvement Allowance has been made available shall be deemed Landlord's property under the terms of this Lease.

2.3    Building Standards. Landlord has established or may establish specifications for certain Building standard components to be used in the construction of the Improvements in the Premises (the "**Standards**"). The quality of Improvements shall be equal to or of greater quality than the quality of the Standards, provided that Landlord may, at Landlord's option, require the Improvements to comply with certain Standards. Landlord may make changes to said specifications for the Standards from time to time. Removal requirements regarding the Improvements are addressed in Article 8 of this Lease.

SECTION 3

CONSTRUCTION DRAWINGS

3.1    Selection of Architect/Construction Drawings. Tenant shall retain an architect/space planner reasonably approved by Landlord (the "**Architect**") to prepare the "Construction Drawings," as that term is defined in this Section 3.1. Tenant shall retain the engineering consultants reasonably approved by Landlord (the "**Engineers**") to prepare all plans and engineering working drawings relating to the structural, mechanical, electrical, plumbing, HVAC, lifesafety, and sprinkler work in the Premises, which work is not part of the Base Building. The plans and drawings to be prepared by Architect and the Engineers hereunder shall be known collectively as the "**Construction Drawings**." All Construction Drawings shall comply with the drawing format and specifications determined by Landlord, and shall be subject to Landlord's approval, which shall not be unreasonably withheld, conditioned or delayed. Tenant and Architect shall verify, in the field, the dimensions and conditions as shown on the relevant portions of the Base Building plans, and Tenant and Architect shall be solely responsible for the same, and Landlord shall have no responsibility in connection therewith. Landlord's review of the Construction Drawings as set forth in this Section 3, shall be for its sole purpose and shall not imply Landlord's review of the same, or obligate Landlord to review the same, for quality, design, Code compliance or other like matters. Accordingly, notwithstanding that any Construction Drawings are reviewed by Landlord or its space planner, architect, engineers and consultants, and notwithstanding any advice or assistance which may be rendered to Tenant by Landlord or Landlord's space planner, architect, engineers, and consultants, Landlord shall have no liability whatsoever in connection therewith and shall not be responsible for any omissions or errors contained in the Construction Drawings, and Tenant's waiver and indemnity set forth in this Lease shall specifically apply to the Construction Drawings.

3.2    Final Space Plan. Tenant shall use commercially reasonable efforts to deliver to Landlord within fifteen (15) (but in no event more than thirty (30) days) days following the date of this Lease, four (4) copies signed by Tenant of its final space plan (along with other renderings or illustrations reasonably required by Landlord to allow Landlord to understand Tenant's design intent) for the Premises before any architectural working drawings or engineering drawings have been commenced. The final space plan (the "**Final Space Plan**") shall include a layout and designation of all offices, rooms and other partitioning, their intended use, and equipment to be contained therein. Landlord may request clarification or more specific drawings for special

EXHIBIT B
-2-

use items not included in the Final Space Plan. Landlord shall advise Tenant within ten (10) business days after Landlord's receipt of the Final Space Plan for the Premises if the same is unsatisfactory or incomplete in any respect. If Tenant is so advised, Tenant shall promptly cause the Final Space Plan to be revised to correct any deficiencies or other matters Landlord may reasonably require.

3.3    Final Working Drawings. After the Final Space Plan has been approved by Landlord, Tenant shall supply the Engineers with a complete listing of standard and non-standard equipment and specifications, including, without limitation, B.T.U. calculations, electrical requirements and special electrical receptacle requirements for the Premises, to enable the Engineers and the Architect to complete the "Final Working Drawings" (as that term is defined below) in the manner as set forth below. Upon the approval of the Final Space Plan by Landlord and Tenant, Tenant shall promptly cause the Architect and the Engineers to complete the architectural and engineering drawings for the Premises (which shall include all necessary compliance requirements with applicable governmental authorities), and Architect shall compile a fully coordinated set of architectural, structural, mechanical, electrical and plumbing working drawings in a form which is complete to allow subcontractors to bid on the work and to obtain all applicable permits (collectively, the "**Final Working Drawings**") and shall submit the same to Landlord for Landlord's approval within forty-five (45) days following Landlord's approval of the Final Space Plan. Tenant shall supply Landlord with four (4) copies signed by Tenant of such Final Working Drawings and concurrently with Tenant's delivery of such hard copies, Tenant shall send to Landlord via electronic mail one (1) .pdf electronic copy of such Final Working Drawings. Landlord shall advise Tenant within ten (10) business days after Landlord's receipt of the Final Working Drawings for the Premises if the same is unsatisfactory or incomplete in any respect. If Tenant is so advised, Tenant shall promptly revise the Final Working Drawings in accordance with such review and any disapproval of Landlord in connection therewith. In addition, if the Final Working Drawings or any amendment thereof or supplement thereto shall require alterations in the Base Building (as contrasted with the Improvements), and if Landlord in its sole and exclusive discretion agrees to any such alterations, and notifies Tenant of the need and cost for such alterations, then Tenant shall pay the cost of such required changes in advance upon receipt of notice thereof. Tenant shall pay all direct architectural and/or engineering fees in connection therewith, plus ten percent (10%) of such direct costs for Landlord's servicing and overhead.

3.4    Approved Working Drawings. Tenant shall deliver the Final Working Drawings for Landlord's approval no later than seventy-five (75) days following mutual execution and delivery of this Lease, which Final Working Drawings shall be approved by Landlord (the "**Approved Working Drawings**") prior to the commencement of construction of the Premises by Tenant. After approval by Landlord of the Final Working Drawings, Tenant shall, within five (5) business days, submit the same to the appropriate municipal authorities for all applicable building permits (the "**Permits**"). Tenant hereby agrees to respond to the applicable municipal authorities (and to keep Landlord informed of any such communications) with respect to any comments or revisions requested to the Approved Working Drawings within thirty (30) days following such notice. Tenant hereby agrees that neither Landlord nor Landlord's consultants shall be responsible for obtaining any building permit or certificate of occupancy for the Premises and that obtaining the same shall be Tenant's responsibility; provided, however, that Landlord shall cooperate with Tenant in executing permit applications and performing other ministerial acts reasonably necessary to enable Tenant to obtain any such permit or certificate of occupancy. No changes, modifications or alterations in the Approved Working Drawings may be made without the prior written consent of Landlord, which consent may not be unreasonably withheld.

3.5    Electronic Approvals. Notwithstanding any provision to the contrary contained in this Lease or this Work Letter, Landlord may, in Landlord's sole and absolute discretion, transmit or otherwise deliver any of the approvals required under this Work Letter via electronic mail to Tenant's representative identified in Section 5.1 of this Work Letter, or by any of the other means identified in Section 29.12 of this Lease.

SECTION 4

CONSTRUCTION OF THE IMPROVEMENTS

4.1    Tenant's Selection of Contractors.

4.1.1    The Contractor. A general contractor approved in writing by Landlord shall be retained by Tenant to construct the Improvements ("**Contractor**").

4.1.2    Tenant's Agents. All subcontractors, laborers, materialmen, and suppliers used by Tenant (such subcontractors, laborers, materialmen, and suppliers, and the Contractor to be known collectively as "**Tenant's Agents**") must be approved in writing by Landlord, which approval shall not be unreasonably withheld or delayed. If Landlord does not approve any of Tenant's proposed subcontractors, laborers, materialmen or suppliers, Tenant shall submit other proposed subcontractors, laborers, materialmen or suppliers for Landlord's written approval.

4.2    Construction of Improvements by Tenant's Agents.

4.2.1    Construction Contract; Cost Budget. Tenant shall engage the Contractor under an AIA form contract (collectively, the "**Contract**"). Prior to the commencement of the construction of the Improvements, and after Tenant has accepted all bids for the Improvements, Tenant shall provide Landlord with a detailed breakdown, by trade, of the final costs to be incurred or which have been incurred, as set forth more particularly in Sections 2.2.1.1 through 2.2.1.8, above, in connection with the design and construction of the Improvements to be performed by or at the direction of Tenant or the Contractor, which costs form a basis for the amount of the Contract (the "**Final Costs**"). Prior to the commencement of construction of the Improvements, Tenant shall supply Landlord with evidence, reasonably acceptable to Landlord, that Tenant has readily available funds sufficient to pay the Final Costs on a timely basis.

4.2.2    Tenant's Agents.

4.2.2.1    Landlord's General Conditions for Tenant's Agents and Improvement Work. Tenant's and Tenant's Agent's construction of the Improvements shall comply with the following: (i) the Improvements shall be constructed in strict accordance with the Approved Working Drawings; (ii) Tenant's Agents shall submit schedules of all work relating to the Improvements to Contractor and Contractor shall, within five (5) business days of receipt thereof, inform Tenant's Agents of any changes which are necessary thereto, and Tenant's Agents shall adhere to such corrected schedule; and (iii) Tenant shall abide by all rules made by Landlord's Building manager with respect to the use of freight, loading dock and service elevators, storage

of materials, coordination of work with the contractors of other tenants, and any other matter in connection with this Work Letter, including, without limitation, the construction of the Improvements.

4.2.2.2    Indemnity. Tenant's indemnity of Landlord as set forth in this Lease shall also apply with respect to any and all costs, losses, damages, injuries and liabilities related in any way to any act or omission of Tenant or Tenant's Agents, or anyone directly or indirectly employed by any of them, or in connection with Tenant's non-payment of any amount arising out of the Improvements and/or Tenant's disapproval of all or any portion of any request for payment. Such indemnity by Tenant, as set forth in this Lease, shall also apply with respect to any and all costs, losses, damages, injuries and liabilities related in any way to Landlord's performance of any ministerial acts reasonably necessary (i) to permit Tenant to complete the Improvements, and (ii) to enable Tenant to obtain any building permit or certificate of occupancy for the Premises.

4.2.2.3    Requirements of Tenant's Agents. Each of Tenant's Agents shall guarantee to Tenant and for the benefit of Landlord that the portion of the Improvements for which it is responsible shall be free from any defects in workmanship and materials for a period of not less than one (1) year from the date of completion thereof. Each of Tenant's Agents shall be responsible for the replacement or repair, without additional charge, of all work done or furnished in accordance with its contract that shall become defective within one (1) year after the later to occur of (i) completion of the work performed by such contractor or subcontractors and (ii) the Lease Commencement Date. The correction of such work shall include, without additional charge, all additional expenses and damages incurred in connection with such removal or replacement of all or any part of the Improvements, and/or the Building and/or Common Areas that may be damaged or disturbed thereby. All such warranties or guarantees as to materials or workmanship of or with respect to the Improvements shall be contained in the Contract or subcontract and shall be written such that such guarantees or warranties shall inure to the benefit of both Landlord and Tenant, as their respective interests may appear, and can be directly enforced by either. Tenant covenants to give to Landlord any assignment or other assurances which may be necessary to effect such right of direct enforcement.

4.2.2.4    Insurance Requirements.

4.2.2.4.1 General Coverages. All of Tenant's Agents shall carry worker's compensation insurance covering all of their respective employees, and shall also carry public liability insurance, including property damage, all with limits, in form and with companies as are required to be carried by Tenant as set forth in this Lease.

4.2.2.4.2 Special Coverages. Tenant shall carry "Builder's All Risk" insurance in an amount approved by Landlord covering the construction of the Improvements, it being understood and agreed that the Improvements shall be insured by Tenant pursuant to this Lease immediately upon completion thereof. Such insurance shall be in amounts and shall include such extended coverage endorsements as may be reasonably required by Landlord including, but not limited to, the requirement that all of Tenant's Agents shall carry excess liability and Products and Completed Operation Coverage insurance, each in amounts not less than $5,000,000 per incident, $5,000,000 in aggregate, and in form and with companies as are required to be carried by Tenant as set forth in this Lease.

4.2.2.4.3 General Terms. Certificates for all insurance carried pursuant to this Section 4.2.2.4 shall be delivered to Landlord before the commencement of construction of the Improvements and before the Contractor's equipment is moved onto the site. All such policies of insurance must contain a provision that the company writing said policy will give Landlord thirty (30) days prior written notice of any cancellation or lapse of the effective date or any reduction in the amounts of such insurance. In the event that the Improvements are damaged by any cause during the course of the construction thereof, Tenant shall immediately repair the same at Tenant's sole cost and expense. Tenant's Agents shall maintain all of the foregoing insurance coverage in force until the Improvements are fully completed and accepted by Landlord, except for any Products and Completed Operation Coverage insurance required by Landlord, which is to be maintained for ten (10) years following completion of the work and acceptance by Landlord and Tenant. All policies carried under this Section 4.2.2.4 shall insure Landlord and Tenant, as their interests may appear or as additional insureds, as applicable, as well as Contractor and Tenant's Agents. All insurance maintained by Tenant's Agents shall preclude subrogation claims by the insurer against Landlord or anyone insured thereunder. Such insurance shall provide that it is primary insurance as respects the owner and that any other insurance maintained by owner is excess and noncontributing with the insurance required hereunder. The requirements for the foregoing insurance shall not derogate from the provisions for indemnification of Landlord by Tenant under Section 4.2.2.2 of this Work Letter.

4.2.3    Governmental Compliance. The Improvements shall comply in all respects with the following: (i) the Code and other state, federal, city or quasi-governmental laws, codes, ordinances and regulations, as each may apply according to the rulings of the controlling public official, agent or other person; (ii) applicable standards of the American Insurance Association (formerly, the National Board of Fire Underwriters) and the National Electrical Code; and (iii) building material manufacturer's specifications.

4.2.4    Inspection by Landlord. Landlord shall have the right to inspect the Improvements at all reasonable times, provided however, that Landlord's failure to inspect the Improvements shall in no event constitute a waiver of any of Landlord's rights hereunder nor shall Landlord's inspection of the Improvements constitute Landlord's approval of the same. Should Landlord disapprove any portion of the Improvements, Landlord shall notify Tenant in writing of such disapproval and shall specify the items disapproved. Any defects or deviations in, and/or disapproval by Landlord of, the Improvements shall be rectified by Tenant at no expense to Landlord, provided however, that in the event Landlord determines that a defect or deviation exists or disapproves of any matter in connection with any portion of the Improvements and such defect, deviation or matter might adversely affect the mechanical, electrical, plumbing, heating, ventilating and air conditioning or life-safety systems of the Building, the structure or exterior appearance of the Building or any other tenant's use of such other tenant's leased premises, Landlord may, on prior notice to Tenant, take such action as Landlord deems necessary, at Tenant's expense and without incurring any liability on Landlord's part, to correct any such defect, deviation and/or matter, including, without limitation, causing the cessation of performance of the construction of the Improvements until such time as the defect, deviation and/or matter is corrected to Landlord's satisfaction.

4.2.5    Meetings. Commencing upon the execution of this Lease, Tenant shall hold not less than one (1) meeting per month prior to the issuance of Permits, and weekly meetings, thereafter, at a reasonable time, with the Architect and the Contractor regarding the progress of the preparation of Construction Drawings and the construction of the Improvements, which meetings shall be held at a location mutually agreed to by the parties or via telephone, and Landlord and/or its agents shall receive prior notice of, and shall have the right to attend, all such meetings (at its sole cost and expense), and, upon Landlord's

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT B
-4-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

request, certain of Tenant's Agents shall attend such meetings. In addition, notes shall be taken at all such meetings, a copy of which shall be promptly delivered to Landlord. One such meeting each month shall include the review of Contractor's current request for payment.

        4.3    Notice of Completion; Copy of Record Set of Plans. Tenant shall cause the completion of the Improvements within one hundred twenty (120) days following obtaining the Permits. Within ten (10) days after completion of construction of the Improvements, Tenant shall cause a Notice of Completion to be recorded in the office of the Recorder of the county in which the Building is located in accordance with Section 8182 of the Civil Code of the State of California or any successor statute, and shall furnish a copy thereof to Landlord upon such recordation. If Tenant fails to do so, Landlord may execute and file the same on behalf of Tenant as Tenant's agent for such purpose, at Tenant's sole cost and expense. At the conclusion of construction, (i) Tenant shall cause the Architect and Contractor (A) to update the Approved Working Drawings as necessary to reflect all changes made to the Approved Working Drawings during the course of construction, (B) to certify to the best of their knowledge that the "record-set" of as-built drawings are true and correct, which certification shall survive the expiration or termination of this Lease, and (C) to deliver to Landlord two (2) sets of copies of such record set of drawings within ninety (90) days following issuance of a certificate of occupancy for the Premises, and (ii) Tenant shall deliver to Landlord a copy of all warranties, guaranties, and operating manuals and information relating to the improvements, equipment, and systems in the Premises.

SECTION 5

MISCELLANEOUS

        5.1    Tenant's Representative. Tenant has designated Slava Vilshtein as its sole representative with respect to the matters set forth in this Work Letter (whose e-mail address for the purposes of this Work Letter is slava.vilshtein@ufcgym.com and phone number is (818) 398-5050), who shall have full authority and responsibility to act on behalf of the Tenant as required in this Work Letter.

        5.2    Landlord's Representative. Landlord has designated Bill Brace as its sole representative with respect to the matters set forth in this Work Letter (whose e-mail address for the purposes of this Work Letter is Billy@investecre.com and phone number is (805) 962-8989, Ext. 320), who, until further notice to Tenant, shall have full authority and responsibility to act on behalf of the Landlord as required in this Work Letter.

        5.3    Time of the Essence in This Work Letter. Unless otherwise indicated, all references herein to a "number of days" shall mean and refer to calendar days. If any item requiring approval is timely disapproved by Landlord, the procedure for preparation of the document and approval thereof shall be repeated until the document is approved by Landlord.

        5.4    Tenant's Lease Default. Notwithstanding any provision to the contrary contained in the Lease or this Work Letter, if any default by Tenant under the Lease beyond any applicable notice and cure period or this Work Letter occurs at any time on or before the substantial completion of the Improvements, then (i) in addition to all other rights and remedies granted to Landlord pursuant to the Lease, Landlord shall have the right to withhold payment of all or any portion of the Improvement Allowance and/or Landlord may, without any liability whatsoever, cause the cessation of construction of the Improvements (in which case, Tenant shall be responsible for any delay in the substantial completion of the Improvements and any costs occasioned thereby), and (ii) all other obligations of Landlord under the terms of the Lease and this Work Letter shall be forgiven until such time as such default is cured pursuant to the terms of the Lease.

EXHIBIT B
-5-

## SCHEDULE 1 TO EXHIBIT B

### LANDLORD'S COLD SHELL CONSTRUCTION SPECIFICATIONS

Landlord shall, at Landlord's sole cost and expense, cause the purchase, construction and/or installation of the following items with respect to the Premises (collectively, the "**Demolition Work**") by the Delivery Date, provided that Landlord shall not commence the Demolition Work prior to review and approval of Tenant's Final Space Plan:

1.      Landlord shall demolish the current improvements in the Premises, provided, however, that Landlord shall not demolish the restrooms, group X studio, and sauna currently in the Premise.

2.      Building systems shall be stubbed to the Premises with capacities suitable for Tenant to extend and distribute within the Premises.

Landlord shall, at Landlord's sole cost and expense, cause the purchase, construction and/or installation of the following items with respect to the Premises (collectively, the "**Landlord's Work**") by the Lease Commencement Date:

1.      Landlord shall replace the currently existing units in the Premises and provide 97 tons HVAC unit(s) with drops.  The replacement HVAC units shall be located in the same location, with the same tonnage as the currently existing units in the Premises.  Distribution within Tenant's space by Tenant.  Any roof penetrations required by the Tenant for the Tenant's use shall be performed by the Landlord's contractor at the Tenant's expense.  Landlord's contractor shall provide competitive pricing against other non-required HVAC contractors.

2.      Landlord will pour slab-on-grade concrete to fill the pool currently existing in the Premises as required by code.  Tenant may install a turf surface over the pool currently existing in the Premises, provided that in the event Tenant installs a turf surface, Tenant shall accommodate the existing drainage structure in the concrete.

3.      Landlord shall paint the exterior walls of the Premises in the Building standard color.

4.      Landlord shall deliver the exterior and entrance to the Premises in compliance with all ADA requirements.

Tenant hereby acknowledges and agrees that all items of work not expressly described hereinabove as included within Demolition Work and Landlord's Work shall be furnished and installed by Tenant at Tenant's sole cost and expense. Tenant must first obtain Landlord's written approval (not to be unreasonably withheld, conditioned or delayed) of Tenant's drawings and specifications for any such initial work in the Premises, and all drawings and specifications shall be prepared by a registered architect and/or professional engineer licensed to practice in California prior to submittal to the City of Oxnard, as further set forth in this Work Letter.

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**EXHIBIT C**

**OPERATING EXPENSE DEFINITIONS AND CALCULATION PROCEDURES**

1.1    <u>Definitions of Key Terms Relating to Additional Rent</u>. As used in this <u>Exhibit C</u>, the following terms shall have the meanings hereinafter set forth:

1.1.1    "**Direct Expenses**" shall mean (i) "Operating Expenses," "Tax Expenses" and "Utilities Costs" attributable to the Retail Center and the Retail Center Common Areas and (ii) those portions of the "Operating Expenses," "Tax Expenses" and "Utilities Costs" attributable to the Center Common Areas that are allocated to the Retail Center pursuant to the Center Declaration.

1.1.2    "**Expense Year**" shall mean each calendar year in which any portion of the Lease Term falls, through and including the calendar year in which the Lease Term expires, provided that Landlord, upon notice to Tenant, may change the Expense Year from time to time to any other twelve (12) consecutive month period, and, in the event of any such change, Tenant's Share of Direct Expenses shall be equitably adjusted for any Expense Year involved in any such change.

1.1.3    "**Operating Expenses**" shall mean all expenses, costs and amounts of every kind and nature which Landlord pays or accrues during any Expense Year (whether directly, or indirectly as assessments under the Center Declaration) because of or in connection with the ownership, management, maintenance, security, repair, replacement, renovation, restoration or operation of the Retail Center, the Retail Center Common Areas and the Center Common Areas (collectively, the "**Shared Expenses Areas**"), or any portion thereof, in accordance with sound real estate management and accounting practices, consistently applied. Without limiting the generality of the foregoing, Operating Expenses shall specifically include any and all of the following: (i) the cost of operating, repairing, replacing, maintaining, renovating and restoring the utility, telephone, mechanical, sanitary, grease traps, storm drainage, and escalator and elevator systems, and the cost of maintenance and service contracts in connection therewith; (ii) the cost of licenses, certificates, permits and inspections and the cost of contesting any governmental enactments which may affect Operating Expenses, and the costs incurred in connection with a governmentally mandated transportation system management program or similar program, or any valet and/or employee transportation to offsite parking provided by Landlord; (iii) the cost of all insurance carried or paid for by Landlord in connection with the Shared Expense Areas; (iv) the cost of landscaping, relamping, and all supplies, tools, equipment and materials used in the operation, repair and maintenance of the Shared Expense Areas, or any portion thereof; (v) costs incurred in connection with the parking areas servicing the Shared Expense Areas; (vi) fees and other costs, including management fees, consulting fees, legal fees and accounting fees, of all contractors and consultants in connection with the management, operation, maintenance, replacement, renovation, repair and restoration of the Shared Expense Areas; (vii) payments under any equipment rental agreements and the fair rental value of any management office space; (viii) wages, salaries and other compensation and benefits, including taxes levied thereon, of all persons (other than persons generally considered to be higher in rank than the position of "Senior Asset Manager") engaged in the operation, maintenance and security of the Shared Expense Areas; (ix) costs under any instrument pertaining to the sharing of costs by the Shared Expense Areas; (x) operation, repair, maintenance, renovation, replacement and restoration of all systems and equipment and components thereof of the Shared Expense Areas; (xi) the cost of janitorial, alarm, security, cable, wireless internet and other services, replacement, renovation, restoration and repair of wall and floor coverings, ceiling tiles and fixtures in Common Areas, maintenance, replacement, renovation, restoration and repair of curbs, walkways, plazas and parking areas, repair to roofs and re-roofing; (xii) amortization of the cost of acquiring or the rental expense of personal property used in the maintenance, operation and repair of the Shared Expense Areas, or any portion thereof (which amortization calculation shall include interest at the "Interest Rate," as that term is set forth in <u>Article 25</u> of this Lease); (xiii) the cost of capital improvements or other costs incurred in connection with the Shared Expense Areas (A) which are intended to effect economies in the operation or maintenance of the Shared Expense Areas, or any portion thereof, (B) that are required to comply with present or anticipated conservation programs or to otherwise further sustainability measures as contemplated by <u>Section 29.26</u> of the Lease, (C) which are replacements or modifications of nonstructural items located in the Shared Expense Areas required to keep the Shared Expense Areas in good order or condition, (D) that are required under any governmental law or regulation by a federal, state or local governmental agency, except for capital repairs, replacements or other improvements to remedy a condition existing prior to the Lease Commencement Date which an applicable governmental authority, if it had knowledge of such condition prior to the Lease Commencement Date, would have then required to be remedied pursuant to then-current governmental laws or regulations in their form existing as of the Lease Commencement Date and pursuant to the then-current interpretation of such governmental laws or regulations by the applicable governmental authority as of the Lease Commencement Date or (E) that relate to the safety or security of the Shared Expense Areas or any portion thereof; provided, however, that any capital expenditure shall be amortized with interest at the Interest Rate over the shorter of (X) seven (7) years, or (Y) its useful life as Landlord shall reasonably determine in accordance with sound real estate management and accounting practices consistently applied or (Z) with respect to those items included under item (A) above, their recovery/payback period as Landlord shall reasonably determine in accordance with sound real estate management and accounting practices; (xiv) costs, fees, charges or assessments imposed by, or resulting from any mandate imposed on Landlord by, any federal, state or local government for fire and police protection, trash removal, community services, or other services which do not constitute "Tax Expenses" as that term is defined in <u>Section 1.1.4.1</u>, below; (xv) payments under any easement, license, operating agreement, declaration, restrictive covenant, or instrument pertaining to the sharing of costs by the Building, including the Center Declaration and any other CC&Rs; (xvi) costs of maintaining and monitoring LEED Certification, and (xvii) costs of any additional services not provided to the Shared Expense Areas as of the Lease Commencement Date but which are thereafter provided by Landlord in connection with its prudent management of the Shared Expense Areas. Notwithstanding the foregoing, for purposes of this Lease, Operating Expenses shall not, however, include:

(a)    any items included in Tax Expenses;

(b)    except as permitted pursuant to items (xii) and (xiii), above, principal or interest on indebtedness, debt amortization or ground rent paid by Landlord in connection with any mortgages, deeds of trust or other financing encumbrances, or ground leases of the Building or the Project;

(c)    capital improvements to the Building or the Project, other than those permitted pursuant to items (xii) and (xiii), above;

(d)    legal, auditing, consulting and professional fees and other costs paid or incurred in connection with financings, refinancings or sales of any interest in Landlord or of Landlord's interest in the Building or the Project or in connection

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT C
-1-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

with any ground lease (including, without limitation, recording costs, mortgage recording taxes, title insurance premiums and other similar costs, but excluding those legal, auditing, consulting and professional fees and other costs incurred in connection with the normal and routine maintenance and operation of the Building and/or the Project);

(e)    legal fees, space planner's fees, architect's fees, leasing and brokerage commissions, advertising and promotional expenditures and any other marketing expense incurred in connection with the leasing of space in the Building (including new leases, lease amendments, lease terminations and lease renewals);

(f)    the cost of any items to the extent to which such cost is reimbursed to Landlord by tenants of the Project (other than as a reimbursement of operating expenses), or other third parties, or is covered by a warranty to the extent of reimbursement for such coverage;

(g)    the cost of performing work or furnishing service to or for any tenant other than Tenant, at Landlord's expense, to the extent such work or service is in excess of any work or service Landlord is obligated to provide to Tenant or generally to other tenants in the Building at Landlord's expense;

(h)    bad debt loss, rent loss, or reserves for bad debt or rent loss;

(i)    damage and repairs necessitated by the gross negligence or willful misconduct of Landlord Parties;

(j)    fees, costs and expenses incurred by Landlord in connection with or relating to claims against or disputes with tenants of the Building or the Project;

(k)    interest, fines or penalties for late payment or violations of Applicable Laws by Landlord, except to the extent incurring such expense is either (1) a reasonable business expense under the circumstances, or (2) caused by a corresponding late payment or violation of an Applicable Law by Tenant, in which event Tenant shall be responsible for the full amount of such expense;

(l)    the cost of remediation and removal of hazardous materials or hazardous substances in the Building or on the Project as required by Applicable Laws, provided, however, that the provisions of this sub-item (l) shall not preclude the inclusion of costs with respect to materials (whether existing at the Project as of the date of this Lease or subsequently introduced to the Project) which are not, as of the date of this Lease (or as of the date of introduction), deemed to be hazardous materials or hazardous substances under Applicable Laws but which are subsequently deemed to be hazardous materials or hazardous substances under applicable laws (it being understood and agreed that Tenant shall nonetheless be responsible under Section 5.2 of this Lease for all costs of remediation and removal of Hazardous Substance to the extent caused by Tenant Parties);

(m)    depreciation for the Building, except as permitted pursuant to items (xii) and (xiii), above;

(n)    reserves for future improvements, repairs, additions, etc.;

(o)    the wages and benefits of any employee who does not devote substantially all of his or her employed time to the Project unless such wages and benefits are prorated on a reasonable basis;

(p)    salaries and all other compensation (including fringe benefits) of persons generally considered to be higher in rank than the position of a person, regardless of title, who supervises property managers that manage the Project and other projects of Landlord and affiliates of Landlord;

(q)    advertising and promotional expenditures, and costs of signs in or on the Building identifying the owner of the Building or other tenants' signs;

(r)    fees payable by Landlord for management of the Project in excess of three and one-half percent (3.5%) (the "**Management Fee Cap**") of Landlord's gross rental revenues, which, to the extent that such fees calculated on such basis, are adjusted and grossed up to reflect a one hundred percent (100%) occupancy of the Project with all tenants paying rent, including base rent, pass-throughs, and parking fees (but excluding the cost of after-hours services or utilities) from the Project for any calendar year or portion thereof; and

(s)    costs for which the Landlord is reimbursed by any tenant or occupant of the Project or by insurance by its carrier or any tenant's carrier or by anyone else (except to the extent of deductibles), and electric power costs for which any tenant directly contracts with the local public service company.

1.1.4    <u>Taxes</u>.

1.1.4.1    "**Tax Expenses**" shall mean all federal, state, county, or local governmental or municipal taxes, fees, charges or other impositions of every kind and nature, whether general, special, ordinary or extraordinary, (including, without limitation, real estate taxes, general and special assessments, transit taxes, leasehold taxes or taxes based upon the receipt of rent, including gross receipts or sales taxes applicable to the receipt of rent, unless required to be paid by Tenant, personal property taxes imposed upon the fixtures, machinery, equipment, apparatus, systems and equipment, appurtenances, furniture and other personal property used in connection with the Shared Expense Areas, or any portion thereof), which shall be paid or accrued during any Expense Year (without regard to any different fiscal year used by such governmental or municipal authority) because of or in connection with the ownership, leasing and operation of the Shared Expense Areas, or any portion thereof. Tax Expenses shall include, without limitation, any assessment, tax, fee, levy or charge in addition to, or in substitution, partially or totally, of any assessment, tax, fee, levy or charge previously included within the definition of real property tax, it being acknowledged by Tenant and Landlord that Proposition 13 was adopted by the voters of the State of California in the June 1978 election ("**Proposition 13**") and that assessments, taxes, fees, levies and charges may be imposed by governmental agencies for such services as fire protection, street, sidewalk and road maintenance, refuse removal and for other governmental services formerly provided without charge to property owners or occupants, and, in further recognition of the decrease in the level and quality of governmental services and amenities as a result of Proposition 13, Tax Expenses shall also include any governmental or private assessments or the Shared Expense Area's contribution towards a governmental or private cost-sharing agreement for the purpose of augmenting or improving the quality of services and amenities normally provided by governmental agencies.

Any costs and expenses (including, without limitation, reasonable attorneys' fees) incurred in attempting to protest, reduce or minimize Tax Expenses shall be included in Tax Expenses in the Expense Year such expenses are paid. Refunds of Tax Expenses shall be credited against Tax Expenses and refunded to Tenant regardless of when received, based on

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT C
-2-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

the Expense Year to which the refund is applicable, provided that in no event shall the amount to be refunded to Tenant for any such Expense Year exceed the total amount paid by Tenant as Additional Rent under this Exhibit C for such Expense Year. If Tax Expenses for any period during the Lease Term or any extension thereof are increased after payment thereof for any reason, including, without limitation, error or reassessment by applicable governmental or municipal authorities, Tenant shall pay Landlord upon demand Tenant's Share of any such increased Tax Expenses included by Landlord as Tax Expenses pursuant to the TCCs of this Lease.

1.1.5    "**Tenant's Share**" shall initially mean the percentage set forth in Section 6 of the Summary. Tenant's Share is calculated by dividing the gross leasable area of the Premises by the gross leasable area attributable from time to time to the Retail Center. The current gross leasable area of the Retail Center is set forth in Section 2.2 of the Summary. In the event the gross leasable area of the Retail Center is remeasured or otherwise modified by Landlord in connection with any addition or deletion of buildings (or portions thereof) to or from the Retail Center, Tenant's Share shall be appropriately adjusted, and, as to the Expense Year in which such change occurs, Tenant's Share for such Expense Year shall be determined on the basis of the number of days during such Expense Year that each such Tenant's Share was in effect.

1.1.6    "**Tenant's Tax Share**" shall initially mean the percentage set forth in Section 6 of the Summary.

1.1.7    "**Utilities Costs**" shall mean all actual charges and costs for utilities for the Shared Expense Areas which Landlord shall pay or incur during any Expense Year, including, but not limited to, the costs of water, sewer and electricity, and the costs of HVAC (including the cost of electricity to operate the HVAC air handlers) and other utilities (but excluding those charges for which tenants directly reimburse Landlord or otherwise pay directly to the utility company) as well as related fees, assessments and surcharges. If, during all or any part of any Expense Year, Landlord shall not provide any utilities (the cost of which, if provided by Landlord, would be included in Utilities Costs) to a tenant (including Tenant) who has undertaken to provide the same instead of Landlord, Utilities Costs shall be deemed to be increased by an amount equal to the additional Utilities Costs which would reasonably have been incurred during such period by Landlord if Landlord had at its own expense provided such utilities to such tenant. Utilities Costs shall include any costs of utilities which are allocated to the Shared Expense Areas under any declaration, restrictive covenant, or other instrument pertaining to the sharing of costs by the Shared Expense Areas or any portion thereof, including the Center Declaration and any other CC&Rs.

1.2    Cost Pools.  Landlord shall have the right, from time to time, to equitably allocate some or all of the Direct Expenses among different portions or occupants of the Building, Retail Center and/or Center, as appropriate (the "**Cost Pools**"), in Landlord's reasonable discretion. The Direct Expenses within each such Cost Pool shall be allocated and charged to the tenants within such Cost Pool in an equitable manner.

1.3    Calculation and Payment of Additional Rent.

1.3.1    Statement of Estimated Direct Expenses.  Landlord shall give Tenant a yearly expense estimate statement (the "**Estimate Statement**") which shall set forth in general major categories Landlord's reasonable estimate (the "**Estimate**") of what the total amount of Direct Expenses for the then-current Expense Year shall be. Tenant shall pay one-twelfth (1/12th) of Tenant's Share of the Estimate to Landlord in monthly installments commencing on the Lease Commencement Date and continuing thereafter on the first day of each calendar month; however, if the Lease Commencement Date is not the first (1st) day of the month, then the first installment shall be prorated in the manner provided in Section 3.1 of the Lease. Landlord shall use commercially reasonable efforts to deliver such Estimate Statement to Tenant on or before May 1 following the end of the Expense Year to which such Estimate Statement relates. The failure of Landlord to timely furnish the Estimate Statement for any Expense Year shall not preclude Landlord from enforcing its rights to collect any Additional Rent under this Exhibit C, nor shall Landlord be prohibited from revising any Estimate Statement theretofore delivered to the extent necessary. Thereafter, Tenant shall pay, within thirty (30) days after receipt of the Estimate Statement, a fraction of Tenant's Share of the Estimate for the then-current Expense Year (reduced by any amounts paid pursuant to the second to last sentence of this Section 1.3.1). Such fraction shall have as its numerator the number of months which have elapsed in such current Expense Year, including the month of such payment, and twelve (12) as its denominator. Until a new Estimate Statement is furnished (which Landlord shall have the right to deliver to Tenant at any time), Tenant shall pay monthly, on the first (1st) day of each calendar month, an amount equal to one-twelfth (1/12th) of Tenant's Share of the total Estimate set forth in the previous Estimate Statement delivered by Landlord to Tenant. Throughout the Lease Term Landlord shall maintain records with respect to Direct Expenses in accordance with generally accepted real estate accounting and management practices, consistently applied.

1.3.2    Statement of Actual Direct Expenses and Payment by Tenant.  Landlord shall give to Tenant following the end of each Expense Year, a statement (the "**Statement**") which shall state in general major categories the Direct Expenses incurred or accrued for such preceding Expense Year. Landlord shall use commercially reasonable efforts to deliver such Statement to Tenant on or before May 1 following the end of the Expense Year to which such Statement relates. If the statement shows that Tenant's Share of the actual Direct Expenses exceeds the amount of Direct Expenses paid by Tenant for such Expense Year, Tenant shall pay, within thirty (30) days after receipt of the Statement, the full amount of the deficiency for such Expense Year, and if Tenant paid more than the actual Direct Expenses, Tenant shall receive a credit in the amount of Tenant's overpayment against Rent next due under this Lease. The failure of Landlord to timely furnish the Statement for any Expense Year shall not prejudice Landlord or Tenant from enforcing its rights under this Exhibit C. Even though the Lease Term has expired and Tenant has vacated the Premises, when the final determination is made of Tenant's Share of Direct Expenses for the Expense Year in which this Lease terminates, if a deficiency is present, Tenant shall, within thirty (30) days after receipt of the Statement, pay to Landlord such amount, and if Tenant paid more than the actual Direct Expenses, Landlord shall, within thirty (30) days, deliver a check payable to Tenant in the amount of the overpayment. The provisions of this Section 1.3.2 shall survive the expiration or earlier termination of the Lease Term. Notwithstanding the immediately preceding sentence, Tenant shall not be responsible for Tenant's Share of any Direct Expenses attributable to any Expense Year which are first billed to Tenant more than two (2) calendar years after the Lease Expiration Date, provided that in any event Tenant shall be responsible for Tenant's Share of Direct Expenses which (x) were levied by any governmental authority or by any public utility companies, and (y) Landlord had not previously received an invoice therefor and which are currently due and owing (i.e., costs invoiced for the first time regardless of the date when the work or service relating to this Lease was performed), at any time following the Lease Expiration Date which are attributable to any Expense Year.

1.4    Operating Expense Cap.  Notwithstanding anything to the contrary contained herein, the total amount of "Controllable Operating Costs," as that term is defined below, included in Operating Expenses for any Expense Year occurring

EXHIBIT C
-3-

during the Lease Term shall not exceed the amount that Controllable Operating Costs would have been in such Expense Year had they increased by five percent (5%) per year (the "**Cap**"), calculated on a cumulative, compounded basis, with no limit on the Controllable Operating Costs during the initial Expense Year during the Lease Term (*i.e.*, the actual Controllable Operating Costs for such initial Expense Year shall be the maximum amount for such Expense Year for purposes of this provision). "**Controllable Operating Costs**" shall mean all Operating Expenses except: (i) any and all assessments, including assessment districts and government-mandated charges with respect to the Building or Center, or any part thereof; (ii) insurance carried by Landlord with respect to the Center and/or the operation thereof; (iii) janitorial and cleaning expenses; (iv) costs of capital expenditures, including, without limitation, costs of capital improvements, capital alterations and capital repairs, costs that do not recur annually and reasonable wages, salaries and other compensation and benefits paid to Landlord's employees, agents or contractors engaged in the operation, management, maintenance or security of the Building or Center; and (v) costs of utilities. Notwithstanding the foregoing, at the commencement of the Option Term (if any), the Cap shall reset to an amount equal to the actual Operating Expenses paid by Landlord during the first Expense Year during the Option Term, and Tenant shall be obligated to pay all Operating Expenses over the first such Expense Year of the Option Term, and thereafter shall pay Operating Expenses in accordance with the Cap (as the same shall be reset at the beginning of the Option Term). The provisions of this paragraph do not apply to Tax Expenses.

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT C
-4-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**EXHIBIT D**

**NOTICE OF LEASE TERM DATES**

To:      _____
         _____
         _____
         _____

Re:      Retail Lease dated _____, 2019 between _____, a _____ ("Landlord"), and _____, a _____ ("Tenant") concerning Suite _____ on floor(s) _____ of the building located at _____, Oxnard, California.

Ladies and Gentlemen:

In accordance with the Retail Lease (the "Lease"), we wish to advise you and/or confirm as follows:

1.      The Lease Term shall commence on or has commenced on _____ for a term of _____ ending on _____.

2.      Rent commenced to accrue on _____, in the amount of _____.

3.      If the Lease Commencement Date is other than the first day of the month, the first billing will contain a pro rata adjustment. Each billing thereafter shall be for the full amount of the monthly installment as provided for in the Lease.

4.      Your rent checks should be made payable to _____ at _____.

                                          "Landlord":

                                          _____,
                                          a _____

                                          By: _____
                                               Name:_____
                                               Its: _____

Agreed to and Accepted
as of _____, 20__.

"Tenant":

_____
a _____
By: _____
     Name:_____
     Its: _____

EXHIBIT D
-1-

## EXHIBIT E

### EXISTING EXCLUSIVES

**Shopping Center Restrictions and Exclusive Uses of Tenants**

**Esplanade Shopping Center**
**Exclusives & Restrictions Report**

#### BANK OF THE WEST

**Section 9.2.** Notwithstanding anything to the contrary set forth in the Lease, after the Date of Lease, Landlord shall not permit another ATM to be located on the Landlord's Property within 150 feet of the Premises.

#### BATH & BODY WORKS

**Section 14.1.4.** Except as to Tenant's leasing over 10,000 contiguous square feet under one trade name, Landlord shall not lease space in the Shopping Center to another tenant which either (i) utilizes more than twenty percent (20%) of its total sales floor area for the sale and/or display of any one of the following categories of goods: body and facial care products, bath items; soaps; creams; lotions; or toiletries, or (ii) utilizes more than twenty percent (20%) of its total sales floor area for the sale and/or display of any or all of the foregoing categories of goods combined.

**Section 14.1.2.** Throughout the Term, Tenant shall not use or permit the use of the Demised Premises, and Landlord shall not lease or permit the use of any portion of the Shopping Center, for the operation of any adult bookstore, adult movie theater, head shop, bar, tavern, restaurant, massage parlor or other similar enterprise whose business is the sale, rental or promotion of sexually explicit materials, acts or entertainment. For the purpose of this lease, "adult bookstore" shall mean any store, a substantial part of the inventory of which is not available for sale to children under the age of 15 because it explicitly deals with or depicts human sexuality, and "head shop" shall mean any store which sells items commonly used or intended for use with or in the consumption of any narcotic, dangerous drug or other controlled substance, including without limitations, any hashish pipe, waterpipe, bong, chillum, pipe screen, rolling papers, rolling devices, coke spoons or roach clips.

#### BJ'S RESTAURANT & BREWERY

**Section 8.2.2.** Notwithstanding anything to the contrary set forth in the Lease, after the Date of Lease, Landlord shall not execute any lease for premises located within the Shopping Center to any other "Competitive Store", as defined below ("Exclusive Use"), subject to the following terms and the satisfaction of each and all of the following conditions. The term "Competitive Store" shall mean the business operation of a new tenant whose "Primary Business" is the operation of a brewery restaurant, if the gross sales derived from the sale of such goods and/or services constitute more than twenty percent (20%) of such tenant's total annual gross sales.

#### BLAZE FAST FIRE'D PIZZA

**Section 22.11.** Provided Tenant is not in default under this Lease beyond applicable notice and grace periods and so long as Tenant is open and operating and is engaged in a business in strict accordance with the Permitted Use, Landlord agrees, during such period that Tenant is so in

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-1-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

compliance with the foregoing, that Landlord will not lease space or permit use of any space in the Shopping Center (as same is depicted on Exhibit A attached hereto) to any other tenant whose primary use shall be a restaurant selling "Artisanal Build Your Own" pizzas in a fast-casual, counter service environment (herein "Competing Tenant"). "Primary use" shall mean that such other tenant derives fifteen percent (15%) or more of its gross sales from the sale of pizza.

## BOOT BARN WESTERN & WORK WEAR

**Section 22.12.** Landlord agrees that Landlord will not lease space in the Shopping Center (as same is depicted on Exhibit A attached hereto) to a tenant (herein "Competing Tenant") whose primary use shall be the retail sale of men's, women's or children's western-style boots and western-style apparel and western-themed work related boots and apparel (including such as: Carhartt, Wrangler, Miss Me, Riggs, Cinch, Rasco, Bullwork, Lapco, Chippewa, Timberland, Carolina, Justin, Wolverine, Ariat, Dan Post, Luchesse, Georgia, CAT, Tommy Lama, Danner, Double Hil and Rocky) (herein "Competing Merchandise"). For purposes of this provision, Primary Use shall mean more than ten percent (10%) of the display area within another tenant's premises is devoted to the display and sale of Competing Merchandise.

**Section 22.14.** So long as the Lease remains in effect and Tenant is open and operating in the Premises, Landlord agrees that Landlord shall not permit any portion of Zone A of the Shopping Center, as noted on Exhibit A, to be used or occupied by any: (a) flea market or junk yard; (b) gambling, off-track betting, or bingo parlor; (c) psychic, tarot card reading or similar services; (d) bail bondsman; (e) sale or distribution of drug supplies or paraphernalia (except as sold by a licensed pharmacist or other legal retailer), including, but not limited to, roach clips, water pipes, bongs, coke spoons, cigarette papers or hypodermic syringes (except as sold by a licensed pharmacist); (f) tattoo parlor, or exotic or erotic dance clubs; (g) the sale or distribution of any pornographic or "adult" materials including, but not limited to, "adult" or "x rated" entertainment or merchandise (including, books, magazines, digital media, videos, or recordings of any kind); (h) any use which produces objectionable noise or vibration; or (i) lounge, bar or nightclub except such as is part of a sit-down restaurant. In addition, Landlord shall not permit any leasable space within forty (40) feet of the Tenant's front door to be occupied by (v) cigar shop or (w) a nail salon or tenant or occupant providing nail services, (x) a dry cleaning processing plant. In addition, Landlord further warrants and agrees that Landlord shall not permit any portion of Zone A of the Shopping Center to be used or occupied by: (m) intentionally deleted; (n) a health spa containing more than 4,000 square feet; (o) a gym containing more than 4,000 square feet; (p) a fitness center containing more than 4,000 square feet; (q) a skating rink; (r) the sale or lease of motor vehicles or trailers; (s) a school containing more than 4,000 square feet; (t) a residence or hospitality use; (w) non-retail office space (retail office space including such as without limitation real estate and insurance brokers) containing more than 4,000 square feet.

## BRIGHT NOW! DENTAL

**Section 22.11.** Landlord hereby grants Tenant the exclusive use to provide general dentistry and specialty dentistry services (including, without limitation, orthodontic services) in the Shopping Center (the "Exclusive Use"). Accordingly, provided Tenant is not in default under this Lease beyond applicable notice and grace periods and so long as Tenant is open and operating the Demised Premises for the Permitted Use, Landlord shall not lease space or sell to, or otherwise permit the operation of, any other tenant or occupant for the Exclusive Use within the Shopping Center (as same is depicted on Exhibit A attached hereto) (herein "Competing Tenant"). The parties

agree that the exclusive granted herein shall not apply to: (v) any tenant using or occupying more than fifteen thousand (15,000) square feet in the Shopping Center.

## CATHERINES

**Section 12.17.** Retail store selling large size (14 and up) women's clothing and/or apparel from an area in excess of twenty (20%) percent of such store's sales area (including in such calculation an allocation for aislesways and corridors). This Section 12.17 shall not apply to the operation in the Shopping Center of any store occupying in excess of 18,300 square feet in the Shopping Center.

## CHIPOTLE

**Section 22.09.** Landlord shall not permit any area 'of the Shopping Center to be used for the operation of any business whose primary use (which such primary use shall be defined as twenty-five percent [25%] of gross sales) is the sale for on or off premises consumption of quick service Mexican food.

    (v)    The Exclusive Use is not applicable to any full service, sit-down restaurant over 3,000 square feet with a wait staff;

    (vi)    The Exclusive Use shall not apply to a restaurant selling primarily wraps provided that such user shall not be permitted to sell a Mexican style wrap or wraps;

    (vii)    The Exclusive Use shall not apply to any other entity whose sale of quick service Mexican food is less than twenty percent (25%) of their business revenue; and

    (viii)    The Exclusive Use is not applicable to any tenant occupying space equal to or in excess of twelve thousand (12,000) square feet.

## COST PLUS WORLD MARKET

**Section 9.3.** A home furnishings business in the Shopping Center similar to that operated by Tenant ("Limited Use").

## DICK'S SPORTING GOODS

**Section 1.4.** The Shopping Center shall not be used for any purpose that is inconsistent with a first-class shopping center, the OEA, matters set forth in Exhibit I and specifically Landlord's Parcel shall not be used:

(a) for any non-retail purposes; provided, however, that (i) repairs, alterations, storage and offices incidental to retailing, shall be deemed retail, (ii) beauty and hair salons (including unisex hair salons offering hair cutting and hair styling services), barbers, and nail salons shall be deemed retail, and (iii) the following office and service uses shall be deemed retail: any office and service uses typically found in first class shopping centers, which office and service uses provide services directly to consumers and such as, by way of example only, banks, mortgage/loan and financial service businesses, real estate services, security brokerage services, tax preparation services, accounting services, insurance services, optical, chiropractic or dental services (e.g., Aspen Dental), navel agencies, automobile clubs (e.g., AAA), tailors, laundromats and dry cleaning facilities (provided there is no on-site dry cleaning), and weight loss/control centers (e.g., Weight Watchers) (collectively, "Permitted Office/Service Uses"); provided, however, that Office/Service Uses shall be permitted in only an aggregate maximum of five percent (5%) of the LFA of the Shopping Center;

-14003/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-3-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

(b) for any entertainment purposes such as a bowling alley, skating rink, bar, night club, discotheque, amusement gallery, cinema, poolroom, health club (except for the Bally's Fitness operating at the Shopping Center as of the Effective Date and any replacement fitness center operating similarly thereto (such as LA Fitness or 24 Hour Fitness) provided that such one fitness center is located in the portion of the Shopping Center marked "Fitness Use Location" on the Lease Plan and has an LFA no greater than 50,000 square feet), massage parlor (except for Massage Envy or a similar national or regional Occupant providing bona fide therapeutic massage), sporting event, sports or game facility or off-track betting club;

(c) for any establishment which sells or displays pornographic materials;

(d) for any establishment which sells or displays used merchandise or second hand goods; or

(e) for a restaurant or establishment selling food prepared on premises for consumption on or off premises located within four hundred (400) lineal feet of the Demised Premises (however, a restaurant shall be permitted within three hundred (300) lineal feet of the Demised Premises if such restaurant is on an out-parcel with self-contained parking with at least fifteen (15) parking spaces for so-called standard size American automobiles, and driveways and footways incidental thereto, for each one thousand (1,000) square feet of LFA).

**Section 1.5.** (a) Landlord warrants and agrees that, during the term of this Lease, it will not, nor will any entity under common control with Landlord, enter into any lease, license agreement or other similar agreement nor permit any premises in Landlord's Parcel (other than the Demised Premises) or any land adjacent to or contiguous (but for roadways or access ways) to Landlord's Parcel which is owned or otherwise controlled by a Landlord Entity (collectively, the "Restricted Property"), or otherwise transfer or allow a possessory interest in the Restricted Property to an Occupant to be used for the sale, rental and/or distribution, either singly or in any combination of (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but no limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear ("Precluded Use Activity(ies)").

Notwithstanding the foregoing Precluded Use Activity(ies) set forth in Subsection (a) above, the retail sale and/or distribution of health, fitness and/or exercise equipment, sporting goods and/or sporting equipment, hunting, camping and fishing equipment and accessories and/or athletic footwear in the lesser of (i) ten percent (10%) in the aggregate of any such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (ii) one thousand (1,000) square feet in the aggregate of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) shall not be prohibited.

In addition, (x) a replacement of the Bally's Fitness operating at the Shopping Center as of the Effective Date shall not be deemed a Precluded Use Activity provided that such replacement is a fitness center operating similarly thereto (such as LA Fitness and 24 Hour Fitness), is located in the portion of the Shopping Center marked Fitness Use Location on the Lease Plan and has an LFA no greater than 50,000 square feet), and (y) with respect to the Golfsmith store operating at the Shopping Center, a waiver letter is attached hereto as Exhibit N;and Landlord warrants and agrees that, during the term of this Lease, (i) Landlord(or any entity under common control with Landlord) will not replace Golfsmith with another golf store or otherwise enter into any lease, license agreement or other similar agreement nor permit any premises in the Restricted Property, to be

operated as a golf store, and (ii) a golf store (other than Golfsmith under its lease as of the Effective Date) shall be a Precluded Use Activity.

GNC

**Section 8.1.1.** Landlord shall not execute any lease for premises located within the Shopping Center to any other "Competitive Store", as defined below (the "Exclusive Use"). The Exclusive Use is not applicable to any premises containing five thousand (5,000) or more square feet of gross floor area. The term "Competitive Store" shall mean the business operation of a new tenant whose primary business is the retail sale of vitamins, mineral and herbal supplements and sports nutrition products, if the gross sales derived from the sale of such goods and/or services constitute more than forty percent (40%) of such tenant's total annual gross sales.

HOME DEPOT

**Section 5.1.** No portion of the Shopping Center other than the Home Depot Parcel shall be used for a home improvement center or for any business which sells, singly or in any combination, lumber, hardware, tools, plumbing supplies, pool supplies, electrical supplies, paint, wallpaper and other wall covering, carpeting and other floor covering, siding, tile (including ceramic tile), ceiling fans, gardening and garden nursery supplies, artificial and natural plants, light fixtures, cabinets or household appliances, except for the incidental sale of such items; provided, however, that the foregoing restriction shall not apply to any of the following retailers (and any successor to any such retailer by merger, consolidation or otherwise provided such successor continues to operate in the premises at the Shopping Center under the same trade name as used prior to such succession or such successor continues to operate the same business as operated at the premises at the Shopping Center prior to the succession) or their uses (so long as such use is consistent with the use at a majority of their other stores) at the Shopping Center: Bed, Bath & Beyond, Cost Plus, Michaels, JoAnne's, Circuit City, TJ Maxx and any "crafts" retail use occupying a premises in the Shopping Center containing not less than eighteen thousand (18,000) square feet of Floor Area. An "incidental sale of such items" is one in which there is no more than the lesser of (i) ten percent (10%) of the total Floor Area of such business or (ii) three hundred (300) square feet of sales and/or display area, relating to such items individually or in the aggregate.

**Section 5.2.** (a) No portion of the Shopping Center shall be used for any non-retail use or for any of the following purposes: a flea market or similar business; cemetery; mortuary; bookstore or other establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene materials; a so-called "head shop"; off track betting parlor; junk yard; recycling facility or stockyard; motor vehicle or boat dealership, repair shop (including lubrication and/or service center), body and fender shop, car wash facility or gasoline station (other than on the Developer Parcel Outparcels designated as P2 and P3 on the Site Plan), or motor vehicle or boat storage facility (the foregoing restriction shall not apply to Home Depot's rental of delivery vehicles to its customers as part of its home improvement business; provided, however, that such rental vehicles shall be stored only in the parking spaces on the Home Depot Parcel specifically designated for such storage as shown on the Site Plan); a laundromat or dry-cleaning facility (but this shall not be deemed to prohibit nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer); a warehouse; a self-storage facility; theater, auditorium, sports or other entertainment viewing facility (whether live, film, audio/visual or video); discotheque, dance hall, comedy club, night club or adult entertainment facility; bowling alley; skating rink; billiard or pool hall; massage parlor, game parlor, video or other type of game room or arcade (which shall be

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-5-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

defined as any store containing more than three (3) electronic games); a beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees and not to customers (but shall specifically not prohibit a school which is incidental to a primary retail purpose); office usage other than incidental in connection with non-prohibited uses; industrial, residential or manufacturing uses, school or house of worship.

**Section 5.4.** There shall be no restriction on restaurant uses in the Shopping Center except as follows: there shall be no Restaurant uses (excluding any such use which is incidental to the Owner's or Occupant's business in the subject location) on either the Developer Parcel Outparcel designated as P2 on the Site Plan, the Developer Parcel Outparcel designated as P3 on the Site Plan or the Developer Parcel Outparcel designated as S3 on the Site Plan, in excess of three thousand five hundred (3,500) square feet in the aggregate for each such Developer Parcel Outparcel. No fitness center, workout facility, gym, health spa or studio, health facility, medical office, dental office, professional office or business office shall be located west of the building line between the premises shown as M3 and M4 on the Site Plan without the prior written consent of Home Depot, which consent may be withheld in Home Depot's sole and absolute discretion; provided, however, that, notwithstanding the foregoing, a fitness center, workout facility, gym, health spa or studio or health facility may be located in the premises designated as M10 on the Site Plan (provided that during the period of any such use in the premises designated as M10 on the Site Plan the main entrance to such premises shall be located on the northwest side of the building located on the premises designated "as M10 on the Site Plan).

### IN-N-OUT BURGER

**Section 11.5.** Landlord shall not allow any real property leased or owned by Landlord or an Affiliate of Landlord and located in the Center to be used for any other quick-serve restaurant deriving twenty-five percent (25%) or more of its gross annual receipts from the sale of hamburgers and french fries, including, without limitation, quick-service restaurants such as Burger King, Carl's Jr., Jack-in-the-Box, McDonald's and Wendy's.

### JAMBA JUICE

**Section 8.1.1.** Landlord shall not execute any lease for premises located within the Shopping Center to any other "Competitive Store", as defined below ("Exclusive Use"), as defined below (the "Exclusive Use"):

(b) The Exclusive Use is not applicable to any premises containing five thousand (5,000) or more square feet of gross floor area;

(e) The term "Competitive Store" shall mean the business operation of a new tenant whose "Primary Business" is the sale of fresh squeezed juices or smoothies, if the gross sales derived from the sale of such goods and/ or services constitute more than five percent (5%) of such tenant's total annual gross sales.

### KIRKLAND'S

**Section 5.03.** Landlord shall not permit the Shopping Center to be used inconsistent with the image of a community shopping center or family oriented center as determined in Landlord's reasonable judgment

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-6-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**LA FITNESS**

**Section 6.3.** Landlord will not enter into new leases for space in the Shopping Center, modify existing leases and/or give its consent where its consent is required for any other tenant in the Shopping Center, to use its premises for a health and fitness club or for a weight-reducing salon, provider of physical therapy or rehabilitative services, any of which offers services such as those non-incidental services described in the Permitted Use. Notwithstanding the foregoing, Landlord shall have the right to lease space to a facility offering chiropractic services provided that no aerobics or similar fitness classes are offered and no work-out machines or equipment are provided therein (except on an incidental basis).

**NORDSTROM RACK**

**Section 4(C).** Neither the Shopping Center, nor any part thereof, shall be used, and no building or other improvement shall be constructed, maintained or used for any purpose other than the following: retail, office, and service establishments of the type common to a first-class promotional shopping center, including, without limitation, financial institutions, brokerage offices, restaurants, and travel and other agencies; provided that so long as Tenant is operating as a retail outlet store upon the Premises, service establishments (excluding theaters and restaurants) shall not, as to Landlord, exceed ten percent (10%) of the Floor Area of the Shopping Center. All businesses conducted within the Shopping Center shall be conducted in a lawful manner.

**Section 4(F).** No use or operation will be made, conducted or permitted on or with respect to all or any part of the Shopping Center, by either Landlord (or its tenants) or Tenant, which use or operation is obnoxious to or out of harmony with the development or operation of a first-class promotional shopping center, including, but not limited to, the following:

(1) Any public or private nuisance.
(2) Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness.
(3) Any obnoxious odor.
(4) Use, storage, transportation, handling, manufacture, or emission of any noxious, toxic, caustic or corrosive fuel or gas or other hazardous or toxic substance unless such materials are handled in accordance with all applicable governmental laws, regulations and codes.
(5) Emission of microwave, radio wave, or other similar electronic, light or noise radiation at levels which are dangerous to health according to governmental regulations or which interfere with the proper operation of electronic, telephone, computer or other business equipment of tenants of the Shopping Center.
(6) Any dust, dirt or fly ash in excessive quantities.
(7) Any unusual fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks.
(8) Any warehouse (but any area for the storage of goods intended to be sold at any retail establishment in the Shopping Center shall not be deemed to be a warehouse), assembly, manufacture, distillation, refining, smelting, agriculture or mining operations. Excluded from this exception shall be a brew pub and ceramics if sold within the Shopping Center.
(9) Any mobile home or trailer court, labor camp, junk yard, stock yard or animal raising. Notwithstanding the foregoing, pet shops shall be permitted within the Shopping Center if located more than two hundred (200) feet from the Premises.
(10) Any drilling for and/or removal of subsurface substances.

(11) Any dumping of garbage or refuse (other than in dumpsters or compactors designed for such purpose).

(12) Any commercial laundry or dry cleaning plant, Laundromat, veterinary hospital, car washing establishment within Tenant's Restricted Parking Area (which is identified on Exhibit B), bowling alley, mortuary or similar service establishment.

(13) Any automobile body and fender repair work other than automobile services provided by any Department Store in connection with its operations as a retail Department Store.

(14) No Kiosk, pushcarts, temporary sales booths or other forms of so-called remote merchandising units ("RMU") shall be allowed within the area identified as the "no RMU area" on the site plan attached hereto and incorporated herein by reference as Exhibit B. Additionally, no food or entertainment use shall be allowed in any space contiguous to the Premises without the Tenant's prior approval, which approval may be withheld in Tenant's sole discretion.

(15) The operation of a "head shop," so-called, or other business devoted to the sale of articles or merchandise normally used or associated with illegal or unlawful activities, such as but not limited to the sale of paraphernalia used in connection with marijuana, cocaine or other controlled drugs or substances.

(16) A massage parlor (not including salon massages provided by a hair or beauty salon or health club), so-called, or the business of the sale of so-called "adult" materials such as, without limitation, magazines, books, movies and photographs.

(18) Automotive sales (selling new or used cars, trailers or mobile homes) and service.

(19) Factory.

(20) Industrial usage.

(21) Processing or rendering plant.

**Section 18E.** Landlord represents and warrants to the Tenant the following: 2) no future exclusive/restrictive use provision will be granted by the Landlord that will impair the Tenant's ability to operate the Premises in accordance with Section 1.K and 4.B of this Lease.

**NRG EVGO**

**Section 1.4.** Host hereby grants eVgo an exclusive right to provide Charging Stations to Host and related services at the Host Property (except for any installation by a lessee of Host and/or any portion of the Host Property subject to a ground lease or not owned/controlled by Host).

**OZEKI NOODLE JAPANESE RESTAURANT**

**Section 8.1.1.** Notwithstanding anything to the contrary set forth in the Lease, after the Date of Lease, Landlord shall not execute any lease for premises located within the Shopping Center to any other "Competitive Store", as defined below ("Exclusive Use").

(b) The Exclusive Use is not applicable to any premises containing five thousand (5,000) or more square feet of gross floor area.

(c) The term "Competitive Store" shall mean the business operation of a new tenant whose "Primary Business" is the sale of Japanese food, including noodles, sushi and other similar food, if the gross sales derived from the sale of such goods and/ or services constitute more than forty percent (40%) of such tenant's total annual gross sales.

**PARTY CITY**

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-8-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**Section 41.02.**

(a) No other premises within the Shopping Center shall be leased, rented, used or occupied for the primary use for the retail sale of any of the following: party goods and related supplies, Halloween costumes, novelty Halloween items and Halloween accessories, paper goods and greeting cards sold primarily at a discount (a "Competing Use"). For the purposes of this Exclusive provision, stores currently operating under the tradename "Dollar Tree" shall be deemed an express competitor hereunder as long as said "Dollar Tree" is operating substantially as it was on full execution of this Lease, but stores currently operating under the tradename "Michaels" shall not be deemed a competitor hereunder.

(b) Landlord covenants and agrees that it shall not lease, rent or suffer or permit any premises in the "Restricted Use Area" in the Shopping Center and shown on Exhibit A to be used or occupied as or for any of the following: theater, bowling alley, skating rink, bar, nightclub, restaurant within 75 feet from the Premises (except for the restaurant in space 1-04 which may be extended, renewed or replaced with another restaurant), massage parlor (which shall not be deemed to include licensed or therapeutic massage facilities such as, by way of example, "Massage Envy"), "adult" bookstore or pornographic literature, materials or devices stores, off-track betting establishment, game room or funeral parlor. Further, nothing herein shall restrict or apply to any Excluded Tenants.

**PICK UP STIX**

**Section 8.2.** Landlord shall not lease or sell any premises located within the Shopping Center to any other "Competitive Store", as defined below ("Exclusive Use").

(a) The Exclusive Use is not applicable to: (i) any premises containing eight thousand (8,000) or more square feet of gross floor area.

(d) The term "Competitive Store" shall mean the business operation of a new tenant whose "Primary Business" is the sale and/or serving of Pan Asian food, if the gross sales derived from the sale of such goods and/or services constitute more than fifteen percent (15%) of such tenant's total annual gross sales.

**SPORTS CLIPS**

**Section 22.10.** Landlord agrees, during such period that Tenant is so in compliance with the foregoing, that Landlord will not lease space in the Shopping Center (as same is depicted on Exhibit A attached hereto) to a tenant whose use shall be the operation of a discount hair cutting salon ("discount hair salon" defined as a salon which cuts hair at a cost of less than Twenty Dollars [$20.00] per haircut on a non-appointment basis), and provides such services primarily to men ("Competing Tenant"). The parties agree that the exclusive granted herein shall not apply to: (iv) any tenant or occupant using or occupying more than twenty thousand (20,000) square feet in the Shopping Center.

**SPRINT PCS**

**8.1.1.** Notwithstanding anything to the contrary set forth in the Lease, after the Date of Lease, Landlord shall not execute any lease for or other agreement for the occupancy of premises located within the Shopping Center to any other "Competitive Store", or to allow any tenant or occupant to operate as a Competitive Store in violation of its lease as defined below ("Exclusive Use"):

(a) The Exclusive Use is not applicable to any premises containing twelve thousand (12,000) or more square feet of gross floor area.

(d) The term "Competitive Store" shall mean the business operation of a new tenant whose "Primary Business" is the sale of wireless phones, wireless phone accessories, wireless services, long distance services, performing wireless phone activations and consultations (collectively "Protected Items"). For purposes of this Lease, the term "Primary Business" shall mean either: (i) the sales area devoted to the sale of all or any of the Protected Items constituting more than ten percent (10%) of the total sales area of such store, not to exceed 500 square feet; or (ii) such store has a separate exterior entrance devoted to the sales area in which all or any of the Restricted Items are sold; or (iii) such store has separate exterior signage advertising the sale of all or any of the Restricted Items.

## STAPLES

**Section 5.2.1.** No part of the Center shall be used for the sale, leasing or distribution of equipment (including computers and telecommunications equipment), furniture or supplies for business or office (including home office) use, or the provision of business or office services (including copying, printing, telecommunications, packing, shipping and business equipment repair services) (collectively, the "Exclusive Goods and Services"). Landlord shall not advertise any other providers of the Exclusive Goods and Services within the Center or on any Center-specific internet web site, nor shall Landlord provide the general public with direct internet access (via link or otherwise) to any such other providers of the Exclusive Goods and Services.

**Section 5.2.2.** No part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa (except as set forth in Section 5.3 below), gymnasium, bowling alley, skating rink or other sports or recreational facility; (ii) school, library, reading room, or house of worship; (iii) movie theatre, gallery, auditorium, meeting hall, hotel or motor inn, or any residential use; (iv) massage parlor, adult bookstore, a so-called "head" shop, off-track betting, gambling, gaming or check cashing facility; (v) car wash, automobile repair -work or automotive service or gas station, tire store, automobile body shop, automobile, boat, trailer or truck leasing or sales, or laundromat; (vi) tavern, bar, amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game, virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement center; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage (except incidental to a full-line retail pet supply operation), pawn shop, flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (x) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

**Section 5.2.3.** Excluding Pad 1 as designated on Exhibit A, no part of the Center within 300 feet of the Premises shall be used for a restaurant or any other use which would place an undue burden on parking.

**Section 5.3.** Notwithstanding the foregoing, Section 5.2 shall not: (ii) prohibit any future tenant from selling, leasing, distributing or providing the Exclusive Goods and Services incidental to such tenant's primary business in no more than an aggregate of 5% of such tenant's sales floor area; (iii) prohibit any tenant leasing premises in excess of 20,000 leaseable square feet in the Center from using such premises as a so called "electronics superstore" as such retailing concept is generally

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-10-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

defined and acknowledged within the retail industry; or (iv) prohibit the operation of first class health and exercise facility containing not more than 25,000 leasable square feet of space, provided that if such facility is located on Landlord's Parcel, its entrance must face west.

## STARBUCKS

Section 5.4. Landlord shall not use or allow any other person or entity (except Tenant) to use any portion of the Property for the sale of (a) freshly ground or whole coffee beans, (b) espresso, espresso-based coffee drinks or coffee-based drinks, or (c) gourmet, brand-identified brewed coffee. This restriction shall also apply to kiosks and carts. Notwithstanding the foregoing, future tenants of the Shopping Center shall be allowed to sell items described in (a), (b) and (c) of this Section 5.4 so long as the total sales of such items with respect to any tenant does not exceed 5% of Tenant's sales in any calendar month.

## SUBWAY

Section 3 (First Amendment to Lease). Exclusive. Provided that Tenant's primary use or purpose is the sale of submarine sandwiches (at least twenty-five percent (25%) of Tenant's gross revenues are from the sale of submarine sandwiches) then Landlord shall not lease to another Tenant whose primary use is the sale of submarine sandwiches. By way of example, Landlord shall not lease to Togo's, Submarina, Cousins Subs, Quiznos, or Jersey Mike's. Tenants such as CheezSteak, Panera Bread, Corner Bakery Cafe, Paradise Bakery or a tenant selling sandwiches on baguette bread do not violate the above exclusive.

## T-MOBILE

5.6 Landlord shall not allow any use within the Shopping Center which (i) causes or creates a nuisance, (ii) is obnoxious, or (iii) generally detracts from the retail nature of the Shopping Center. Such prohibited uses shall include, but not be limited to, (a) flea markets, (b) storage of motor vehicles, boats or trailers, (c) automobile repair operations, (d) "head shops" or other similar type uses, (e) automobile sales, (f) educational facilities, (g) vocational schools or training classes unrelated to a primary retail use, (h) manufacturing or assembly facilities, (i) churches or places of religious congregations, and (j) any other non-retail uses which cause or Contribute to excessive use of the parking areas of the Shopping Center.

## T.J. MAXX

Schedule B. Landlord agrees that as long as any retail sales activity shall be conducted in the Demised Premises the remainder of the Shopping Center shall not be used for any non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices, not being deemed non-retail), or for any entertainment purposes such as a bowling alley, skating rink, cinema (except in the areas labeled "Movie" and "Theaters" on the Lease Plan), bar, nightclub, discotheque, amusement gallery, poolroom, health club, massage parlor, sporting event, sports or game facility, off-track betting club or for any establishment for the sale or display of pornographic materials. No restaurants or establishments selling prepared food for consumption on or off premises shall be located in Tenant's Critical Area.

## TILLY'S

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-11-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**Section 8.1.1.** Notwithstanding anything to the contrary set forth in the Lease, and except for Anchor Blue occupying 6,000 square feet in the Shopping Center, after the Date of Lease, Landlord shall not execute any lease for premises located within the Shopping Center to any other "Competitive Store", as defined by Tenant's Permitted Use clause ("Exclusive Use").

Permitted Use clause: The Premises shall be used for the retail sale of: (i) men's, women's and children's clothing and shoes, beachwear, and accessories; and (ii) skateboards, surfboards, snowboards, scooters, surfware, skiwear and related accessories and items customarily sold in a Tilly's, as defined in the Lease and for no other purpose.

(b) The Exclusive Use is not applicable to any premises containing eighteen thousand three hundred (18,300) or more square feet of gross floor area.

<u>WAL-MART</u>

**Section 5.** Without limiting the generality of the foregoing, as of the Effective Date of this Lease, Tenant shall have the exclusive right within Landlord's Property to sell groceries and operate a grocery store as a primary business ("Tenant's Exclusive"). Notwithstanding the foregoing, Tenant's Exclusive shall not apply to (iv) the ancillary sale of groceries by any other tenant or occupant of any other premises within the Shopping Center. For purposes of the immediately preceding sentence, "ancillary" shall be defined as occupying the lesser of: (a) ten percent (10%) of the floor area of such other tenant's or occupant's premises, or (b) one thousand (1,000) square feet of such other tenant's or occupant's premises, with no space devoted to the sale or display of fresh produce and/or refrigerated meat, seafood, and/or poultry. For the purposes hereof; "groceries" shall mean a variety of dry, refrigerated and frozen meat, seafood, poultry, produce, dairy products, delicatessen products and bakery products, sold for off-premises consumption. In no event shall Tenant's Exclusive be deemed to restrict or preclude the use or occupancy of any portion of the Shopping Center by restaurants (whether dine in or take out), yogurt or ice cream shops, bakeries, bagel stores, candy or nut shops, or other similar types of stores whose primary product line consists of a single specialized type of prepared foods (i.e., no specialized product lines consisting of fresh produce). Furthermore, for purposes of clarity (even though beverages are not specifically included within the term "groceries" hereunder), Tenant's Exclusive shall not restrict or preclude the use or occupancy of any portion of the Shopping Center for the sale of beer, wine, liquor or other beverages by (A) volume beverage specialty retailers (such as; by way of illustration but not as a limitation, BevMo and Total Wine & More), (B) boutique wine stores or wine bars (such as, by way of illustration but not as a limitation, Wine Styles, Wines for Less, or the Grape), or (C) multi-purpose retail chain stores (such as, by way of illustration but not as a limitation, Big Lots, Dollar Tree, or 99 Cent Only) or drug stores (such as, by way of illustration but not as a limitation, Longs Drugs, CVS, Rite Aid and Walgreens).

**Section 1B.** Landlord shall not allow any other space in the Landlord's Property to be occupied by or used for any of the following uses or purposes (the "Prohibited Uses") without the written consent of Tenant, which consent Tenant may withhold in its sole and absolute discretion: (a) a nightclub or other place of recreation or amusement; (b) any business which derives fifty percent (50%) or more of its gross sales volume serving or selling alcoholic beverages ("Liquor Restriction"); (c) any business or facility used in growing, delivering, transferring, supplying, dispensing, dispersing, distributing or selling marijuana, whether by prescription, medical recommendation or otherwise, and whether consisting of live plants, seeds, seedlings or processed or harvested portions of the marijuana plant; (d) a cemetery; (e) a mortuary; (f) any establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene material, with

the exception of any store selling pornographic materials as an incidental part of its business (e.g., a bookstore such as Barnes & Noble, Borders, Crown or Brentano's shall be permitted in the Shopping Center so long as its operations are substantially similar to the operations of a majority of its other stores in the region); (g) a so-called "head shop"; (h) an off-track betting parlor; (i) a junkyard; (j) a flea market; (k) a recycling facility or stockyard; (l) a motor vehicle or boat dealership; (m) a body and fender shop; (n) a motor vehicle or boat storage facility; (o) a house of worship; (p) a discotheque or dance hall; (q) a skating rink; or (r) any industrial or manufacturing uses. Tenant shall not use the Premises for any Prohibited Uses, or allow the Premises to be occupied by or used for any Prohibited Uses, without the written consent of Landlord, which consent Landlord may withhold in its sole and absolute discretion. Furthermore, the Liquor Restriction shall not restrict or preclude the use or occupancy of any portion of the Shopping Center for the sale of beer, wine, liquor or other beverages by (A) volume beverage specialty retailers (such as, by way of illustration but not as a limitation, BevMo and Total Wine & More), (B) boutique wine stores or wine bars (such as, by way of illustration but not as a limitation, Wine Styles, Wines for Less, or the Grape), or (C) multi-purpose retail chain stores (such as, by way of illustration but not as a limitation, Big Lots, Dollar Tree, or 99 Cent Only) or drug stores (such as, by way of illustration but not as a limitation, Longs Drugs, CVS, Rite Aid and Walgreens).

<u>AGREEMENT AFFECTING REAL PROPERTY (NOVEMBER 15, 2000)</u>

**Section 1(d)**

    d.    Comply with the following standards:

        (1)    <u>Municipal Code Compliance</u>  Neither the Developer Parcel, the Home Depot Parcel, the Robinson's May parcel nor any part of them shall be used and no building or other improvements shall be constructed, maintained, or used for any purposes other than that which is allowed by the City's Municipal Code and development permits, if any, issued therefor.

        (2)    <u>Prohibited Operations and Nuisances</u>  No use or operation will be made, conducted or permitted on or with respect to all or any part of the Developer Parcel, Home Depot Parcel or Robinson's May Parcel, which use or operation is obnoxious to or out of harmony with the use of the Developer Parcel, Home Depot Parcel and Robinson's May Parcel as a first-class retail shopping center or is not a sales tax generating use (except as otherwise allowed pursuant to subsection (m) below), including, but not limited to, the following:

            (a)    Any public or private nuisance (as defined in California Civil Code Section 3479) connected with business operations conducted on the Developer Parcel, Home Depot Parcel or Robinson's May Parcel;

            (b)    Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness;

            (c)    Any obnoxious odor;

            (d)    Any noxious, toxic or caustic, or corrosive fuel or gas;

-14000/11-27-19/JNO/JNO02666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-13-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

(e)     Any dust, dirt or particulate matter in excessive quantities;

(f)     Any unusual fire, explosion, or other damaging or dangerous hazard;

(g)     Any warehouse, other than that which is incidental to the primary commercial use or business operation, and any assembly, manufacturing, distillation, refining, smelting, agriculture, or mining operation;

(h)     Any pawn shop or retail sales operation involving second-hand merchandise;

(i)     Any adult business or facility as defined and regulated in the City's Municipal Code. Such uses include, without limitation, massage establishments, adult news racks, adult bookstores, adult motion picture theaters, and paraphernalia businesses;

(j)     Any gun shop or retail sales operation for which the main commercial use or business operation is the sale of guns;

(k)     Intentionally Omitted;

(l)     Any retail sales operation for which the average price of merchandise is $5.00 or less, except that this prohibition shall not apply to any retail sales operation for which the main commercial use or business operation is the sale of food and/or beverages;

(m)     Any non-retail, non-sales tax generating use, which represents, in the aggregate, more than twenty percent (20%) of the total building area on the Developer Parcel, Home Depot Parcel and Robinson's May Parcel, unless such non-retail orientation of the Developer Parcel Project, the Home Depot Retail Store or the Robinson's May Parcel Project;

(n)     Intentionally Omitted.

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-14-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**PROHIBITED USES**
**ESPLANADE SHOPPING CENTER**

GENERALLY PROHIBITED USES:

(1)  Any public or private nuisance (as defined in California Civil Code Section 3479) connected with business operations conducted on the Developer Parcel, Home Depot Parcel or Robinson's May Parcel;

(2)  Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness;

(3)  Any obnoxious odor;

(4)  Any noxious, toxic or caustic, or corrosive fuel or gas;

(5)  Any dust, dirt, or particulate matter in excessive quantities;

(6)  Any unusual fire, explosion, or other damaging or dangerous hazard;

(7)  Any warehouse, other than that which is incidental to the primary commercial use or business operation, and any assembly, manufacturing, distillation, refining, smelting, agriculture, or mining operation;

(8)  Any pawn shop or retail sales operation involving second-hand merchandise;

(9)  Any adult business or facility as defined and regulated in the City's Municipal Code. Such uses include, without limitation, massage establishments, adult news racks, adult bookstores, adult motion picture theaters, and paraphernalia businesses;

(10)  Any gun shop or retail sales operation for which the main commercial use or business operation is the sale of guns;

(11)  Any retail sales operation for which the average price of merchandise is $5.00 or less, except that this prohibition shall not apply to any retail sales operation for which the main commercial use or business operation is the sale of food and/or beverages;

(12)  Any non-retail, non-sales tax generating use, which represents, in the aggregate, more than twenty percent (20%) of the total building area on the Developer Parcel, Home Depot Parcel and Robinson's May Parcel, unless such non-retail, non-sales tax generating uses do not detract from the overall retail orientation of the Developer Parcel Project, the Home Depot Retail Store or the Robinson's May Parcel Project;

(13)  No portion of the Shopping Center shall be used for any non-retail use or for any of the following purposes: a flea market or similar business; cemetery; mortuary; bookstore or other establishment engaged in the business of selling, exhibiting, or delivering pornographic or obscene materials; a so-called "head shop"; off-track betting parlor; junk yard; recycling facility or stockyard; motor vehicle or boat dealership, repair shop (including lubrication and/or service center), body and fender shop, car wash facility or gasoline station (other than on the Developer Parcel Outparcels designated as P2 and P3 on the Site Plan), or motor vehicle or boat storage facility (the foregoing restriction shall not apply to Home Depot's rental of delivery vehicles to its customers as part of its home improvement business; provided, however, that such rental vehicles shall be stored only in the parking spaces on the Home Depot Parcel specifically designated for such storage as shown on the Site Plan); a laundromat or dry-cleaning facility (but this shall not be deemed to prohibit nominal supportive facilities for on-site service oriented to pickup and delivery by the ultimate consumer); a warehouse; a self-storage facility; theater, auditorium, sports or other entertainment viewing facility (whether live, film, audio/visual or video); discotheque, dance hall, comedy club, night club or adult entertainment facility; bowling alley; skating rink; billiard or pool hall; massage parlor, game parlor, video or other type of gameroom or arcade (which shall be defined as any store containing more than three (3) electronic games); a beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees and not to customers (but shall specifically not prohibit a school which is incidental to a primary retail purpose); office usage other than incidental in connection with nonprohibited uses; industrial, residential or manufacturing uses, school or house of worship.

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-15-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

(14)  Without the prior written consent of the Consenting Owners, the following shall not be allowed to operate in the Shopping Center or Common Areas: traveling carnivals, fairs, auctions, shows, kiosks, booths for the sale of fireworks, sales by transient merchants utilizing vehicles or booths and other promotions of any nature. In the event that unauthorized Persons, including without limitation tenants or invitees or tenants occupying Buildings now or at any future time located in the Shopping Center, utilize the parking area for other than temporary parking by customers while shopping in the Shopping Center, the Owner of the Parcel upon which such unauthorized utilization is originating shall at its sole expense, upon written request by any other Owner, take whatever action as shall be reasonably necessary to prevent said unauthorized utilization.

(15)  No portion of the Shopping Center shall be used for a business or use which creates strong, unusual or offensive odors, fumes, dust or vapors; emits noise or sounds which are objectionable due to intermittence, beat, frequency, shrillness or loudness; creates unusual fire, explosive or other hazards; or materially increases the rate of insurance for any other Parcel, Owner, or Occupant.

(16)  No oil development operations, oil refining, quarrying or mining operations of any kind shall be permitted upon or in any portion of the Parcels, nor shall oil wells, tanks, tunnels, or mineral excavation or shafts be permitted upon the surface of any portion of the Parcels, or within five hundred (500) feet below the surface of any of the Parcels. No derrick or other structure designed for use in boring for water, oil, natural gas or other minerals shall be erected, maintained or permitted on any portion of the Shopping Center.

(17)  No portion of the Common Area shall be used for the sale, storage or display of merchandise; provided, however, that the seasonal sale of merchandise shall be permitted from the Outside Sales Areas, if any, shown on the Site Plan subject to the following restrictions: (i) no such use of the Common Area shall impede, restrict or otherwise adversely impact the flow of traffic in the Shopping Center or otherwise unreasonably interfere with the use and enjoyment of the Common Area by the Owners and/or Occupants of the Shopping Center and/or their customers and other Permittees, (ii) all booths, stands, displays and other structures erected in connection with seasonal sales shall be promptly removed upon termination of the seasonal sale activity; and (iii) the Common Area shall be promptly repaired to its condition immediately prior to the seasonal sale activity at the sole cost and expense of the Owner of the Parcel so used.

(18)  There shall be no enclosed malls in the Shopping Center unless the Consenting Owners have first given their written consent, which consent can be withheld in the sole and absolute discretion of the Consenting Owners to the location of the entrance to such mall.

(19)  There shall be no restriction on restaurant uses in the Shopping Center except as follows: there shall be no Restaurant uses (excluding any such use which is incidental to the Owner's or Occupant's business in the subject location) on either the Developer Parcel Outparcel designated as P2 on the Site Plan, the Developer Parcel Outparcel designated as P3 on the Site Plan or the Developer Parcel Outparcel designated as S3 on the Site Plan, in excess of three thousand five hundred (3,500) square feet in the aggregate for each such Developer Parcel Outparcel.

(20)  No portion of the Shopping Center other than the Home Depot Parcel shall be used for a home improvement center or for any business which sells, singly or in any combination, lumber, hardware, tools, plumbing supplies, pool supplies, electrical supplies, paint, wallpaper and other wallcovering, carpeting and other floor covering, siding, tile (including ceramic tile), ceiling fans, gardening and garden nursery supplies, artificial and natural plants, light fixtures, cabinets or household appliances, except for the incidental sale of such items; provided, however, that the foregoing restriction shall not apply to any of the following retailers (and any successor to any such retailer by merger, consolidation or otherwise provided such successor continues to operate in the premises at the Shopping Center prior to succession) or their uses (so long as such use is consistent with the use at a majority of their other stores) at the Shopping Center: Bed, Bath & Beyond, Cost Plus, Michaels, JoAnns, Circuit City, TJ

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-16-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

Maxx and any "crafts" retail use occupying a premises in the Shopping Center containing not less than eighteen thousand (18,000) square feet of Floor Area. An "incidental sale of such items" is one in which there is no more than the lesser of (i) ten percent (10%) of the total Floor Area of such business, or (ii) three hundred (300) square feet of sales and/or display area, relating to such items individually or in the aggregate.

(21)   No Owner, Prime Lessee or other Person or Occupant of all or any portion of the Home Depot Parcel shall engage in, nor shall any use thereof be made, which violates any exclusive use right granted to any Owner, Prime Lessee or other Person or Occupant of any other portion of the Shopping Center pursuant to a written lease entered into prior to the date of this Agreement, provided Home Depot has been given written notice of such exclusive use right prior to the date of the Agreement. The use restrictions in this section shall not prevent or exclude Home Depot or its successor in interest, licensees or concessionaires from selling hot dogs, hamburgers or sandwiches within the Home Depot store on the Home Depot Parcel, or on the Perimeter Sidewalks adjacent to the Home Depot store on the Home Depot Parcel.

(22)   No fitness center, workout facility, gym, health spa or studio, health facility, medical office, dental office, professional office or business office shall be located west of the building line between the premises shown as M3 and M4 on the Site Plan without the prior written consent of Home Depot, which consent may be withheld in Home Depot's sole and absolute discretion; provided, however, that, notwithstanding the foregoing, a fitness center, workout facility, gym, health spa or studio or health facility may be located in the premises designated as M10 on the Site Plan (provided that during the period of any such use in the premises designated as M10 on the Site Plan the main entrance to such premises shall be located on the northwest side of the building located on the premises designated as M10 on the Site Plan).

USE RESTRICTIONS PURSUANT TO MAJOR EXISTING LEASES AT THE SHOPPING CENTER:

1.   (Bank of the West): *See Exhibit H Attached Hereto*
2.   (Bath & Body Works): Throughout the Term, Tenant shall not use or permit the use of the Demised Premises, and Landlord shall not lease or permit the use of any portion of the Shopping Center, for the operation of any adult bookstore, adult movie theater, head shop, bar, tavern, restaurant, massage parlor or other similar enterprise whose business is the sale, rental or promotion of sexually explicit materials, acts or entertainment. For the purpose of this lease, "adult bookstore" shall mean any store, a substantial part of the inventory of which is not available for sale to children under the age of 15 because it explicitly deals with or depicts human sexuality, and "head shop" shall mean any store which sells items commonly used or intended for use with or in the consumption of any narcotic, dangerous drug or other controlled substance, including without limitations, any hashish pipe, waterpipe, bong, chillum, pipe screen, rolling papers, rolling devices, coke spoons or roach clips.

Landlord warrants and represents that Exhibit H Attached hereto is a complete list of all use restrictions and exclusive use rights that affect the use of the Demised Premises, and that except for the matters set forth in Exhibit H, there are no other exclusives or use restrictions outstanding which would in any manner derogate from Tenant's right to use the Demised Premises as set forth in Section [above]. Tenant agrees that its operations in the Demised Premises shall not violate said restrictions or exclusives. *See Exhibit H Attached Hereto*

3.   (BJ's Restaurant & Brewery): *See Exhibit H Attached Hereto*
4.   (Blaze Fast Fire'd Pizza): *See Exhibit F Attached Hereto*
5.   (Bob's Discount Furniture): *See Exhibit H Attached Hereto*
6.   (Boot Barn): So long as the Lease remains in effect and Tenant is open and operating in the Premises, Landlord agrees that Landlord shall not permit any portion of Zone A of the Shopping Center, as noted on Exhibit A, to be used or occupied by any: (a) flea market or junk yard; (b) gambling, off-track betting,

-14000/11-27-19/JNO/JNO#02666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-17-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

or bingo parlor; (c) psychic, tarot card reading or similar services; (d) bail bondsman; (e) sale or distribution of drug supplies or paraphernalia (except as sold by a licensed pharmacist or other legal retailer), including, but not limited to, roach clips, water pipes, bongs, coke spoons, cigarette papers or hypodermic syringes (except as sold by a licensed pharmacist; (f) tattoo parlor, or exotic or erotic dance clubs; (g) the sale or distribution of any pornographic or "adult" materials including, but not limited to, "adult" or "x rated" entertainment or merchandise (including, books, magazines, digital media, videos, or recordings of any kind); (h) any use which produces objectionable noise or vibration; or (i) lounge, bar or nightclub except such as is part of a sit-down restaurant. In addition, Landlord shall not permit any leasable space within forty (40) feet of the Tenant's front door to be occupied by (v) cigar shop or (w) a nail salon or tenant or occupant providing nail services, (x) a dry cleaning processing plant. In addition, Landlord further warrants and agrees that Landlord shall not permit any portion of Zone A of the Shopping Center to be used or occupied by: (m) intentionally deleted; (n) a health spa containing more than 4,000 square feet; (o) a gym containing more than 4,000 square feet; (p) a fitness center containing more than 4,000 square feet; (q) a skating rink; (r) the sale or lease of motor vehicles or trailers; (s) a school containing more than 4,000 square feet; (t) a residence or hospitality use; (w) non-retail office space (retail office space including such as without limitation real estate and insurance brokers) containing more than 4,000 square feet.

7.    (Bright Now Dental): *Tenant Prohibited Uses:* Tenant shall not use the Demised Premises or permit the Demised Premises to be used (i) for any purpose or in any manner that violates any legal requirement and/or the requirements of the insurance underwriters(s) of the Shopping Center; (ii) for the sale, rental or display of drug paraphernalia, or any goods and/or services that, in the sole and absolute discretion of Landlord, are inconsistent with the image of a community or family-oriented center; (iii) as a massage parlor, adult bookstore or second-hand store; (iv) to operate any video, pinball or other gaming machines; (v) to keep live animals of any kind unless otherwise permitted by this Lease; (vi) to sell any irregular merchandise or "seconds" unless such merchandise is so advertised and marked; (vii) to conduct a "discount operation" unless specifically permitted to the contrary in Tenant's Permitted Use or (viii) for the conducting of any fire, auction, bankruptcy, "going-out-of business", "lost-our-lease" or other similar sales. Tenant shall keep the Demised Premises, and every part thereof, in a clean and wholesome condition, free from any objectionable noises, loud music, odors or nuisances. In no event may Tenant, or any party using or occupying the Demised Premises by or through Tenant, use the Demised Premises in violation of the provisions of Exhibit F, attached hereto and made a part hereof.

Tenant shall not perform any acts or carry on any practice which may be a nuisance or unreasonable disturbance to other tenants and business invitees or the general public.

8.    (Catherine's): *Tenant Restricted Uses:* No portion of the Shopping Center may be used for a home improvement center or for any business whose principle use is the sale of lumber, hardware, tools, plumbing supplies, pool supplies, electrical supplies, paint, wallpaper and other wall covering, carpeting and other floor covering, siding, tile (including ceramic tile) ceiling fans, gardening and garden nursery supplies, artificial and natural plants, patio furniture, light fixtures, cabinets and unfinished and finished furniture, and household appliances.

Tenant shall not use more than ten percent (10%) of the Store, not to exceed 500 feet, for the sale of any of the following categories of merchandise:
1. Intentionally Omitted
2. Intentionally Omitted
3. Mattresses
4. Party goods
5. Office supplies
6. Shoes

7. Books
8. Electronics and computer related items
9. Linens and domestics
Tenant shall not use the Store or any portion thereof as a health club.

9. (Chipotle): Tenant shall not use the Demised Premises or permit the Demised Premises to be used (i) for any purpose or in any manner that violates any legal requirement and/or the requirements of the insurance underwriter(s) of the Shopping Center; (ii) for the sale, rental or display of drug paraphernalia, or any goods and/or services that, in the reasonable discretion of Landlord, are inconsistent with the image of a community or family-oriented center; (iii) as a massage parlor, adult bookstore or second-hand store; (iv) to operate any video, pinball or other gaming machines; (v) to keep live animals of any kind unless otherwise permitted by this Lease; (vi) to sell any irregular merchandise or "seconds" unless such merchandise is so advertised and marked; (vii) to conduct a "discount operation" or to advertise or permit anything to be done that will categorize Tenant's business as a "discount operation" unless specifically permitted to the contrary in Tenant's Permitted Use or (viii) for the conducting of any fire, auction, bankruptcy, "going-out-of business", "lost-our-lease" or other similar sales. Tenant shall keep the Demised Premises, and every part thereof, in a clean and wholesome condition, free from any objectionable and unreasonable noises, loud music, odors or nuisances. In no event may Tenant, or any party using or occupying the Demised Premises by or through Tenant, use the Demised Premises in violation of the provisions of Exhibit F, attached hereto and made a part hereof.

Notwithstanding anything to the contrary set forth herein, Landlord understands that some odors are associated with the operation of a "Chipotle" restaurant and that the presence of such odors shall not – constitute a breach of this Lease or a violation of any rules or regulations of Landlord. In addition, Tenant, during its hours of operation, shall be allowed to play music within the Demised Premises, and on any outdoor seating area of the Demised Premises, and Landlord agrees that such music does not constitute a nuisance, provided however, it is not a disturbance, as reasonably determined, to other tenants. In the event that Landlord receives a complaint as to the volume of the music in the outdoor seating area of the Demised Premises, Landlord shall provide Tenant with written notice of the same and the opportunity to adjust the volume thereof, upon receipt of the notice. Landlord hereby represents and warrants that the provisions of Exhibit F, and any exclusives granted to other tenants in the Shopping Center do not prohibit Tenant's use of the Demised Premises as a Chipotle Mexican Grill.

10. (Cost Plus): The Shopping Center is and will remain retail in character, and further, no part of which shall be used for office or residential purposes or as a theater (other than north of Home Depot), auditorium, meeting hall, school, church or other place of public assembly, "flea market," gymnasium or health club (other than north of Home Depot), dance hall, billiard or pool hall, massage parlor, video game arcade, bowling alley, skating rink, car wash, facility for the sale, leasing or repair of motor vehicles, night club or adult book or adult video store (which are defined as stores at least ten percent (10%) of the inventory of which is not available for sale or rental to children under 15 years old because such inventory explicitly deals with or depicts human sexuality). No restaurant shall be permitted in the Shopping Center within two hundred (200) feet of the Store without the prior written consent of Tenant, except for a delicatessen, sandwich shop, cookie store, ice cream parlor or similar food service retailer with limited seating capacity.

11. (Dick's Sporting Goods): *Exclusives/Restrictions*: Subject to the rights of Occupants under leases in effect on the Effective Date as listed on Exhibit M, and their permitted successors and assigns under such leases, as the premises under such leases may be relocated, and the rights of any Occupant under a lease that shall be a replacement (as to permitted use) for any Occupant under a lease listed on Exhibit M but provided that (x) the permitted use of the replacement Occupant shall be substantially the same as the Occupant being replaced, (y) Landlord shall not modify any such existing lease to

-14000/11-27-19/JNO/JNO#02666.07/VLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-19-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

permit any such Occupant to use its premises in violation of this Section 1.4 and (z) the provisions below in this Section 1.4 and in Section 1.5 regarding Bally's Fitness, a health club, Golfsmith and a golf store shall supersede the preceding provisions of this Section 1.4 regarding existing Occupants and their replacements, Landlord agrees that during the term of this Lease and as long as any retail sales activity shall be conducted in the Demised Premises excluding interruptions (a) not exceeding one hundred eighty (180) consecutive days, or (b) due to alterations, restoration, casualty, taking and a Force Majeure Event, which shall be deemed to be the conduct of retail sales activity for purposes of this section, the Shopping Center shall not be used for any purpose that is inconsistent with a first-class shopping center, the OEA, matters set forth in Exhibit I and specifically Landlord's Parcel shall not be used:

(a) for any non-retail purposes; provided, however, that (i) repairs, alterations, storage and offices incidental to retailing, shall be deemed retail, (ii) beauty and hair salons (including unisex hair salons offering hair cutting and hair styling services), barbers, and nail salons shall be deemed retail, and (iii) the following office and service uses shall be deemed retail: any office and service uses typically found in first class shopping centers, which office and service uses provide services directly to consumers and such as, by way of example only, banks, mortgage/loan and financial service businesses, real estate services, security brokerage services, tax preparation services, accounting services, insurance services, optical, chiropractic or dental services (e.g., Aspen Dental), travel agencies, automobile clubs (e.g., AAA), tailors, laundromats and dry cleaning facilities (provided there is no on-site dry cleaning), and weight loss/control centers (e.g., Weight Watchers) (collectively, "Permitted Office/Service Uses"); provided, however, that Office/Service Uses shall be permitted in only an aggregate maximum of five percent (5%) of the LFA of the Shopping Center;

(b) for any entertainment purposes such as a bowling alley, skating rink, bar, night club, discotheque, amusement gallery, cinema, poolroom, health club (except for the Bally's Fitness operating at the Shopping Center as of the Effective Date and any replacement fitness center operating similarly thereto (such as LA Fitness or 24 Hour Fitness) provided that such one fitness center is located in the portion of the Shopping Center marked "Fitness Use Location" on the Lease Plan and has an LFA no greater than 50,000 square feet), massage parlor (except for Massage Envy or a similar national or regional Occupant providing bona fide therapeutic massage), sporting event, sports or game facility or off-track betting club;

(c) for any establishment which sells or displays pornographic materials;

(d) for any establishment which sells or displays used merchandise or second hand goods; or

(e) for a restaurant or establishment selling food prepared on premises for consumption on or off premises located within four hundred (400) lineal feet of the Demised Premises (however, a restaurant shall be permitted within three hundred (300) lineal feet of the Demised Premises if such restaurant is on an out-parcel with self-contained parking with at least fifteen (15) parking spaces for so-called standard size American automobiles, and driveways and footways incidental thereto, for each one thousand (1,000) square feet of LFA).

Landlord agrees that the Shopping Center shall not be used for any purpose that is not permitted under the Title Matters, specifically including the OEA, and that Landlord will enforce the provisions of the Title Matters and the OEA against the parties to the OEA and other Occupants. Reciprocally, subject to the representations by Landlord contained in Section 16.4 herein, Tenant agrees that the Demised Premises shall not be used for any purpose in violation of the matters set forth on Exhibit I. Landlord warrants and agrees that, during the term of this Lease, it will not, nor will any entity under common control with Landlord, enter into any lease, license agreement or other similar agreement nor permit any premises in Landlord's Parcel (other than the Demised Premises) or any land adjacent to or contiguous (but for roadways or access ways) to Landlord's Parcel which is owned or otherwise controlled by a Landlord Entity (collectively, the "Restricted Property"), or otherwise transfer or allow a

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-20-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

possessory interest in the Restricted Property to an Occupant to be used for the sale, rental and/or distribution, either singly or in any combination of (i) health, fitness and/or exercise equipment; (ii) sporting goods and sporting equipment (including, but not limited to, golf equipment and accessories); (iii) hunting, camping and fishing equipment and accessories; and/or (iv) athletic footwear ("Precluded Use Activity(ies)").

Notwithstanding the foregoing Precluded Use Activity(ies) set forth above, the retail sale and/or distribution of health, fitness and/or exercise equipment, sporting goods and/or sporting equipment, hunting, camping and fishing equipment and accessories and/or athletic footwear in the lesser of (i) ten percent (10%) in the aggregate of any such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) or (ii) one thousand (1,000) square feet in the aggregate of such Occupant's LFA (which shall include an allocable portion of the aisle space adjacent to such sales floor area of such use) shall not be prohibited.

In addition, (x) a replacement of the Bally's Fitness operating at the Shopping Center as of the Effective Date shall not be deemed a Precluded Use Ac6vity provided that such replacement is a fitness center operating similarly thereto (such as LA Fitness and 24 Hour Fitness), is located in the portion of the Shopping Center marked Fitness Use 1.ocation on the Lease Plan and has an LFA no greater than 50,000 square feet), and (y) with respect to the Golfsmith store operating at the Shopping Center, a waiver letter is attached hereto as Exhibit N: and Landlord warrants and agrees that, during the term of this Lease, (i) Landlord (or any entity under common control with Landlord) will not replace Golfsmith with another golf store or otherwise enter into any lease, license agreement or other similar agreement nor permit any premises in the Restricted Property, to be operated as a golf store, and (u) a golf store (other than Golfsmith under its lease as of the Effective Date) shall be a Precluded Use Activity.

12.   (Euphoria Nails & Spa): *Tenant Restrictions:* Tenant shall not, without Landlord's prior written consent: (a) conduct any auction or bankruptcy sales; (b) conduct any fire sale except as a result of a fire on the Premises; (c) conduct any close-out sale except at the expiration of the Lease term; (d) sell any so-called "surplus", 'Army and Navy', or "secondhand" goods, as those terms are generally used at this time and from time to time hereafter; (e) permit anything to be done on the Premises which will in any way obstruct, interfere with or infringe on the rights of other occupants or invitees of the Shopping Center; (f) cause, maintain or permit any nuisance on the Premises or cause or permit any waste to be committed on the Premises; (g) install or erect any satellite dish or other roof- or building-mounted equipment; (h) install any pay telephones in or about the Premises; or (i) bring or keep on the Premises any item or thing or permit any act thereon which is prohibited by any law, statute, ordinance or governmental regulation now in force or hereinafter enacted or promulgated, or which is prohibited by any Standard form of fire insurance policy. Tenant's business shall be conducted in a first class manner, and that no liquidating sales, auctions, or other non-first class business operations shall be conducted on the Premises. Tenant shall not use, and shall not allow anyone else to use, the Leased Premises as a habitation. Such prohibition shall include, without limitation, sleeping, eating, or bathing in the Leased Premises.

13.   (Five Below): *See Exhibit H Attached Hereto*

14.   *(GNC): Tenant Restrictions:* Tenants may use the demised premises only for the use as stated in the lease and for no other purpose. Without Landlord's consent, tenants may not utilize the common areas, sidewalks or walkways adjacent to the demised premises nor the roof of the demised premises for any of the following uses: to display, store, or place any merchandise, equipment or devices; to install public telephones/telecommunication systems, newsstands, vending or other coin operated machines; nor may the demised premises be used to conduct any type of distress or "going out of business" sale; to store any merchandise or materials, other than those reasonably necessary for the

-I4000/11-27-19/JNO/JNO802666.07/WLA
999903+I4000/11-27-19/JNO/JNO

EXHIBIT E
-21-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

operation of a tenant's business, or to black out or otherwise obstruct the windows of the demised premises. In addition no shopping carts and/or baskets may be stored outside the designated areas.

15. (Home Depot): *Restrictions Regarding Home Depot Parcel & Shopping Center:* Items 20-22 above. *Prohibited Uses:* In addition to the usual shopping center restrictions against uses which create offensive odors, objectionable noise or unusual fire, explosion or other hazards and "adult entertainment" uses, the REA prohibits:

   (i) Body and fender shop, car wash facility or gasoline station (other than on the Developer Parcel Outparcels designated as P2 and P3 on the Site Plan);
   (ii) Laundromat or dry-cleaning facility (except that a pick-up and delivery facility is permitted);
   (iii) Warehouse or self-storage facility;
   (iv) Theatre, auditorium, sports or other entertainment viewing facility;
   (v) Game parlor, video or other type of game room or arcade;
   (vi) Beauty school, barber collage, reading room, place of instruction or other operation catering primarily to students or trainees and not to customers;
   (vii) Office usage other than incidental to nonprohibited uses;
   (viii) Industrial or manufacturing uses;
   (ix) School or house of worship.

   Kiosks, booths and promotional uses are prohibited in the Common Areas without prior written consent of the Consenting Owners. However, seasonal sales of merchandise shall be permitted from the Outside Sales Areas, if any, shown on the Site Plan.

   No oil development operations or mining of any kind is permitted on the surface or within 500 feet below the surface of any portion of the Shopping Center. This restriction, while not unusual, is significant because of the mineral rights reservations in the legal description of the Property, some of which may include rights of surface entry. Our Title Comments Memorandum specifies that the Title Policy must include a modified form of CLTA Endorsement 100.26 insuring against damage to existing or future improvements resulting from the exercise of any right to use the surface of the land or any portion of the subsurface thereof lying above a depth of 500 feet below the present surface of the land, in the exercise of any mineral rights excepted from the description of the land.

16. (In-N-Out Burger): *Silent*
17. (Jamba Juice): *See Exhibit H Attached Hereto*
18. (Kirkland's): *Tenant Restrictions:* Tenant shall not use the Demised Premises or permit the Demised Premises to be used: (i) for any purpose or in any manner that violates any legal requirement and/or the requirements of the insurance underwriter(s) of the Shopping Center (Landlord represents, to the best of Landlord's actual knowledge, as of the Effective Date that Tenant's Permitted Use as a "Kirkland's" as Tenant typically operates nationally as of the Effective Date, should not cause any increase in premiums); (ii) for the sale, rental or display of drug paraphernalia, or any goods and/or services that are inconsistent with the image of a community or family-oriented center as determined in Landlord's commercially reasonable business judgment; (iii) as a massage parlor, adult bookstore or second-hand store; (iv) to operate any video, pinball or other gaming machines; (v) to keep live animals of any kind unless otherwise permitted by this Lease; (vi) to sell any irregular merchandise or "seconds" unless such merchandise is so advertised and marked; (vii) to conduct a "discount operation" or to advertise or permit anything to be done that will categorize Tenant's business as a "discount operation" (unless specifically permitted to the contrary in Tenant's Permitted Use of the Demised Premises) or (viii) for the conducting of any fire, auction, bankruptcy, "going-out-of business", "lost-our-lease" or other similar sales. Tenant shall not be prohibited from conducting its regular sales, or any sale in which Tenant offers increasing discounts over time, but none of those such sales could be categorized as a fire, auction, bankruptcy, "going-out-of-business", "lost our lease" or other similar sales. Tenant shall keep the Demised Premises, and every part thereof, in a clean and wholesome condition, free from any

*14000/1-27-19/JNO/JNO802666.07/WLA
999903-14000/1-27-19/JNO/JNO

EXHIBIT E
-22-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

objectionable noises, loud music, odors or nuisances. Nothing herein shall prohibit Tenant from carrying on its usual business practices, including hanging pictures when necessary. In no event may Tenant, or any party using or occupying the Demised Premises by or through Tenant, use the Demised Premises in violation of the provisions of Exhibits "F", "F-1" or "F-2" attached hereto and made a part hereof.

*Prohibited Uses:* Landlord shall not permit the Shopping Center to be used inconsistent with the image of a community or family oriented center as determined in Landlord's reasonable judgment.

*See Exhibit F Attached Hereto.*

19. (L&L Hawaiian BBQ): Tenant Restrictions: Tenant shall not, without Landlord's prior written consent: (a) conduct any auction or bankruptcy sales; (b) conduct any fire sale except as a result of a fire on the Premises; (c) conduct any close-out sale except at the expiration of the Lease term; (d) sell any so-called "surplus", "Army and Navy", or "secondhand" goods, as those terms are generally used at this time and from time to time hereafter; (e) permit anything to be done on the Premises which will in any way obstruct, interfere with or infringe on the rights of other occupants or invitees of the Shopping Center; (f) cause, maintain or permit any nuisance on the Premises or cause or permit any waste to be committed on the Premises; (g) install or erect any satellite dish or other roof- or building-mounted equipment; (h) install any pay telephones in or about the Premises; or (i) bring or keep on the Premises any item or thing or permit any act thereon which is prohibited by any law, statute, ordinance or governmental regulation now in force or hereinafter enacted or promulgated, or which is prohibited by any Standard form of fire insurance policy.

20. (Liza Threading): The Demised Premises shall be limited by and be subject to certain express restrictions and prohibitions deemed necessary to preserve the value, desirability, and family orientation of the Shopping Center and its tenants, without regard to whether the prohibited activities, services or merchandise are offered gratuitously or nongratuitously, publicly or privately, materially or incidentally, as follows: A bar, lounge, nightclub or discotheque or any use where the sale of alcoholic beverages by the drink exceeds forty percent (40%) of such occupant's total gross sales; A place of public entertainment or recreation facility, including, without limitation, a bowling alley, theater, skating rink, billiard parlor, bingo parlor, off-track betting facility, gambling casino, gaming hall, gun range, computer game room or amusement center with arcade, pinball, video or electronic games; An auditorium or similar place of general assembly; A massage parlor or tattoo parlor; A funeral home; A training or educational facility including, without limitation, a beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees, rather than retail customers; The sale of drug paraphernalia except as may be permitted in a standard drug store; The sale or display of pornographic material, as determined by community standards for the area in which the Shopping Center is located; A flea market, second-hand store or pawn shop; Any business or use which emits offensive odors, fumes, dust or vapor or constitutes a public or private nuisance, or emits loud noises or sounds which are objectionable to the Shopping Center customers, users or occupants, or which creates a fire, explosive or other hazard; A manufacturing facility; A warehouse, except warehousing incidental to the operation of Tenant's business at the Demised Premises, or otherwise for the storage of goods or merchandise, other than such goods or merchandise offered for sale by Tenant at the Demised Premises; A car wash or for the use of storage, sale, display, repair, rental or servicing or cars, boats or other motorized vehicles or equipment; A hotel or other lodging facilities; A dry cleaner or other business that uses hazardous materials; Any primarily non-retail use other than a financial institution, a real estate or insurance office, a medical or dental office, a loan office, a brokerage office, a financial planner's office or a tax preparation office; Any use that violates any legal requirement and/or the requirements of the insurance underwriter(s) of the coverages on the Shopping Center; Any fire, auction, bankruptcy, "going-out-of-business," "lost our lease," or other similar sale.

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-23-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

21.  (Nordstrom Rack): No use or operation will be made, conducted or permitted on or with respect to all or any part of the Shopping Center, by either Landlord (or its tenants) or Tenant, which use or operation is obnoxious to or out of harmony with the development or operation of a first-class promotional shopping center, including, but not limited to, the following:

(1) Any public or private nuisance.

(2) Any noise or sound that is objectionable due to intermittence, beat, frequency, shrillness or loudness.

(3) Any obnoxious odor.

(4) Use, storage, transportation, handling, manufacture, or emission of any noxious, toxic, caustic or corrosive fuel or gas or other hazardous or toxic substance unless such materials are handled in accordance with all applicable governmental laws, regulations and codes.

(5) Emission of microwave, radio wave, or other similar electronic, light or noise radiation at levels which are dangerous to health according to governmental regulations or which interfere with the proper operation of electronic, telephone, computer or other business equipment of tenants of the Shopping Center.

(6) Any dust, dirt or fly ash in excessive quantities.

(7) Any unusual fire, explosion or other damaging or dangerous hazard, including the storage, display or sale of explosives or fireworks.

(8) Any warehouse (but any area for the storage of goods intended to be sold at any retail establishment in the Shopping Center shall not be deemed to be a warehouse), assembly, manufacture, distillation, refining, smelting, agriculture or mining operations. Excluded from this exception shall be a brew pub and ceramics if sold within the Shopping Center.

(9) Any mobile home or trailer court, labor camp, junk yard, stock yard or animal raising. Notwithstanding the foregoing, pet shops shall be permitted within the Shopping Center if located more than two hundred (200) feet from the Premises.

(10) Any drilling for and/or removal of subsurface substances.

(11) Any dumping of garbage or refuse (other than in dumpsters or compactors designed for such purpose).

(12) Any commercial laundry or dry cleaning plant, Laundromat, veterinary hospital, car washing establishment within Tenant's Restricted Parking Area (which is identified on Exhibit B), bowling alley, mortuary or similar service establishment.

(13) Any automobile body and fender repair work other than automobile services provided by any Department Store in connection with its operations as a retail Department Store.

(14) No Kiosk, pushcarts, temporary sales booths or other forms of so-called remote merchandising units ("RMU") shall be allowed within the area identified as the "no RMU area" on the site plan attached hereto and incorporated herein by reference as Exhibit B. Additionally, no food or entertainment use shall be allowed in any space contiguous to the Premises without the Tenant's prior approval, which approval may be withheld in Tenant's sole discretion.

(15) The operation of a "head shop," so-called, or other business devoted to the sale of articles or merchandise normally used or associated with illegal or unlawful activities, such as but not limited to the sale of paraphernalia used in connection with marijuana, cocaine or other controlled drugs or substances.

(16) A massage parlor (not including salon massages provided by a hair or beauty salon or health club), so-called, or the business of the sale of so-called "adult" materials such as, without limitation, magazines, books, movies and photographs.

(18) Automotive sales (selling new or used cars, trailers or mobile homes) and service.

(19) Factory.

(20) Industrial usage.

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-24-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

(21) Processing or rendering plant.

22. (Ozeki Noodle): *See Exhibit G Attached Hereto*
23. (Party City): *See Exhibit H Attached Hereto*
24. (Pick Up Stix): *See Exhibit H Attached Hereto*
25. (Sport Clips): Tenant's use and occupancy of the Demised Premises shall be limited by and be subject to certain express restrictions and prohibitions deemed necessary to preserve the value, desirability, and family orientation of the Shopping Center and 'its tenants, without regard to whether the prohibited activities, services or merchandise are offered gratuitously or nongratuitously, publicly or privately, materially or incidentally, as follows: A bar, lounge, nightclub or discotheque or any use where the sale of alcoholic beverages by the drink exceeds forty percent (40%) of such occupant's total gross sales; A place of public entertainment or recreation facility, including, without limitation, a bowling alley, theater, skating rink, billiard parlor, bingo parlor, off-track betting facility, gambling casino, gaming hall, gun range, computer game room or amusement center with arcade, pinball, video or electronic games; An auditorium or similar place of general assembly; A massage parlor or tattoo parlor; A funeral home; A training or educational facility including, without limitation, a beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees, rather than retail customers; The sale of drug paraphernalia except as may be permitted in a standard drug store; The sale or display of pornographic material, as determined by community standards for the area in which the Shopping Center is located; A flea market, second-hand store or pawn shop; Any business or use which emits offensive odors, fumes, dust or vapor or constitutes a public or private nuisance, or emits loud noises or sounds which are objectionable to the Shopping Center customers, users or occupants, or which creates a fire, explosive or other hazard; A manufacturing facility; A warehouse, except warehousing incidental to the operation of Tenant's business at the Demised Premises, or otherwise for the storage of goods or merchandise, other than such goods or merchandise offered for sale by Tenant at the Demised Premises; A car wash or for the use of storage, sale, display, repair, rental or servicing or cars, boats or other motorized vehicles or equipment; A hotel or other lodging facilities; A dry cleaner or other business that uses hazardous materials; Any primarily non-retail use other than a financial institution, a real estate or insurance office, a medical or dental office, a loan office, a brokerage office, a financial planner's office or a tax preparation office; Any use that violates any legal requirement and/or the requirements of the insurance underwriter(s) of the coverages on the Shopping Center. Any fire, auction, bankruptcy, "going-out-of-business," "lost our lease," or other similar sale.
26. (Sprint): *See Exhibit G Attached Hereto*
27. (Staples): *Prohibited Uses:* No part of the Center shall be used for any of the following: (i) tanning, health, exercise or racquet club or spa (except as set forth in Section 5.3 below), gymnasium, bowling alley, skating rink or other sports or recreational facility; (ii) school, library, reading room, or house of worship; (iii) movie theatre, gallery, auditorium, meeting hall, hotel or motor inn, or any residential use; (iv) massage parlor, adult bookstore, a so-called "head" shop, off-track betting, gambling, gaming or check cashing facility; (v) car wash, automobile repair -work or automotive service or gas station, tire store, automobile body shop, automobile, boat, trailer or truck leasing or sales, or laundromat; (vi) tavern, bar, amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video game, virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement center; (vii) any manufacturing, warehouse or office use (except incidental to a retail operation); (viii) funeral parlor, animal raising or storage (except incidental to a full-line retail pet supply operation), pawn shop, flea market or swap meet, junk yard; (ix) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (x) any use which constitutes a public or private nuisance or produces objectionable noise

-14000/11-27-19/JNO/JNO02666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-25-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

or vibration; and *Restricted Uses*: Excluding Pad I as designated on Exhibit A. no part of the Center within 300 feet of the Premises shall be used for a restaurant or any other use which would place an undue burden on parking.

28.    (Starbucks): *Silent*

29.    (Subway): *See Exhibits G & H Attached Hereto*

30.    (TJ Maxx): *See Generally Prohibited Uses Above*

31.    (Tilly's): *See Exhibit G Attached Hereto*

32.    (T-Mobile): Landlord shall not allow any use within the Shopping Center which (i) causes or creates a nuisance, (ii) is obnoxious, or (iii) generally detracts from the retail nature of the Shopping Center. Such prohibited uses shall include, but not be limited to, (a) flea markets, (b) storage of motor vehicles, boats or trailers, (c) automobile repair operations, (d) "head shops" or other similar type uses, (e) automobile sales, (f) educational facilities, (g) vocational schools or training classes unrelated to a primary retail use, (h) manufacturing or assembly facilities, (i) churches or places of religious congregations, and (j) any other non-retail uses which cause or Contribute to excessive use of the parking areas of the Shopping Center.

33.    (Wal-Mart): Except as may otherwise be permitted under the Existing Leases, Landlord shall not allow any other space in the Landlord's Property to be occupied by or used for any of the following uses or purposes (the "Prohibited Uses") without the written consent of Tenant, which consent Tenant may withhold in its sole and absolute discretion: (a) any nightclub or other place of recreation or amusement; (b) any business which derives fifty percent (50%) or more of its gross sales volume serving or selling alcoholic beverages ("Liquor Restriction"); (c) any business or facility used in growing, delivering, transferring, supplying, dispensing, dispersing, distributing or selling marijuana, whether by prescription, medical recommendation or otherwise, and whether consisting of live plants, seeds, seedlings or processed or harvested portions of the marijuana plant; (d) a cemetery; (e) a mortuary; (f) any establishment engaged in the business of selling, exhibiting or delivering pornographic or obscene material, with the exception of any store selling pornographic materials as an incidental part of its business (e.g., a bookstore such as Barnes & Noble, Borders, Crown or Brentano's shall be permitted in the Shopping Center so long as its operations are substantially similar to the operations of a majority of its other stores in the region); (g) a so-called "head shop"; (h) an off-track betting parlor; (i) a junkyard; (j) a flea market; (k) a recycling facility or stockyard; (1) a motor vehicle or boat dealership; (m) a body and fender shop; (n) a motor vehicle or boat storage facility; (o) a house of worship; (p) a discotheque or dance hall; (q) a skating rink; or (r) any industrial or manufacturing uses. Tenant shall not use the Premises for any Prohibited Uses, or-allow the Premises to be occupied by or used for any Prohibited Uses, without the written consent of Landlord, which consent Landlord may withhold in its sole and absolute discretion. Furthermore, the Liquor Restriction shall not restrict or preclude the use or occupancy of any portion of the Shopping Center for the sale of beer, wine, liquor or other beverages by (A) volume beverage specialty retailers (such as, by way of illustration but not as a limitation, BevMo and Total Wine & More), (B) boutique wine stores or wine bars (such as, by way of illustration but not as a limitation, Wine Styles, Wines for Less, or the Grape), or (C) multi-purpose retail chain stores (such as, by way of illustration but not as a limitation, Big Lots, Dollar Tree, or 99 Cent Only) or drug stores (such as, by way of illustration but not as a limitation, Longs Drugs, CVS, Rite Aid and Walgreens).

<u>Attachments</u>

Exhibit F: Demised Premises Restrictions

Exhibit G: Demised Premises Rules & Regulations

Exhibit H: Exclusives & Restrictions Report (included in several leases, although some are outdated).

-14000/11-27-19/JNO/JNO802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT E
-26-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**EXHIBIT F**

**GUARANTY OF LEASE**

THIS GUARANTY OF LEASE (this "**Guaranty**") is made as of ~~December 2~~ 2019, by Slava Vilshtein, an individual, and Ludmila Vilshtein, an individual (collectively, the "**Guarantors**" and individually, each a "**Guarantor**"), whose addresses are set forth in Paragraph 9 hereof, in favor of G&I IX ESPLANADE PROPERTY LP, a Delaware limited partnership ("**Landlord**").

WHEREAS, Landlord and SEN FITNESS GROUP, INC., a California corporation ("**Tenant**") desire to enter into that certain Retail Lease dated December 2, 2019 (the "**Lease**") concerning the premises in the building located at 451 W. Esplanade Drive, in the City of Oxnard, County of Ventura, State of California (the "**Building**");

WHEREAS, Guarantors have a financial interest in the Tenant; and

WHEREAS, Landlord would not execute the Lease if Guarantors did not execute and deliver to Landlord this Guaranty.

NOW THEREFORE, for and in consideration of the execution of the foregoing Lease by Landlord and as a material inducement to Landlord to execute said Lease, Guarantors hereby jointly, severally, and absolutely, presently, continually, unconditionally and irrevocably guaranty (subject to the terms of Section 23 below) the prompt payment by Tenant of all rentals and all other sums payable by Tenant under said Lease and the faithful and prompt performance by Tenant of each and every one of the terms, conditions and covenants of said Lease to be kept and performed by Tenant, and further agree as follows:

1.      It is specifically agreed and understood that the terms, covenants and conditions of the Lease may be altered, affected, modified, amended, compromised, released or otherwise changed by agreement between Landlord and Tenant, or by course of conduct and each Guarantor does guaranty and promise to perform all of the obligations of Tenant under the Lease as so altered, affected, modified, amended, compromised, released or changed and the Lease may be assigned by or with the consent of Landlord or any assignee of Landlord without consent or notice to Guarantors and that this Guaranty shall thereupon and thereafter guaranty the performance of said Lease as so changed, modified, amended, compromised, released, altered or assigned.

2.      This Guaranty shall not be released, modified or affected by failure or delay on the part of Landlord to enforce any of the rights or remedies of Landlord under the Lease, whether pursuant to the terms thereof or at law or in equity, or by any release of any person liable under the terms of the Lease (including, without limitation, Tenant) or any other Guarantor, including without limitation, any other Guarantor named herein, from any liability with respect to Guarantors' obligations hereunder.

3.      Subject to Section 23 below, each Guarantor's liability under this Guaranty shall continue until all rents due under the Lease have been paid in full in cash and until all other obligations to Landlord have been satisfied, and shall not be reduced by virtue of any payment by Tenant of any amount due under the Lease.  If all or any portion of Tenant's obligations under the Lease is paid or performed by Tenant, the obligations of Guarantor hereunder shall continue and remain in full force and effect in the event that all or any part of such payment(s) or performance(s) is avoided or recovered directly or indirectly from Landlord as a preference, fraudulent transfer or otherwise.

4.      Each Guarantor warrants and represents to Landlord that such Guarantor now has and will continue to have full and complete access to any and all information concerning the Lease, the value of the assets owned or to be acquired by Tenant, Tenant's financial status and its ability to pay and perform the obligations owed to Landlord under the Lease. Each Guarantor further warrants and represents that such Guarantor has reviewed and approved copies of the Lease and is fully informed of the remedies Landlord may pursue, with or without notice to Tenant, in the event of default under the Lease.  So long as any of Guarantors' obligations hereunder remains unsatisfied or owing to Landlord, each Guarantor shall keep fully informed as to all aspects of Tenant's financial condition and the performance of said obligations.

5.      Each Guarantor hereby covenants and agrees with Landlord that if a default shall at any time occur in the payment of any sums due under the Lease by Tenant or in the performance of any other obligation of Tenant under the Lease, such Guarantor shall and will forthwith upon demand pay such sums, and any arrears thereof, to Landlord in legal currency of the United States of America for payment of public and private debts, and take all other actions necessary to cure such default and perform such obligations of Tenant.

6.      The liability of Guarantors under this Guaranty is a guaranty of payment and performance and not of collectability, and is not conditioned or contingent upon the genuineness, validity, regularity or enforceability of the Lease or the pursuit by Landlord of any remedies which it now has or may hereafter have with respect thereto, at law, in equity or otherwise.

7.      Each Guarantor hereby waives and agrees not to assert or take advantage of to the extent permitted by law:  (i) all notices to Guarantor (or any of them), to Tenant, or to any other person, including, but not limited to, notices of the acceptance of this Guaranty or the creation, renewal, extension, assignment, modification or accrual of any of the obligations owed to Landlord under the Lease and, except to the extent set forth in Paragraph 9 hereof, enforcement of any right or remedy with respect thereto, and notice of any other matters relating thereto; (ii) notice of acceptance of this Guaranty; (iii) demand of payment, presentation and protest; (iv) any right to require Landlord to apply to any default any security deposit or other security it may hold under the Lease; (v) any right or defense that may arise by reason of the incapability, lack or authority, death or disability of Tenant or any other person; and (vi) all principles or provisions of law which conflict with the terms of this Guaranty. Moreover, each Guarantor agrees that such Guarantor's obligations shall not be affected by any circumstances which constitute a legal or equitable discharge of a guarantor or surety.

8.      Each Guarantor agrees that Landlord may enforce this Guaranty without the necessity of proceeding against Tenant or any other guarantor, including, without limitation, any other Guarantor named herein. Each Guarantor hereby waives the right to require Landlord to proceed against Tenant, to proceed against any other guarantor, including, without limitation, any other Guarantor named herein, to exercise any right or remedy under the Lease or to pursue any other remedy or to enforce any other right.

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT F
-1-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

9.    (a)    Each Guarantor agrees that nothing contained herein shall prevent Landlord from suing on the Lease or from exercising any rights available to it thereunder and that the exercise of any of the aforesaid rights shall not constitute a legal or equitable discharge of Guarantor.  Without limiting the generality of the foregoing, each Guarantor hereby expressly waives any and all rights and defenses that are or may become available to such Guarantor by reason of Sections 2787 through 2855, inclusive, of the California Civil Code, and the second sentence of California Civil Code § 2822(a).  In addition, each Guarantor agrees that Landlord (not Tenant) shall have the right to designate the portion of Tenant's obligations under the Lease that is satisfied by a partial payment by Tenant.

(b)    Each Guarantor agrees that such Guarantor shall have no right of subrogation against Tenant or any right of contribution against any other Guarantor hereunder unless and until all amounts due under the Lease have been paid in full and all other obligations under the Lease have been satisfied.  Each Guarantor further agrees that, to the extent the waiver of such Guarantor's rights of subrogation and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation such Guarantor may have against Tenant shall be junior and subordinate to any rights Landlord may have against Tenant, and any rights of contribution such Guarantor may have against any other Guarantor shall be junior and subordinate to any rights Landlord may have against such other Guarantor.

(c)    To the extent any dispute exists at any time between or among any of the Guarantors as to any Guarantor's right to contribution or otherwise, each Guarantor agrees to indemnify, defend and hold Landlord harmless from and against any loss, damage, claim, demand, cost or any other liability (including, without limitation, reasonable attorneys' fees and costs) Landlord may suffer as a result of such dispute.

(d)    The obligations of each Guarantor under this Guaranty shall not be altered, limited or affected by any case, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Tenant or any defense which Tenant may have by reason of order, decree or decision of any court or administrative body resulting from any such case.  Landlord shall have the sole right to accept or reject any plan on behalf of each Guarantor proposed in such case and to take any other action which such Guarantor would be entitled to take, including, without limitation, the decision to file or not file a claim.  Each Guarantor acknowledges and agrees that any payment which accrues with respect to Tenant's obligations under the Lease (including, without limitation, the payment of rent) after the commencement of any  such proceeding (or, if any such payment ceases to accrue by operation of law by reason of the commencement of such proceeding, such payment as would have accrued if said proceedings had not been commenced) shall be included in Guarantors' obligations hereunder because it is the intention of the parties that said obligations should be determined without regard to any rule or law or order which may relieve Tenant of any of its obligations under the Lease.  Each Guarantor hereby permits any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person to pay Landlord, or allow the claim of Landlord in respect of, any such payment accruing after the date on which such proceeding is commenced.  Each Guarantor hereby assigns to Landlord such Guarantor's right to receive any payments from any trustee in bankruptcy, receiver, debtor-in-possession, assignee for the benefit of creditors or similar person by way of dividend, adequate protection payment or otherwise.

10.    Any notice, statement, demand, consent, approval or other communication required or permitted to be given, rendered or made by either party to the other, pursuant to this Guaranty or pursuant to any applicable law or requirement of public authority, shall be in writing (whether or not so stated elsewhere in this Guaranty) and shall be deemed to have been properly given, rendered or made only if hand-delivered or sent by first-class mail, postage pre-paid, addressed to the other party at its respective address set forth below, and shall be deemed to have been given, rendered or made on the day it is hand-delivered or one day after it is mailed, unless it is mailed outside of the county in which the Building is located, in which case it shall be deemed to have been given, rendered or made on the third business day after the day it is mailed.  By giving notice as provided above, either party may designate a different address for notices, statements, demands, consents, approvals or other communications intended for it.

To Guarantors:        Slava Vilshtein
                      4417 Presidio Drive
                      Simi Valley, CA 93063

                      with copies to:

                      Paris Ackerman LLP
                      103 Eisenhower Parkway
                      Roseland, NJ 07068
                      Attention:  Craig H. Feldman, Esq.
                      Email:  cfeldman@parisackerman.com

To Landlord:          Investec Real Estate Companies
                      200 E. Carrillo, Suite 200
                      Santa Barbara, CA 93101
                      Attention:  Director of Leasing

                      with copies to:

                      Investec Real Estate Companies
                      c/o DRA Advisors LLC
                      200 E. Carrillo, Suite 200
                      Santa Barbara, CA 93101
                      Attention:  Nick Ife
                      Facsimile:  (212) 697-7403
                      Email:  nife@dradvisors.com

                      and:

Allen Matkins Leck Gamble Mallory & Natsis LLP
1901 Avenue of the Stars, Suite 1800
Los Angeles, California 90067-6019
Attention:  Alain M. R'bibo, Esq.

11.    Each Guarantor represents and warrants to Landlord as follows:

(a)    No consent of any other person, including, without limitation, any creditors of such Guarantor, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by such Guarantor in connection with this Guaranty or the execution, delivery, performance, validity or enforceability of this Guaranty and all obligations required hereunder.  This Guaranty has been duly executed and delivered by such Guarantor, and constitutes the legally valid and binding obligation of such Guarantor enforceable against such Guarantor in accordance with its terms.

(b)    The execution, delivery and performance of this Guaranty will not violate any provision of any existing law or regulation binding on such Guarantor, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on such Guarantor, or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which such Guarantor is a party or by which such Guarantor or any of such Guarantor's assets may be bound, and will not result in, or require, the creation or imposition of any lien on any of such Guarantor's property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

12.    The obligations of Tenant under the Lease to execute and deliver estoppel statements, as therein provided, shall be deemed to also require the Guarantors hereunder to do and provide the same relative to Guarantors.

13.    This Guaranty shall be binding upon each Guarantor, such Guarantor's heirs, representatives, administrators, executors, successors and assigns and shall inure to the benefit of and shall be enforceable by Landlord, its successors, endorsees and assigns.  Any married person executing this Guaranty agrees that recourse may be had against community assets and against his separate property for the satisfaction of all obligations herein guaranteed.  As used herein, the singular shall include the plural, and the masculine shall include the feminine and neuter and vice versa, if the context so requires.

14.    The term "Landlord" whenever used herein refers to and means the Landlord specifically named in the Lease and also any assignee of said Landlord, whether by outright assignment or by assignment for security, and also any successor to the interest of said Landlord or of any assignee in the Lease or any part thereof, whether by assignment or otherwise.  So long as the Landlord's interest in or to demised premises (as that term is used in the Lease) or the rents, issues and profits therefrom, or in, to or under the Lease, are subject to any mortgage or deed of trust or assignment for security, no acquisition by Guarantors of the Landlord's interest in demised premises or under the Lease shall affect the continuing obligations of Guarantors under this Guaranty, which obligations shall continue in full force and effect for the benefit of the mortgagee, beneficiary, trustee or assignee under such mortgage, deed of trust or assignment, of any purchaser at sale by judicial foreclosure or under private power of sale, and of the successors and assigns of any such mortgagee, beneficiary, trustee, assignee or purchaser.

15.    The term "Tenant" whenever used herein refers to and means the Tenant in the Lease specifically named and also any assignee or sublessee of said Lease and also any successor to the interests of said Tenant, assignee or  sublessee of such Lease or any part thereof, whether by assignment, sublease or otherwise.

16.    In the event of any dispute or litigation regarding the enforcement or validity of this Guaranty, Guarantors shall be obligated to pay all charges, costs and expenses (including, without limitation, reasonable attorneys' fees) incurred by Landlord, whether or not any action or proceeding is commenced regarding such dispute and whether or not such litigation is prosecuted to judgment.

17.    This Guaranty shall be governed by and construed in accordance with the laws of the state in which the Building is located without regard for choice of law principles, and in a case involving diversity of citizenship, shall be litigated in and subject to the jurisdiction of the courts of the State in which the Building is located.

18.    Every provision of this Guaranty is intended to be severable.  In the event any term or provision hereof is declared to be illegal or invalid for any reason whatsoever by a court of competent jurisdiction, such illegality or invalidity shall not affect the balance of the terms and provisions hereof, which terms and provisions shall remain binding and enforceable.

19.    This Guaranty may be executed in any number of counterparts each of which shall be deemed an original and all of which shall constitute one and the same Guaranty with the same effect as if all parties had signed the same signature page.  Any signature page of this Guaranty may be detached from any counterpart of this Guaranty and re-attached to any other counterpart of this Guaranty identical in form hereto but having attached to it one or more additional signature pages.

20.    No failure or delay on the part of Landlord to exercise any power, right or privilege under this Guaranty shall impair any such power, right or privilege, or be construed to be a waiver of any default or an acquiescence therein, nor shall any single or partial exercise of such power, right or privilege preclude other or further exercise thereof or of any other right, power or privilege.

21.    This Guaranty shall constitute the entire agreement between each Guarantor and the Landlord with respect to the subject matter hereof.  No provision of this Guaranty or right of Landlord hereunder may be waived nor may [any ]Guarantor be released from any obligation hereunder except by a writing duly executed by an authorized officer, director or trustee of Landlord.

22.    The liability of each Guarantor and all rights, powers and remedies of Landlord hereunder and under any other agreement now or at any time hereafter in force between Landlord and such Guarantor relating to the Lease shall be cumulative and not alternative and such rights, powers and  remedies shall be in addition to all rights, powers and remedies given to Landlord by law.

23.    Subject to the terms of this Section 23, if as of the fifth (5th) anniversary of the Lease Commencement Date (the "Termination Date"), Tenant has not previously been in default beyond any applicable notice and cure period under the Lease more than once and Tenant is not then in breach or in default beyond any applicable notice and cure period under the Lease, the Guarantors shall be relieved of their obligations with respect to any claims first arising following the Termination

EXHIBIT F
-3-

Date.  Notwithstanding the foregoing, the Guarantors may be released from their obligations pursuant to Section 14.7 of the Lease.

IN WITNESS WHEREOF, Guarantors have executed this Guaranty as of the day and year first above written.

"GUARANTORS"

_____
Slava Vilshtein

_____
Ludmila Vilshtein

802666.07/VLA
959903-14000/11-27-19/JNO/JNO

EXHIBIT F
-4-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

**EXHIBIT G**

**FRANCHISE RIDER**

This Lease Addendum attaches to the Lease entered into between G&I IX ESPLANADE PROPERTY LP, a Delaware limited partnership ("Lessor"), and SEN FITNESS GROUP, INC., a California corporation("Lessee") dated December 2, 2019 (the "Lease").

**RECITALS**

A.    Lessee has agreed to use the leased premises (the "**Premises**") only for the operation of a UFC Gym pursuant to a franchise agreement ("**Franchise Agreement**") with UG Franchise Operations, LLC, a California limited liability company ("**Franchisor**") dba UFC Gym Franchise Company.

B.    The parties desire to attach to the Lease the terms and conditions contained in this Addendum.

**AGREEMENT**

1.    **Remodeling and Décor**.  Lessor acknowledges that Lessee intends to operate a UFC Gym in the Premises, and that Lessee's rights to operate a UFC Gym and to use the UFC GYM® name, trademarks and service marks are solely pursuant to the Franchise Agreement.  Lessee's operations at the Premises are independently owned and operated.  Lessor acknowledges that Lessee is responsible for all obligations under the Lease unless and until Franchisor or another franchisee expressly assumes such obligations.

2.    **Assignment**.  Lessee has the right to assign all of its right, title and interest in the Lease to Franchisor or its successor, at any time during the term of the Lease, including any extensions or renewals, without first obtaining Lessor's consent (each a, "**Permitted Franchise Assignee**").  No assignment will be effective, however, until Franchisor or its successor gives Lessor written notice of its acceptance of the assignment.  If Franchisor elects to assume the Lease under this paragraph or unilaterally assumes the Lease as provided for in Sections 5(c) or 6(a), Lessor and Lessee agree that (a) Lessee will remain liable for the responsibilities and obligations, including amounts owed to Lessor, and (b) Franchisor will have the right to assign the Lease or sublease the Premises to another UFC GYM® franchise, subject to Lessor's approval which will not be unreasonably withheld, conditioned or delayed provided the franchisee agrees to operate the Premises as a UFC GYM® pursuant to a franchise agreement with Franchisor.  Moreover, Lessor:  (i) agrees not to impose any assignment fee or similar charge, or to increase or accelerate rent under the Lease, in connection with such an assignment (and/or sublease); and (ii) shall not exercise any recapture right that it may have with respect to the Premises in connection with any proposed assignment or subletting.

3.    **Franchisor Entry Rights**.  Franchisor shall have the right to enter the Premises at any time and from time to time (a) to make any repairs, alterations, or removals it considers reasonably necessary to protect the Franchisor system and marks. (b) to cure any default under the Lease, and (c) to remove the distinctive elements of the Franchisor trade dress upon the expiration or termination of the Franchise Agreement and/or the Lease.  Franchisor shall repair. or reimburse Lessor for the reasonable cost to repair. any damage to the Premises that results from Franchisor's removal of trade dress items and other property from the Premises pursuant to this paragraph.

4.    **Default and Notice.**

(a)    In the event there is a default or violation by Lessee under the terms of the Lease, Lessor agrees to give Lessee and Franchisor written notice of such default or violation within a reasonable time after Lessor knows of its occurrence.  Lessor agrees to provide Franchisor a copy of any written notice of default on the same day Lessor gives it to Lessee.  Although Franchisor is under no obligation to cure the default, Franchisor will notify Lessor if it intends to cure the default and unilaterally assume Lessee's interest in the lease as provided in Section 5(c).

(b)    All notices to Franchisor must be sent by registered or certified mail, postage prepaid, to the following address:

UFC Gym Franchise Company
Attn.: National Director of Real Estate
1241 E. Dyer Rd, #100
Santa Ana, CA 92705
(714) 668-0911

Franchisor may change its address for receiving notices by giving Lessor written notice of the new address.  Lessor agrees to notify both Lessee and Franchisor of any change in Lessor's mailing address to which notices should be sent.

(c)    Upon Lessee's default and failure to cure a default under either the Lease or the Franchise Agreement, Franchisor has the right (but not the obligation) to unilaterally assume Lessee's interest in the Lease in accordance with Section 2 of this Lease Addendum.

(d)    To the extent that Franchisor elects to cure any defaults of Lessee under the Lease, Lessee shall reimburse Franchisor for all costs incurred by Franchisor in effecting such cure.

5.    **Termination or Expiration.**

(a)    Upon the expiration or termination of the Franchise Agreement, Franchisor has the right (but not the obligation) to unilaterally assume Lessee's interest in the Lease in accordance with Section 2 of this Lease Addendum.

802666.06/WLA
999903-14000/11/27-19/JNO/JNO

EXHIBIT G
-1-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

(b)    Upon the expiration or termination of the Lease, if Franchisor does not assume Lessee's interest in the Lease, Lessor agrees to cooperate and allow Franchisor to enter the Premises, following reasonable advance written notice and evidence of reasonably acceptable insurance, without cost and without being guilty of trespass and without incurring any liability to Lessor, to remove all signs and all other items identifying the Premises as a UFC Gym and to make such other modifications as are reasonably necessary to protect the marks and system, and to distinguish the Premises from Franchisor. In the event Franchisor exercises its option to purchase assets of Lessee, Lessor agrees to permit Franchisor to remove all such assets being purchased by Franchisor.

6.    **Consideration; No Liability.**

(a)    Lessor acknowledges that Lessee is not an agent or employee of Franchisor and Lessee has no authority or power to act for, or to create any liability on behalf of, or to in any way bind Franchisor or any affiliate of Franchisor and that Lessor has entered into this Addendum with full understanding that it creates no duties, obligations, or liabilities of or against Franchisor or any affiliate of Franchisor,

(b)    Nothing contained in this Addendum makes Franchisor or its affiliates a party or guarantor to the Lease, and does not create any liability or obligation of Franchisor or its affiliates.

7.    **Reaffirmation of Lease.** Except as amended or modified by this Addendum, all of the terms, conditions, and covenants of the Lease remain in full force and effect.

8.    **Miscellaneous.**

(a)    Franchisor is a third party beneficiary of this Addendum and the Lease, with independent rights of enforcement with respect thereto.

(b)    References to the Lease and to the Franchise Agreement include all amendments, addenda, extensions, and renewals to those documents.

(c)    References to Lessor, Lessee, and Franchisor include the successors and assigns of each of the parties.

(d)    In the event of a conflict between the terms of the Lease and the terms of this Addendum, the terms of this Addendum shall prevail.

IN WITNESS WHEREOF, Lessor and Lessee have executed this Addendum as of the date written above.

LESSOR:

G&I IX ESPLANADE PROPERTY LP, a Delaware limited partnership

By:
Name: Andrew Peltz
Title: Vice President

LESSEE:

SEN FITNESS GROUP, INC., a California corporation

By:
Name: SLAVA VILSHTEIN
Title: owner/president

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT G
-2-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

<u>EXHIBIT H</u>

<u>LANDLORD'S SIGNAGE PLAN</u>

## THE ESPLANADE
Oxnard, California

## MASTER SIGN PROGRAM

PREPARED BY:

M&H PROPERTY MANAGEMENT
12555 High Bluff Dr., Suite 385
San Diego, California 92130
(858) 259-9909

SUBMITTED TO:

CITY OF OXNARD
305 West Third Street
Oxnard, California 93030

August 2000
Sign Program



The Esplanade
Master Sign Program

## A.   INTRODUCTION:

This criteria has been established for the purpose of assuring a functional, coordinated and visually attractive sign program for the mutual benefit of all tenants. Conformance will be strictly enforced. Upon demand by the landlord, or the City, any installed non-conforming or unproved sign must be brought into conformance or removed at the non-conforming tenant's expense.

The project sign consultant is to interpret these guidelines, but he is not empowered to authorize any departure from them without written approval of the City and the Landlord.

## B.   SCOPE:

The Esplanade Master Sign Program sets forth requirements for all signs attached to a tenant frontage or building, including Tenant Identification signs, Secondary Identification signs, entry signs, window signs, under canopy signs, standards for freestanding signs and center identification signs.

## C.   APPROVALS:

All signage shall comply with the standards of The Esplanade Master Sign Program. A sign permit application must be submitted to the city for any proposed sign. Sign permit applications and instructions concerning required exhibits are available from the city. No sign shall be fabricated or installed without applicable permit(s) from the city nor without prior written approval from the Landlord. In cases not covered by this sign program, City of Oxnard Sign Ordinance shall apply.

## D.   DEFINITIONS:

1.   **Advertising Message:** A display on a sign face by either written or graphic form which calls attention to products, events, services or a business.

2.   **Awning Sign:** A tenant name, logotype or logo which is displayed on an awning attached to tenant space.

3.   **Building Frontage:** The linear dimension of a building which faces upon a street; for the purpose of this criteria, the main field of the common area parking lost shall be considered a "street".

4.   **Building Sign:** Any sign which is fastened, attached, painted upon, connected or supported in whole or in part by a building or wall.

5.   **City:** The City of Oxnard, including any of its applicable departments.

6.   **Directional or Informational Sign:** A sign which directs on-site movement of vehicles or pedestrians, and signs identifying rest rooms, public telephones or similar features or facilities. Containing no advertising message.

Page 1

502666.07/WLA
999503-14000/11-27-19//JND/JND

EXHIBIT H
-4-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

7. **Exterior Wall:** All walls of a structure which can be viewed from the exterior of the structure but not through openings in any other wall.

8. **Fascia Sign:** A sign shall be considered to be a fascia sign if the sign would fall without support from the building wall or other structure. Additionally, these signs shall be mounted flush against or parallel to the surface of the building facade. These signs typically consist of either, individual letters, or in the case of logos, signage enclosed within a cabinet box.

9. **Freestanding Sign:** Any sign supported wholly by a foundation, uprights or braces placed in the ground and being detached from any building or structure.

10. **Internally Illuminated Sign:** Any sign whose illumination originates from within the structure of the sign and the source of which is not visible from the exterior of the sign.

11. **Landlord:** The party responsible for the management of The Esplanade's common area.

12. **Logo:** A distinctive trademark recognizable to the public as a symbol of an established company or business. A logo is usually displayed in conjunction with a logotype.

13. **Logotype:** A standardized representation of a company or business, comprised of a particular typeface, graphic layout and color(s), which is consistently used on signs, letterhead, business cards et al.

14. **Maximum Fascia Sign Horizontal Dimension:** The maximum allowable horizontal dimension for a fascia sign shall be 80% of the length of the tenant fascia upon which it is mounted.

15. **Maximum Fascia Sign Vertical Dimension:** The maximum allowable vertical dimension for a sign varies depending on the tenant location.

16. **Maximum Sign Area:** The Maximum allowable vertical dimension for a sign varies depending on the tenant location.

17. **Monument Sign:** No building sign may exceed eighty percent (80%) of the surface upon which it is mounted.

18. **Net Sign Area:** The total square footage of any given sign. This area can be determined by enclosing the perimeter of the sign with no more than ten (10) horizontal and/or vertical lines.

19. **Pad Tenant:** A tenant occupying a freestanding building.

20. **Parapet Wall:** An exterior wall which extends vertically above the roof line.

Page 2

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-5-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

21. **Portable Sign:** A sign which is capable of being carried or moved by manual or mechanical means from one location to another and which is not affixed to the ground, a structure, or a vehicle. Portable signs also include blimps and balloons which may or may not contain advertising messages.

22. **Projecting Sign:** A sign, other than a wall sign, which is attached to a building or other structure and extends beyond the line of the building or structure to which it is attached.

23. **Roof Line:** The highest point of a parapet wall or the main roof structure or the highest point of a parapet wall other than such architectural features as cupolas, pylons, projections or minor raised portions of the roof.

24. **Secondary Identification Sign:** A sign identifying a generic type of merchandise or service, such as a pharmacy, garden center or bakery. Anchor or major tenants only are allowed secondary identification signs as set forth under Sign Allowances below.

25. **Sign:** Any structure, device or material which, whether directly or indirectly, advertises, informs or identifies persons, businesses, commodities, services or ideas, including painted wall signs and all forms of flags, streamers, pennants, banners and balloons. Any words or symbols used for visual communication including its structure and component parts intended to be used to attract activity.

26. **Sign Structure:** Any structure which supports or is capable of supporting any sign. A sign structure may or may not be an integral part of the building. For the purpose of a freestanding sign, the sign structure shall include the aggregate area of the sign including the sign copy and all structural elements of the sign.

27. **Temporary Sign:** Any sign, banner, pennant, valance or advertising display constructed of cloth, canvas, light fabric, cardboard, wallboard, or other light materials with or without frames, intended to be displayed for a short period of time.

28. **Tenant:** The word "Tenant" in this criteria refers to occupants of space within The Esplanade, whether the occupant owns or leases the space.

29. **Under Canopy Sign/Blade Sign:** A pedestrian-scale sign mounted perpendicular to the storefront at the main entry to a major tenant or shop tenant space. An under canopy sign/blade sign is not included as part of the maximum number of signs or maximum allowable square feet of sign area permitted for a tenant space. Under canopy sign/blade sign shall be less than three square feet in area on each of its two (2) faces.

30. **Wall Sign:** A sign attached to or erected against the wall of a building or other structure with the exposed face of the sign in a plane parallel to the face of the wall.

31. **Window Sign:** A sign applied directly onto a window or internal to the window within twelve (12) inches of the window and visible from the public right-of-way.

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-6-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

E.    **GENERAL TENANT REQUIREMENTS:**

1.    Tenant shall be responsible for fulfillment of all requirements stated in this sign criteria.

2.    Tenant shall verify all sign location(s) and size(s) with Landlord prior to the beginning of fabrication and installation.

3.    Tenant shall pay for all signs, their installation including electrical connections(s) and all related labor and materials and maintenance.

4.    Tenant shall obtain all necessary permits.

5.    Electrical service to Tenant's sign(s) shall be paid for by the Tenant.

6.    Tenants shall be responsible for the care and maintenance of Tenants' exterior signs. Regularly scheduled maintenance shall include cleaning, servicing and repairing as required to maintain sign(s) in good working condition.

7.    Tenant shall provide repair service within five (5) days of any malfunction, vandalism or breakage. Unsafe conditions, resulting from damage shall be attended to immediately.

8.    Any submittal approved by the Landlord which deviates from this sign program shall not be deemed approved until it receives the required approval(s) from the city.

9.    Landlord has the right to repair or remove (at tenant's expense) any sign(s) which are not maintained in good operating condition.

10.   No sign shall be constructed until applicable permits from the city are received.

11.   Installation of any sign shall be done in a prompt and safe manner with as little disruption to business and traffic as possible and with minimum inconvenience to the landlord and other tenants.

12.   Sign contractor shall, prior to installation, submit to Landlord for Landlord's approval certificates of insurance naming Landlord as additional insured, protecting contractor, tenant and landlord against any property damage or liability claim caused or connected with the installation, use or structural sufficiency of the sign(s).

13.   Tenant's sign contractor shall repair any damage to Landlord's building caused by his work. Damage to structure that is not repaired by the sign contractor shall become the tenant's responsibility to correct to Landlord's satisfaction.

14.   Tenant shall be fully responsible for the work of tenant's sign contractor and shall indemnify, defend and hold the Owner harmless from damages or liabilities.

Page 4

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-7-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

15.    It shall be the responsibility of the tenant to ensure that all signs are removed from a tenant space within ten (10) days of its being vacated.

F.    **GENERAL SIGN DESIGN REQUIREMENTS:**

1.    All signs shall be fabricated, constructed, erected or installed and maintained in such a manner as will comply with all ordinances of the city and approved permit.

2.    Illuminated Signs. Lighting for externally illuminated signs shall be so arranged and maintained so that the light source is not directly visible from a public right-of-way or adjacent property. Internally illuminated signs shall be designed with an opaque, semi-opaque, or matte finish background on the sign face.

3.    No portion of a building sign shall exceed the height of the roof line or parapet wall upon which it is mounted. The horizontal dimension of a building sign shall not exceed eighty percent (80%) of the surface upon which it is mounted.

4.    Directional and/or information signs bearing no advertising message may be erected when necessary to facilitate circulation with the site, facilitate egress and ingress or facilitate a public need, such as identification of rest rooms, public telephones, walkways, and similar features.

5.    Each commercial use which has direct pedestrian access through an exterior building wall which is visible from public right-of-way, shall be allowed at least sixteen (20 sf) square feet of building sign area, regardless of building occupancy frontage.

6.    Signs in the form of banners shall be allowed to be displayed a maximum total of thirty (30) days during a calendar year.

7.    Power will be provided from the tenant's electrical panel to a junction box at all sign locations. Power hookup shall be by tenant. Photocell shall be provided by tenant to turn signage on at dusk and off at dawn.

8.    All electrical signs, their electrical components and their electrical assemblies shall be UL labels (not visible to public), and their installation shall comply with all local building and electrical codes.

9.    All penetrations of the building structure required for sign installation shall be neatly sealed in a water-tight condition with silicone sealant and shall be patched to match adjacent finish.

10.    All lettering shall be restricted to the "net sign area". No projection above or below the "net sign area" will be permitted (except as otherwise approved in writing). See accompanying design criteria for specific information.

Page 5

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-8-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program

11.     All bolts, fastenings, clips, etc., shall be painted to match the adjacent surface.

12.     No sign maker's label or other identification shall be permitted on the exposed surface of the sign, except for those required by local ordinance, and these shall be placed in an inconspicuous locations and shall be colored so as to remain inconspicuous against the surface on which they are placed.

13.     No exposed conduit, tubing light source, or raceways shall be permitted. No exposed neon lighting shall be used on signs, symbols or decorative elements.

14.     All conductors, transformers, and other equipment shall be concealed.

15.     Building wall and fascia signs shall be custom fabricated individual letters of non-corrosive metal, wood or other proven durable material.

16.     Signs may be internally-illuminated or externally-illuminated. External illumination of sign elements shall be with approved architectural lighting fixtures designed for exterior use. Location and design of fixtures shall be subject to Landlord approval. Externally-illuminated monument signs shall be lit with direct-burial sign light fixtures. No exposed flood lamps accepted.

17.     Translucent faces of internally-illuminated channel letters shall be constructed of "Rohm & Hass" acrylic plastic (3/16" minimum thickness, fastened with trim cap in an approved manner.) Plastic joint seams shall be electric weld only.

18.     No painted wall signs or awning signs are allowed. Cabinet signs are only allowed for ancillary graphic elements.

19.     Signs shall have a maximum of three (3) rows of copy.

20.     All fascia signs shall be centered left to right on the fascia or tenant frontage, and generally centered top to bottom between fascia reveals. (The vertical position will vary depending on the configuration of the sign and the locations of the reveals on the sign fascia. Proposed sign locations for tenant logo types and/or symbols with unusual configurations shall be submitted to the Landlord for review prior to the filing of an application with the City.

21.     The copy letter style, color and logo design for all tenant owned signs shall be determined by the Tenant, and approved by Landlord.

22.     Sign colors shall be complementary to the storefront architectural color palette, approved by Landlord.

23.     Banners or theme flags shall be permitted for seasonal or special events only and must be approved by the Landlord and the City of Oxnard.

Page 6

802666.07/WLA
999903-14000/11-27-19//NOJ/NO

EXHIBIT H
-9-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program

24.   Temporary window signs for special or seasonal sales shall be subject to Landlord and City of Oxnard.

25.   Wall signs shall be restricted to the maximum allowed "net sign area" as calculated per the attached guidelines.

26.   Internal illumination may be 60 milli-amp neon lamps installed and labeled in accordance with the "National Board of Fire Underwriters Specifications."

27.   Channel letters shall have service access to neon, transformers and wiring.

28.   Tenant's sign company shall verify all conduit and electrical service transformer locations prior to fabrication.

G.   **LANDLORD SUBMITTAL REQUIREMENTS:**

1.   Each tenant shall submit or cause to be submitted at least four (4) copies of detailed and sealed drawings to the Landlord for approval, before fabrication, including all lettering and/or graphics, one (1) in full color with exposed material samples of the proposed. Submittals shall be on 8 ½" x 14" paper.

   a.   Address of sign location.
   b.   Name and phone number of tenant
   c.   Name, address and phone number of contractor or erector.
   d.   Site plan showing location of proposed signs.
   e.   Elevation showing location on the building or other structure including heights of signs and any projection from building.
   f.   Elevation of sign showing dimensions and materials.
   g.   Construction details of typical sections for all applicable signs.
        In some cases, the Building Inspector will require that the details are accompanied by a California licensed engineer or architect.
   h.   Sign valuation.
   i.   The number of transformers
   j.   Milli-amp rating, color and diameter of neon.
   k.   Method for penetrating walls with wiring (PK housings, etc.)
   l.   Grounding method.
   m.   6" x 5" blank area on each sheet for Landlord's approval stamps.
   n.   Method of attaching signs.
        Landlord's Approval:
        *The Esplanade*
        *Attn: Sandi Dellibovi*
        *M&H Property Management*
        *210 Esplanade Drive*
        *Oxnard, California 93030*
        *(805) 485-1146*

Page 7

802666.07/WLA
999903-14000/11-27-19//NO//NO

EXHIBIT H
-10-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program

**II.    PROHIBITED SIGNS:**

1.    Signs so located as to prevent free ingress and egress from any door, window or fire escape.

2.    Signs erected at or near the intersection of public and/or private rights-of-way in such a manner as to create a safety hazard by obstructing clear view of pedestrian and vehicular traffic. Signs which by color, wording, design location or illuminations resemble or conflict with any traffic control device.

3.    Nonconforming signs and sign structures associated with an activity, business, product or service which has not been sold, produced, provided or conducted on the premises for a period of thirty (30) days.

4.    No flags, banners, streamers, balloons, etc. shall be allowed on tenant leased space or frontage except as temporary special event advertising with the prior approval of the Owner and in keeping with the City Sign Ordinance. Each tenant may display one (1) temporary "Grand Opening" banner and accompanying flags/banners for a maximum of fourteen (14) days after tenant's opening of store.

5.    No signs of any sort shall be permitted on building roofs.

6.    All animated signs except public service signs, such as time and temperature units.

7.    Revolving signs except for barber poles.

8.    Signs containing statement, words or characters of an obscene, indecent or immoral character such as will offend public morals or decency.

9.    Signs emitting sound.

10.    Portable signs.

11.    Murals which contain advertising copy or which function as advertisement.

12.    Vehicle Signs: Signs, parking lot fliers on or affixed to trucks, automobiles, trailers, or other vehicles which advertise, identify, or provide direction to use or activity not related to its lawful making of deliveries of sales or merchandise or rendering of services from such vehicles, are prohibited.

**I.    CONSTRUCTION NOTES:**

Tenant shall be fully responsible for the operation of his sign contractor. The Sign Contractor shall repair damage to any site or building elements which occurred during sign installation.

*Page 8*

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-11-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

  

The Esplanade
Master Sign Program

J.    GUARANTEE:

Tenant's sign contractor shall guarantee the entire display for one (1) year from the date of installation against defects in material and workmanship, wherein defective parts shall be replaced without charge.

K.    INSURANCE:

Sign Company shall carry worker's compensation and public liability insurance against all damage suffered or done to any and all persons and/or property while engaged in construction or erection of signs in the amount of $1,000,000 per occurrence.

L.    SIGN CATEGORIES:

The planned sign program shall be grouped into two categories:  Freestanding Ground Signs, Storefront Signs and Regulatory Signs.  Size, color, location and design of each sign type shall not exceed maximum limitations for each category.  The Landlord and the City of Oxnard shall be the final authority in determining specific limitations for each individual sign.

Freestanding Ground Signs

E.    Primary Shopping Center Identification, Freestanding On-Site Pylon.
B.    Primary Shopping Center Identification On-Site Monuments.
C.    Freestanding Tenant Identification Sign at Site Entrances.
D.    Tenant Directory, Freestanding Kiosk.
E.    Pedestrian Information, Directional Pole Sign.

Storefront Signs

A.    Major Tenant Identification, Building/Storefront Wall Sign.
   •    In-Line Tenant Identification, Wall Sign.
   •    Tenant Identification, Freestanding Pad & In-line Tenant Wall Sign.
   •    Tenant Identification, Freestanding Multiple Pad, Wall Sign.
   •    Tenant Identification, Interior Mall Tenant with no Exterior Frontage.
   •    Tenant Identification, Second Story Tenant Identification.
B.    Tenant Identification, Under Canopy Sign
C.    Tenant Identification, Storefront Window Sign
D.    Tenant Identification, Service Entrance Sign.

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-12-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

**M.**    **PRIMARY SHOPPING CENTER, ON-SITE PYLON SIGN (SIGN TYPE 'A'):**

Two freestanding Pylon Signs may be provided at key on-site locations adjacent to the Freeway to aid in Shopping Center identification and provide tenant identifications.  Eligible Tenants shall be provided one panel on the sign to display their names.  All Tenant names shall be limited to a pre-determined size and be typographically set, in the approved project typestyle, unless otherwise determined by the Landlord.

Where double-faced signs may be deemed practical, eligible Tenants shall be provided with one panel for each sign face.  Tenants shall be responsible for the fabrication cost and installation of such panels which must conform to established design standards and specifications and which shall be fabricated by a sign contractor of the Landlord's choosing.

The Landlord shall be the sole determiner of Tenant eligibility for this sign type, including the locations and number of signs which a Tenant's name by be displayed.  The Landlord also reserves the right to omit this sign from implementation with the planned sign program without notice, at any time.

A.    Maximum Sign Area shall be limited to 300.0 square feet of sign copy per face and the sign shall not exceed an overall height of 75'- 0" unless otherwise approved by the City of Oxnard.  The total area of aggregate surface of the sign structure may not exceed 600.0 square feet.

(See next page for illustration)

Page 10

802666.07/WLA
959903-14000/11-27-19/JNO/JNO

EXHIBIT H
-13-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program



SIGN TYPE 'A'

Page 11

802666.07/VLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-14-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program

**N.    PRIMARY SHOPPING CENTER AND TENANT IDENTIFICATION SIGN (SIGN TYPE 'B'):**

Three Primary Shopping Center Identification signs may be provided to identify the site. This sign shall be owned by the Landlord and shall include tenant identification.

A.    Maximum Sign Area shall be limited to 150.0 square feet of sign copy per face. The total area of the aggregate surface of the sign structure may not exceed three hundred (300.0) square feet. The Freestanding Sign shall not exceed a height of thirty-six (36) feet.



Page 12

802666.07/WLA
959503-14000/11-27-19/JNO/JNO

EXHIBIT H
-15-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

**O.   FREESTANDING TENANT IDENTIFICATION SIGN AT SITE ENTRANCES (SIGN TYPE 'C'):**

Freestanding Vehicular Directional Signs may be provided at each major entrance to the site. These signs are intended to provide Tenant directional information to all visitors entering the site. Eligible Tenants shall be provided one panel on the sign to display their names. All Tenant names shall be limited to a pre-determined size and be typographically set, in the approved project typestyle, unless otherwise determined by the Landlord.

Where double-faced signs may be deemed practical, eligible Tenants shall be provided with one panel for each sign face. Tenants shall be responsible for the fabrication cost and installation of such panels which must conform to established design standards and specifications and which shall be fabricated by a sign contractor of the Landlord's choosing.

The Landlord shall be the sole determiner of Tenant eligibility for this sign type, including the location and number of signs which a Tenant's name may be displayed. The Landlord also reserves the right to omit this sign from implementation with the planned sign program without notice, at any time.

A.   Maximum Sign Area shall be limited to 120.0 square feet per sign face and the sign shall not exceed an overall height of 15' - 0" unless otherwise approved by the city of Oxnard. One sign is allowed at each major site entrance unless already identified by a Primary Shopping Center Identification Sign (Type B). The sign shall be set back 10.0 feet from the property line unless otherwise determined by the City of Oxnard.



Page 13

EXHIBIT H
-16-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

Q.    PEDESTRIAN INFORMATION, DIRECTIONAL POLE SIGN (SIGN TYPE 'E'):

Tenants may have directional panels on the pedestrian mall directional sign which may be located at key points throughout the common pedestrian circulation corridors of the shopping center.  Tenant names shall be displayed in the standard project typestyle unless otherwise determined by the Landlord.

The Landlord shall be the sole determiner of Tenant eligibility for this sign type, including the location and number of signs upon which a Tenant's name may be displayed.  The Landlord also reserves the right to omit this sign from implementation with the planned sign program without notice, at any time.



Page 15

802666.07/WLA
999903-14060/11-27-19/JNO/JNO

EXHIBIT H
-17-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program

R.    TENANT IDENTIFICATION, BUILDING WALL SIGN:

Building wall signs shall be permitted to identify Tenant names in the corporate signature (logo style and/or symbol) trademark of the business, subject to the provisions below.

Signs may be composed of individual custom fabricated letters or custom fabricated internally-illuminated sign cabinets with laser cut copy treatments.  Individual letters may have painted, gold-leafed or faux-finish.

1.    Net Sign Area shall be limited to 2.0 square feet of signage for every 1.0 lineal foot of its exterior building frontage (see S.1 and S.2).  Except as other provided by this sign program, the maximum sign area for any individual business shall be 1,200 square feet.

2.    No individual sign or group of signs on one building face shall exceed 300 square feet except as provided below, nor shall it exceed 80% of the surface on which it is mounted. Maximum letter height is 8'-0".

3.    Net Sign Area:  The total square footage of any given sign.  This area can be determined by enclosing the perimeter of the sign with no more than ten (10) horizontal and /or vertical lines.

4.    Attached signs may be permitted to exceed 300 square feet in accordance with the graph below where major buildings have in excess of 30,000 square feet of floor area, where such building is setback more than 150 feet from the street and where the bottom of the sign is at least 6 feet above the average finish grade.  The signs on any one elevation shall not exceed 10% of the total wall surface of the elevation.



Page 16

EXHIBIT H
-18-

The Esplanade
Master Sign Program

5.    An under canopy sign may be permitted for each business, provided it shall not exceed five (5) feet in length or one foot in height. Such under canopy signs may be located either perpendicular to the face of the building or parallel to the face of the building under the canopy. Under canopy signs shall observe an eight foot clearance between the bottom of the sign and the sidewalk or other pedestrian way.

6.    Window signs placed entirely within building shall not cover more than twenty percent (20%) of any window of the ground floor. None shall be permitted above the ground floor.

7.    The Landlord reserves the right to restrict the Net Sign Area allowed for any tenant building wall sign to less than the maximum area permitted herein at his sole discretion. The Landlord shall be the sole determiner of Tenant eligibility for this sign type.

8.    Building signs shall be mounted flushed against or be oriented parallel to the wall of the structure in which it is located. No part of the sign shall extend more than eighteen inches (18") from the surface of the structure.



Page 17

B02666.07/WLA
959903-14000/11-27-19/JNO/JNO

EXHIBIT H
-19-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

S.    NUMBER OF BUILDING WALL AND FASCIA SIGNS PERMITTED:

   1.    Free Standing Building:  Free-standing Buildings which are occupied by a single Tenant
         may have signage on four sides of the building.



Page 18

R02666.07/AVLA
999903-14000/11-27-19//JNO//JNO

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program

2.    Multiple Tenant In-Line Position:  Multiple Tenants in Free-Standing Buildings may
have three building wall signs; one building wall sign per elevation when the tenant is
located on the end cap position of the building.  If the Tenant is not located at the end cap
position, tenant is eligible to have only two building wall sign locations.



Page 19

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-21-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

**T.    TENANT IDENTIFICATION, UNDER CANOPY SIGN:**

Under-canopy signs may be used to provide identification for Tenants at building storefront
entrances.  Such signs shall be located under the canopy, perpendicular to the building storefront
and the pedestrian path of travel.

Creative design for this sign type is encouraged in order to achieve a pedestrian friendly, village
atmosphere. Signs may be electrified from internal or external illumination. No exposed flood
lamping accepted.  Each sign design shall be reviewed on a case-by-case basis by the Landlord.
Tenant shall submit a sign drawing to be approved by the Landlord prior to start of any sign
construction or fabrication.



Page 20

802666.07/VLA
999903-14000/11-27-19//JNO/JNO

EXHIBIT H
-22-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

The Esplanade
Master Sign Program

**U.    TENANT INFORMATION, STOREFRONT WINDOW SIGN:**

Tenants may have signs showing store name and logo, business hours and credit card accepted, if so desired. The sign shall be of white machine cut vinyl letters, hand-painted, gold-leafed or surface screen-printed on the inside of the glass.

The standard letter style shall be Helvetica Medium and shall be set in a standard copy format to be used throughout the shopping center. Any deviation from this copy format must first be approved by the Landlord.





Page 21

802666.07/WLA
999900-14000/11-27-19/JNO/JNO

EXHIBIT H
-23-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

### V.   TENANT INFORMATION, SERVICE ENTRANCE SIGN:

Service entry doors shall have signs showing store name, logo and hours of operation.  The sign shall be white machine cut vinyl letters, hand-painted, or surface screen-printed on the service entry door or on a glass sidelight immediately adjacent to the door.

Signs on doors without glass shall be white machine cut vinyl applied permanently to the face of the door.  The approved typestyle shall be Helvetica Medium and all copy shall be set in a standard format to be used throughout the shopping center.





Page 22

802666.07/WLA
999903-14000/11-27-19//NO//NO

EXHIBIT H
-24-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]



The Esplanade
Master Sign Program

**W.    SUMMARY:**

The Sign Standards and Guidelines set forth in this document have been established to control signs throughout the shopping center for the purpose of maintaining and preserving a quality shopping experience for all visitors.

These are suggested guidelines.  Creativity in sign design for tenant identification signs is encouraged and all proposed designs will be considered on a case-by-case basis.  Modifications to these guidelines may be given consideration by the Landlord.

The Landlord reserves the right to determine Tenant eligibility for any type addressed herein. The Landlord also reserves the right to omit any sign from implementation with the planned sign program without notice, at any time.

Page 23

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT H
-25-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

EXHIBIT I

PREMISES RESTRICTIONS

Landlord hereby establishes the following rules and regulations for the safety, care and cleanliness of (i) the store areas (hereinafter referred to as the. "demised premises") of any tenant or tenants of the Shopping Center (hereinafter referred to as the "tenant"); (ii) the common area; and (iii) the Shopping Center in general. The following is not intended to be exclusive, but to indicate the manner in which the right to use the store and common areas is limited and controlled by Landlord.

1. All floor areas of the demised premises, doors, fixtures, windows and plate glass shall be maintained in a clean, safe and good condition.

2. All trash, refuse' and waste materials shall be stored in adequate containers and regularly removed from the demised premises. These containers shall not be visible to the general public and shall not constitute a health or fire hazard, or a nuisance to any other tenant.

3. Tenants may use the demised premises only for the use as stated in the lease and for no other purpose. Without Landlord's consent, tenants may not utilize the common areas, sidewalks or walkways adjacent to the demised premises nor the roof of the demised premises for any of the following uses: to display, store, or place any merchandise, equipment or devices; to install public telephones/ telecommunication systems, newsstands, vending or other coin operated machines; nor may the demised premises be used to conduct any type of distress or "going out of business" sale; to store any merchandise or materials, other than those reasonably necessary for the operation of a tenant's business, or to black out or otherwise obstruct the windows of the demised premises. In addition no shopping carts and/or baskets may be stored outside the designated areas.

4. Other than those areas, if any, specifically designated as Premises on Exhibit "A" attached hereto, all tenants and their authorized representatives and invitees shall use any roadway or walkway (including the enclosed mall, if any) only for ingress and egress from the stores in the Shopping Center in accordance with directional or other signs or guides. Roadways shall not be used at a speed in excess of five (5) miles per hour. Walkways (including the enclosed mall, if any) shall be used only for pedestrian travel.

5. Other than those areas, if any, specifically designated as Premises on Exhibit A attached hereto, the parking areas shall be used only for parking motor vehicles, which shall be parked in an orderly manner within the designated painted lines. Parking in front of the designated area will subject the vehicle to being towed off the parking lot.

6. Landlord agrees to furnish either within the Shopping Center or reasonably close thereto, a limited amount of space for employee parking, which designation may be changed by Landlord from time to time at Landlord's sole and absolute discretion. Tenant shall furnish Landlord with its and its employees' license numbers within five (5) days after requested by Landlord and tenant shall thereafter notify Landlord of any change within five (5) days after such change occurs. If tenant or its employees fail to park their vehicles in designated parking areas, Landlord may charge tenant Twenty-Five Dollars ($25.00) per day for each day or partial day per vehicle parked in any areas other than those designated. Tenant hereby authorizes Landlord to tow away from the Shopping Center, at tenant's expense, any vehicle or vehicles belonging to tenant or tenant's employees that are parked in violation of the foregoing.

7. No person shall use any of the common areas, (or any of the cars in the parking lot) for any of the following uses without the prior written consent of Landlord: (i) vending, peddling or soliciting orders for sale or distributing of any matter; (ii) exhibiting or distributing any written material; (iii) soliciting membership or contributions for any purpose; (iv) parading, patrolling, picketing, demonstrating of any kind; (v) any purpose when none of the businesses in the Shopping Center are open for business; or (vi) any sound-making device that is annoying or unpleasant to the general public.

EXHIBIT I
-1-

Tenant shall use and occupy the Demised Premises strictly in accordance with the Permitted Use defined in the Lease. Additionally, but without limiting any other provision contained in the Lease, the Demised Premises may not under any circumstance be used or occupied by Tenant or any subtenant, assignee or other occupant, for any of the following uses. In the event Tenant violates the provisions of this Exhibit, such shall constitute a material default hereunder and Landlord shall be entitled, if it so elects, in addition to any of the other rights or remedies listed for a default in the Lease, to institute and prosecute proceedings in any court of competent jurisdiction to obtain damages, to seek an injunction against the violation of the provisions of this Exhibit and/or to seek the immediate termination of the Lease.

1.  Tenant's use and occupancy of the Demised Premises, and Landlord's use of the Shopping Center, shall be limited by and be subject to certain express restrictions and prohibitions deemed necessary to preserve the value, desirability, and family orientation of the Shopping Center and its tenants, without regard to whether the prohibited activities, services or merchandise are offered gratuitously or nongratuitously, publicly or privately, materially or incidentally, as follows:

    *   A bar, lounge, nightclub or discotheque or any use where the sale of alcoholic beverages by the drink exceeds forty percent (40%) of such occupant's total gross sales;
    *   A place of public entertainment or recreation facility, including, without limitation, a bowling alley, theater, skating rink, billiard parlor, bingo parlor, off-track betting facility, gambling casino, gaming hall, gun range, computer game room or amusement center with arcade, pinball, video or electronic games (provided, however, this shall not be deemed to prohibit Landlord from leasing space within the Shopping Center to a tenant or occupant where the use of arcade, pinball, video or other electronic gaming machines are operated in connection with a restaurant and/or incidental to another retail use (e.g. a business similar in manner and fashion to that tenant operating under the trade name "GameStop");
    *   An auditorium or similar place of general assembly;
    *   A massage parlor or tattoo parlor (provided, however, this shall not be deemed to prohibit Landlord from leasing space within the Shopping Center to (i) any reputable therapeutic massage business similar in manner and fashion to those businesses operating under the trade names "Massage Envy" and/or "Hand & Stone", or (ii) a salon (including hair/nail salon), spa, gym, fitness and/or health club where massage services are offered as part of such tenants permitted use;
    *   A funeral home;
    *   A training or educational facility including, without limitation, a beauty school, barber college, reading room, place of instruction or any other operation catering primarily to students or trainees, rather than retail customers (provided, however, this shall not be deemed to prohibit Landlord from leasing space within the Shopping Center to a tutoring center and/or learning academy similar in manner and fashion to those businesses operating under the trade names "Huntington Learning Center', "Sylvan", "C2 Educational Center" and/or "Athena Learning Center";
    *   The sale of drug paraphernalia (provided, however, this shall not be deemed to prohibit Landlord from leasing space within the Shopping Center to a standard drug store/pharmacy (i) similar in manner and fashion to those operating under the trade names "Walgreen's" and/or "CVS", (ii) operated in connection with a grocery store or supermarket, or (iii) operated by a large format retail operator similar in manner and fashion to those operating under the trade names "Target", "Wal-Mart", "Meijer' and/or "Kmart";
    *   The sale or display of pornographic material, as determined by community standards for the area in which the Shopping Center is located;

802666.07/WLA
999903-14000/11-27-19/JNO/JNO

EXHIBIT I
-2-

ESPLANADE CENTER
[Retail Center Lease]
[UFC Gym]

- A flea market, second-hand store or pawn shop (provided, however, this shall not be deemed to prohibit Landlord from leasing space within the Shopping Center to any first class second hand store and/or gently used store similar in manner and fashion to those businesses operating under the trade names "Plato's Closet", "Clothes Mentor", "Plat It Again Sports" and/or "Once Upon a Child");
- Any business or use which emits offensive odors, fumes, dust or vapor or constitutes a public or private nuisance, or emits loud noises or sounds which are objectionable to the Shopping Center customers, users or occupants, or which creates a fire, explosive or other hazard (provided, however, this shall not be deemed to prohibit Landlord from leasing space within the Shopping Center to restaurants, nail salons and/or other similar users that potentially emits offensive odors, fumes, dust or vapors);
- A manufacturing facility;
- A warehouse, except warehousing incidental to the operation of any tenants business within the Shopping Center, or otherwise for the storage of goods or merchandise, other than such goods or merchandise offered for sale by a tenant from their respective premises at the Shopping Center;
- A car wash or for the use of storage, sale, display, repair, rental or servicing or cars, boats or other motorized vehicles or equipment (provided, however, this shall not be deemed to prohibit Landlord from leasing space to car rental operations similar in manner and fashion to those operating under the trade named "Enterprise", "Budget" and/or "Avis" that rent motorized vehicles or equipment and, as ancillary to such use, sell and display cars or other motorized vehicles or equipment);
- A hotel or other lodging facilities;
- A dry cleaner or other business that uses hazardous materials except in a de minimus manner in compliance with applicable laws (provided, however this shall not prohibit Landlord from leasing space in the Shopping Center to a drop-off dry cleaning facility);
- Any primarily non-retail office use (provided, however, this shall not be deemed to prohibit Landlord from leasing space in the Shopping Center to financial institutions, real estate or insurance offices, medical or dental offices, a loan offices, a brokerage offices, financial planner's offices and/or tax preparation offices);
- Any use that violates any legal requirement and/or the requirements of the insurance underwriter(s) of the coverages on the Shopping Center;
- Any fire, auction, bankruptcy, "going-out-of-business," "lost our lease," or other similar sale.

2.  Tenant agrees that the value of the Demised Premises and the reputation of Landlord will be seriously injured if the Demised Premises are used for any obscene or pornographic purposes or any sort of commercial sex establishment. Tenant agrees that Tenant will not bring or permit any obscene or pornographic material (including without limitation pornographic videotapes and movies) on the Demised Premises, and shall not permit or conduct any obscene, nude, or semi-nude live performances on the Demised Premises, nor permit use of the Demised Premises for nude modeling, rap sessions, or as a so-called rubber goods shop, or as a sex club of any sort, or as a "massage parlor." Tenant agrees that if at any time Tenant violates any of the provisions of this Section, such violation shall be deemed a significant breach of the terms of the Lease and objectionable conduct. Pornographic material is defined for purposes of this Section as any written, videotaped, videodisk, filmed, or pictorial matter with prurient appeal, or any objects or instruments that are primarily concerned with lewd or prurient sexual activity. Notwithstanding the foregoing, if Tenant is permitted to sell or rent video tapes, then pornographic video tapes may be sold subject to the following restrictions, the careful observance of which by Tenant is a material inducement to Landlord to enter into the Lease:

    (i)    They shall not be displayed in the store or in the store windows.
    (ii)   They shall not be shown on any playback devices in the store or store windows.

    (iii)  They shall not be mentioned in any way, directly or indirectly, on any signs within or without the Demised Premises
    (iv)   The name of the store shall not in any way allude to such materials nor shall such name contain the word "adult" or the letters "X", "NC-17" or any successor designation by the Motion Picture Association of America, or any other rating service.
    (v)    Such sale must be permitted under the law by all authorities having jurisdiction.
    (vi)   Video tapes of an adult nature shall be kept discreetly in a separate room in the rear of the store and not in an area for the general public, nor visible through any store windows or from the main (front) portion of the store. Obscene material is defined here as it is in N.Y. Penal Law Section 235.00.

3.  In furtherance thereof, Tenant agrees that no sublease, assignment, concession or license agreement will be entered into by Tenant with any party whose operation would or could include any of the restricted or prohibited activities listed above, or whose activities or merchandise would be generally defined by the community as being pornographic, sexually graphic or sexually explicit.

**RETAIL CENTER LEASE**

<u>ESPLANADE CENTER</u>

**G&I IX ESPLANADE PROPERTY LP,**

a Delaware limited partnership,

as Landlord,

and

**SEN FITNESS GROUP, INC.,**

a California corporation,

as Tenant.

Building: 451 West Esplanade

Trade Name: UFC Gym

## TABLE OF CONTENTS

Page

ARTICLE 1      PREMISES, BUILDING, RETAIL CENTER, CENTER, AND COMMON AREAS ............................. 1
ARTICLE 2      LEASE TERM; OPTION TERMS ................................................................................................ 2
ARTICLE 3      BASE RENT ................................................................................................................................ 3
ARTICLE 4      ADDITIONAL RENT .................................................................................................................. 3
ARTICLE 5      USE OF PREMISES .................................................................................................................... 4
ARTICLE 6      UTILITIES .................................................................................................................................. 7
ARTICLE 7      REPAIRS ..................................................................................................................................... 7
ARTICLE 8      ADDITIONS AND ALTERATIONS ........................................................................................... 7
ARTICLE 9      COVENANT AGAINST LIENS .................................................................................................. 8
ARTICLE 10     INDEMNIFICATION AND INSURANCE ................................................................................. 8
ARTICLE 11     DAMAGE AND DESTRUCTION ............................................................................................ 10
ARTICLE 12     NONWAIVER ........................................................................................................................... 11
ARTICLE 13     CONDEMNATION ................................................................................................................... 11
ARTICLE 14     ASSIGNMENT AND SUBLETTING ....................................................................................... 11
ARTICLE 15     SURRENDER OF PREMISES; OWNERSHIP AND  REMOVAL OF TRADE FIXTURES .................. 13
ARTICLE 16     HOLDING OVER ...................................................................................................................... 13
ARTICLE 17     ESTOPPEL CERTIFICATES .................................................................................................... 13
ARTICLE 18     SUBORDINATION ................................................................................................................... 13
ARTICLE 19     DEFAULTS; REMEDIES .......................................................................................................... 14
ARTICLE 20     COVENANT OF QUIET ENJOYMENT ................................................................................... 15
ARTICLE 21     INTENTIONALLY OMITTED .................................................................................................. 15
ARTICLE 22     INTENTIONALLY OMITTED .................................................................................................. 15
ARTICLE 23     SIGNS ....................................................................................................................................... 15
ARTICLE 24     COMPLIANCE WITH LAW ..................................................................................................... 16
ARTICLE 25     LATE CHARGES ...................................................................................................................... 17
ARTICLE 26     LANDLORD'S RIGHT TO CURE DEFAULT; PAYMENTS BY TENANT .................................... 17
ARTICLE 27     ENTRY BY LANDLORD .......................................................................................................... 17
ARTICLE 28     PARKING .................................................................................................................................. 17
ARTICLE 29     MISCELLANEOUS PROVISIONS ........................................................................................... 18
1.        Remodeling and Décor ............................................................................................................... 1
2.        Assignment ................................................................................................................................. 1
3.        Franchisor Entry Rights .............................................................................................................. 1
4.        Default and Notice ...................................................................................................................... 1
5.        Termination or Expiration .......................................................................................................... 1
6.        Consideration; No Liability ........................................................................................................ 2
7.        Reaffirmation of Lease ............................................................................................................... 2
8.        Miscellaneous ............................................................................................................................. 2

EXHIBIT LIST

EXHIBIT "A"      DEPICTION OF RETAIL CENTER
EXHIBIT "A-1"    DEPICTION OF BUILDING
EXHIBIT "B"      WORK LETTER
EXHIBIT "C"      OPERATING EXPENSE DEFINITIONS AND CALCULATION PROCEDURES
EXHIBIT "D"      NOTICE OF LEASE TERM DATES
EXHIBIT "E"      EXISTING EXCLUSIVES
EXHIBIT "F"      GUARANTY OF LEASE
EXHIBIT "G"      FRANCHISE RIDER
EXHIBIT "H"      LANDLORD'S SIGNAGE PLAN
EXHIBIT "I"      RULES AND REGULATIONS

## INDEX

| | Page(s) |
|---|---|
| Accountant | 4 |
| Additional Rent | 3 |
| Alterations | 7 |
| Applicable Laws | 16 |
| Approved Working Drawings | *Exhibit B* |
| Architect | *Exhibit B* |
| Audit Period | 4 |
| Bank Prime Loan | 16 |
| Base Building | 7 |
| Base Rent | 3 |
| Breaching Location | 3 |
| Brokers | 19 |
| Building Common Areas | 1 |
| CC&Rs | 5 |
| Common Areas | 1 |
| Condition Precedent | 2 |
| Construction Drawings | *Exhibit B* |
| Contingency Period | 2 |
| Contract | *Exhibit B* |
| Contractor | *Exhibit B* |
| Controllable Operating Costs | 4 |
| Cost Pools | *Exhibit C* |
| Damage Termination Notice | 10 |
| Delivery Date | *Exhibit B* |
| Direct Expenses | *Exhibit C* |
| Engineers | *Exhibit B* |
| Estimate | *Exhibit C* |
| Estimate Statement | *Exhibit C* |
| Exercise Notice | 3 |
| Expense Year | *Exhibit C* |
| Exterior Signage | 15 |
| Final Costs | *Exhibit B* |
| Final Retention | *Exhibit B* |
| Final Space Plan | *Exhibit B* |
| Final Working Drawings | *Exhibit B* |
| Force Majeure | 18 |
| Guarantor | 20 |
| Guaranty | 20 |
| Improvement Allowance Items | *Exhibit B* |
| Interest Rate | 16 |
| Landlord | 1 |
| Landlord Cold Shell Construction Specifications | *Exhibit B* |
| Landlord Parties | 8 |
| Landlord Protected Use Violation | 6 |
| Landlord's Work | *Exhibit B* |
| Lease | 1 |
| Lease Commencement Date | 2 |
| Lease Expiration Date | 2 |
| Lease Term | 2 |
| Management Fee Cap | 2 |
| Net Worth | 11 |
| Notices | 18 |
| OFAC | 20 |
| Operating Expenses | *Exhibit C* |
| Option Rent | 3 |
| Option Term | 2 |
| Other Improvements | 19 |
| Parking Program | 17 |
| Patriot Act | 21 |
| Permitted Use | 2 |
| Premises | 1 |
| Prohibited Persons | 21 |
| Project Common Areas | 1 |
| Project Declaration | 1 |
| Promotional Area | 1 |
| Promotional Structure | 1 |
| Proposition 13 | 2 |
| Protected Use | 6 |
| Renovations | 19 |
| Rent Abatement | 3 |
| Rent Abatement Period | 3 |
| Rent | 3 |

**Page(s)**

Retail Center Common Areas ................................................................................................. 1
Rogue Tenant ......................................................................................................................... 6
Rules and Regulations ........................................................................................................... 5
Shared Expenses Areas ......................................................................................... *Exhibit C*
Sign Program ....................................................................................................................... 15
Signage Specifications ........................................................................................................ 15
Signs .................................................................................................................................... 15
Standards .............................................................................................................. *Exhibit B*
Statement ............................................................................................................... *Exhibit C*
Substitute Rent ...................................................................................................................... 6
Summary ................................................................................................................................ 1
Superior Agreements, ............................................................................................................ 1
Tax Expenses ........................................................................................................ *Exhibit C*
TCCs ...................................................................................................................................... 1
Tenant .................................................................................................................................... 1
Tenant Affiliate ...................................................................................................................... 3
Tenant Energy Use Disclosure ........................................................................................... 20
Tenant Parties ........................................................................................................................ 8
Tenant's Agents .................................................................................................... *Exhibit B*
Tenant's Share ....................................................................................................... *Exhibit C*
Tenant's Tax Share ................................................................................................ *Exhibit C*
Termination Date ................................................................................................................... 2
Termination Notice ................................................................................................................ 2
Termination Option ................................................................................................................ 2
Third Party Contractor ........................................................................................................... 9
Transfer ................................................................................................................................ 11
Transfer Premium ................................................................................................................ 11
Turnover Condition .............................................................................................. *Exhibit B*
Utilities Costs ........................................................................................................ *Exhibit C*
Water Sensors ..................................................................................................................... 20
Work Letter ............................................................................................................................ 1

## FIRST AMENDMENT TO RETAIL LEASE

This FIRST AMENDMENT TO RETAIL LEASE ("**First Amendment**") is made and entered into as of September **23**, 2020, by and between G&I IX ESPLANADE PROPERTY LP, a Delaware limited partnership ("**Landlord**"), and SEN FITNESS GROUP, INC., a California corporation (the "**Tenant**").

## R E C I T A L S :

A.    Landlord and Tenant are parties to the Retail Lease dated December 2, 2019 (the "**Lease**"), pursuant to which Tenant leases approximately 25,000 rentable square feet of space (the "**Premises**") located at 451 W. Esplanade Drive, Oxnard, California 93036 (the "**Building**"), in the retail center commonly referred to as the "Esplanade Center".

B.    The parties desire to amend the Lease on the terms and conditions set forth in this First Amendment.

## A G R E E M E N T :

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Terms**.  All capitalized terms when used herein shall have the same respective meanings as are given such terms in the Lease unless expressly provided otherwise in this First Amendment.

2.    **Condition of the Premises; Delivery Date**.    As of the date of this First Amendment, Article 1 of the Work Letter attached to the Lease is hereby deleted in its entirety and replaced with the following:

"Landlord shall deliver the Premises to Tenant (such delivery date is referred to herein as the "**Delivery Date**") by the date that is no later than five (5) days after the mutual execution and delivery of the First Amendment.  Tenant acknowledges that it has inspected the Premises prior to the date of this First Amendment and Tenant accepts the Premises from Landlord in its presently existing "as-is" condition.    Tenant also acknowledges that neither Landlord nor any agent of Landlord has made any representation or warranty regarding the condition of the Premises or the Building or with respect to the suitability of the same for the conduct of Tenant's business.  Except as specifically set forth in this Lease and in the Work Letter, Landlord shall not be obligated to provide or pay for any improvement work or services related to the improvement of the Premises. As of the Lease Commencement Date, Landlord, at its sole cost and expense, shall paint

the exterior of the Premises in a Building standard paint color; provided, that if Tenant provides Landlord with an alternate paint color that is consistent with (i) the Building standard methods, materials and finishes and (ii) the City of Oxnard applicable requirements, no later than sixty (60) days prior to the Lease Commencement Date, Landlord shall paint the exterior of the Premises Tenant's chosen paint color."

Accordingly, as of the date of this First Amendment, Schedule 1 to the Work Letter attached to the Lease is hereby deleted in its entirety.

3.     **Lease Commencement Date**.  As of the date of this First Amendment, Section 3.2 of the Summary of the Lease is hereby deleted in its entirety and replaced with the following:

"The "**Lease Commencement Date**" shall be the date that is one hundred and eighty (180) days following the Delivery Date."

4.     **Permit Contingency**.  As of the date of this First Amendment, Section 1.3 of the Lease is hereby deleted in its entirety.

5.     **Improvement Allowance; Improvements**.   As of the date of this First Amendment, Section 2.1 of the Work Letter attached to the Lease is hereby deleted in its entirety and replaced with the following:

"Tenant shall be entitled to a one-time improvement allowance (the "**Improvement Allowance**") in the amount of $960,000.00 for the costs relating to the initial design and construction of Tenant's improvements, which are permanently affixed to the Premises (the "**Improvements**"), which Improvements include the work set forth on Schedule A attached to the First Amendment. In no event shall Landlord be obligated to make disbursements pursuant to this Work Letter in a total amount which exceeds the Improvement Allowance. Any unused portion of the Improvement Allowance remaining as of the date that is six (6) months following the Lease Commencement Date shall revert to Landlord and Tenant shall have no further right thereto."

6.     **Base Building**.  As of the date of this First Amendment, the definition of "**Base Building**" shall be deleted in its entirety and replaced with the following:

"The "**Base Building**" shall mean the structural portions of the Building and the systems and equipment located therein, and any improvements existing as of the Delivery Date."

7.    **Damage and Destruction**.  As of the date of this First Amendment, the second sentence of <u>Section 11.1</u> of the Lease shall be deleted in its entirety and replaced with the following:

"Such restoration shall be to substantially to the condition existing as of the Delivery Date with respect to the Premises and to substantially the same condition as existing prior to the casualty with respect to such Building Common Areas, except for modifications required by zoning and building codes and other laws, or any other modifications to the Building Common Areas deemed desirable by Landlord, provided access to the Premises shall not be materially impaired."

8.    **Broker**.  Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this First Amendment, and that they know of no real estate broker or agent who is entitled to a commission in connection with this First Amendment.  Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including without limitation reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of any dealings with any real estate broker or agent, occurring by, through, or under the indemnifying party.  The terms of this <u>Section 8</u> shall survive the expiration or earlier termination of the term of the Lease, as hereby amended.

9.    **CASp**.  The terms of <u>Section 24</u> of the Lease shall continue to apply to the Lease, as hereby amended, as if set forth herein in full.

10.   **Counterparts**.  This First Amendment may be executed in counterparts with the same effect as if both parties hereto had executed the same document.  Both counterparts shall be construed together and shall constitute a single lease.  The parties hereto consent and agree that this First Amendment may be signed and/or transmitted by facsimile, e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature. The parties further consent and agree that (1) to the extent a party signs this First Amendment using electronic signature technology, by clicking "SIGN", such party is signing this First Amendment electronically, and (2) the electronic signatures appearing on this First Amendment shall be treated, for purposes of validity, enforceability and admissibility, the same as handwritten signatures.

11.   **No Further Modification**.    Except as specifically set forth in this First Amendment, all of the terms and provisions of the Lease shall remain unmodified and in full force and effect.

**[SIGNATURES FOLLOW ON NEXT PAGE]**

IN WITNESS WHEREOF, this First Amendment has been executed as of the day and year first above written.

**"LANDLORD"**

G&I IX ESPLANADE PROPERTY LP,
a Delaware limited partnership

By: G&I IX Esplanade GP LLC, its general partner

   By: G&I IX Esplanade LLC, a Delaware
   limited liability company

     By: G&I IX Esplanade Series LLC, a
     Delaware limited liability company,
     its managing member

     By: *Valla Brown*
     Name: Valla Brown
     Its: Vice President

**"TENANT"**

SEN FITNESS GROUP, INC.,
a California corporation

By: _____
Name: SLAVA Vilshtem
Its: President

## SCHEDULE A

## TENANT'S CONSTRUCTION SPECIFICATIONS

In addition to all other costs and expenses required to construct the Tenant Improvements, Tenant shall, at Tenant's sole cost and expense, cause the purchase, construction and/or installation of the following items with respect to the Premises (collectively, the "**Demolition Work**"), provided that Tenant shall not commence the Demolition Work prior to Landlord's review and approval of Tenant's Final Space Plan:

1.      Tenant shall perform all work shown on the Esplanade Shopping Center Tenant M-11 plan prepared by Nadel Architects, Inc., 2nd PC Submittal dated December 19, 2019 (the "**Demolition Plan**") set forth herein below and coincides with Permit #201318.  Landlord hereby authorizes Tenant or its Contractor to pull Permit #201318.  Notwithstanding the foregoing, Landlord hereby approves those certain modifications set forth on that certain Esplanade Shopping Center Tenant M-11 plan prepared by Nadel Architects Inc. dated August 14, 2020. Additionally, and notwithstanding the foregoing, Tenant acknowledges that notwithstanding the city-approved Demolition Plan and availability of Permit #201318, in the event Tenant desires to alter the Demolition Plan, Tenant may, at its own cost and expense, revise and submit an alternate demolition plan for the Premises, which alternative demolition plan shall be subject to Landlord's prior reasonable approval, and Tenant shall obtain all required permits in connection with any such alternative demolition plan.

2.      Building systems shall be stubbed to the Premises with capacities suitable for Tenant to extend and distribute within the Premises.



**PRELIMINARY DEMO PLAN - OPTION 4**

Additionally, Tenant shall, at Tenant's sole cost and expense, cause the purchase, construction and/or installation of the following items with respect to the Premises by the Lease Commencement Date:

1.    Tenant shall replace the currently existing units in the Premises and provide 97 tons HVAC unit(s) with drops in accordance with the Demolition Plan, or the approved, alternative demolition plan, as applicable.  The replacement HVAC units shall be located in the same location, with the same tonnage as the currently existing units in the Premises.  Any roof penetrations required by the Tenant for the Tenant's use shall be performed by the Tenant's Contractor at the Tenant's expense.

2.    Tenant will pour slab-on-grade concrete to fill the pool currently existing in the Premises as required by code.  Tenant may install a turf surface over the pool currently existing in the Premises, provided that in the event Tenant installs a turf surface, Tenant shall accommodate the existing drainage structure in the concrete.

3.    Tenant shall ensure the exterior and entrance to the Premises are in compliance with all ADA requirements.

812526.02/WLA

378659-00004/9-17-20//JNO          SCHEDULE A

ESPLANADE CENTER
[First Amendment]
[UFC Gym]

**G&I IX ESPLANADE PROPERTY LP**
**c/o Investec Real Estate Companies**
**200 E. Carrillo, Suite 200**
**Santa Barbara, CA 93101**

<u>**LETTER AGREEMENT**</u>

<u>**Via Overnight Courier**</u>

August 8, 2023
Sen Fitness Group, Inc.                      Paris Ackerman LP
Attention: Slava Vilshtein                   103 Eisenhower Parkway
4417 Presidio Drave                          Roseland, NJ 007068
Simi Valley, CA 93063                        Attn:  Craig H. Feldman, Esq.

Re:   Retail Lease dated December 26, 2019 (the "Original Lease"), as
      amended by that certain First Amendment to Retail Lease dated
      September 23, 2020 (the "First Amendment", and together with the
      Original Lease, the "Lease") between G&I IX ESPLANADE
      PROPERTY LP, a Delaware limited partnership (the "Landlord"), and
      SEN FITNESS GROUP, INC., a California corporation (the "Tenant"),
      for certain premises commonly known as "Suite M11" (the "Premises")
      and located in that certain building located at 451 West Esplanade Drive,
      Oxnard, California.

To Whom It May Concern:

       The purpose of this letter agreement (this "**Letter Agreement**") is to memorialize the
understanding between Landlord and Tenant with respect to the payment schedule for all past due amounts
owed by Tenant to Landlord and other applicable Lease modifications relating thereto.  Each capitalized
term when used herein shall have the same respective meaning as is given such term in the Lease, unless
expressly provided otherwise in this Letter Agreement below.  Notwithstanding any provision to the
contrary contained in the Lease, Landlord and Tenant hereby acknowledge and agree as follows:

1.     In accordance with the Lease as amended by this Letter Agreement, Landlord and Tenant
       agree as follows:

       a.     Tenant currently owes Landlord a past due balance in an amount equal to
              $123,023.36 (the "**Past Due Balance**"), which amount represents a past due rent
              balance of $54,273.36 (the "**Past Due Rent Amount**") and a deferred rent balance
              of $68,750.00 (the "**Deferred Rent Amount**").

       b.     [Concurrently with the mutual execution and delivery of this Letter Agreement],
              Tenant shall pay to Landlord the Past Due Rent Amount in accordance with this
              Letter Agreement, and otherwise in accordance with the terms of the Lease.

       c.     Commencing in August of 2023, and continuing through the remainder of the 2023
              calendar year, Tenant's monthly Rent obligation shall be equal to $61,096.51 (the
              "**2023 Rent Amount**") per month, which 2023 Rent Amount is equal to Tenant's

monthly Base Rent obligation in the amount of $48,833.33 in addition to Tenant's Share of the Estimate in the amount of $15,263.18. Notwithstanding anything to the contrary contained in <u>Section 3.1</u> of the Original Lease (as amended by this Letter Agreement), the 2023 Rent Amount shall be due and payable on or before the tenth (10th) of each month in accordance with this Letter Agreement and otherwise in accordance with the terms of the Lease.

d.    Tenant's monthly Base Rent obligation for the 2024 calendar year (the "**2024 Rent Amount**") shall be comprised of Tenant's monthly Base Rent obligation in the amount of $48,833.33 in addition to Tenant's Share of the Estimate, which amount shall calculated by Landlord in accordance with the terms of the Lease. Notwithstanding anything to the contrary contained in <u>Section 3.1</u> of the Original Lease (as amended by this Letter Agreement),  the 2024 Rent Amount through and including the month of June 2024, shall be due and payable on or before the tenth (10th) of each month in accordance with this Letter Agreement below and otherwise in accordance with the terms of the Lease.

e.    Provided that Tenant timely pays to Landlord its 2023 Rent Amount for the months of August and September in accordance with this Letter Agreement and otherwise in accordance with the terms of the Lease, then Landlord shall provide to Tenant a fifteen percent (15%) reduction of the Deferred Rent Amount due to Landlord, in an amount equal to $10,312.50, which amount shall be deducted from the total outstanding Deferred Rent Amount.

f.    Provided that Tenant timely pays to Landlord its 2023 Rent Amount for the months of October, November, and December in accordance with this Letter Agreement and otherwise in accordance with the terms of the Lease, then Landlord shall provide to Tenant an additional thirty-five percent (35%) reduction of the Deferred Rent Amount due to Landlord, in an amount equal to $24,062.50, which amount shall be deducted from the remaining outstanding Deferred Rent Amount.

g.    Provided that Tenant timely pays to Landlord its 2024 Rent Amount for the months of January through June of the 2024 calendar year in accordance with this Letter Agreement and otherwise in accordance with the terms of the Lease, then Landlord shall provide to Tenant a reduction of the Deferred Rent Amount equal to the remaining fifty percent (50%) of the outstanding Deferred Rent Amount balance due to Landlord, in an amount equal to $34,375.00.

h.    Notwithstanding the above, if Tenant shall, at any time during the months of January through June of the 2024 calendar year, be in monetary or material non-monetary default under this Lease beyond any applicable notice and cure period, then the remaining fifty percent (50%) of the outstanding Deferred Rent Amount balance due to Landlord in the amount of $34,375.00 shall not be reduced and be shall be immediately due and payable to Landlord in accordance with the terms of this Letter Agreement.

i.    Commencing on July 1, 2024, Tenant shall pay all Rent due under the Lease in accordance with the terms of the Lease.

2.    Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Letter Agreement, and

that they know of no other real estate broker or agent who is entitled to a commission in connection with this Letter Agreement.  Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any real estate broker or agent.  The terms of this <u>Section 2</u> shall survive the expiration or earlier termination of the Lease, as amended.

3.      This Letter Agreement may be (i) executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute a single instrument and (ii) signed and/or transmitted by facsimile, e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature.  The parties further consent and agree that (1) to the extent a party signs this Letter Agreement using electronic signature technology, by clicking "SIGN", such party is signing this Letter Agreement electronically, and (2) the electronic signatures appearing on this Letter Agreement shall be treated, for purposes of validity, enforceability and admissibility, the same as handwritten signatures.

4.      In the event of any conflict between the terms and provisions of the Lease and the terms and provisions of this Letter Agreement, the terms and provisions of this Letter Agreement shall prevail.  Except as specifically set forth in this Letter Agreement, all of the terms and provisions of the Lease shall remain unmodified and in full force and effect.

If you concur with the aforementioned, please execute and return this Letter Agreement to William Brace, billy@investecre.com.

Sincerely,

**Landlord:**

G&I IX ESPLANADE PROPERTY LP,
a Delaware limited partnership

By:   G&I IX Esplanade Property LP,
        its general partner

      By:   G&I IX Esplanade LLC,
           a Delaware limited liability company

          By:   G&I IX Esplanade Series LLC,
              a Delaware limited liability company, its managing member

             By: *Robert Hyman*
                 Robert Hyman (Aug 22, 2023 10:38 EDT)
             Name:  Robert Hyman
             Its:     Vice President

*[signatures continue on following page]*

**ACCEPTED AND AGREED:**

**Tenant**:

SEN FITNESS GROUP, INC.,
a California corporation

Name: Slava Vilshtein
Its: President

Date: August 14, 2023

August __, 2024

**Via E-Mail & Overnight Mail**

SEN FITNESS GROUP, INC.    Paris Ackerman LLP
4417 Presidio Drive       120 Eagle Rock Avenue, Suite 315
Simi Valley, CA 93063      East Hanover, NJ 07039
Slaca.vilshtein@ufcgym.com    Attention: Craig H. Feldman, Esq.
Attention: Slava Vilshtein

Re:  That certain Retail Lease by and between G&I IX ESPLANADE PROPERTY LP, a Delaware limited partnership ("**Landlord**"), and SEN FITNESS GROUP, INC., a California corporation ("**Tenant**"), dated December 26, 2019, as amended by that certain First Amendment to Retail Lease dated September 23, 2020, as modified by that certain Letter Agreement dated August 8, 2023 (as amended and modified, the "Lease"), for the lease of those certain premises known as Building M 11 (the "**Premises**") in that certain building located at 451 West Esplanade Drive, Oxnard, California.

Dear Mr. Vilshtein:

  The purpose of this letter agreement (this "**Letter Agreement**") is to memorialize the understanding between Landlord and Tenant with respect to certain deferred payments and other applicable Lease modifications relating thereto. Each capitalized term when used herein shall have the same respective meaning as is given such term in the Lease, unless expressly provided otherwise in this Letter Agreement below. Notwithstanding any provision to the contrary contained in the Lease, Landlord and Tenant hereby acknowledge and agree as follows:

1. In accordance with the Lease as amended by this Letter Agreement, Landlord and Tenant agree as follows:

  a. **Lease Commencement Date**.  The Lease Commencement Date occurred on _____20__.

  b. **Past Due Balance**. Tenant currently owes Landlord a past due balance in an amount equal to $_____247,951.14_____ (the "**Past Due Balance**").

  c. **Deferred Period and Deferred Amount**. Commencing retroactively on May 1, 2024 and continuing through August 31, 2024 ("**Deferred Period**"), Tenant's monthly Rent obligation shall be equal to $00.00 (the "**Deferral Period Rent Amount**") per month, which Deferral Period Rent Amount will include Tenant's monthly Base Rent obligation, in addition to Tenant's Share of Direct Expenses and Tenant's Tax Share, representing a monthly deferral amount of $61,987.78 ("**Monthly Deferred Amount**") and a total deferred amount of $247,951.14 ("**Total Deferred Amount**").

      d.      **Commencement of Standard Rent**. Commencing on September 1, 2024, Tenant shall pay full Rent, including full Base Rent and full Additional Rent due under the Lease in accordance with the terms of the Lease, without any abatement, deferral or relief.

      e.      **Repayment of Deferred Amount**.   Tenant shall repay the Total Deferred Amount to Landlord in twenty four (24) equal monthly installments of $10,331.30 ("**Monthly Repayment Amount**") commencing on January 1, 2026 and ending December 31, 2027. Tenant shall make the Monthly Repayment Amount without prior notice or demand to Landlord or Landlord's agent at the management office of the Center, or, at Landlord's option, at such other place as Landlord may from time to time designate in writing.

2.      Landlord and Tenant hereby warrant to each other that they have had no dealings with any real estate broker or agent in connection with the negotiation of this Letter Agreement, and that they know of no other real estate broker or agent who is entitled to a commission in connection with this Letter Agreement. Each party agrees to indemnify and defend the other party against and hold the other party harmless from any and all claims, demands, losses, liabilities, lawsuits, judgments, costs and expenses (including, without limitation, reasonable attorneys' fees) with respect to any leasing commission or equivalent compensation alleged to be owing on account of the indemnifying party's dealings with any real estate broker or agent. The terms of this Section 2 shall survive the expiration or earlier termination of the Lease, as amended.

3.      Tenant hereby acknowledges that, if it fails to perform any of the terms and obligations in this Letter Agreement: (i) such failure will constitute a default under the Lease, and (ii) Landlord, in the event of any default by Tenant under the Lease, as amended by this Letter Agreement, will be entitled, in Landlord's sole discretion, to recover and enforce collection on any remaining unpaid portion of the Past Due Balance.

4.      Tenant hereby acknowledges and certifies that, as of the date of this Letter Agreement: (a) Landlord is not in default in any respect under the Lease; (b) Tenant does not have any defenses to its obligations under the Lease; and (c) there are no offsets against Rent, except as may expressly be provided herein.  Tenant hereby acknowledges and agrees that (i) the certifications it makes to Landlord herein constitute a material consideration to Landlord in entering into this Letter Agreement, (ii) such certifications are being made by Tenant for the purpose of inducing Landlord to enter into this Letter Agreement, and (iii) Landlord is relying on such certifications in entering into this Letter Agreement.

5.      Tenant, on behalf of itself and its affiliates and their respective shareholders, partners, member, directors, officers, employees, agents, representatives and contractors, and their respective successors and assigns (collectively, the "**Releasing Parties**"), hereby releases, remises, acquits, and forever discharges each of Landlord and its affiliates and their respective shareholders, partners, member, directors, officers, employees, agents, representatives and contractors, and their respective successors and assigns (all of the foregoing hereinafter called the "**Released Parties**"), from any and all actions and causes of action, judgments, executions, suits, debts, claims, demands, liabilities, obligations, damages and expenses of any and every character, including legal fees, known or unknown, direct and/or indirect, at law or in equity, of whatsoever kind or nature, whether heretofore or hereafter arising, for or because of any matter or things done, omitted or

UFC Gym
August __, 2024
Page 3

suffered to be done by any of the Released Parties prior to and including the date of this Letter Agreement that, in any way directly or indirectly, arise out of or in any way are connected to or related to the Lease, the transactions contemplated by this Letter Agreement, or the Premises.

6.      Tenant acknowledges that the terms and conditions of this Letter Agreement are to remain confidential, and may not be disclosed to anyone, by any manner or means, directly or indirectly, without Landlord's prior written consent; however, Tenant may disclose the terms and conditions of this Letter Agreement to its attorneys, accountants, employees and existing or prospective financial partners, or if required by Law or court order, provided all parties to whom Tenant is permitted hereunder to disclose such terms and conditions are advised by Tenant of the confidential nature of such terms and conditions and agree to maintain the confidentiality thereof (in each case, prior to disclosure). Tenant shall be liable for any disclosures made in violation of this Section by Tenant or by any entity or individual to whom the terms of and conditions of this Letter Agreement were disclosed or made available by Tenant.

7.      In the event that Tenant seeks bankruptcy protection or is otherwise placed into bankruptcy under federal or any state law, the rights granted to Tenant under this Letter Agreement shall terminate and Tenant will be required to immediately pay to Landlord any remaining unpaid portion of the Past Due Balance and any other unpaid sums due to Landlord under the Lease.

8.      Except as modified pursuant hereto, no other changes or modifications to the Lease are intended or implied and in all other respects the Lease is hereby specifically ratified, restated and confirmed by all parties hereto as of the effective date hereof. To the extent of conflict between the terms of this Letter Agreement and the Lease, the terms of this Letter Agreement shall control.

9.      This Letter Agreement may be (i) executed in one or more counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute a single instrument and (ii) signed and/or transmitted by facsimile, e-mail of a .pdf document or using electronic signature technology (e.g., via DocuSign or similar electronic signature technology), and that such signed electronic record shall be valid and as effective to bind the party so signing as a paper copy bearing such party's handwritten signature. The parties further consent and agree that (1) to the extent a party signs this Letter Agreement using electronic signature technology, by clicking "SIGN", such party is signing this Letter Agreement electronically, and (2) the electronic signatures appearing on this Letter Agreement shall be treated, for purposes of validity, enforceability and admissibility, the same as handwritten signatures.

If you have any questions or would like to discuss the above, please contact us.

Very truly yours,

**TUVF-ESPLANADE, LLC**

a Delaware limited liability company

By:   The Urban Vision Fund I GP, LLC

        a Delaware limited liability company

Its:    Manager

    By:    Primestor Development, LLC
        a Delaware limited liability company

    Its:    Manager

        By:    Primestor Development, Inc.
           a Nevada corporation

By: Arturo Sneider (Oct.11, 2024 22:36 GMT+4)
Name: Arturo Sneider
Title: CEO

**ACCEPTED AND AGREED TO:**

**Tenant:**

SEN FITNESS GROUP, INC.,
a California corporation

By: Slava Vilshtein
Name: Slava Vilshtein
Title: President

**Signature:** Elana Trujillo

**Email:** etrujillo@primestor.com

# Primestor - Esplanade Center - UFC Gym Letter Agreement.2_

Final Audit Report                                                    2024-10-11

| | |
|---|---|
| Created: | 2024-10-10 |
| By: | Kimberly Evangelista (kevangelista@primestor.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAb24mA7WKsUV7WXMrExWQV61iZPjFuDrp |

## "Primestor - Esplanade Center - UFC Gym Letter Agreement.2_" History

Document created by Kimberly Evangelista (kevangelista@primestor.com)
2024-10-10 - 10:49:02 PM GMT

Document emailed to Elena Trujillo (etrujillo@primestor.com) for signature
2024-10-10 - 10:50:11 PM GMT

Email viewed by Elena Trujillo (etrujillo@primestor.com)
2024-10-11 - 4:08:34 PM GMT

Document e-signed by Elena Trujillo (etrujillo@primestor.com)
Signature Date: 2024-10-11 - 4:08:50 PM GMT - Time Source: server

Document emailed to Arturo Sneider (arturo@primestor.com) for signature
2024-10-11 - 4:08:52 PM GMT

Email viewed by Arturo Sneider (arturo@primestor.com)
2024-10-11 - 6:36:00 PM GMT

Document e-signed by Arturo Sneider (arturo@primestor.com)
Signature Date: 2024-10-11 - 6:36:28 PM GMT - Time Source: server

Agreement completed.
2024-10-11 - 6:36:28 PM GMT

# EXHIBIT 2

## **NOTICE TO PAY RENT OR QUIT**

To:

Sen Fitness Group, Inc.          Sen Fitness Group, Inc.
dba UFC Gym                      dba UFC Gym
4417 Presidio Drive              451 West Esplanade Drive
Simi Valley, CA 93063            Oxnard, CA 93036
Attention: Slava Vilshtein
Slava.vilshtein@ufcgym.com

With Copy To:

Paris Ackerman LLP
120 Eagle Rock Avenue, Suite 315
East Hanover, NJ 07039
Attention: Craig H. Feldman, Esq.
cfeldman@parisackerman.com

And any other person in possession of the Premises.

NOTICE IS HEREBY GIVEN that, within five (5) business days after service on you of this notice, you must pay to the Landlord, TUVF-ESPLANADE, LLC, in full, the rent now due and unpaid for the premises located at 451 West Esplanade Drive, Oxnard, CA 93036, in the amount of $435,365.08 being the estimated rent (including base rent and additional rent) that came due within the last year that is currently past due through December 9, 2024**,** or alternatively to surrender possession of the premises to landlord.

If you fail to pay the rent or to surrender possession within the five business-day period, Landlord elects to declare a forfeiture of the lease and legal proceedings will be commenced against you to recover possession and to recover a judgment for the rent and damages for your unlawful detention of the premises.

BE FURTHER ADVISED that such termination and such forfeiture of said lease will not relieve you from liability for additional monetary damages which may be awarded under California Civil Code Section 1951.2, and related provisions of the lease, the law and in equity.

The estimated amount stated above may not include all amounts that you owe to Landlord pursuant to the lease (e.g. late fees), and Landlord does not waive any such amounts not included in the above amount and reserves its rights and remedies under the lease as to any such amounts. Landlord further reserves the right to refrain from seeking to recover possession of the premises, and Landlord's non-enforcement of this notice is not intended and shall not be construed to be an admission or implied assertion that you have cured any or all defaults under the Lease and shall not waive any of Landlord's rights.

NOTICE IS FURTHER GIVEN that in the event you make a partial payment, Landlord accepts such payment without waiving any legal or equitable rights, including any right Landlord may have to recover possession of the premises. The address of Landlord is TUVF-ESPLANADE, LLC c/o Primestor Development, 9950 Jefferson Blvd., Bldg. 2, Culver City, CA 90232, ATTN:

Leslie Halili, 213.223.5540. Their office hours to accept payment are from Monday to Friday, from 9:00 am to 5:00 pm.

Dated: December 9, 2024

_____
Jamie Altman Buggy, Harvest LLP
Attorneys for TUVF-ESPLANADE, LLC

# EXHIBIT 3

| | COURT USE ONLY |
|---|---|
| TITLE OF CASE (ABBREVIATED) | |
| ATTORNEY OR PARTY WITHOUT ATTORNEY (NAME AND ADDRESS):  TELEPHONE NO.:<br>Jamie Altman Buggy (SBN 280075)<br>jbuggy@harvestllp.com<br>Fernando Landa (SBN 259864)<br>flanda@harvestllp.com            Tel. 310.842.8038<br>HARVEST LLP<br>10940 Wilshire Blvd, Suite 1600<br>Los Angeles, CA 90024 | |

| ATTORNEYS FOR:<br>TUVF-ESPLANADE, LLC | | CASE NUMBER: |
|---|---|---|

### PROOF OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. My business address is Harvest LLP, 12636 High Bluff Drive, Suite 400, San Diego, CA 92130.  On December 9, 2024, I served the following documents:

1.    **NOTICE TO PAY RENT OR QUIT**

on the persons below, as follows:

Sen Fitness Group, Inc.                Sen Fitness Group, Inc.
dba UFC Gym                          dba UFC Gym
4417 Presidio Drive                    451 West Esplanade Drive
Simi Valley, CA 93063                 Oxnard, CA 93036
Attention: Slava Vilshtein

Paris Ackerman LLP
120 Eagle Rock Avenue, Suite 315
East Hanover, NJ 07039
Attention: Craig H. Feldman, Esq.

☒    **By overnight delivery.**  I caused the documents to be enclosed in an envelope or package provided by an overnight delivery carrier and addressed to the persons at the addresses above.  I caused the envelope or package to be placed for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier with delivery fees provided for.
☒ **Federal Express.**

And on the persons below, as follows:

Sen Fitness Group, Inc.                Paris Ackerman LLP
dba UFC Gym                          Attention: Craig H. Feldman, Esq.
Attention: Slava Vilshtein              cfeldman@parisackerman.com
Slava.vilshtein@ufcgym.com

☒    **By e-mail or electronic transmission.** My electronic service address is atenreiro@harvestllp.com. I caused the documents to be sent to the persons at the e-mail addresses listed above.  I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on December 9, 2024, at San Juan, Puerto Rico.

Alicia Tenreiro

PROOF OF SERVICE

Dear Customer,

The following is the proof-of-delivery for tracking number: 770616495333

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivered To: | Residence |
| Signed for by: | Signature not required | Delivery Location: | |
| Service type: | FedEx Standard Overnight | | |
| Special Handling: | Deliver Weekday; Residential Delivery | | SIMI VALLEY, CA, |
| | | Delivery date: | Dec 10, 2024 16:35 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 770616495333 | Ship Date: | Dec 9, 2024 |
| | | Weight: | 0.5 LB/0.23 KG |

| Recipient: | Shipper: |
|---|---|
| SIMI VALLEY, CA, US, | SAN DIEGO, CA, US, |

**Reference**                1061-00062

Proof-of-delivery details appear below; however, no signature is available for this FedEx Express shipment because a signature was not required.

Thank you for choosing FedEx

Dear Customer,

The following is the proof-of-delivery for tracking number: 770616567370

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Receptionist/Front Desk |
| **Signed for by:** | C.FELDMAN | **Delivery Location:** | |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday | | LIVINGSTON, NJ, |
| | | **Delivery date:** | Dec 10, 2024 10:49 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 770616567370 | **Ship Date:** | Dec 9, 2024 |
| | | **Weight:** | 0.5 LB/0.23 KG |
| **Recipient:** | | **Shipper:** | |
| LIVINGSTON, NJ, US, | | SAN DIEGO, CA, US, | |

| | |
|---|---|
| **Reference** | 1061-00062 |

FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this
shipment.  Please check again later for a signature.

Thank you for choosing FedEx

**FedEx**

Dear Customer,

The following is the proof-of-delivery for tracking number: 770616632621

---

**Delivery Information:**

| | | | |
|---|---|---|---|
| **Status:** | Delivered | **Delivered To:** | Receptionist/Front Desk |
| **Signed for by:** | U.UFC | **Delivery Location:** | |
| **Service type:** | FedEx Standard Overnight | | |
| **Special Handling:** | Deliver Weekday | | OXNARD, CA, |
| | | **Delivery date:** | Dec 10, 2024 10:08 |

**Shipping Information:**

| | | | |
|---|---|---|---|
| **Tracking number:** | 770616632621 | **Ship Date:** | Dec 9, 2024 |
| | | **Weight:** | 0.5 LB/0.23 KG |
| **Recipient:** | | **Shipper:** | |
| OXNARD, CA, US, | | SAN DIEGO, CA, US, | |

**Reference**              1061-00062

FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment.  Please check again later for a signature.

Thank you for choosing FedEx

**HARVEST LLP**
Jamie Altman Buggy (SBN 280075)
Michael G. Olinik (SBN 291020)
10940 Wilshire Blvd, Suite 1600
Los Angeles, CA 90024
Telephone:  310.842.8038
E-mail:    jbuggy@harvestllp.com
          michael@oliniklaw.com

Attorneys for Plaintiff
TUVF – Esplanade, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>SEN Fitness Group dba UFC Gym Oxnard,<br><br>Debtor. | Case No. 9:25-bk-10820-RC<br><br>**SUPPLEMENTAL DECLARATION OF JAMIE ALTMAN BUGGY IN SUPPORT OF MOTION FOR RELIEF FROM STAY** |

I, Jamie Altman Buggy, declare

1.    I am a partner in the law firm of Harvest LLP ("Harvest"), attorney for Creditor, TUVF - Esplanade, LLC ("Creditor" or "Landlord") in the above-captioned action.

2.    On December 20, 2024, I caused to be filed the unlawful detainer action entitled *TUVF-ESPLANADE, LLC V. SEN FITNESS GROUP*, Superior Court of the State of California, County of Ventura Case Number 2024CUUD034876 (the "UD Action").

3.    From the outset of the filing of the UD Action, Sen Fitness Group ("Debtor") took unmeritorious actions that were neither supported by fact or law in order to cause unnecessary delay in the UD Action.

///

///

///

4.    First, on January 21, 2025, Debtor filed a Motion to Quash, saying that its agent was never served with the complaint – despite the declaration under penalty of perjury of a licensed process server who stated that she personally served the agent, Slava Vilshtein, who was identified at the premises by his employees. That motion was denied.

5.    Next, on February 10, 2025, Debtor filed a Writ of Mandate to appeal the denial of the Motion to Quash. The sole grounds for the Writ was a challenge to the factual findings of the trial court, which is not available on appeal. The petition was denied, but the filing of the writ extended Debtor's time to respond to the summons and complaint from the traditional five days after a ruling on a motion to quash to thirty days, thus rewarding Debtor with an additional an additional delay.

6.    On March 4, 2025, Debtor filed a Demurrer to the UD Complaint. The Demurrer was improper, as it did not challenge the complaint, argued points that were only applicable to residential unlawful detainers, and only raised factual issues related to service. The Demurrer was denied.

7.    On April 9, 2025, Debtor filed a Notice of Removal, seeking to remove the UD Action to federal court. The Notice of Removal was filed after the deadline to remove cases, and did not identify any proper grounds for removal to federal court.  On April 14, 2025, the district court remanded the UD Action back to state court sua sponte.

8.    On May 14, 2025, in order to further delay trial of the UD Action, Debtor deposited jury fees, though did not properly request a jury trial, for a four to five-day jury trial for a simple UD matter that arises from the non-payment of rent.  Debtor has persisted in demanding a four-day jury trial in state court, which has caused weeks of delay as the Court seeks a jury that can sit for four days. Based on Debtor's answer in the unlawful detainer matter, there is no justification for the four to five day jury request because most of the affirmative defenses pled are only applicable to residential unlawful detainer actions.

9.    Trial in this matter was originally scheduled to start on June 2, 2025 at 1:30 p.m. Despite Creditor appearing at trial and being ready to proceed, the Court did not have a judge who could hear the trial due to Debtor's unjustified trial length, and the parties were put on the wheel.  On June 10, 2025, the Ventura County Superior Court set the Unlawful Detainer jury trial to begin on June 23, 2025. Subsequently, on June 13, 2025, I received from previous counsel for Debtor, a Motion

to Be Relieved as Counsel of Record, and an *ex parte* application for an order shortening time on the Motion to Be Relieved as Counsel of Record. On June 16, 2025, previous counsel for Debtor's *ex parte* application for an order shortening time on the Motion to Be Relieved as Counsel of Record and the Motion itself were heard and granted. The Unlawful Detainer trial date of June 23, 2025, remained on the Court's calendar.

10.    On the eve of trial, June 19, 2025, Debtor filed its Chapter 11 Bankruptcy Petition. It is apparent that Debtor has filed bankruptcy for purposes of avoiding the consequences of the looming Unlawful Detainer trial. Debtor's bankruptcy having been filed in bad faith is evidenced by the fact that Creditor is only one of few creditors listed in the Debtor's case commencement. This tactic also fits into the pattern of delay tactics that Creditor has observed throughout the course of the UD Action.

11.    Further, no organization is reasonably in prospect, as evidenced by Debtor's failure to file Schedules A/B, D, E/F, G, H, Summary of Assets and Liabilities, and Statement of Financial Affairs, along with the Voluntary Bankruptcy Petition.

12.    On June 23, 2025, Ventura County Superior Court continued the Unlawful Detainer trial to July 28, 2025, due to the automatic stay.

13.    Debtor has established a pattern of unreasonable delay tactics. If this Court does not waive the 14-day stay set forth in FRBP 4001 (a)(3) and/or shorten time for hearing of the Motion to be Relieved from the Automatic Stay, it is probable that the Unlawful Detainer trial will have to be continued yet again.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this 24th day of June 2025, at San Diego, California.


*Jamie Altman Buggy*
Jamie Altman Buggy

SUPPLEMENTAL DECLARATION OF JAMIE ALTMAN BUGGY IN SUPPORT OF MOTION FOR RELIEF FROM STAY

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document entitled: **APPLICATION FOR ORDER SETTING HEARING ON SHORTENED NOTICE [LBR 9075-1(b)]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) June 24, 2025 , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Eric Bensamochan
The Bensamochan Law Firm, Inc.
eric@eblawfirm.us

Brian David Fittipaldi
US Department of Justice
brian.fittipaldi@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| June 24, 2025 | Alicia Tenreiro | *Alicia Ten* (signature) |
| *Date* | *Printed Name* | *Signature* |

This form is optional.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

A true and correct copy of the foregoing document entitled: **APPLICATION FOR ORDER SETTING HEARING ON SHORTENED NOTICE [LBR 9075-1(b)]** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) _____, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _June 24, 2025_, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

### SEE ATTACHMENT TO PROOF OF SERVICE BY UNITED STATES MAIL

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 24, 2025 | *Lucia Melan* | *[signature]* |
|---|---|---|
| Date | Printed Name | Signature |

This form is optional.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

December 2012                                   Page 3                          **F 9075-1.1.APP.SHORT.NOTICE**

## ATTACHMENT TO PROOF OF SERVICE BY UNITED STATES MAIL

Employment Development Dept.

Bankruptcy Group MIC 92E

P.O. Box 826880

Sacramento, CA 94280-0001


County Assessor

County Government Center, Room 100

San Luis Obispo, CA 93408-0001


County Tax Collector

P.O. Box 357

Santa Barbara, CA 93102-0357


Franchise Tax Board

Bankruptcy Section MS: A-340

P.O. Box 2952

Sacramento, CA 95812-2952


Internal Revenue Service

P.O. Box 7346

Philadelphia, PA 19101-7346


Securities & Exchange Commission

444 South Flower St., Suite 900

Los Angeles, CA 90071-2934


Northern Division

1415 State Street,

Santa Barbara, CA 93101-2511


CT Corporation System, as Representative

330 N Brand Blvd. Suite 700

ATTN: SPRS

Glendale, CA 91203-2336


Jeremy Cook

Law Office of Jeremy Cook

312 West Fifth St., #512

Los Angeles, CA 90013-1746


Navitas Credit Corp.

201 Executive Center Drive

Suite 100

Columbia, SC 29210


Superior Court of California

County of Ventura, Hall of Justice

800 South Victoria Ave. Dept 21

Ventura, CA 93009-2000


Superior Court of California

County of Ventura, Hall of Justice

800 South Victoria Ave. Dept 41

Ventura, CA 93009-2000

Transportation Allicance Bank, Inc.

4185 Harrison Blvd.

Ogden, UT 84403-2475


UG Franchise Operations, LLC

1501 Quail Street, Suite 100

Newport Beach, CA 92660-2797


UG Management Company, LLC

Attn: UFC Gym Legal Department

4160 Temescal Canyon Road, Ste 112

Corona, CA 92883-2606


US Securities & Exchange Commission

444 S Flower St., # 900

Los Angeles, CA 90071-2934


United States Trustee

915 Wilshire Blvd. Suite 1850

Los Angeles, CA 90017-3560


United States Trustee (ND)

915 Wilshire Blvd, Suite 1850

Los Angeles, CA 90017-3560


Ludmila Vilshtein

4417 Presidio Drive

Simi Valley, CA 93063-1254

Label Matrix for local noticing
0973-9
Case 9:25-bk-10820-RC
Central District of California
Santa Barbara
Tue Jun 24 07:57:35 PDT 2025

County Assessor
County Government Center, Room 100
San Luis Obispo, CA 93408-0001

County Tax Collector
P.O. Box 357
Santa Barbara, CA 93102-0357


Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

Franchise Tax Board
Bankruptcy Section MS: A-340
P.O. Box 2952
Sacramento, CA 95812-2952

Internal Revenue Service
PO Box 7346
Philadelphia, PA 19101-7346


SEN Fitness Group
4417 Presidio Drive
Simi Valley, CA 93063-1254

Securities & Exchange Commission
444 South Flower St., Suite 900
Los Angeles, CA 90071-2934

Northern Division
1415 State Street,
Santa Barbara, CA 93101-2511


CT Corporation System,
as Representative
330 N Brand Blvd. Suite 700
ATTN:  SPRS
Glendale, CA 91203-2336

G&I IX Esplanade Property LP
Allen Matkins Leck Gamble Mallory
& Natsis LLP
865 S Figueroa St. Ste 2800
Los Angeles, CA 90017-2795

Jeremy Cook
Law Office of Jeremy Cook
312 West Fifth St., #512
Los Angeles, CA 90013-1746


Ludmila Vilshtein
4417 Presidio Drive
Simi Valley, CA 93063-1254

(p)NAVITAS CREDIT CORP
ATTN JOYCE MCKULKA
201 EXECUTIVE CENTER DR SUITE 100
COLUMBIA SC 29210-8410

Slava Vilshtein
4417 Presidio Drive
Simi Valley, CA 93063-1254


Superior Court of California
County of Ventura
Hall of Justice
800 South Victoria Ave. Dept 21
Ventura, CA 93009-2000

Superior Court of California
County of Ventura
Hall of Justice
800 South Victoria Ave. Dept 41
Ventura, CA 93009-2000

TUVF - Esplanade, LLC
Jamie Buggy / Michael Olinik
Harvest LLP
10940 Wilshire Blvd., Ste. 1600
Los Angeles, CA 90024-3910


Transportation Allicance Bank, Inc.
4185 Harrison Blvd.
Ogden, UT 84403-2475

UG Franchise Operations, LLC
1501 Quail Street, Suite 100
Newport Beach, CA 92660-2797

UG Management Company, LLC
Attn: UFC Gym Legal Department
4160 Temescal Canyon Road, Ste 112
Corona, CA 92883-2606


US Securities & Exchange Commission
444 S Flower St., # 900
Los Angeles, CA 90071-2934

United States Trustee
915 Wilshire Blvd. Suite 1850
Los Angeles, CA 90017-3560

United States Trustee (ND)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560


Eric Bensamochan
The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064-3371


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Navitas Credit Corp.
201 Executive Center Drive
Suite 100
Columbia, SC 29210

End of Label Matrix

| | |
|---|---|
| Mailable recipients | 24 |
| Bypassed recipients | 0 |
| Total | 24 |