Eric Bensamochan, Esq. SBN255482
The Bensamochan Law Firm, Inc.
2566 Overland Ave., Suite 650
Los Angeles, CA 90064
Tel: (818) 574-5740
Fax: (818) 961-0138
Email: eric@eblawfirm.us

Proposed Attorney for Debtor and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION

| | |
|---|---|
| IN RE: | Case No.  9:25-bk-10820-RC |
| | Chapter 11 |
| SEN FITNESS GROUP | **DEBTOR'S OPPOSITION TO APPLICATION FOR ORDER SETTING HEARING ON SHORTENED NOTICE FILED BY TUVF – ESPLANADE LLC'S MOTION FOR RELIEF FROM STAY; DECLARATION OF ERIC BENSAMOCHAN, ESQ.** |
| DEBTOR. | |

**TO THE HONORABLE RONALD A. CLIFFORD III, UNITED STATES BANKRUPTCY JUDGE, AND ALL OTHER PARTIES IN INTEREST:**

SEN Fitness Group (the "Debtor"), the chapter 11 debtor and debtor in possession in the chapter 11 bankruptcy case captioned above, hereby opposes the Application For Order Setting Hearing On Shortened Notice [LBR 9075-1(b)] (the "Application") (Docket No. 7) filed by TUVF - Esplanade LLC ("TUVF"), in connection with the Motion For Relief From The Automatic Stay (Docket No. 6).

The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064

# I. INTRODUCTION

Creditor, TUVF - Esplanade, LLC is the Debtor's landlord. On June 19, 2025, a mere six days ago, the Debtor filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code. The filing was precipitated by the pending UD action filed by TUVF, and the Debtor's desire to reorganize its affairs in order to continue its operations of serving its membership. The case was filed on an emergency basis because of the looming UD trial, coupled with the risk of losing its operation, its members, and the tremendous financial loss such a shut down would cause. Even before the case commencement documents are due, before the 7 day package can be completed, and before the Debtor has been able to get first day motions on file, TUVF wants to end things early by getting relief from stay in record time and moving forward. By its own admission, the UD trial has been continued to July 28, 2025, which would have been enough time to set this hearing on regular notice. More importantly, however, is the opportunity for the Debtor to attempt to reorganize its affairs. Something the creditor wishes to strip away. As will be shown, there is no cause for the relief being requested.

## Cause Does Not Exist To Set A Hearing On Shortened Notice

Under LBR 9075-1(b), an applicant seeking shortened notice must show an actual emergency or irreparable harm if the motion is not heard on regular notice. TUVF's application fails to satisfy this standard:

1.    **No immediate and Irreparable Harm Exists.** TUVF has not identified any immediate or irreparable harm. The application for shortened time only indicates that a

The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064

The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064

pending trial date is set for the end of next month.  While the application and accompanying motion is replete with emotion and innuendo as to the Debtor's motivation for filing, that does not rise to the level of emergency or irreparable harm. Further, while it is true that the Debtor has not yet completed its schedules, that in and of itself is not automatically indicative of a bad faith tactic, especially when it is raised by the party who is seeking this type of relief.

2.    **The Request Prejudices the Debtor.** The Debtor has only been in Chapter 11 for a mere six (6) days. Granting the application for shortened time prejudices the Debtor as it will force the Debtor to race to file oppositions and appearances during this initial critical period of the case. The primary purpose of the automatic stay is to provide debtors with a breathing spell by temporarily halting collection activities from creditors. This allows debtors time to reorganize their finances, explore various options such as assuming a lease, rejecting a lease, while preserving assets. In this case, the physical location is key to reorganization as it provides a multitude of services to its members.

3.    **Expedited Hearings Are Reserved for True Emergencies.** The circumstances warranting an ex parte order under cases like *In re Intermagnetics America, Inc., 101 B.R. 191, 193-94 (C.D. Cal. 1989)* require that: (1) where there is some genuine urgency such that "immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney, can be heard in opposition; (2) where there is a danger that notice to an opposing party will result in that party's flight, destruction of evidence, etc.; and (3) where there is an actual need for a hearing on

shortened notice." None of these conditions apply here. TUFV simply wants a faster hearing to satisfy its own impatience, which is not an emergency warranting deviation from standard notice rules.

4.     Here, not only are none of these conditions satisfied, they are not even offered by TUVF as reasons why an expedited hearing is an absolute necessity. TUVF has not demonstrated any need for an emergency hearing, nor demonstrated or even alleged that it will suffer immediate and irreparable harm if a hearing is held on regular notice. On the contrary, it is the Debtors that will be harmed by an emergency hearing, which would not provide any reasonable opportunity to respond to the Motion.

5.     In short, the Application is indicative of the tactics of TUVF's that contributed to the Debtors' decision to commence these bankruptcy cases. Rather than affording the Debtors an opportunity to proceed in an orderly manner, TUVF would have the Debtors engage in a needless "fire drill" for tactical reasons only. Based on the foregoing, the Debtors submit that the Application is unsupported and unsupportable and should be denied so that the Motion may be heard on regular notice

Dated: June 25, 2025                    THE BENSAMOCHAN LAW FIRM., INC.

                                        By: Eric Bensamochan
                                        Eric Bensamochan, Esq.
                                        Proposed Attorney for Debtor

The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064

OPPOSITION TO APPLICATION FOR ORDER SETTING HEARING ON SHORTENED NOTICE

## Declaration of Eric Bensamochan, Esq.

I, Eric Bensamochan, Esq, do hereby declare that all of the following is true and correct to the best of my personal knowledge and if called upon as a witness I could and would competently testify to the truthfulness of all of the below statements.

1.  I am an attorney duly licensed to practice law in the State of California, and in this United States Bankruptcy Court for the Central District of California.

2.  I am proposed counsel for the Debtor In Possession, SEN Fitness Group.

3.  That the case was commenced on June 19, 2025 by causing to be filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code.

4.  The filing was initiated as an emergency filing, initially due to the fact that the Debtor operates under a management agreement with UG management as part of a franchise agreement with UFC Gyms. (Please see attached hereto as **Exhibit "A"** a true and correct copy of the management agreement).

5.  That due to the nature of the management structure, the management company maintains all books and records for the Debtor entity, which makes it more difficult to quickly obtain the necessary information to complete the schedules prior to the filing. My office has already been in touch with the management company's counsel, who has helped facilitate the supply of documents and needed information to complete the debtor's schedules within the fourteen-day window.

OPPOSITION TO APPLICATION FOR ORDER SETTING HEARING ON SHORTENED NOTICE

The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064

6. That my understanding is that the pending UD trial has been continued to the end of July.

7. That the landlord will not be prejudiced by having the hearing heard on regular notice, and to allow the Debtor sufficient time to respond to the motion for relief filed.

8. That the next several days were planned on being spent completing the schedules and filing the necessary first day motions. Given the complexity of the management structure and accounting, this has taken longer than was initially anticipated.

I declare under penalty of perjury that the foregoing in true and correct, and that this declaration is executed on the 25th day of June, 2025.

/s/ Eric Bensamochan
Eric Bensamochan, Esq.
PROPOSED ATTORNEY FOR DEBTOR

# EXHIBIT "A"

### MANAGEMENT SERVICES AGREEMENT



### UFC GYM MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT (the "**Agreement**") is entered into as of December 7 , 2019 (the "**Effective Date**") by and between Slava Vilshtein ("**Owner**") and UG Management Company, LLC ("**Manager**"). Unless otherwise noted, capitalized terms in this Agreement have the meaning set forth in Section 12 hereof.

### RECITALS

WHEREAS, on or about February 16, 2019, Owner entered into a UFC Gym Franchise Agreement (the "**Franchise Agreement**") with Manager's affiliate, UG Franchise Operations, LLC ("**Franchisor**"), pursuant to which Franchisor has granted Owner the right to develop and operate a UFC

Gym business located at 451 West Esplanade Drive, Oxnard, CA 93036 (the "**Premises**").

WHEREAS, Owner desires to engage Manager to manage and operate the UFC Gym businesses located on the Premises (the "**Franchise**"), and Manager desires to accept the engagement, on the terms and conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Owner and Manager agree as follows:

## 1   APPOINTMENT OF MANAGER

1.1   Appointment. Owner hereby appoints Manager as its exclusive independent contractor to manage, supervise, direct and control the operations of the Franchise throughout the Term. Manager accepts the appointment and agrees to manage the Franchise during the Term in accordance with the terms and conditions of this Agreement and the Franchise Agreement.

2.2   Operations. Manager will manage the Franchise in accordance with the provisions of this Agreement and all standards imposed by the Franchise Agreement, and having regard for customary practices of the fitness industry in the United States for facilities comparable to the Franchise. Owner hereby agrees that Manager will have the authority to carry out all functions described in this Agreement and all other actions necessary in connection with the management and operation of the Franchise (all of which shall be at the expense of Owner), including without limitation:

1.2.1   Recruit, employ, supervise, direct and discharge the employees working at the Franchise and maintain adequate staff to carry out its duties under this Agreement.

1.2.2    Establish prices, rates and charges for services provided by the Franchise.

1.2.3    Establish and revise, as necessary, administrative policies and procedures, including policies and procedures for the control of revenue and expenditures, for the purchasing of supplies and services, for the control of credit and for the scheduling of maintenance, and verify that the foregoing procedures are operating in a sound manner.

1.2.4    Make payments on all accounts payable and collect all accounts receivable, and otherwise manage each Operating Account with respect to the Franchise, and pay all amounts required to be paid with respect to the operation and management of the Franchise (including, without limitation, any amounts paid as a Deduction).

1.2.5    Procure on behalf of Owner all Inventories and replace supplies.

1.2.6    At Manager's sole option, Manager will either provide, or select and contract with third-parties to provide, back-office support services for the operations and accounting functions of the Franchise (including, without limitation, accounting, payroll processing and reporting, sales tax administration, vendor management, dues collection and human resources support) (collectively, "**Back-Office Support**").

1.2.7    Prepare (or have prepared by third-party service providers) and deliver Accounting Period Statements and Annual Operating Statements, repair and equipment estimates and such other information as is required by this Agreement.

1.2.8    Plan, execute and supervise repairs and maintenance.

1.2.9    Obtain the insurance required to be obtained by Manager pursuant to Section 6 of this Agreement.

1.2.10  Obtain and keep in full force and effect, either in its own name or in Owner's name, all licenses and permits required by applicable law, to the extent within the control of Manager (or, if not within the control of Manager, Manager agrees to use commercially reasonable efforts to obtain and keep same in full force and effect, at the expense of Owner).

1.2.11  Arrange for and supervise public relations and advertising and prepare marketing plans.

1.2.12  Manage and operate the Franchise at all times in compliance with the Franchise Agreement, the Manual and the System Standards.

1.2.13  Select, obtain and manage the Software and related computer services for member management and point of sale systems for the Franchise.

1.2.14  Prepare plans for capital expenditures relating to the Franchise.

1.2.15  Provide or engage third parties to prepare and provide at Owner's expense, reports and statements as needed for the preparation of annual tax filings relating to the Franchise; provided however, that all tax preparation and filing of tax documents with governmental authorities will be

DocuSign Envelope ID: C789D5A91A37 0 6A5D1 8BC3 DBF9D1A4895A

performed by Owner or by third-party tax consultants at Owner's expense.

1.3    <u>Authority of Manager</u>. Operation of the Franchise will be under the exclusive supervision and control of Manager, except as otherwise specifically provided in this Agreement.

1.4    <u>Applicable Legal Requirements</u>. Manager shall comply with and abide by all applicable Legal Requirements pertaining to its operation of the Franchise. The reasonable expenses of any contest or dispute with respect to a Legal Requirement shall be paid from Gross Revenues as Deductions. If such expenses will result in an Operating Loss for any Accounting Period(s), Additional Working Capital may be required under Section 4.6 below.

1.5    <u>Employees</u>. All personnel employed at the Franchise will at all times be the employees of Manager and not the employees of Owner. Manager will have full discretion with respect to all personnel employed at the Franchise, including, without limitation, decisions regarding hiring, promoting, transferring, compensating, supervising, terminating, directing and training all employees, and, generally, establishing and maintaining all policies relating to employment.

1.6    <u>Owner's Right to Inspect</u>. Owner and its representatives, employees, agents, and Affiliates shall have access to the Franchise during normal business hours for the purpose of inspection or exercising any of its rights under this Agreement.

1.7    <u>Owner's Right to Engage Professionals</u>.  Notwithstanding anything to the contrary, Owner, in its sole discretion and at its sole cost, shall be authorized to engage third-party accounting firms and law firms to represent and provide services on its behalf.

1.8    <u>Annual Meetings</u>. At Owner's request, Owner and Manager shall meet on an annual basis at mutually convenient locations and times. Manager shall be represented at such meetings by the Manager's Representative and such other personnel as the Manager's Representative may deem appropriate. The purpose of the meetings shall be to discuss the performance of the Franchise and other related issues.

## 2    TERM

2.1    <u>Term</u>. Subject at all times to Section 7 herein, this Agreement begins on the Effective Date and terminates on the one (1) year anniversary of the Effective Date (the "**Term**") and Owner shall have the option to renew (the "**Renewal Option**") this Agreement for a term of three (3) years (the "**Renewal Term**") on the same terms and conditions set forth in this Agreement; provided, however that (i) Owner is not in default under any of the other terms and conditions of this Agreement or the Franchise Agreement; and (ii) the expiration, termination or assignment (to any party that is not a party to this Agreement) of the Franchise Agreement will, in Manager's sole discretion, result in the immediate termination of this Agreement.

2.2    <u>Franchise Agreement Extensions</u>. If Owner renews the Franchise Agreement to continue the operations of the Franchise, then Owner must also engage Manager's services hereunder for the renewal term (subject to Manager's consent and agreement to provide continued management services in connection with such renewal term).  To renew Manager's services, Manager may require, among other things, that Owner and Manager enter into a new management agreement using the standard form of "Management Agreement" that Manager is then offering to franchisees of Franchisor, or amend this

DocuSign Envelope ID: CF80D5A8A37AAA91-88C3-DBE9D1A6895A

Agreement to continue the Manager's services with respect to the Franchise.

## 3    INCENTIVE FEES; BACK OFFICE FEES

3.1    On a quarterly basis, Manager will be paid a percentage of the Operating Profit of the Franchise per the following schedule ("Incentive Fees") beginning on the date that the Franchise opens for workouts to the public ("Opening Date") and throughout the Term in accordance with the terms and conditions set forth below:

| Franchise Operating Profit (%) | Manager Incentive Fee (%) |
|---|---|
| 0% to 5% | 0% |
| 5% to 10% | 10% |
| 10% to 15% | 15% |
| 15% to 20% | 17.5% |
| Greater than 20% | 20% |

As a matter of clarity, the Incentive Fee for each quarterly period during the Term shall be based on the Operating Profit achieved by the Franchise in the applicable quarter. For example, if the Franchise Operating Profit in a quarter is 12%, or $100,000, then the Manager Incentive Fee paid to Manager will be $15,000 for such quarter.   If, at the end of any Fiscal Year during the Term, the Annual Operating Statement shows a discrepancy in the amount of the Operating Profit used to calculate the amount of Incentive Fees paid to Manager during that Fiscal Year, then manager shall notify Owner in writing of such discrepancy within thirty (30) days of the completion of the Annual Operating Statement for that Fiscal Year.  Within ten (10) days of Owner's receipt of such notice from Manager, either Owner shall pay manager the amount of any deficiency in the Incentive Fees that were paid to Manager as compared to the Incentive Fees that should have been paid to Manager according to the Operating Profit under the Annual Operating Statement, or Manager shall reimburse to Owner the amount of any overpayment in the Incentive Fees that were paid to Manager as compared to the Incentive Fees that should have been paid to Manager according to the Operating Profit under the Annual Operating Statement.

3.2    <u>Management Fee</u>.  Owner shall pay Manager a management service fee of $10,000 per month, which amount shall be subject to annual increases in the discretion of Manager (the "**Management Fee**"), on the first of each month in advance.  Any upward adjustments to the Management Fee shall be reasonably made by Manager depending on the scope of the management services provided. The management services shall commence on the Effective Date.  Notwithstanding the foregoing, Owner shall pay Manager a reduced Management Fee of $5,000 for the first month, and thereafter the Management Fee shall revert back to $10,000 per month.

3.3    <u>Back Office Support Fee.</u>  Owner shall also pay Manager a back office support service fee of $3,000 per month, which amount shall be subject to annual increases in the discretion of Manager (the "**Back Office Support Fee**"), on the first of each month, in advance.  Any upward adjustments to the Back Office Support Fee shall be reasonably made by Manager depending on the scope of the Back

Office Support provided. The back office support shall commence on the Effective Date of this Agreement.


# 4    ACCOUNTING, BOOKKEEPING AND BANK ACCOUNTS

4.1    <u>Accounting, Distributions and Annual Reconciliation</u>.

4.1.1    Within thirty (30) days after the close of each Accounting Period, Manager shall provide an interim accounting statement (the "**Accounting Period Statement**") to Owner showing Gross Revenues, Deductions, Operating Profit (or Operating Loss), capital expenditures, cash flow and applications and distributions thereof for the preceding Accounting Period.

4.1.2    Within one hundred-twenty (120) days after the close of each Fiscal Year, Manager shall deliver to Owner a statement (the "**Annual Operating Statement**") showing Gross Revenues, Deductions, Operating Profit (or Operating Loss), capital expenditures, cash flow and applications and distributions thereof for the preceding Fiscal Year, in reasonable detail. In the event of discrepancy between the Annual Operating Statement and any one or more of the Accounting Period Statements, the Annual Operating Statement shall be controlling over the Accounting Period Statements.

4.2    <u>Books and Records</u>.    Books of control and account pertaining to operations at the Franchise shall be kept by Manager or its designee on the accrual basis in all material respects. Owner may at reasonable intervals during Manager's normal business hours examine such records. If Owner desires to audit, examine or review the Annual Operating Statement, Owner's Representative shall notify Manager in writing within sixty (60) days after receipt of such Annual Operating Statement of its intention to audit and begin such audit no sooner than ten (10) days after Manager's receipt of such notice. Owner's Representative shall use reasonable efforts to complete such audit within sixty (60) days after commencement thereof. If Owner does not make such an audit, then such Annual Operating Statement shall be deemed to be conclusively accepted by Owner as being correct, except in the event of manifest error or fraud, misrepresentation, misconduct or gross negligence by Manager or its agents, employees, representatives or contractors or other third parties. If any audit discloses that Manager has not received any amounts due to it, Owner shall pay Manager such amounts. The cost of the audit shall be paid by Owner. If the Franchise Agreement requires Owner to pay interest and/or the cost of an audit to the Franchisor on account of an understatement in reports provided by Manager, Manager shall pay such interest and costs in accordance with the Franchise Agreement.

4.3    <u>Account, Expenditures</u>.

4.3.1    Manager shall direct Manager's preferred member software vendor (which as of the Effective Date is ClubReady) to deposit all funds derived from operation of the Franchise in Owner's bank account managed by Manager in a bank designated by Manager (the "**Operating Account**"). Owner shall have access to all bank accounts used for the Franchise. Withdrawals by Manager from the Operating Account may be made only by the person acting as the Manager's Representative or such other representatives of Manager whose signatures have been authorized by Owner's Representative. Reasonable petty cash funds shall be maintained at the UFC Gym Business on the Premises.

4.3.2    Except as otherwise provided in this Agreement, all payments made by Manager

hereunder shall be made from the Operating Account or, for amounts under $1,000 and only as necessary or expedient in Manager's sole discretion, from Manager's petty cash funds. Manager shall not be required to make any advance or payment with respect to the Franchise except out of such funds, and Manager shall not be obligated to incur any liability or obligation with respect to the Franchise.

       4.3.3   Debts and liabilities incurred by Manager as a result of its operation and management of the Franchise pursuant to the terms hereof, whether asserted before or after Termination, will be paid by Owner to the extent funds are not available for that purpose from the Operating Account ("**Covered Liabilities**"); provided, however, that debts and/or liabilities directly caused by Manager's gross negligence or willful misconduct ("**Manager's Liabilities**") shall be the responsibility of Manager. Owner shall indemnify, defend and hold Manager harmless from and against all loss, costs, liability, and damage (including, without limitation, reasonable attorneys' fees and expenses) arising from Owner's failure to pay or perform such Covered Liabilities, Owner's breach of this Agreement, and/or Owner's gross negligence or willful misconduct. Manager shall pay, indemnify, defend and hold Owner harmless from and against all Manager's Liabilities. The provisions of this Section 4.3.3 will survive Termination.

       4.4   <u>Annual Operating Projection</u>. For each Fiscal Year (or partial Fiscal Year) under this Agreement, Manager shall prepare and deliver to Owner for its review, a preliminary draft of the business plan (including a proposed budget) and a projection of the estimated Gross Revenues, Deductions, Operating Profit or Operating Loss, capital expenditures, and cash flow for the Franchise for that Fiscal Year (each an "**Annual Operating Projection**") for approval by Owner's Representative. In the case of the Fiscal Year encompassing the Effective Date, Manager will deliver the Annual Operating Projection to Owner's Representative within forty-five (45) days of the Effective Date. For each subsequent Fiscal Year during the Term, Manager will deliver the Annual Operating Projection to Owner by February 15th of the then-current Fiscal Year. During any period between the end of the prior Fiscal Year and the date Manager delivers the Annual Operating Projection for the then-current Fiscal Year, Owner and Manager will continue on an interim basis under this Agreement using the budget in effect under the prior Fiscal Year's Annual Operating Projection. Manager will consider in good faith suggestions made by Owner's Representative with respect to the Annual Operating Projection and make modifications thereto that are agreed upon by Owner's Representative and Manager. Upon approval of the Annual Operating Projection by Owner's Representative and Manager, Manager shall use commercially reasonable efforts to adhere to the Annual Operating Projection for that Fiscal Year. In the event Owner's Representative and Manager are unable to agree upon the Annual Operating Projection within sixty (60) days after Manager provides the proposed Annual Operating Projection for that Fiscal Year, then Owner and Manager will continue on an interim basis under this Agreement using the budget in effect during the prior Fiscal Year, adjusted by the Consumer Price Index; provided, however, that in such instance Manager will have the right to terminate this Agreement upon thirty (30) days' advance written notice to Owner's Representative, and Owner shall be jointly and severally obligated to make any payments required in connection with the termination of this Agreement, including, without limitation, the Early Termination Payment.

       4.5   <u>Initial Capital; Minimum Working Capital</u>. Owner shall cause to be deposited in the Operating Account as of the Effective Date an amount equal to or greater than the Initial Capital. Owner shall also cause to be maintained in the Operating Account at all times throughout the Term an amount equal to or greater than the Minimum Working Capital. Owner represents that the Minimum Working Capital will be held in the Operating Account during the Term of this Agreement and may be used by Manager according to the terms of this Agreement.

DocuSign Envelope ID: C780D5A81A3704A50-88C3-DBE5B1A8895A

4.6     Additional Working Capital.

    4.6.1    Manager may from time to time during the Term request that Owner contribute additional funds ("**Additional Working Capital**") necessary to maintain Working Capital at levels reasonably determined by Manager to be necessary to satisfy the ongoing needs of the Franchise (which may include, without limitation, having sufficient cash in the Operating Account to maintain the normal course operations of the Franchise or to pay any committed or required capital expenditures, interest payments, debt payments, or other similar cash payments over the ensuing three (3) months).

    4.6.2    If Manager requests Additional Working Capital under Section 4.6.1 or because (a) there is an Operating Loss for any Accounting Period, (b) in Manager's business judgment, Manager projects that there will be an Operating Loss or cash deficit for an upcoming Accounting Period, and/or (c) the Franchise generates insufficient cash to pay any due and owing obligations of the Franchise when due, Owner must contribute Additional Working Capital in the amount of the actual or projected Operating Loss or cash deficit (as determined by Manager) within five (5) days after Manager has delivered written notice thereof to Owner's Representative.

    4.6.3    Additionally, Manager will have the right (without affecting Manager's other remedies under this Agreement), but no obligation, to advance funds on behalf of Owner as needed to pay Essential Operating Expenses to keep the Franchise in operation as required by the Franchise Agreement. To the extent that Manager advances any monies for Essential Operating Expenses or otherwise, Manager will have the right to fully reimburse itself as soon as practical.  Any amounts reimbursed to Manager under this Section 4.6.4 will not be a "Deduction" from Gross Revenues in determining the Operating Profits and for purposes of calculating the Incentive Fee.

    4.6.4    Manager will have the right to terminate this Agreement upon written notice to Owner 's Representative at least fifteen (15) days before the effective date of the termination in the event that Owner does not provide the Additional Working Capital described in this Section, or if Owner does not maintain the Minimum Working Capital described herein.

# 5     REPAIRS, MAINTENANCE, CAPITAL EXPENDITURES AND REPLACEMENTS

    5.1     Repairs and Maintenance to be Paid from Gross Revenues. Subject to the availability of adequate funds, Manager shall maintain the Franchise in good repair and condition, use commercially reasonable efforts to comply with and abide by all applicable Legal Requirements pertaining to its operation of the Franchise and shall make or cause to be made such routine maintenance, repairs and minor alterations as it determines are necessary for such purposes and as required pursuant to the terms of the Franchise Agreement and to ensure operations consistent with the System Standards. The phrase "routine maintenance, repairs, and minor alterations" as used in this Section 5.1 shall include only those which are normally expensed under generally accepted accounting principles. The cost of such maintenance, repairs and alterations shall be paid from Gross Revenues and shall be treated as a Deduction.

    5.2     Capital Expenditures and Equipment Replacements.

    5.2.1    Subject to the availability of adequate funds, Manager shall from time to time (a) make such replacements, renewals and additions to the FF&E of the Franchise, and (b) make such Routine Capital Expenditures, as may be agreed upon by Owner and Manager and as may be required

UG Franchise Operations, LLC
UFC GYM Management Services Agreement – 2019

by the Franchise Agreement and as included in the Annual Operating Projection.  Manager may from time to time prepare estimates as to the projected costs of such improvements, and may propose an increase to the Working Capital or changes in the Annual Operating Projection to adequately fund the projected expenditures.

5.2.2    If Owner requests that Manager perform capital improvements that are not included in the Annual Operating Projection, Manager may perform such improvements provided that Owner pays for such improvements as an Additional Capital infusion.

5.2.3    Notwithstanding the foregoing, in case of threatened damage or destruction to the Franchise or Persons or property thereon due to force majeure or other comparable emergency, Manager may make such repairs, replacements or improvements to the Franchise as Manager reasonably deems necessary to avoid and/or minimize any such damage or destruction.

## 6    INSURANCE

6.1    <u>Insurance</u>.  Manager shall, commencing with the Effective Date and for the duration of the Term, procure and maintain, using funds deducted from Gross Revenues, insurance for the Franchise as needed to comply with the requirements of the Franchise Agreement (or, if requested by Owner, insurance coverages in excess of the policies needed to comply with the Franchise Agreement).

6.2    <u>Manager Insurance</u>. In the event that Manager is required by applicable laws or regulations relating to the performance of its duties under this Agreement to obtain insurance coverage directly relating to its activities as Manager in addition to coverage Manager already maintains, then Manager will procure and maintain the necessary insurance using funds deducted from Gross Revenues.

6.3    <u>Coverage</u>. All insurance described in Sections 6.1 and 6.2 may be obtained by Manager by endorsement or equivalent means under its blanket insurance policies, provided that such blanket policies fulfill the requirements and limits of the Franchise Agreement.  Owner shall be named as the insured, and Manager and Franchisor shall be the named additionally insureds with respect to comprehensive general public liability insurance against claims for all injury, death or property damage occurring on, in, or about the Franchise, and, to the extent applicable, such other insurance, including excess/umbrella coverage.  Manager shall be the named insured and Owner and Franchisor shall be additional insureds on employer's practice liability insurance, workers compensation insurance and fidelity bonds or crime insurance.

6.4    <u>Costs and Expenses</u>. Insurance premiums and any costs or expenses with respect to the insurance described in this Section 6 shall be Deductions in determining Operating Profit. Premiums on policies for more than one year shall be charged pro rata against Gross Revenues over the period of the policies. Any reserves, losses, costs, damages or expenses which are uninsured, or fall within deductible limits, shall be treated as a cost of insurance and shall be Deductions in determining Operating Profit.

## 7    EVENTS OF DEFAULT

7.1    <u>Events of Default</u>. Each of the following shall, to the extent permitted by applicable law, constitute an "**Event of Default**" under this Agreement.

7.1.1    The failure of Owner to make any payment required to be made in accordance

DocuSign Envelope ID: C7830D5A81A37044F0-84F0-8963-DBF9D1A4895A1

with the terms of this Agreement, as of the due date as specified in this Agreement and, unless stated otherwise herein, the failure to cure such default within ten (10) days after receipt of written notice from Manager demanding such cure.

7.1.2    The failure of Owner to perform, keep or fulfill any of the other covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of such default for a period of thirty (30) days after Owner's receipt of written notice from Manager of the failure.

7.1.3    Any default by Owner under the Franchise Agreement or any other agreement with Franchisor (or its Affiliates), subject to the same provisions for notice and cure, if any, as may be applicable to the default under the Franchise Agreement or other agreement(s).

7.1.4    The gross negligence or willful misconduct of Manager in the performance of its obligations under this Agreement; provided such gross negligence or willful misconduct results in material damage to Owner; and provided further that Owner notifies Manager in writing of such gross negligence or willful misconduct and Manager fails to cure within thirty (30) days of notice, or, if the default is such that it cannot reasonably be cured within the thirty (30) day period of time, if Manager fails to commence the cure of the default within the thirty (30) day period of time or thereafter fails to diligently pursue such efforts to completion and fails to cure the default within sixty (60) days of the original written notice.

7.1.5    The Sale of the Franchise or any unapproved "change of control" of Owner.

7.1.6    The filing by Owner of a voluntary petition in bankruptcy or insolvency or a petition for reorganization under any bankruptcy law by any party.

7.1.7    The consent by Owner to an involuntary petition in bankruptcy or the failure to vacate, within ninety (90) days from the date of entry thereof, any order approving an involuntary petition by any party.

7.1.8    The entering of an order, judgment or decree by any court of competent jurisdiction, on the application of a creditor, adjudicating Owner as bankrupt or insolvent or approving a petition seeking reorganization or appointing a receiver, trustee, or liquidator of all or a substantial part of Owner's assets, and such order, judgment or decree's continuing unstayed and in effect for an aggregate of sixty (60) days (whether or not consecutive).

7.1.9    The breach by Owner of any lease agreement with respect to the Franchise.

7.1.10    The breach by Owner of any equipment lease agreement with respect to the Franchise.

7.2    <u>Remedies</u>.

7.2.1    Upon the occurrence of an Event of Default, the non-defaulting party shall have the right to pursue any one or more of the following courses of action: (a) to terminate this Agreement by written notice to the defaulting party, which termination shall be effective as of the effective date which is set forth in the notice, provided that the effective date is at least thirty (30) days after the date of the notice (or ten (10) days in the case of an Event of Default pursuant to Section 7.1.1); (b) to initiate

DocuSign Envelope ID: C789D5A8-A37A-4A51-88C3-DBE9B1A4895A

any and all proceedings permitted by law or equity including, without limitation (but subject to the provisions of Section 10 hereof), actions for specific performance and/or damages.

7.2.2   Upon the occurrence of an Event of Default, any amounts owed to the non-defaulting party shall accrue interest, at the lesser of 10% per annum or the highest rate allowed by law, from and after the date on which the Event of Default occurred.

7.2.3   The remedies granted under this Section 7.2 shall not be in substitution for, but shall be in addition, to, any and all rights and remedies available to the non-defaulting party (including, without limitation, injunctive relief and damages) by reason of applicable provisions of law or equity and shall survive Termination.

7.2.4   In the event of any termination of this Agreement, Owner shall immediately pay any and all amounts due and owing to Manager, Franchisor (and any of their Affiliates) under this Agreement, the Franchise Agreement and any other agreement between Owner, on one hand, and Manager and/or Franchisor (and/or their Affiliates), on the other hand, including without limitation, the Early Termination Payment (which shall become due and payable upon any termination of this Agreement by Manager, other than termination predicated on Manager's gross negligence or willful misconduct).

# 8   ASSIGNMENT

8.1   <u>Assignment by Manager</u>.  Manager shall have the right, without consent, to irrevocably and totally assign this Agreement and/or its interest in this Agreement to: (i) any of its Affiliates; (ii) any successor by merger, consolidation, stock sale, reorganization or other 'change of control' transaction; or (iii) any party succeeding to substantially all of the assets or equity securities of Manager or its Affiliates.  Any other assignment shall require the consent of Owner which shall not be unreasonably withheld or delayed.

8.2   <u>Assignment by Owner</u>.  Subject to Owner's obligations under the Franchise Agreement, Owner may not assign this Agreement in any circumstance without the prior written consent of Manager which may be withheld in Manager's sole discretion.  For the avoidance of doubt, any "change of control" of Owner shall constitute an assignment governed by Sections 8.2 and 8.3 hereof and shall require the prior written consent of Manager.

8.3   Nothing contained in this Agreement will limit or waive any obligations of Owner as Franchisee under Section 11 of the Franchise Agreement relating to transfers and Owner/Franchisee must comply with such obligations as a condition of any assignment under this Agreement.

# 9   Indemnification.

9.1   <u>Owner's Indemnity</u>. Owner shall indemnify, defend and hold harmless Manager, Manager's affiliated entities, and its and their officers, directors, employees, attorneys, members, managers, shareholders and other representatives (collectively, the "**Manager Indemnified Parties**") from, against and in respect of any and all losses, judgments, settlements, claims, fines, penalties, liabilities, damages, costs or expenses (including reasonable attorney's fees and expenses) (collectively, "**Losses**") asserted against or incurred or sustained by Manager Indemnified Parties, arising out of, or resulting from, in whole or in part:

UG Franchise Operations, LLC
UFC GYM Management Services Agreement – 2019

9.1.1   any breach of any warranty or misrepresentation by Owner or Owner's breach of any covenant, agreement or obligation under this Agreement;

9.1.2   the management and/or operation of the Franchise by Manager or any of its agents, officers, employees, attorneys or representatives, unless resulting from gross negligence or willful misconduct of Manager or any of its agents, officers, employees or representatives;

9.1.3   any injury suffered by any personnel, member or any other person at the Franchise, unless resulting from gross negligence or willful misconduct of Manager or any of its agents, officers, employees or representatives;

9.1.4   the failure of Owner to comply with the terms of any contract with members with respect to the Franchise or any other contract to which Owner is a party or which Owner has assumed with respect to the Franchise, unless such breach is caused by Manager's willful failure to perform its obligations under this Agreement; and

9.1.5   any employment-related claim by personnel of the Franchise.

9.2   <u>Manager's Indemnity</u>.  Manager hereby agrees to indemnify, defend and hold harmless the Owner and its and their officers, directors, employees, shareholders and other representatives (collectively, the "**Owner Indemnified Parties**") from, against and in respect of any and all Losses asserted against or incurred or sustained by the Owner Indemnified Parties, arising out of, or resulting from, in whole or in part, the gross negligence or willful misconduct on the part of Manager or any of its agents, officers, employees or representatives; provided that Manager shall have no liability hereunder for any actions, decisions or intentional omissions if such action, decision or omission at issue was undertaken at the direction of, or in consultation with, the Owner

9.3   <u>Procedures for Indemnification</u>. The provisions of this Section 9 shall govern actions for indemnification under this Agreement.  As soon as practicable after a Manager Indemnified Party or an Owner Indemnified Party seeking indemnification under this Section 9 (an "**Indemnitee**") becomes aware of any fact, condition or event which may give rise to Losses for which indemnification may be sought hereunder, the Indemnitee will deliver to the Person required to provide indemnification hereunder (the "**Indemnitor**") written notice thereof, whereupon the Indemnitor shall have the right to participate in, and, if the Indemnitor agrees in writing that it will be responsible for any costs, expenses, judgments, damages and losses incurred by the Indemnitee with respect to such claim, to assume the defense thereof with counsel selected by the Indemnitor and reasonably acceptable to the Indemnitee or by counsel selected by the Indemnitor's insurer; provided, however, that the Indemnitee shall have the right to retain its own counsel, with the fees and expenses to be paid by the Indemnitor, if representation of the Indemnitee by the counsel retained by the Indemnitor would be inappropriate due to conflict of interests between the Indemnitee and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the Indemnitor within a reasonable time of becoming aware of any such claim shall relieve the Indemnitor of any liability to the Indemnitee under the applicable indemnification provisions only if and to the extent that such failure is prejudicial to the Indemnitor's ability to defend such action, and the omission to timely deliver written notice to the Indemnitor will not relieve it of any liability that it may have to the Indemnitee other than under such provisions.  If an Indemnitee settles a claim without the prior written consent of the Indemnitor, then the Indemnitor shall be released from liability with respect to such claim unless the Indemnitor has unreasonably withheld

DocuSign Envelope ID: C7B9D5A8A3704A50-8863-DBE59D1A4895A

such consent. Owner and Manager shall cooperate in all reasonable respects in connection with any such claim for indemnification and shall take such action as shall be reasonably requested by the other Party to endeavor to achieve a favorable outcome with respect to the underlying claim with respect to which such indemnification is sought. Without limiting the generality of the preceding sentence, Owner and Manager, as applicable, shall (a) furnish the other Party with copies of all written communications, pleadings and other material documents and instruments sent to, served upon or prepared by such Party in connection with such underlying claim, provided that there is no waiver of attorney work product or attorney-client privileges that either Party may wish to assert, (b) make available to the other Party the advisors, consultants, principals and employees of such Party, as is reasonably requested and (c) promptly upon request, furnish the other Party with copies of all other materials which, in the opinion of the requesting Party or such Party's attorneys, would be helpful under the circumstances.

## 10   DISPUTE RESOLUTIONS

10.1   <u>Mediation</u>.  Except as otherwise provided herein, if a dispute arises out of or relates to this Agreement, the breach hereof, the rights and obligations of the parties hereto, or the performance of either party under this Agreement, the parties agree first to try in good faith to settle the dispute by non-binding mediation administered by the American Arbitration Association ("**AAA**") in accordance with its Commercial Mediation Rules, before resorting to arbitration, litigation, or some other dispute resolution procedure.  Such mediation shall take place before a sole mediator at a location designated by Manager within ten (10) miles of Manager's principal business address, which is currently located in Orange County, California.  The parties shall each bear all of their own costs of mediation; provided, however, the fees of the mediator shall be divided equally between Owner and Manager.  Mediation shall not be required with respect to: (a) any claim or dispute involving any payment obligation of Owner that is past due; (b) any claim or dispute involving actual or threatened disclosure or misuse of our confidential information; (c) any claim or dispute involving the ownership, validity, or use of the UFC GYM Trademarks or UFC GYM Intellectual Property; (d) any claim or dispute involving the insurance or indemnification provisions of this Agreement; or (e) any claim or dispute involving a non-curable default.

10.2   <u>Arbitration</u>.  Manager and Owner agree that all controversies, disputes, or claims between Manager and its Affiliates (and their respective shareholders, officers, directors, attorneys, agents, and/or employees) and Owner (and/or its owners, guarantors, Affiliates, and/or employees) arising out of or related to (i) this Agreement or any other agreement between Manager (and its Affiliates) and Owner (and its Affiliates), except the Franchise Agreement (in which case the terms and conditions of the Franchise Agreement shall control), (ii) the relationship of Manager and Owner, or (iii) the scope and validity of this Agreement or any other agreement between Manager (and its Affiliates) and Owner (and its Affiliates), except the Franchise Agreement (in which case the terms and conditions of the Franchise Agreement shall control), or any provision of such agreements (including the validity and scope of the arbitration obligations under this Section, which the parties acknowledge is to be determined by an arbitrator and not a court), which are not settled by mediation under Section 10.1 hereof must be submitted for binding arbitration, on demand of either party, to the AAA, except as provided in Sections 10.2.4 and 10.2.6 below.  The arbitration proceedings will be conducted by one arbitrator and, except as this Section otherwise provides, according to the then current commercial arbitration rules of the AAA. All proceedings will be conducted at a suitable location chosen by the arbitrator within ten (10) miles of Manager's principal business address, which is currently located in Orange County, California.  All matters relating to arbitration will be governed by the Federal Arbitration Act (9 U.S.C. §§ 1 et seq.).

DocuSign Envelope ID: C78C05A81A376A4B1-89C3-DBE9B1A48954

Judgment upon the arbitrator's award may be entered in any court of competent jurisdiction.

10.2.3  The arbitrator has the right to award or include in his or her award any relief which he or she deems proper, including, without limitation, money damages (with interest on unpaid amounts from the date due), specific performance, injunctive relief, and attorneys' fees and costs, provided that the arbitrator may not declare any UFC GYM Trademark generic or otherwise invalid or award any punitive or exemplary damages against either party (Manager and Owner hereby waiving to the fullest extent permitted by law, any right to or claim for any punitive or exemplary damages against the other).

10.2.4  Manager and Owner agree to be bound by the provisions of any limitation on the period of time in which claims must be brought under applicable law or this Agreement, whichever expires earlier.  Manager and Owner further agree that, in any arbitration proceeding, each must submit or file any claim which would constitute a compulsory counterclaim (as defined by Rule 13 of the Federal Rules of Civil Procedure) within the same proceeding as the claim to which it relates.  Any claim which is not submitted or filed as required is forever barred.  The arbitrator may not consider any settlement discussions or offers that might have been made by either Manager or Owner.  Manager reserves the right, but has no obligation, to advance Owner's share of the costs of any arbitration proceeding in order for such arbitration proceeding to take place and by doing so will not be deemed to have waived or relinquished its right to seek the recovery of those costs in accordance with Section 10.5.

10.2.5  Manager and Owner agree that arbitration will be conducted on an individual, not a class wide, basis and that an arbitration proceeding between Manager and Manager's Affiliates (including Manager's and Manager Affiliates' respective shareholders, officers, directors, agents, and/or employees) and Owner (and/or its owners, guarantors, Affiliates, and/or employees) may not be consolidated with any other arbitration proceeding between the parties and any other person.  Notwithstanding the foregoing or anything to the contrary in this Section or elsewhere in this Agreement, if any court or arbitrator determines that all or any part of the preceding sentence is unenforceable with respect to a dispute that otherwise would be subject to arbitration under this Agreement, then the parties agree that this arbitration clause will not apply to that dispute and that such dispute will be resolved in a judicial proceeding in accordance with this Section 10 (excluding this Section 10.2).

10.2.6  Despite the parties' agreement to arbitrate, Manager and Owner each have the right in a proper case to seek temporary restraining orders and temporary or preliminary injunctive relief from a court of competent jurisdiction; provided, however, that the parties must contemporaneously submit the dispute for arbitration on the merits as provided in this Section.

10.2.7  The provisions of this Section are intended to benefit and bind certain third party non-signatories and will continue in full force and effect subsequent to and notwithstanding this Agreement's expiration or termination.

10.2.8  The obligation to arbitrate is not binding on either party for claims involving the UFC GYM Intellectual Property; claims involving any lease of real property between the parties or their related entities; or matters involving actions that may impair the goodwill associated with the UFC GYM Intellectual Property.

10.3  <u>Jurisdiction and Venue</u>. In connection with any proceedings the parties irrevocably and unconditionally (i) agree that any mediation, arbitration, legal action or legal proceeding involving the

DocuSign Envelope ID: C789D5A8A37D4A80-8893-DBE9D1A4895A1

Franchise, this Agreement or the Manager and/or Owner will be conducted in the county where Manager's principal place of business is then-located (currently, Orange County, California) or may be brought in the District Court of the United States, in the district where Manager's principal place of business is then located or, if this court lacks jurisdiction, the courts of record of the state and county where Manager's principal place of business is then located; (ii) consent to the jurisdiction of each court listed herein in any action or proceeding; (iii) waive any objection that he, she or it may have to the laying of venue of any action or proceeding in any of the courts listed herein; and (iv) agree that service of any court paper may be effected on the party by mail at the last known address, as provided in this Agreement, or in any other manner as may be provided under applicable laws or court rules in the state where Manager's principal place of business is then located. Manager and Owner have selected this location for the resolution of disputes based upon practical business realities, such as (1) the fact that relevant business records, and many of Manager's personnel (who may be critical as witnesses or otherwise available to assist in resolution of the dispute), will generally be located at Manager's then current headquarters and (2) Manager and Owner have a shared interest in avoiding inconsistent legal resolutions in multiple jurisdictions, which could adversely affect the consistent operation of the UFC Gym businesses and Manager's day-to-day affairs.

10.4 <u>Applicable Law</u>. Except to the extent governed by the United States Trademark Act of 1946 (Lanham Act, 15 U.S.C. §§ 1051 et seq. or the United States Arbitration Act, 9 U.S.C. §§ 1 et seq.), this Agreement and any other agreement between the parties and all transactions contemplated by this Agreement and all disputes between the parties are governed by the laws of the State of California without regard to principles of conflicts of laws.

10.5 <u>Enforcement Costs</u>. If any arbitration, legal action or other proceeding is begun for the enforcement of this Agreement, or for an alleged dispute, breach, default or misrepresentation under any term of this Agreement, the prevailing party (as determined by the court or arbitrator) is entitled to recover reasonable attorneys' fees, court costs and all expenses (including all fees and expenses incident to arbitration, appellate, bankruptcy and post-judgment proceedings), incurred in the action or proceeding, in addition to any other relief that the party is entitled.

10.6 <u>Waiver of Jury Trial</u>. The parties waive the right to a trial by a jury of all claims made between them whether existing now or in the future, including all claims, defenses, counterclaims, cross claims third-party claims and intervenor's claims involving the negotiation, signing or performance of the transaction involving this Agreement.

10.7 <u>Limitation Period</u>. Except for claims arising from Owner's non-payment or underpayment of amounts payable to Manager, any and all claims arising out of or relating to this Agreement or any agreement related to this Agreement or executed concurrently herewith or the relationship of the parties hereto, shall be barred unless a judicial proceeding is commenced within two (2) years from the date of the complaining party knew or should have known of the facts giving rise such a claim.

DocuSign Envelope ID: CF82D5A9-A37C-4A51-89C3-DBE5B1A4895A

## 11   MISCELLANEOUS

11.1   <u>Right to Make Agreement</u>. Each party warrants, with respect to itself, that neither the execution of this Agreement nor the performance of the transactions contemplated hereby shall violate any provision of law or judgment, writ, injunction, order or decree of any court or governmental authority having jurisdiction over it; result in or constitute a breach or default under any indenture, contract, other commitment or restriction to which it is a party or by which it is bound; or, require any consent, vote or approval which has not been taken, or at the time of the transaction involved shall not have been given or taken. Each party covenants that it has and will continue to have throughout the Term and any extensions thereof, the full right to enter into this Agreement and perform its obligations hereunder.

11.2   <u>Cooperation</u>.   Owner agrees to cooperate with Manager by executing such leases, subleases, licenses, concessions, equipment leases, service contracts and other agreements negotiated in good faith and at arm's length by Manager and pertaining to the Franchise that, in Manager's reasonable judgment, should be made in the name of the Owner, provided that all such agreements shall be subject to Owner's prior approval and are consistent with Owner's obligations as Franchisee under the Franchise Agreement. Further, Owner agrees to timely provide all information, data, reports, materials, and documents to Manager as Manager may request in order to perform its duties under this Agreement, and Owner agrees to timely perform any such other tasks and provide any other deliverables as Manager may request.

11.3   <u>Relationship</u>. The relationship of Owner and Manager shall be that of independent contractors, and neither this Agreement nor any agreements, instruments, documents, or transactions contemplated hereby shall in any respect be interpreted, deemed or construed as making Manager an agent of or partner or joint venturer with Owner. Owner and Manager each agree that they will not make any contrary assertion, claim or counterclaim in any action, suit, arbitration or other legal proceedings involving Owner and Manager. Any contract or agreement that Manager enters into with an Affiliate of Manager or with a third party to provide goods or services to the Franchise shall be entered into in the name of Manager or Owner (and shall be paid from the Gross Revenues), provided that no such contract or agreement shall be entered into in the name of Owner without such parties prior written consent and approval of each such agreement and contract.

11.4   <u>Headings</u>. Headings of articles and sections are inserted only for convenience and are in no way to be construed as a limitation on the scope of the particular articles or sections to which they refer.

11.5   <u>Notices</u>. All notices, requests, consents and other communications required or permitted under this Agreement must be in writing and must be hand delivered by messenger or courier service, emailed (proof of receipt required), or mailed (airmail if international) by registered or certified mail (postage prepaid), return receipt requested, addressed to:

If to Manager:                                          If to Owner:

UG Management Company, LLC                              UFC Gym c/o Slava Vilshtein
1501 Quail Street, Suite 100                            4417 Presidio Dr.
Newport Beach, CA 92660                                 Simi Valley, CA 93063
Attn:  General Counsel                                  Slava Vilshtein

11.6   Confidentiality; Projections.

11.6.1  The parties agree that the terms of this Agreement are strictly confidential and each party will use their reasonable efforts to ensure that the terms of this Agreement are not disclosed to any outside person or entities without the prior written consent of the other party, except (1) as either party may determine is required by any law, rule, regulation or judicial process, or by any regulatory or supervisory authority having jurisdiction over the parties or any of their Affiliates or (2) to the extent reasonably necessary, (i) to obtain licenses, permits and other public approvals, (ii) in connection with a financing of the Franchise or Owner (iii) subject to the provisions of Section 4.2, in connection with an audit or other investigation conducted pursuant to this Agreement, or (iv) in connection with either party's enforcement of its rights and remedies under this Agreement.  Notwithstanding the foregoing or anything to the contrary set forth herein, the terms of this Agreement shall not be deemed confidential to the extent that such information becomes generally available to the public other than as a result of unauthorized disclosure by the recipient or persons to whom such recipient has made the information available.  Nothing in this Agreement will limit Owner's obligations regarding confidentiality under the Franchise Agreement.

11.6.2  Owner acknowledges and agrees that any written or oral projections, pro formas, or other similar information that has been (prior to execution of this Agreement) or will (during the Term) be provided by Manager (or any Affiliate) to Owner is for information purposes only, and that Manager, and any such Affiliate do not guarantee that the Franchise will achieve the results set forth in any such projections, pro formas, or other similar information, including without limitation, the Annual Operating Projection.  Owner further acknowledges that any such projections, pro formas, or other similar information, including without limitation, the Annual Operating Projection, are based on assumptions and estimates, and unanticipated events may occur subsequent to the date of the preparation of such projections, pro formas, and other similar information, including without limitation, the Annual Operating Projection, and the actual results achieved by the Franchise are likely to vary from the estimates contained in any such projections, pro formas, or other similar information, including without limitation, the Annual Operating Projection, and such variations might be material.

11.7   Actions to be Taken Upon Termination. Upon a Termination, the following shall be applicable:

11.7.1  Manager shall, within ninety (90) days after Termination, prepare and deliver to Owner a final accounting statement with respect to the Franchise, as more particularly described in Section 4.1 hereof, along with a statement of any sums due from Owner to Manager pursuant hereto, dated as of the date of Termination. Within thirty (30) days of the receipt by Owner of the final accounting statement, the parties will make whatever cash adjustments are necessary pursuant to the final statement. The cost of preparing the final accounting statement will be a Deduction, paid by Owner.

DocuSign Envelope ID: C7B0D5A8-A37A-4A50-88C5-DBE59DA4895A

Manager and Owner acknowledge that there may be certain adjustments for which the information will not be available at the time of the final accounting and the parties agree to readjust such amounts and make the necessary cash adjustments when such information becomes available; provided, however, that all accounts shall be deemed final two (2) years after Termination.

11.7.2  Manager shall immediately release and transfer to Owner any of Owner's funds which are held or controlled by Manager with respect to the Franchise and which are in excess of any amounts due to Franchisor under the Franchise Agreement and due to Manager under this Agreement, including, without limitation, the Early Termination Payment.  Owner authorizes Manager to use funds held by Manager under this Agreement to pay amounts due to Franchisor upon termination of the Franchise Agreement and to use funds held by Manager under this Agreement to pay amounts due to Manager upon termination of this Agreement.

11.7.3  Manager shall make available to Owner such books and records respecting the Franchise (including those from prior years) as will be needed by Owner to prepare the accounting statements for the Franchise for the year in which the Termination occurs and for any subsequent year.

11.7.4  Manager shall (to the extent permitted by law) assign to Owner or to the new manager all operating licenses and permits for the Franchise which have been issued in Manager's name; provided that if Manager has expended any of its own funds in the acquisition of any of any of such licenses or permits, Owner shall reimburse Manager.

11.7.5  If this Agreement is terminated by reason of Owner's Event of Default, a reasonable reserve shall be established from Gross Revenues to reimburse Manager for all costs and expenses incurred by Manager in terminating its employees at the Franchise, such as wages and commissions due, severance pay, unemployment compensation, accrued and payable unused vacation, employment relocation and other employee liability costs arising out of the termination of employment of Manager's employees at the Franchise.  If Gross Revenues are insufficient to meet the requirements of such reserve, then Owner shall deliver to Manager, within ten (10) Business Days after receipt of Manager's written request therefor, the sums necessary to establish such reserve.

11.7.6  Manager shall peacefully vacate and surrender the Franchise to Owner on the date of termination unless otherwise agreed to by the parties.

11.7.7  Owner will obtain and maintain for a three (3) year period following the expiration or termination of this Agreement insurance policies according to the coverage standards of Section 6.1 and 6.3 above, relating to potential liabilities arising during the Term.

11.7.8  Owner agrees that nothing contained in this Agreement will limit or waive its obligations as Franchisee under Section 13 of the Franchise Agreement or relating to its obligations as Franchisee upon termination or non-renewal of the Franchise Agreement, and that such obligations include, without limitation, the requirements to: cease all use of the UFC GYM Trademarks, UFC GYM Intellectual Property, and any other rights licensed to Owner under the Franchise Agreement; repay membership fees to any persons who were members of the Franchise for cancelled memberships; fully de-identify the Premises, including, but not limited to, removing UFC GYM Trademarks from the interior and exterior of the Premises (including the surrounding premises); removing all signage bearing the UFC GYM Trademarks; making all alterations to the Premises (including the surrounding premises)

as may be necessary to distinguish the Premises from a UFC Gym; and comply with the non-competition covenants. Owner acknowledges and agrees that, if it fails to make the required alterations and modifications, Manager will have the right to make all necessary changes and modifications without being guilty of trespass or other tort. If Manager makes such changes or modifications, upon demand from Manager, Owner shall pay all costs and expenses incurred by Manager in connection with those changes or modifications.

11.8    Manager's Right to Purchase the Franchise. Owner agrees that, in addition to Franchisor's right to purchase the Franchise under Section 11.5 of the Franchise Agreement, Manager shall have an independent right (but not an obligation) to purchase the Franchise and/or all of the Owner's assets with respect to such Franchise upon the termination or non-renewal of this Agreement, including with respect to each individual Franchise, (unless the Franchisor exercises its purchase rights under the Franchise Agreement). In such event, Owner agrees to sell and transfer all of its assets and/or equity interests with respect to the Franchise to Manager (or its Affiliates) for a purchase price equal to the fair market value of such assets (to be determined by Manager (or its Affiliates) in its sole and reasonable discretion), and such asset purchase shall also be subject to such other terms, conditions, covenants, representations, warranties and indemnification provisions as Manager may require. If Owner reasonably disagrees with the Manager's determination of the fair market value of the assets subject to the transaction referenced above, Owner may, at its sole expense, engage an independent and reputable accounting firm or investment bank with experience performing corporate valuations to conduct a valuation of such assets (such valuation to be completed within thirty (30) days after Manager's initial notification of the assets' fair market value). If the valuation determined by such independent third party is less than Manager's determination of fair market value, Owner and Manager shall use the Manager's determination of fair market value in connection with the determination of the purchase price. If the valuation determined by such independent third party is greater than Manager's determination of fair market value, Owner and Manager shall average the Manager's determination of fair market value and the independent party's valuation in connection with the determination of the purchase price. The parties further agree that the terms and conditions of Section 11.5 of the Franchise Agreement regarding Franchisor's right to purchase the Franchise will apply with respect to Manager's right under this Agreement to purchase the Franchise, and that the parties will comply with the terms of Section 11.5 of the Franchise Agreement as though fully incorporated and set forth in this Agreement.

11.9    Waiver. The failure of either party to insist upon a strict performance of any of the terms or provisions of this Agreement, or to exercise any option, right or remedy contained in this Agreement, shall not be construed as a waiver or as a relinquishment for the future of such term, provision, option, right or remedy, but the same shall continue and remain in full force and effect. No waiver by either party of any term or provision hereof shall be deemed to have been made unless expressed in writing and signed by such party.

11.10    Partial Invalidity. If any portion of any term or provision of this Agreement, or the application thereof to any person or circumstance shall be invalid or unenforceable, at any time or to any extent, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and be enforced to the fullest extent permitted by law.

11.11    Negotiation of Agreement. Owner and Manager are business entities having substantial

UG Franchise Operations, LLC
UFC GYM Management Services Agreement – 2019

DocuSign Envelope ID: C7B9D5A8A37A6A81-88C3-DBE9B1A4895A

experience with the subject matter of this Agreement, and each has fully participated in the negotiation and drafting of this Agreement. Accordingly, this Agreement shall be construed without regard to the rule that ambiguities in a document are to be construed against the draftsman. No inferences shall be drawn from the fact that the final, duly executed Agreement differs in any respect from any previous draft hereof.

11.12  <u>Restrictions on Operating the Franchise in Accordance with System Standards</u>.  In the event of either (i) a Legal Requirement, including an order, judgment or directive by a court or administrative body which is issued in connection with any Litigation involving Owner, or (ii) any action taken by a lender in connection with a foreclosure, which in either case restricts or prevents Manager, in a material and adverse manner, from operating the Franchise in accordance with System Standards (including without limitation, any restrictions on expenditures by Manager from the Operating Account, other than restrictions which are set forth in this Agreement), Manager shall be entitled, at its option, to terminate this Agreement upon sixty (60) days' written notice to Owner. The foregoing shall not reduce or otherwise affect the rights of the parties under Section 7.

11.13  <u>Entire Agreement</u>. This Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered pursuant to this Agreement, constitutes the entire agreement between the parties and supersedes all prior understandings and writings, and may be changed only by a written instrument that has been duly executed by the parties hereto.

11.14  <u>Franchise Agreement</u>. During the Term of this Agreement with respect to the Franchise, and subject to the availability of adequate funds, Manager agrees to perform all of the obligations of Owner as "Franchisee" under the Franchise Agreement but only to the extent such obligations relate to the management or operation of the Franchise, and Manager shall not commit any act or omit to take any action that would cause a default by the Franchisee under the Franchise Agreement (with the exception of defaults caused by Owner including Owner's failure to fund the amounts required herein). In the event of any inconsistency between the provisions of this Agreement and the provisions of the Franchise Agreement, the provisions of the Franchise Agreement shall prevail. Manager shall send promptly to Owner any and all notices that Manager receives from the Franchisor with respect to the Franchise or the Franchise Agreement and shall keep Owner fully informed with respect to all matters that come to Manager's attention under the Franchise Agreement.

11.15  <u>Sale of the Franchise</u>.  Owner acknowledges and agrees that it will not sell, transfer or assign any of its equity interests to any third party, or sell, transfer or assign any of the assets with respect to the Franchise to any third party, without the express and prior written consent of Manager.

11.16  <u>Transaction Expenses</u>.  Owner agrees to pay all of its legal, accounting and other fees and expenses incurred by it in connection with the transactions contemplated by this Agreement.  In addition, Owner agrees to pay (on the Effective Date of this Agreement) all of Manager's (or its Affiliates) legal fees and expenses incurred in connection with this transaction.

DocuSign Envelope ID: C780D5A81A3704A31-88C3-DBE58A48895A

## 12   DEFINITIONS OF TERMS

The following terms when used in this Agreement shall have the meanings indicated:

"**AAA**" has the meaning ascribed to it in Section 10.1.

"**Accounting Period**" means each three-month period (or portion thereof) beginning on January 1st of each Fiscal Year (i.e., quarters run from January 1 through March 31, April 1 through June 30, July 1 through September 30, and October 1 through December 31), unless Manager notifies Owner in writing that an alternative period will be used to conform Franchisor's accounting system to the calendar as may be required under the Franchise Agreement.

"**Accounting Period Statement**" has the meaning ascribed to it in Section 4.1.1.

"**Additional Working Capital**" has the meaning ascribed to it in Section 4.6.1.

"**Affiliate**" means, as to any Person, any other Person that, directly or indirectly, controls, is controlled by or is under common control with such Person. For purposes of this Agreement, the term "control" (including the terms "controlling," "controlled by" and "under common control with") of a Person means the possession, directly or indirectly, of the power: (i) to vote more than fifty percent (50%) of the voting stock or other beneficial interests of such Person; or (ii) to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting stock, by contract or otherwise.

"**Agreement**" means this Management Agreement including the exhibits attached hereto.

"**Annual Operating Projection**" has the meaning ascribed to it in Section 4.4.

"**Annual Operating Statement**" has the meaning ascribed to it in Section 4.1.2.

"**Back Office Support Fee**" has the meaning ascribed to it in Section 3.3.

"**Business Day**" means any day other than a Saturday, Sunday or legal holiday in the State where the Premises are located.

"**Consumer Price Index**" means the Consumer Price Index as published by the U.S. Bureau of Labor Statistics, or if it no longer publishes the Index, then Manager will have the right to designate a reasonable alternative measure of inflation.

"**Deductions**" means the following:

      i.      Essential Operating Expenses;

      ii.     Routine Capital Expenses; and

      iii.    a reasonable reserve for uncollectible accounts receivable as reasonably determined by Manager.

     For purposes of calculating Operating Profit / Operating Loss , the term "Deductions" does not

DocuSign Envelope ID: C789D5A8-A3104A5D-89C3-DBEF9B1A4895A

include (a) debt service payments pursuant to any mortgage or loan (which shall be the responsibility of Owner outside of this Agreement); or (b) amounts to reimburse Manager for any monies that Manager advances to pay Essential Operating Expenses (even if the underlying expenses are items that would have been Deductions if there were sufficient funds to be paid from Working Capital).

"**Default**" means the occurrence of any event which, with the lapse of time, the giving of notice or both, would constitute an Event of Default.

"**Early Termination Payment**" means the payment that Owner shall pay to Manager, as consideration for the early termination of this Agreement in the event that this Agreement is terminated due to an Event of Default by Owner.  The Early Termination Payment shall be an amount equal to (i) five percent (5%) of Gross Revenues for the period beginning on the Effective Date up to and including the eighteenth (18th) month following the Effective Date; plus (ii) one and a half percent (1.5%) of Gross Revenues for the period beginning with the nineteenth (19th) month following the Effective Date to the date of Termination; plus (iii) an amount equal to the average Incentive Fees earned by Manager for the twelve (12) month period immediately preceding termination. Owner and Manager agree that this Early Termination Payment represents liquidated damages, and not a penalty, it being agreed by the parties that it is difficult to determine the actual amount of Manager's damages arising out of the early termination of this Agreement, and the calculation for determining the Early Termination Payment is a fair estimate.

"**Effective Date**" has the meaning ascribed to it in the Preamble.

"**Event of Default**" has the meaning ascribed to it in Section 7.1.

"**Essential Operating Expenses**" means (i) the payroll expenses of the personnel / employees / consultants of Manager working at the Franchise, (ii) rent (including maintenance, insurance and taxes) and utilities for the Franchise, (iii) premiums for insurance coverages required under this Agreement, (iv) required fees and payments under the Franchise Agreement (including any royalty obligations), (v) the Back Office Support Fee, (vi) any travel costs and expenses of Manager in connection with Manager's performance of services under this Agreement (including without limitation, travel for Manager's executives to the Premises), (vii) and such other expenses that are reasonably necessary for the continued proper and efficient operation of the Franchise during normal business hours.

"**FF&E**" means the furniture, furnishings and fixtures located in the Franchise, including but not limited to: soft goods, case goods, signage, exercise and gym equipment, audio-visual equipment, maintenance and housekeeping appliances, vehicles, carpeting and equipment, including front desk and back-of-the-house computer equipment, but does not include Software.

"**Fiscal Year**" means the fiscal year as of the Effective Date that ends at midnight on December 31 in each calendar year. Any partial Fiscal Year between the Effective Date and the commencement of the first full Fiscal Year shall constitute a separate Fiscal Year. A partial Fiscal Year between the end of the last full Fiscal Year and the Termination of this Agreement shall also constitute a separate Fiscal Year. If a Fiscal Year is changed in the future, appropriate adjustment to this Agreement's reporting and accounting procedures shall be made; provided, however, that no such change or adjustment shall alter the term of this Agreement or in any way reduce the distributions of Operating Profit or other payments

DocuSign Envelope ID: C78DD5A8A37D4AB1-88C3-DBE9D1A6895A

due hereunder.

"**Franchise**" has the meaning ascribed to it in the Recitals.

"**Franchise Agreement**" has the meaning ascribed to it in the Recitals.

"**Franchisor**" has the meaning ascribed to it in the Recitals.

"**Gross Revenues**" means all revenues and receipts of every kind derived from operating the Franchise and all parts thereof, including, but not limited to: income (from both cash and credit transactions) from the rental of lockers, telephone charges, exhibit or sales space of every kind; license, lease and concession fees and rentals (not including gross receipts of licensees, lessees and concessionaires); income from vending machines; income from parking; any food and beverage sales; wholesale and retail sales of merchandise; service charges; and proceeds, if any, from business interruption or other loss of income insurance; provided, however, that Gross Revenues does not include the following: gratuities to employees of the Franchise; federal, state or municipal excise, sales or use taxes or any other taxes collected directly from patrons or guests or included as part of the sales price of any goods or services; proceeds from the sale of FF&E; interest received or accrued with respect to the funds in Operating Accounts of the Franchise; any refunds, rebates, discounts and credits of a similar nature, given, paid or returned in the course of obtaining Gross Revenues or components thereof; insurance proceeds (other than proceeds from business interruption or other loss of income insurance); condemnation proceeds (other than for a temporary taking); or any proceeds from any Sale of the Franchise (if approved by Manager) or from the financing or refinancing of any debt encumbering the Franchise.

"**Incentive Fee**" has the meaning ascribed to it in Section 3.

"**Indemnitee**" has the meaning ascribed to it in Section 9.3.

"**Indemnitor**" has the meaning ascribed to it in Section 9.3.

"**Initial Capital**" means cash of the Owner in the Operating Account as of the Effective Date, as reflected in the bank statement provided by Owner to Manager on or before the Effective Date. For the avoidance of doubt, Initial Capital shall be no less than Fifty Thousand Dollars ($100,000).

"**Inventories**" means items that are purchased and used or offered for sale in connection with the operation of the Franchise, which may include, but not be limited to, merchandise intended for sale; training supplies; operational supplies; mechanical supplies; stationery; provisions in storerooms; and other expensed supplies and similar items.

"**Legal Requirement(s)**" means any federal, state or local law, code, rule, ordinance, regulation or order of any governmental authority or agency having jurisdiction over the business or operation of the Franchise or the matters which are the subject of this Agreement.

"**Litigation**" means: (i) any cause of action (including, without limitation, bankruptcy or other debtor/creditor proceedings) commenced in a federal, state or local court; or (ii) any claim brought before an administrative agency or body (for example, without limitation, employment discrimination claims).

"**Losses**" has the meaning ascribed to it in Section 9.1.

DocuSign Envelope ID: C780D5A81A3704A81-88C0-DBE9B1A4895A1

"**Manager**" means UG Management Company, LLC.

"**Manager Indemnified Parties**" has the meaning ascribed to it in Section 9.1.

"**Manager's Liabilities**" has the meaning ascribed to it in Section 4.3.2.

"**Manager's Representative**" means the employee(s) of the Manager that are specifically designated to perform managerial responsibilities under this Agreement on behalf of the Manager.

"**Manual**" means the written operating manuals for a UFC GYM Club created and updated by Franchisor from time to time.

"**Minimum Working Capital**" means cash of the Owner maintained in the Operating Account at all times throughout the Term which shall be no less than Fifty Thousand Dollars ($100,000).

"**Operating Account**" has the meaning ascribed to it in Section 4.3.1.

"**Operating Loss**" means a negative Operating Profit.

"**Operating Profit**" means the excess of Gross Revenues over Deductions.

"**Owner Indemnified Parties**" has the meaning ascribed to it in Section 9.2.

"**Owner's Representative**" means the appointed representative of Owner who is designated to communicate with Manager and make material and day-to-day decisions on behalf of Owner.

"**Person**" means an individual (and the heirs, executors, administrators, or other legal representatives of an individual), a partnership, a corporation, limited liability company, a government or any department or agency thereof, a trustee, a trust and any unincorporated organization.

"**Routine Capital Expenditures**" means certain routine, non-major expenditures which are classified as "capital expenditures" under generally-accepted accounting principles. Routine Capital Expenditures consist of the following types of expenditures: exterior and interior painting; resurfacing building walls and floors; resurfacing parking areas; and miscellaneous similar expenditures. Routine Capital Expenditures are not non-routine capital expenditures or major repairs or major alterations or improvements as determined by Manager in its sole discretion.

"**Sale of the Franchise**" means any sale, assignment, transfer or other disposition, for value or otherwise, voluntary or involuntary, of the Franchise(s) or the assets or equity of Owner, or any interest therein, in whole or part.

"**Software**" means all computer software programs, applications and accompanying documentation (including all future upgrades, enhancements, additions, substitutions and modifications thereof), other than computer software which is generally commercially available, which are used by Manager in connection with operating or otherwise providing services to the Franchise.

"**System**" has the meaning set forth in the Franchise Agreement.

"**System Standards**" means any one or more (as the context requires) of the following three (3)

DocuSign Envelope ID: C7820D5A91A3704A501-8963-DBE59D1A4895A

categories of standards: (i) operational standards (for example, services offered to customers, cleanliness, staffing and employee compensation and benefits, and other similar programs); (ii) physical standards (for example, quality and quantity of the FF&E, frequency of replacements to FF&E, etc.); and (iii) technology standards (for example, those relating to software, hardware, telecommunications, system security and information technology).  System Standards includes any standards and requirements established by Franchisor under the Franchise Agreement.

"**Term**" has the meaning ascribed to it in Section 2.1.

"**Termination**" means the expiration or sooner cessation of this Agreement.

"**UFC GYM Intellectual Property**" means the UFC GYM Trademarks, trade secrets, trade dress (which includes the design, decoration, layout, equipment, furniture, fixtures and signs utilized in UFC Gym businesses), any patents, the confidential information and copyrighted information of Manager, Franchisor, or their Affiliates that Owner is entitled to use under the Franchisee Agreement.

"**UFC GYM Trademarks**" means the service mark and logo "UFC GYM®" and certain other trademarks, service marks, trade names, logos and commercial symbols in operating UFC Gym businesses, which Franchisor may specify for use in operating UFC Gym businesses.

"**Working Capital**" means funds that are used in the day-to-day operation of the business of the Franchise, including, without limitation, amounts sufficient for the maintenance of change and petty cash funds, amounts deposited in operating bank accounts, receivables, amounts deposited in payroll accounts, prepaid expenses and funds required to maintain Inventories, less accounts payable and accrued current liabilities.


**IN WITNESS WHEREOF**, the parties hereto have duly signed this Agreement as of the Effective Date.


**OWNER:**                                  **MANAGER:**

SLAVA VILSHTEIN                     UG MANAGEMENT COMPANY, LLC


By: _____     By: _____
        *Slava Vilshtein*                            *Adam Sedlack*
Name: Slava Vilshtein                Name: Adam Sedlack
Title:  Buyer                              Title:   President

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:

**2566 Overland Ave., Suite 650, Los Angeles CA 90064**

A true and correct copy of the foregoing document entitled (*specify*): **DEBTOR'S OPPOSITION TO APPLICATION FOR ORDER SETTING HEARING ON SHORTENED NOTICE FILED BY TUVF – ESPLANDE LLC'S MOTION FOR RELIEF FROM STAY; DECLARATION OF ERIC BENSAMOCHAN, ESQ.** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **06/25/2025** , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**Brian David Fittipaldi**: brian.fittipaldi@usdoj.gov
**Eric Bensamochan, Esq.**: eric@eblawfirm.us

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **06/25/2025**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____ , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| June 25, 2025 | Karina Arita | /s/ Karina Arita |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL NOTICE:**

Employment Development Dept.
Bankruptcy Group MIC 92E
P.O. Box 826880
Sacramento, CA 94280-0001

County Assessor
County Government Center, Room 100
San Luis Obispo, CA 93408-0001

County Tax Collector
P.O. Box 357
Santa Barbara, CA 93102-0357

Franchise Tax Board
Bankruptcy Section MS: A-340
P.O. Box 2952
Sacramento, CA 95812-2952

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

Securities & Exchange Commission
444 South Flower St., Suite 900
Los Angeles, CA 90071-2934

Northern Division
1415 State Street,
Santa Barbara, CA 93101-2511

CT Corporation System, as Representative
330 N Brand Blvd. Suite
ATTN: SPRS
Glendale, CA 91203-2336

Jeremy Cook
Law Office of Jeremy Cook
312 West Fifth St., #512
Los Angeles, CA 90013-1746

Navitas Credit Corp.
201 Executive Center Drive
Suite 100
Columbia, SC 29210

Superior Court of California
County of Ventura, Hall of Justice
800 South Victoria Ave. Dept 21
Ventura, CA 93009-2000

Superior Court of California
County of Ventura, Hall of Justice
800 South Victoria Ave. Dept 41
Ventura, CA 93009-2000

Transportation Allicance Bank, Inc.
4185 Harrison Blvd.
Ogden, UT 84403-2475

UG Franchise Operations, LLC
1501 Quail Street, Suite 100
Newport Beach, CA 92660-2797

UG Management Company, LLC
Attn: UFC Gym Legal Department
4160 Temescal Canyon Road, Ste 112
Corona, CA 92883-2606

US Securities & Exchange Commission
444 S Flower St., # 900
Los Angeles, CA 90071-2934

United States Trustee
915 Wilshire Blvd. Suite 1850
Los Angeles, CA 90017-3560

United States Trustee (ND)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Ludmila Vilshtein
4417 Presidio Drive
Simi Valley, CA 93063-1254

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

Label Matrix for local noticing
0973-9
Case 9:25-bk-10820-RC
Central District of California
Santa Barbara
Wed Jun 25 09:41:01 PDT 2025

SBN Fitness Group
4417 Presidio Drive
Simi Valley, CA 93063-1254

TUVF - Esplanade, LLC
c/o HARVEST LLP
10940 Wilshire Blvd, Suite 1600
Los Angeles, CA 90024-3910

Northern Division
1415 State Street,
Santa Barbara, CA 93101-2511

CT Corporation System,
as Representative
330 N Brand Blvd. Suite 700
ATTN:  SPRS
Glendale, CA 91203-2336

G&I IX Esplanade Property LP
Allen Matkins Leck Gamble Mallory
& Natsis LLP
865 S Figueroa St. Ste 2800
Los Angeles, CA 90017-2795

Jeremy Cook
Law Office of Jeremy Cook
312 West Fifth St., #512
Los Angeles, CA 90013-1746

Ludmila Vilshtein
4417 Presidio Drive
Simi Valley, CA 93063-1254

(p)NAVITAS CREDIT CORP
ATTN JOYCE MCKULKA
201 EXECUTIVE CENTER DR SUITE 100
COLUMBIA SC 29210-8410

Slava Vilshtein
4417 Presidio Drive
Simi Valley, CA 93063-1254

Superior Court of California
County of Ventura
Hall of Justice
800 South Victoria Ave. Dept 21
Ventura, CA 93009-2000

Superior Court of California
County of Ventura
Hall of Justice
800 South Victoria Ave. Dept 41
Ventura, CA 93009-2000

TUVF - Esplanade, LLC
Jamie Buggy / Michael Olinik
Harvest LLP
10940 Wilshire Blvd., Ste. 1600
Los Angeles, CA 90024-3910

Transportation Allicance Bank, Inc.
4185 Harrison Blvd.
Ogden, UT 84403-2475

UG Franchise Operations, LLC
1501 Quail Street, Suite 100
Newport Beach, CA 92660-2797

UG Management Company, LLC
Attn: UFC Gym Legal Department
4160 Temescal Canyon Road, Ste 112
Corona, CA 92883-2606

US Securities & Exchange Commission
444 S Flower St., # 900
Los Angeles, CA 90071-2934

United States Trustee
915 Wilshire Blvd. Suite 1850
Los Angeles, CA 90017-3560

United States Trustee (ND)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Eric Bensamochan
The Bensamochan Law Firm, Inc.
2566 Overland Ave, Ste 650
Los Angeles, CA 90064-3371

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Navitas Credit Corp.
201 Executive Center Drive
Suite 100
Columbia, SC 29210

End of Label Matrix
Mailable recipients      19
Bypassed recipients       0
Total                    19